# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

## CONCISE SUMMARY OF THE CASE

Pursuant to 3rd Cir. LAR 33.3, counsel are required to file a concise summary of the case within **14** days of the date of docketing of the Notice of Appeal. Total statement is limited to no more than 2 pages, single-spaced.  Counsel may utilize this form or attach a 2 page statement encompassing the information required by this form.

SHORT CAPTION: In re LTL Management LLC

USCA NO.: 23-2971

LOWER COURT or AGENCY and DOCKET NUMBER:
U.S. Bankruptcy Court for the District of New Jersey, 23-BK-12825

NAME OF JUDGE: Michael B. Kaplan

Specify who is suing whom, for what, and the subject of this action.  Identify (1) the nature of the action; (2) the parties to this appeal; (3) the amount in controversy or other relief involved; and (4) the judgment or other action in the lower court or agency from which this action is taken:

(1) This appeal arises from the bankruptcy court's order dismissing the bankruptcy case of debtor LTL Management LLC ("LTL") for cause under 11 U.S.C. § 1112(b).  (2) LTL is the appellant in 23-2971.  The Ad Hoc Committee of Supporting Counsel is the appellant in consolidated appeal 23-2792.  The Official Committee of Talc Claimants, the U.S. Trustee, and various talc claimants are appellees in both appeals.  (3)/(4) LTL seeks reversal of the bankruptcy court's order dismissing the case and authorizing the continued existence of the Official Committee of Talc Claimants after the dismissal of the case.

LIST and **ATTACH** a copy of each order, judgment, decision or opinion which is involved in this appeal.  If the order(s) or opinion(s) being appealed adopt, affirm, or otherwise refer to the report and recommendation of a magistrate judge or the decision of a bankruptcy judge, the report and recommendation or decision shall also be attached.

Attached are the bankruptcy court's (A) opinion (dkt. 1127) and (B) order (dkt. 1211) dismissing LTL's bankruptcy case.

Provide a short statement of the factual and procedural background, which you consider important to this appeal:

LTL's predecessor, J&J Consumer, beginning in approximately 2013, became besieged by tens of thousands of claims alleging that Johnson & Johnson's Baby Powder, a ubiquitous product that had been sold for over 100 years, contained asbestos and caused cancer. Although LTL and J&J Consumer believe these claims are without merit, and prevailed in most of the cases, J&J Consumer nonetheless faced mounting legal costs, increasing demands that reached hundreds of millions, even billions of dollars, and occasional blockbuster verdicts. To resolve these pending claims and all future claims through bankruptcy, the only forum where mass tort claims with long latency periods can be resolved, J&J Consumer split itself into two new entities: LTL and New Consumer. LTL received the asbestos liability, a subsidiary with a royalty business, and a funding agreement from New Consumer and J&J, the purpose of which was to ensure that LTL had sufficient funding to pay the claims. In In re LTL Management LLC, 64 F.4th 84 (3d Cir. 2023), the court dismissed LTL's filing for lack of good faith, finding that, because of the extent of its funding, LTL was not in financial distress. Following that decision and at the direction of the bankruptcy court, LTL continued to engage in settlement discussions with plaintiff counsel and ultimately reached agreement on a plan of reorganization with counsel representing a majority of the claimants. That agreement contemplated the establishment of a trust funded with $8.9 billion net present value, the largest settlement ever reached in an asbestos bankruptcy case. After LTL entered into new funding arrangements, it filed for bankruptcy a second time to pursue confirmation of the agreed plan. While counsel representing the majority of claimants supported the filing, various parties moved to dismiss. At trial, LTL presented evidence showing, among other things, that the number of claims pending against it had increased from 40,000 to 100,000 and that the costs of defense, together with projected settlement and verdict amounts, would materially impair the value of the resources available to LTL and could exhaust entirely the funding available to LTL. Nevertheless, based on its interpretation of the court's financial distress standard, the bankruptcy court found that LTL was not in sufficient imminent or immediate financial distress. This appeal followed.

Identify the issues to be raised on appeal:

- Whether the bankruptcy court misapplied the law and made clearly erroneous findings of fact in dismissing LTL's bankruptcy petition "for cause" under 11 U.S.C. 1112(b), by determining that LTL lacked good faith in filing its Chapter 11 petition because it was not in imminent financial distress.
- Whether the bankruptcy court reversibly erred in authorizing the continued existence of the Official Committee of Talc Claimants and requiring LTL to pay its ongoing fees and expenses, notwithstanding the dismissal of LTL's bankruptcy case.

This is to certify that this Concise Summary of the Case was electronically filed with the Clerk of the U.S. Court of Appeals for the Third Circuit and a copy hereof served to each party or their counsel of record

this __13th__ day of __November__,20__23__.

# C. Kevin Marshall

Signature of Counsel

Rev. 07/2015

# **EXHIBIT A**

FOR PUBLICATION

| |
|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY<br>**Caption in Compliance with D.N.J. LBR 9004-2(c)** |
| In re:<br><br>LTL MANAGEMENT, LLC,<br><br>                    Debtor. |

Case No. 23-12825 (MBK)

Chapter 11

Hearing Date: June 26-30, 2023

Judge: Michael B. Kaplan

*All Counsel of Record*

## MEMORANDUM OPINION

At a point early in the first chapter 11 filing of LTL Management, LLC ("Debtor" or "LTL") (Case No. 21-30589, "LTL 1.0"), the Court queried of Debtor's counsel the origin of the name given the 2021 Corporate Restructuring Project—Project Plato—which gave rise to the initial bankruptcy filing. The Court was familiar with comparable divisive merger efforts undertaken by other companies in chapter 11 cases pending in North Carolina, which employed project names such as "Project Omega"[1] or "Project Horizon"[2], but thought there may be other relevance attached to the chosen project name in this matter. While Debtor's counsel suggested that the project name was selected randomly, this Court harbors some doubts and imputes far greater significance to the denomination, "Plato". Indeed, with the long-awaited opportunity to

---

[1] Bestwall LLC (Case No. 17-31795, Bankr. W.D.N.C. Nov. 2, 2017) filed on November 2, 2017.

[2] DBMP LLC (Case No. 20-30080, Bankr. W.D.N.C. Jan. 23, 2020) filed on January 23, 2020.

draw finally upon the lessons instilled in my mandatory undergraduate philosophy course,[3] the Court perceives a far more relevant—if unintended— meaning.[4]

It is well acknowledged, without need of citation, that Plato was one of the earliest ancient Greek philosophers and is undoubtedly one of the most prominent thinkers of Western philosophy. In his influential work, the *Republic*, Plato suggests that a right or just action can be defined as one which flows naturally from a just disposition.[5]  In other words, whether an action is "good" or "bad" depends on the outcome. This ethical philosophy is commonly identified as "consequentialism," in which actions are judged right or wrong based on their consequences.[6]  For consequentialists, the ends necessarily justify the means.

So, the ultimate inquiry for this Court would be whether the aptly named Project Plato, with its corporate restructuring in 2021, as modified in 2023, and resulting two chapter 11 filings, could, in fact, produce a just and right result, notwithstanding the highly debatable means undertaken.  For the reasons discussed below, and based on the evidence at trial,[7] this Court is

---

[3] With appreciation to the late Dr. Thomas P. McTighe, Past Chair of the Philosophy Department at Georgetown University.

[4] It should be noted, of course, that the Court's observation reflects little more than conjecture, and that the truth may well rest on the mere fact that an attorney involved in the underlying transaction has a dog or cat named "Plato".

[5] PLATO, THE REPUBLIC 443-444, Book 4 (c. 375 BCE).

[6] CONSEQUENTIALISM, BRITANNICA.COM, https://www.britannica.com/topic/consequentialism (last visited July 27, 2023).

[7] Given the extensive number of witnesses offered by all parties and the considerable data-driven nature of the evidence, direct testimony of the witnesses was submitted by declaration.  The witnesses were present at the trial for live cross examination and re-direct.  The direct testimony was admitted with limited or no objection.  The experts' reports and rebuttal reports were attached as exhibits to the declarations.  Although the reports are technically hearsay, no party objected exclusively on such grounds and other limited objections were resolved by the Court on the record.

constrained to bypass this challenging inquiry and dismiss this chapter 11 proceeding, as the evidentiary record fixed at trial does not establish sufficient "imminent" or "immediate" financial distress to satisfy the criteria enunciated by the Third Circuit in *In re LTL Mgmt., LLC*. 64 F.4th 84 at 102, 108 (3d Cir. 2023). Simply put, the Debtor does not meet the more exacting gateway requirement implemented by the Circuit with respect to "good faith" under 11 U.S.C. §1112(b), which would allow LTL to take advantage of the tools available under the Bankruptcy Code to resolve its present and future talc liabilities. Therefore, for the reasons expressed below, the Court GRANTS the motions seeking dismissal of the within bankruptcy proceeding as having been filed in bad faith (collectively, "Motions").[8] The Court issues the following findings of fact and conclusions of law as required by FED. R. BANKR. P. 7052.[9]

---

[8] The Motions—ten in total, with two joinders—were filed by the Official Committee of Talc Claimants (ECF No. 286), by Maune, Raichle, Hartley, French & Mudd LLC on behalf of the Ad Hoc Group of Mesothelioma Claimants (ECF No. 335) and Various Talc Claimants (ECF No. 358), by Moshe Maimon on behalf of Paul Crouch (ECF No. 346), by the Ad Hoc Committee of States Holding Consumer Protection Claims (ECF No. 350), by the United States Trustee (ECF No. 379), by the law firm of Arnold & Itkin, LLP on behalf of certain talc personal injury claimants (ECF No. 384), by the State of Mississippi and the State of New Mexico (ECF No. 480); and two motions mistakenly filed in the Adversary Proceeding by the Estate of Melissa Fleming (ECF No. 117 in Adv. Pro. No. 23-01092) and the Estate of Sherri Gendelman (ECF No. 118 in Adv. Pro. No. 23-01092) (together, "Movants"). Joinders to the Motions were filed by the Barnes Law Group, LLC on behalf of Georgia State Court Claimants (ECF No. 473) and by Leah Cylia Kagan on behalf of Various Talc Claimants (ECF No. 352).

[9] To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

## I.  Venue and Jurisdiction

The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and

157(a) and the Standing Order of the United States District Court dated July 10, 1984, as amended

September 18, 2012, referring all Bankruptcy cases to the Bankruptcy Court.  This matter is a core

proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).  Venue is proper in this Court pursuant

to 28 U.S.C. § 1408.

## II.  Background & Procedural History

The parties are familiar with the factual background and procedural history of this case.

LTL Management, LLC, which is an indirect subsidiary of Johnson & Johnson ("J&J"), traces its

roots back to Johnson & Johnson Baby Products, Company, a New Jersey company incorporated

in 1970 as a wholly owned subsidiary of J&J. *Declaration of John K. Kim in Support of First Day*

*Pleadings* ("*Kim First Day Decl.*") ¶¶ 13-15, ECF No. 4 in Case No. 23-12825.[10]  A thorough

discussion of the history of J&J and its talc products can be found in this Court's February 25,

2022, Opinion Denying the Motions to Dismiss and the Court will limit its recitation of the factual

background here. *See In re LTL Mgmt., LLC*, 637 B.R. 396 (Bankr. D.N.J. 2022).  In relevant part,

in 1979, J&J transferred all its assets associated with the Baby Products division to J&J Baby

Products Company (the "1979 Agreement").    Thereafter, as the result of intercompany

transactions, one of J&J's corporate subsidiaries, Johnson & Johnson Consumer Inc. ("Old JJCI")

---

[10] Unless otherwise specified, all ECF Nos. will refer to docket entries in the instant bankruptcy case ("LTL 2.0"),
Case No. 23-12825.

assumed responsibility for all claims alleging that J&J's talc-containing products caused ovarian

cancer and mesothelioma. *Kim First Day Decl.* ¶¶ 16-21, ECF No. 4.

On October 12, 2021, Old JJCI engaged in a series of transactions pursuant to the Texas

divisional merger statute, *See* TEX. BUS. ORGS. CODE ANN. §§ 10.001 *et seq.* (the "2021 Corporate

Restructuring") through which it ceased to exist and two new companies, LTL and Johnson &

Johnson Consumer Inc. ("New JJCI"), were formed. *Kim First Day Decl.* ¶ 24, ECF No. 4.  The

alleged purpose of this restructuring was to "globally resolve talc-related claims through a chapter

11 reorganization without subjecting the entire Old JJCI enterprise to a bankruptcy proceeding."

*Kim Decl. in Support of First Day Pleadings* ¶ 21, ECF No. 5 in Case No. 21-30589.  As a result

of the restructuring, LTL assumed responsibility for all Old JJCI's talc-related liabilities. *Id.*

Through the restructuring, LTL also received rights under a funding agreement (the "2021 Funding

Agreement"). *Kim Decl.* ¶ 32, ECF No. 4.  Under the 2021 Funding Agreement, J&J and New JJCI

were obligated to pay, *inter alia*, the "Payee's Talc-Related Liabilities", as well as "any and all

costs and expenses" LTL incurs during its bankruptcy case, "including the costs of administering

the Bankruptcy Case" to the extent necessary. *Kim First Day Decl. Annex 2 – Funding Agreement*

6, ECF No. 5 in Case No. 21-30589; *see also Kim First Day Decl.* ¶ 32, ECF No. 4.

On October 14, 2021, LTL filed its initial voluntary petition for chapter 11 relief in the

United States Bankruptcy Court for the Western District of North Carolina. *Petition*, ECF No. 1

in Case No. 21-30589.  One week after the chapter 11 filing, Debtor initiated an adversary

proceeding (the "Talc Adversary Proceeding"), seeking declaratory and injunctive relief against

plaintiffs (the "Talc Claimants") who had filed federal and state actions against Debtor's affiliates

and other entities for talc-related claims (the "Talc Actions"). *Complaint*, ECF No. 1 in Adv. Pro.
No. 21-03032. By way of the Talc Adversary Proceeding, the Debtor sought an order declaring
that the automatic stay applies to those actions against non-debtors or, in the alternative, to enjoin
such actions and grant a temporary restraining order pending a final hearing. Debtor
simultaneously filed a motion requesting a preliminary injunction enjoining the prosecution of
actions outside of the chapter 11 case on account of the same talc claims that exist against the
Debtor in the chapter 11 case. *Motion*, ECF No. 2 in Adv. Pro. No. 21-03032. Ultimately, the
chapter 11 and related adversary proceeding case were transferred to the District of New Jersey.
Following a five-day evidentiary hearing—during which the Court contemporaneously heard
arguments on the pending motions to dismiss and continuation of the preliminary injunction—the
Court denied the motions to dismiss in the underlying bankruptcy case and granted the motion for
preliminary injunction in the Talc Adversary Proceeding. *See In re LTL Mgmt., LLC*, 637 B.R. 396
(Bankr. D.N.J. 2022) (denying motions to dismiss); *In re LTL Management, LLC*, 638 B.R. 291,
297 (Bankr. D.N.J. 2022) (granting preliminary injunction). Several other adversary proceedings
followed wherein Debtor sought similar relief. *See Securities Adversary Proceeding*, Adv. Pro.
No. 22-01073; *Consumer Protection Adversary Proceeding*, Adv. Pro. No. 22-01231. This Court
likewise granted the motion for preliminary injunction and extended the automatic stay to non-
debtor defendants in those actions. *See In re LTL Mgmt., LLC*, 640 B.R. 322 (Bankr. D.N.J. 2022);
*In re LTL Mgmt., LLC*, 645 B.R. 59 (Bankr. D.N.J. 2022).

Meanwhile, several parties appealed this Court's denial of the motions to dismiss and its
imposition of a preliminary injunction in the Talc Adversary Proceeding. While the appeals were

pending, New JJCI—which had continued consumer health operations—changed its name to

Johnson & Johnson HoldCo (NA) Inc. ("HoldCo") in December 2022. *Kim First Day Decl.* ¶ 26,

ECF No. 4. HoldCo is the direct parent of the Debtor. *Id.* at ¶ 27. In early January 2023, HoldCo

spun off its consumer health business assets to its parent entity, Janssen Pharmaceuticals, Inc. *Id.*

at ¶ 26; *see also TCC's Proposed Findings of Fact and Conclusions of Law* ¶ 121, ECF No. 1075.

"The transfer was in connection with the long-contemplated transfer of the [c]onsumer [b]usiness

as a new entity, called Kenvue, Inc., which was publicly announced in November 2021." *Lisman*

*Decl.* ¶ 21, Trial Ex. D-4. The evidence presented supports Debtor's contention that "[t]here was

no relationship between the transfer of the [c]onsumer [b]usiness and the filing of either the 2021

or the 2023 Chapter 11 Case." *Id.*; *see also Debtor's Reply in Support of Motion to Extend and*

*Modify Preliminary Injunction* 2, ECF No. 185 in Adv. Pro. No. 23-01092; *Exhibits C & D to*

*Supplemental Decl. of Amanda Rush in Support of Motion to Extend and Modify Preliminary*

*Injunction*, ECF Nos. 185-4 & 185-5 in Adv. Pro. No. 23-01092.

On January 30, 2023, the Third Circuit ruled on the pending appeals and issued an opinion

directing this Court to dismiss the 2021 Chapter 11 Case (the "Third Circuit Opinion"). *See In re*

*LTL Mgmt., LLC*, 58 F.4th 738 (3d Cir. 2023) as amended by 64 F.4th 84 (3d Cir. 2023).

Specifically, the Third Circuit determined that the case was not filed in good faith due to Debtor's

lack of imminent and apparent financial distress. The Debtor filed a petition for rehearing and

rehearing *en banc* with the Third Circuit, which the Circuit denied on March 22, 2023. The Debtor

then filed a motion seeking a stay of the Third Circuit's mandate, pending appeal to the United

States Supreme Court, which the Circuit denied on March 31, 2023. After the Third Circuit's

Opinion was issued, LTL, J&J, and various plaintiff law firms—with the assistance of the court-appointed mediators and pursuant to the Court's mediation order—continued negotiating a potential consensual resolution of the case. *Murdica Decl.* ¶ 40, Trial Ex. D-5; *Watts Decl.* ¶ 25, Trial Ex. D-6; *Onder Decl.* ¶¶ 23-24, Trial Ex. D-7; *June 28, 2023 Hr'g Tr. (vol. 2) – Onder Redirect*, 117:16-118:9, ECF No. 957.

This Court entered an order dismissing the initial chapter 11 bankruptcy case on April 4, 2023. *Dismissal Order*, ECF No. 3938 in Case No. 21-30589. Approximately two hours later, Debtor initiated the instant bankruptcy case, the impetus of which was a proposal by law firms representing nearly 60,000 talc claimants for a bankruptcy resolution of the Debtor's talc liability. Mikal Watts, a plaintiff lawyer representing over 16,000 talc claimants, had contacted James Murdica of Barnes & Thornburg to discuss a final, global resolution of the talc liability, including all present and future claims, to be efficiently administered through a second bankruptcy by LTL. *Murdica Decl.* ¶¶ 40-41; *Watts Decl.* ¶¶ 7, 25-26; *June 28, 2023 Hr'g Tr. (vol. 1) – Murdica Cross*, 39:3-9, ECF No. 956. Mr. Murdica, J&J's long-time settlement counsel who has worked for over three years to resolve the talc litigation, was authorized by LTL and J&J to negotiate on their behalf. *June 27, 2023 Hr'g Tr. – Kim Cross*, 238:8-15, ECF No. 933; *June 28, 2023 Hr'g Tr. (vol. 1) – Murdica Cross*, 8:21-9:8. In early 2023, Mr. Watts and other plaintiffs' lawyers (including Mr. James Onder, who represents over 20,000 talc claimants) negotiated with Mr. Murdica and Erik Haas, J&J's Worldwide Head of Litigation, regarding terms of a Plan Support Agreement ("PSA"), pursuant to which the parties agreed to work together to finalize and seek confirmation of a plan of reorganization that, if confirmed and consummated, would fully resolve all current

and future talc claims. *Murdica Decl.* ¶ 43; *Watts Decl.* ¶¶ 26-27; *June 28, 2023 Hr'g Tr. (vol. 2)*
*– Watts Cross*, 32:5-11; *Onder Decl.* ¶¶ 24-27.

Once the deal terms were agreed upon, LTL, J&J, and 17 law firms executed PSAs that
were substantially identical. *Murdica Decl.* ¶¶ 42-43; *Watts Decl.* ¶ 28; *Onder Decl.* ¶ 28; *Kim*
*Decl.* ¶ 29, Trial Ex. D-1; *Kim Decl.* Exs. A-V, Trial Ex. D-1; *First Supplemental Verified*
*Statement of Paul Hastings LLP*, Trial Ex. D-486; *Verified Statement of Paul Hastings LLP*, Trial
Ex. D-563. According to the 2019 statements filed with the Court, these supporting law firms
disclosed that they represent approximately 58,392 claimants. *See Verified Statement of Paul*
*Hastings LLP*, Trial Ex. D-563; *First Supplemental Verified Statement of Paul Hastings LLP*, Trial
Ex. D-486. The 17 firms that signed PSAs formed the Ad Hoc Committee of Supporting Counsel
("AHC") to advance their common interests in connection with LTL's second bankruptcy. *Id.* The
AHC include counsel to members of the mass tort plaintiffs' bar who have decades of experience
in mass tort litigation generally and who have led the talc litigation specifically. *Id.*; *Onder Decl*.
¶ 29. Thousands of their clients filed talc lawsuits before LTL commenced the 2021 Chapter 11
Case. *Id.* Two of the 17 firms that comprise the AHC—Nachawati Law Firm (f/k/a Fears
Nachawati) and OnderLaw, LLC—were previously counsel to members of the Official Committee
of Talc Claimants in the 2021 Chapter 11 Case. *Murdica Decl*. ¶ 44.

Thereafter, in conjunction with the Petition, Debtor filed the PSA and term sheet which
provided for a plan of reorganization that includes the establishment of a trust funded in the amount
of $8.9 billion on a net present value basis. *Murdica Decl.* ¶ 47; *Kim Decl.* ¶ 28; *id.* Exs. A-V. One
key issue that was also resolved in principle relates to medical liens on settlement amounts that

claimants would be entitled to receive under the Plan. *June 28, 2023 Hr'g Tr. (vol. 2) – Onder Redirect*, 120:4-19, ECF No. 957.  Additionally, a settlement has been reached with counsel to private lienholders, which hold around 85-90% of the medical liens. *Id*. at 134:5-135:25. This resolution would allow payments to claimants to be made faster, which is a primary goal of the AHC. *Id.*  Members of the AHC anticipated recommending to their clients that they vote in favor of the plan, once finalized. *June 28, 2023 Hr'g Tr. (vol. 2) – Watts Redirect*, 26:12-18, 58:5-11, ECF No. 957; *id. – Onder Redirect* at 121:14-122:9.

Along with the execution of the PSAs and term sheets, the Debtor also structured new funding arrangements in anticipation of the new chapter 11 filing. Specifically, the Debtor authorized the execution of three agreements to implement the April 4, 2023, changes to its funding arrangements.  First, Debtor executed a Termination and Substitution Agreement (the "TSA") with HoldCo and J&J to terminate the 2021 Funding Agreement. *Termination and Substitution Agreement*, TCC Trial Ex. 1081.  Second, Debtor executed a new 2023 Funding Agreement ("2023 Funding Agreement") with HoldCo, which obligated HoldCo to provide funding to Debtor for talc liabilities and other costs in the normal course of business. *2023 Funding Agreement*, TCC Trial Ex. 1082.  Third, Debtor executed a Support Agreement with J&J ("J&J Support Agreement") and HoldCo, for J&J to provide a funding backstop only upon the confirmation of a Chapter 11 Plan consistent with the PSAs and term sheet. *J&J Support Agreement*, TCC Trial Ex. 1083.  Debtor contends that the substitution of a new funding agreement was necessary to address issues raised by both J&J and the Debtor as to the continuing enforceability of the 2021 Funding Agreement.

Under the 2023 Funding Agreement, Debtor (as Payee) has a right to seek from HoldCo

(as Payor) a funding request for any permitted funding use, the only restriction being that Debtor

may not request more than it needs for permitted funding uses. *2023 Funding Agreement* 6-7, TCC

Trial Ex. 1082.  A "permitted funding use" includes the "payment of any and all costs and expenses

of the Payee incurred in the normal course of its business . . . at any time when there is no

proceeding under the Bankruptcy Code pending with respect to the Payee," as well as "the funding

of any amounts to satisfy (i) the Payee's Talc Related Liabilities . . . at any time when there is no

proceeding under the Bankruptcy Code pending with respect to the Payee . . . and (iii) in the case

of either (i) or (ii),any ancillary costs and expenses of the Payee associated with such Talc Related

Liabilities and any litigation thereof, including the costs of any appeals."  *Id.* at 4-5.  The J&J

Support Agreement applies inside bankruptcy only and requires J&J to backstop HoldCo's

payment obligations under the 2023 Funding Agreement solely to fund plan trusts created in

connection with this bankruptcy. *J&J Support Agreement* 4 (§ 2(a)(i)), TCC Trial Ex. 1083.  The

J&J Support Agreement also confirms that HoldCo's funding obligation to Debtor exists outside

of bankruptcy. *Id.* at 1 (Recital B).

Shortly after filing the Petition, Debtor commenced an Adversary Proceeding (Adv. Pro.

No. 23-01092) and filed a motion seeking to extend the automatic stay and issue an injunction

preventing continued litigation directed at certain named "Protected Parties".  The Court issued an

*ex parte* Temporary Restraining Order (ECF No. 9 in Adv. Pro No. 23-01092), which was thrice

amended (ECF Nos. 15, 16, and 20 in Adv. Pro No. 23-01092).  After considering objections and

arguments raised during a hearing April 18, 2023, the Court entered a limited preliminary

injunction (the "Preliminary Injunction") that dissolved the prior temporary restraints, extended the automatic stay, and granted limited relief. *Preliminary Injunction*, ECF No. 91 in Adv. Pro. No. 23-01092. Apart from the Multi-District Litigation ("MDL"), the limited Preliminary Injunction prohibited only the commencement or continuation of any trial and appellate practice against any of the parties identified in Appendix B to the Verified Complaint, as amended.[11] The Motions to Dismiss were filed shortly after the Court issued the Preliminary Injunction.

Notably, when the Court issued the Preliminary Injunction, the Court declined to rule at that time on a Motion for Relief from Stay filed in the main case (ECF No. 71) by Joseph Satterley, Esq. on behalf of talc claimant, Anthony Hernandez Valadez. Instead, that matter was carried to May 3, 2023. On that date, the Court granted relief from the automatic stay and from the Preliminary Injunction—permitting the plaintiff to proceed to trial and verdict in the case captioned *Anthony Hernandez Valadez v. Johnson & Johnson, et al.* (the "*Valadez* Case"), which was pending in the Superior Court of California, County of Alameda, against the Debtor and certain parties protected by the Preliminary Injunction. *Order Granting Movant Anthony Hernandez Valadez Relief from the Automatic Stay and Preliminary Injunction*, ECF No. 585. The *Valadez* Case proceeded to trial before a California court, while the remaining parties proceeded in this Court and—with the Court's assistance—established a briefing schedule and selected hearing dates for the Motions to Dismiss.

---

[11] As discussed on the record during the April 20, 2023, hearing, Janssen Pharmaceuticals, Inc. and Kenvue Inc. were excluded, and the Preliminary Injunction does not extend to those entities.

The Debtor and the AHC filed objections to the Motions (ECF Nos. 614 & 613, respectively), certain Movants filed Replies and Joinders[12], and Debtor and the AHC filed sur-replies.[13]  On June 27, 2023, the Court commenced a four-day evidentiary hearing to address the Motions and the continuation of the Preliminary Injunction in the pending Adversary Proceeding (ECF No. 2 in Adv. Pro. No. 23-01092).  Prior to the hearing, the Movants, Debtor and AHC stipulated to the admission of certain evidence. *Evidentiary Stipulation*, ECF No. 852.  Both sides presented oral argument and introduced fact and expert witnesses.   Specifically, the Court considered live testimony from the following fact witnesses:

- Robert O. Wuesthoff, President of LTL Management, LLC and President of Royalty A&M LLC
- Richard Dickinson, Chief Financial Officer of LTL Management, LLC and member of Board of Managers
- John H. Kim, Chief Legal Officer of LTL Management, LLC
- James Murdica, Esq., Barnes & Thornburg, LLP, J&J's national settlement counsel
- Mikal Watts, Esq., Member of the Ad Hoc Committee of Supporting Counsel ("AHC")
- James Onder, Esq., Member of the AHC
- Adam Lisman, Vice President and Assistant Corporate Controller of Johnson & Johnson

The Court also heard testimony from five expert witnesses including:

- Charles H. Mullin, PhD, Managing Partner at Bates White Economic Consulting for Debtor
- Sheila Birnbaum, Esq., Co-Chair, Products Liability & Mass Tort Group, Dechert, LLP, for Debtor
- Saul E. Burian, Managing Director at Houlihan Lokey, for Movants

---

[12] Replies were filed by the Official Committee of Talc Claimants (ECF No. 857), the Ad Hoc Committee of States (ECF No. 863), the United States Trustee (ECF No. 862), Arnold & Itkin, on behalf of certain talc claimants (ECF No. 854), Maune Raichle Harley French & Mudd, LLC (ECF No. 855), State of New Mexico and State of Mississippi (ECF No. 872), and one Joinder was filed by the Ad Hoc Group of Mesothelioma Claimants (ECF No. 866).

[13] *AHC's Sur-Reply*, ECF No. 900; *Debtor's Sur-Reply*, ECF No. 906.

- Hon. Royal Fergeson, U.S.D.J. (ret.), for Movants
- Prof. Theodore Rave, University of Texas School of Law, for Movants

Additionally, the Court has reviewed declarations and/or video deposition testimony for

the following witnesses:

- Gregory K. Bell, PhD, Group Vice President of Charles River Associates, for Debtor
- John R. Castellano, Managing Director at Alix Partners, for Debtor
- Matthew Diaz, Senior Managing Director at FTI Consulting, Inc., for Movants
- Majed Nachawati, Esq., Member of the AHC, for Debtor
- Adam Pulaski, Esq., Member of the AHC, for Debtor
- Erik Haas, Esq., Counsel for Johnson & Johnson, for Debtor

On June 30, 2023, the Court heard closing arguments and the parties submitted their

electronic slide decks to the Court. At the Court's instruction, the parties submitted a stipulation

of admitted exhibits. *Joint Stipulation and Agreed Order Regarding the Admission of Exhibits and

Deposition Designations*, ECF No. 1100. The Court also directed the parties to submit proposed

findings of fact and conclusions of law no later than July 19, 2023.


## III. Discussion

### A. Overview

Movants have asked this Court to dismiss Debtor's case "for cause" under 11 U.S.C

§1112(b), as not having been filed in good faith. *See In re SGL Carbon Corp.*, 200 F.3d 154, 162

(3d Cir. 1999) (explaining that "a Chapter 11 petition is subject to dismissal for 'cause' under 11

U.S.C. § 1112(b) unless it is filed in good faith"). Under the standard employed in the Third

Circuit, a petition is filed in good faith if it (i) serves a valid bankruptcy purpose and (ii) is not

filed merely to obtain a tactical litigation advantage. *LTL Mgmt.*, 64 F.4th at 100-01 (citing *In re*

*15375 Mem'l Corp. v. BEPCO, L.P.*, 589 F.3d 605, 618 (3d Cir. 2009) and *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 119-20 (3d Cir. 2004)).  The parties' arguments—both in their briefing and during the four-day trial—touch on a significant issue previously debated in LTL 1.0: namely, whether and to what extent a corporation facing staggering mass tort claims may employ the bankruptcy courts to resolve its mass tort liabilities. The Court expressed its thoughts on this issue in its Opinion denying the Motions to Dismiss in the LTL 1.0 case. *See In re LTL Mgmt., LLC*, 637 B.R. 396 (Bankr. D.N.J. 2022).  This Court's views remain unchanged; nor did the Third Circuit's ruling delve much into the merits and value of the tools that bankruptcy offers for resolving mass torts, apart from noting, "[t]he takeaway here is that when financial distress is present, bankruptcy may be an appropriate forum for a debtor to address mass tort liability." *In re LTL Mgmt.*, 64 F.4th at 104.  Nevertheless, this Court's beliefs as to the benefits and advantages of bankruptcy, or the appropriateness of employing a chapter 11 filing to resolve mass tort liability are of no moment for resolution of the pending Motions.  Taking guidance from the Third Circuit, this Court "start[s], and stay[s], with good faith" and the requirement of financial distress. *In re LTL Mgmt., LLC*, 64 F.4th at 93.

### B.  Financial Distress Requirement of Good Faith

"[A] Chapter 11 petition is subject to dismissal for 'cause' under 11 U.S.C. § 1112(b) unless it is filed in good faith." *In re SGL Carbon Corp.*, 200 F.3d 154, 162 (3d Cir. 1999).  It is well-established in the Third Circuit that "good faith necessarily requires some degree of financial distress on the part of a debtor." *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 121 (3d Cir. 2004); *see also In re LTL Mgmt., LLC*, 64 F.4th at 101 ("Our precedents show a debtor who

does not suffer from financial distress cannot demonstrate its Chapter 11 petition serves a valid

bankruptcy purpose supporting good faith."); *In re SGL Carbon Corp.*, 200 F.3d at 166. "Once at

issue, the burden to establish good faith is on the debtor." *Id.* at 100. "Whether the good faith

requirement has been satisfied is a 'fact intensive inquiry' in which the court must examine 'the

totality of facts and circumstances' and determine where a 'petition falls along the spectrum

ranging from the clearly acceptable to the patently abusive.'" *In re 15375 Mem'l Corp. v. Bepco,

L.P.*, 589 F.3d at 618 (citing *In re Integrated Telecom Express, Inc.*, 384 F.3d at 118) (other

citations omitted). Here, Debtor's good faith—specifically, the financial distress requirement—

has been placed squarely at issue. Thus, the burden shifts to the Debtor to demonstrate that it was

financially distressed at the time of the chapter 11 filing.

The Third Circuit has not "set out any specific test to apply rigidly when evaluating

financial distress." *In re LTL Mgmt., LLC* 64 F.4th at 102. To be sure, the Circuit confirms that it

is not possible to "predict all forms of financial difficulties that may in some cases justify a debtor's

presence in [c]hapter 11." *Id.* ("So many spokes can lead to financial distress in the right

circumstances that we cannot divine them all."). Rather, considering "all relevant facts in light of

the purposes of the Code," "the good-faith gateway asks whether the debtor faces the kinds of

problems that justify [c]hapter 11 relief." *Id.*

Financial distress serves as a gating requirement for relief under chapter 11; in denying the

motions to dismiss in LTL 1.0, this Court found LTL to be distressed sufficiently to avail itself of

the bankruptcy system. *See In re LTL Mgmt., LLC*, 637 B.R. at 417-421 (discussing Debtor's

financial distress). Nevertheless, the Third Circuit reached an opposite conclusion. The chief

16

difference lies in the perceived lack of "immediacy" of such financial distress. *See In re LTL*

*Mgmt., LLC*, 64 F.4th at 102 ("[f]inancial distress must not only be apparent, but it must be

immediate enough to justify a filing.").  The Third Circuit mandated that the Debtor's financial

distress must be "immediate", "imminent" and "apparent"; the Circuit further advanced that "an

attenuated possibility standing alone" regarding a bankruptcy filing does not establish good faith.

*Id.* (quoting *SGL Carbon*, 200 F.3d at 164).  One can view the Third Circuit's ruling as being

somewhat at odds with a pro-active approach to trouble.  When one smells smoke, the wise course

of action is to get out of the house and call for help.  However, as it stands now, in gauging financial

distress, observing smoke may not be enough—one must see flames. Indeed, as noted by the TCC:

> The Court of Appeals referred to "businesses teetering on the verge of a fatal
> financial plummet", [*LTL Mgmt.,* 64 F.4th] at 103, and drew comparisons to *In re
> Johns-Manville Corp.*, 36 B.R. 727, 730 (Bankr. S.D.N.Y. 1984), where the debtor
> faced "urgency," including "forced liquidation of key business segments," and *In
> re A.H. Robins Co., Inc.*, 89 B.R. 555, 558 (E.D. Va. 1988), which "had only $5
> million in unrestricted funds" and was unable to borrow. *LTL Mgmt.*, 64 F.4th at
> 103–04. The Third Circuit did not treat such "urgen[t]" circumstances as ***merely
> one illustrative type*** of financial distress that would warrant bankruptcy. *Id.* at 104.
> Rather, it treated them as an ***essential precondition*** for a bankruptcy filing, warning
> that "[r]isks associated with premature filing may be particularly relevant in the
> context of a mass tort bankruptcy" and explaining that further litigation in the tort
> system would help, not hinder, LTL's reorganization.

*TCC's Proposed Findings of Fact and Conclusions of Law* ¶ 5, ECF No. 1075 (citation omitted)

(emphasis in original).

Few will argue that from a financial restructuring perspective, a "wait and see" approach

often gives rise to serious risks and increased costs that may threaten the viability of the business.

Chapter 11 professionals know all too well that companies which flounder too long without

restructuring assistance face increased borrowing costs, diminished goodwill, and a lethal loss of

leverage with vendors and lenders.  Drawing upon the history of mass tort bankruptcies, most

companies fare no better when trying to ride out massive, decades-long litigation firestorms.  Here,

"LTL inherited massive liabilities," *In re LTL Mgmt., LLC*, 64 F.4th at 109, and faces tens of

thousands of potential lawsuits involving various types of cancer, *id.* at 108 (conceding that "the

number of talc claims had surged in recent years").  This case involves more than the mere

possibility of threatened litigation.  In point of fact, the record suggests that there are tens of

thousands of additional claims since LTL's first filing, and that the Debtor expects to face tens of

thousands more in the future.  While it is difficult to assess the eventual cost to defend and resolve

the talc claims, there is nothing speculative about the fact the Debtor faces substantial liability.  It

has already incurred billions of dollars in judgments, settlements, and litigation costs.  And, due to

the backlog that developed during LTL 1.0, the Debtor faces significant increases in the number

of individual trials, the dollar-value of settlement demands, and related defense costs.  As counsel

conceded during the hearing, Movants have already sought—and intend to pursue—consolidated

trials (like the one that resulted in the multi-billion-dollar *Ingham* judgment).  These trials pose

enhanced verdict risk—both in terms of an increased risk of a verdict for the claimants and an

increased risk of larger dollar awards. *Kim Decl.* at ¶ 36; *see also June 27, 2023 Hr'g Tr. – Kim

Redirect*, 261:2-262:20.

The $4.5 billion verdict in *Ingham* has been described as an "outlier" in the few trials that

proceeded to verdict. *In re LTL Mgmt., LLC*, 64 F.4th at 107.  Yet, how many more *Ingham*-sized

verdicts must be rendered before the claims are deemed a threat to LTL's resources?  Is it

unreasonable to anticipate a dozen or more such "outliers" out of tens of thousands of current

claims, let alone future claims?  Indeed, in the recent single-plaintiff *Valadez* Case, plaintiff's
counsel asked the jury to return a $500 million verdict against J&J—$50 million for compensatory
damages and "nine times" that amount for punitive damages.  In the end, notwithstanding
counsel's plea, the jury returned a verdict of $18.8 million in compensatory damages and no
punitive damages in favor of the plaintiff. *July 18, 2023 Jury Verdict Transcript (Valadez Case)*,
Trial Ex. D-566.  At what frequency must large verdicts be handed out before it is apparent that a
debtor will come close to exhausting its funding capacity?  These are questions for another day.

Unquestionably, the Third Circuit recognizes that "the Code contemplates 'early access to
bankruptcy relief to allow a debtor to rehabilitate its business before it is faced with a hopeless
situation;'" however, the prospect and benefits of an early filing must be balanced against the
potential for, and risks of, premature filings. *In re LTL Mgmt., LLC*, 64 F.4th at 102 (quoting *SGL
Carbon*, 200 F.3d at 163).  The Circuit acknowledges that there is often a "fine line" between a
proper, early filing and an abusive, premature filing, and reaffirms that bankruptcy courts are "in
the best position to draw it." *Id.*  By way of these Motions, this Court has been asked again to draw
such a line.  Given the Circuit's focus on immediacy and certainty, this Court rules, as discussed
in greater detail below, that on the petition date, LTL fell on the wrong side of the line.

It is undisputed that, as of the filing date of LTL 2.0, Debtor was solvent and—with
assistance from HoldCo and the 2023 Funding Agreement—was able to satisfy its liabilities. *See,
e.g. Wuesthoff Decl.* ¶ 26; *Tr. of June 27, 2023 Hrg. – Wueshoff Cross* 71:1-14; *Tr. of June 27,
2023 Hrg. – Dickinson Cross* 134:19-21.  Although "balance-sheet insolvency or insufficient cash
flows to pay liabilities (or the future likelihood of these issues occurring) are likely always

relevant," the Third Circuit has been clear in holding that a debtor is not required to be insolvent—either from a balance-sheet or equitable perspective—to file for chapter 11 relief. *See In re LTL Mgmt., LLC*, 64 F.4th. at 102 ("We recognize as much, as the Code conspicuously does not contain any particular insolvency requirement.") (citing *In re SGL Carbon Corp.*, 200 F.3d at 163; *Integrated Telecom*, 384 F.3d at 121). Thus, the threshold issue for a chapter 11 filing is not "insolvency" but "financial distress." Nevertheless, Debtor's solvency as of the petition date provides this Court with a starting point for the financial distress analysis.

With respect to assets available to the Debtor as of its April 4, 2023, filing, the Court looks first to its cash position and future revenues. The Debtor has $14.5 million in cash, annual royalty revenue streams and access to approximately $1.3 billion in cash from HoldCo, the obligor under the 2023 Funding Agreement, including a $912 million dividend that HoldCo received in June 2023. *Expert Report of Gregory K. Bell, Ph.D. ("Bell Report")* ¶¶ 39-41, June 7, 2023, Trial Ex. D-66; *Supplemental Expert Report of Gregory K. Bell, Ph.D. ("Supp. Bell Report")* ¶ 8, June 20, 2023, Trial Ex. D-67. Specifically, on June 22, 2023, HoldCo received a dividend of $912 million from its indirect subsidiary GH Biotech, through several intermediate subsidiaries. *Id*. Nothing in the record suggests that the receipt of this dividend was extraordinary. Rather, HoldCo expects significant ongoing future dividends, according to Debtor's expert, Dr. Bell. *Bell Report* ¶ 71, Trial Ex. D-66; *see also Bell Report Ex. N*. An independent third party's free cash flow forecasts for Janssen Sciences Ireland Unlimited Company ("JSI"), relied upon by Dr. Bell, estimates between $3.6 billion and $5.6 billion in annual total free cash flows over the next decade, which would translate into billions of dollars of dividends to HoldCo. *Bell Report Ex. M*. HoldCo has other

subsidiaries that also generate hundreds of millions of dollars in annual cash flow. *Rebuttal Expert*

*Report of Saul Burian ("Burian Rebuttal Report")* 34, TCC Trial Ex. 1112.

As to other assets— as of the date of the chapter 11 filing—LTL owned the equity interest

in Royalty A&M, worth nearly $400 million and, again, has access to the value of HoldCo's equity

interests, valued at approximately $29.9 billion or, if discounted in a forced liquidation, $22.3

billion. *Bell Report* ¶ 39-41, 58.  In this regard, Dr. Bell testified that HoldCo holds 36.1143%

minority interests in two J&J affiliates domiciled in Ireland, JSI and Janssen Irish Finance

Unlimited Company ("JIFC"). *Bell Report* ¶ 45.  As of April 4, 2023, JSI's fair market value was

$34,672,900,000, for a HoldCo share of $12,521,875,000, and JIFC's fair market value was

$26,569,100,000, for a HoldCo share of $9,595,244,000. *Bell Report Ex. H*; *Lisman Decl.* ¶ 24,

Trial Ex. D-4.  HoldCo's other major assets are 100% holdings in Janssen-Cilag GmbH, valued at

$4,007,900,000, and Janssen France Treasury Unlimited Company valued at $1,778,407,000. *Bell*

*Report Ex. H*; *Lisman Decl.* at 9, Figure 1. HoldCo also holds several other interests valued at a

total of $1,972,941,000, along with $300 million in cash. *Bell Report Ex. H*; *Lisman Decl.* at 9,

Figure 1.  According to Dr. Bell, if forced to liquidate its equity interests, HoldCo would receive

$22.3 billion, after applying a 10% "minority interest discount" to JSI and JIFC and a marketability

discount of 20.6%, for sales of restricted stock.  *Bell Report* ¶ 51.

Debtor posits that—although it can meet its debts *now*—its liabilities will increase in both

the short and long term.  However, LTL's Chief Financial Officer, Mr. Wuestoff, did not have any

financial flow analysis if the talc claims were returned to the tort system. *See, e.g., June 27, 2023*

*Hr'g Tr. – Wuestoff Cross*, 58:13-16.  He knew only what had been historically spent on defense

costs. *Id.* at 137:9. Likewise, in advance of the chapter 11 filing, LTL had not performed any

evaluation of how much cash flow it would need in the tort system over the next three or even five

years. *June 27, 2023 Hr'g Tr. – Dickinson Cross*, 163:17–22. J&J's assistant controller testified

that outside of bankruptcy, "J&J has no aggregate estimate of talc liability." *June 28, 2023 Hr'g*

*Tr. (vol. 2) – Lisman Cross*, 144:12-15. Without such estimate, Debtor has opted to present expert

opinions to buttress its financial distress contentions. Dr. Charles H. Mullin opined that LTL faces

a "wave of litigation" in the near future. *Mullin Report* ¶ 64. Dr. Mullin constructed three

hypothetical "cash flow" scenarios and pegs the estimated short-term defense and resolution costs

upon a return to the tort system in a range between $3 billion and $7 billion over the next 3 years.[14]

*Id.* at ¶ 12; *Debtor's Proposed Findings of Fact and Conclusions of Law* ¶75, ECF No. 1079. Yet,

these figures are bottomed on assumptions which are dramatically at odds with the historical run

rates as to both trial costs and settlements.

On rebuttal, Movants' expert, Mr. Burian, questioned Dr. Mullin's use of 100 trials in two

of his three scenarios (or even 20 trials in his third scenario), noting that Mr. Wuestoff had

previously testified that LTL could not realistically try more than 10 cases per year, and even 20

was not possible. *Burian Rebuttal Report* 12, TCC Trial Ex. 1112; *Feb. 14, 2022 Hr'g Tr. –*

---

[14] The three scenarios are: (a) "Litigate All," which assumed 100 trials per year and no settlements or paid judgments (given that all judgments would be appealed) and assumed LTL's non-trial litigation costs would increase by 150%; (b) "Selective Litigation and Settlements (Low End)," which assumed 20 trials per year and certain settlements with no paid judgments (again on account of appeals) and assumed LTL's non-trial litigation costs would decrease by 25%, and (c) "Selective Litigation and Settlements (High End)," which assumed 100 trials per year and substantial settlements and paid judgments, and assumed LTL's non-trial litigation costs would increase by 150%. LTL's total costs in the first three years upon return to the tort system according to Dr. Mullin would be $2.7 billion under the first scenario, $2.65 billion under the second scenario, and $6.9 billion under the third scenario. *Mullin Report* ¶¶ 59-89, Trial Ex. D-65; *id.*, TCC Trial Ex. 1001.

*Wuestoff Cross*, 180:7-16, ECF No. 1481 in Case No. 21-30589.  Mr. Burian further challenged as inflated Dr. Mullin's assumptions with respect to trial and non-trial litigation costs. *Burian Rebuttal Report* at 12-14.  Using Dr. Mullin's $40 million quarterly figure for non-trial litigation costs but adjusting other variables (revising per-trial costs to $3.5 million based on the historical average, and assuming an average of ten trials per year, consistent with the historical average and LTL's president's testimony), Mr. Burian performed a re-analysis of Dr. Mullin's short term "cash flow" scenarios. *Id*.  With Mr. Burian's adjustments, LTL's total costs in the first three years upon return to the tort system would be only $0.6 billion under the first scenario, $2.6 billion under the second scenario, and $4.8 billion under the third scenario.  *Id.* at 15.  Ultimately, Mr. Burian's re-analysis provides the more credible projections.  And although, on paper, there is not enough cash in either LTL's or HoldCo's coffers to satisfy even the TCC's lower numbers, clearly there are resources readily available to LTL to secure satisfaction of these amounts.  Given LTL's assets—including the 2023 Funding Agreement—the record demonstrates that LTL can satisfy these costs; accordingly, there is no imminent financial distress.

Regarding total talc liabilities facing the Debtor, Dr. Mullin provided at trial an "above-expectation" estimate of LTL's total aggregate talc liabilities—which would extend out for "decades" into the future and includes the cost to "defend and resolve" all personal injury talc claims, governmental talc claims, and any indemnification obligations—at approximately $11 billion. *Mullin Report* ¶¶ 7, 102, 104, 112, Trial Ex. D-65; *June 29, 2023 Hr'g Tr. (vol. 2) – Mullin Cross*, 82:7–83:19, 154:13–16.23, ECF No. 1028.  Dr. Mullin further performed a "high-end stress test scenario" that estimates a worst-case scenario for talc liability at $21 billion. *Mullin Report*

¶¶ 19, 105; *June 29, 2023 Hr'g Tr. (vol. 2) – Mullin Cross* at 83:3–5. Even assuming total talc liability closer to this worst-case scenario figure, the Debtor still will not have exhausted the total value of the 2023 Funding Agreement. As explained, that asset includes not only LTL's cash and equity interests, HoldCo's cash, HoldCo's anticipated revenue through subsidiaries, and HoldCo's expected future dividends with projected values in the billions, but also HoldCo's $22.3 billion forced liquidation value—which, alone, could cover the Debtor's total estimated worst-case scenario for talc liability.

In further support of its financial distress argument, Debtor points to the unpredictability of future costs. Unquestionably, LTL's precise cash needs are speculative and will depend on LTL's chosen litigation strategy and litigation events, the timing of which may be beyond LTL's control. *See Mullin Report* at ¶ 83. Moreover, Dr. Mullin opined that expenditures in the tort system will become increasingly uncertain and volatile beyond the three-year period used for his analysis. *Id.* at ¶¶ 7, 102, 104, 112. The TCC argues that the Third Circuit's emphasis on "imminent" and "immediate" financial distress forecloses consideration of this "considerable uncertainty" surrounding Debtor's future talc liabilities in the financial distress analysis. This takes the Circuit's ruling too far. There is nothing in the Bankruptcy Code which requires that liabilities be liquidated or certain to justify a voluntary chapter 11 filing—especially in cases invoking § 524(g) to address asbestos liability. Quite the opposite. *See* 11 U.S.C. §524(g)(2)(B)(ii)(II).

In sum, given the freeze in litigation arising from the automatic stay and Preliminary Injunction, this Court is presented with nearly the same record with respect to verdicts and costs

24

as in LTL 1.0. In reviewing that record, the Third Circuit found that LTL's ability to fund its

liabilities "exceeded any reasonable projections available on the record." *In re LTL Mgmt., LLC*,

64 F.4th at 109. While recognizing that the tort landscape may change and that LTL may encounter

larger verdicts in the future, the Third Circuit stated that "[t]he 'attenuated possibility' that talc

litigation may require it to file for bankruptcy in the future does not establish its good faith as of

its petition date." *Id.* This Court abides by that ruling.

Given the submissions and testimony at trial, this Court concludes that LTL is not

sufficiently financially distressed to avail itself of bankruptcy at this time. The weight of the

evidence indicates that LTL does "not have any likely need in the present or the near-term . . . to

exhaust its funding rights to pay talc liabilities." *In re LTL Mgmt., LLC*, 64 F.4th at 108. Consistent

with the Third Circuit's instructions, courts analyzing financial distress must focus on the financial

state of the debtor. *In re LTL Mgmt., LLC*, 64 F.4th at 105. At the time of filing, LTL had assets

valued at approximately $380 million, with approximately $14.5 million in cash. *Debtor's

Proposed Findings of Fact and Conclusions of Law* ¶ 61, ECF No. 1079; *Lisman Decl* ¶¶ 12-13;

*Bell Report* ¶ 55. Most importantly, the Debtor was contractually entitled to a funding backstop—

in the form of the 2023 Funding Agreement—that allowed it to access the value of HoldCo's

significant cash holdings, anticipated annual dividends, and equity interests having a value

approaching $30 billion—exceeding the projected near term and aggregate talc liability. This

asset—which the Third Circuit previously described as "an ATM disguised as a contract"—is

properly considered in LTL's financial distress analysis. Thus, "the financial condition of

[HoldCo] is relevant only to the extent it informs [this Court's] view of the financial condition of

LTL itself." *In re LTL Mgmt.*, LLC, 64 F.4th at 106.  In sum, this Court smells smoke, but does

not see the fire.[15]  Therefore, the emphasis on certainty and immediacy of financial distress closes

the door of chapter 11 to LTL at this juncture.

### C.  Best Interests of Creditors

Having found cause for dismissal, the Court is compelled to address the possibility of

continuing this chapter 11 bankruptcy in the best interests of the creditors.  *See* 11 U.S.C.

§1112(b)(1) & (2).  The Court asked the parties to brief these issues amid the Court's concerns

over the obstacles hindering claimants' collective access to recoveries outside of bankruptcy.

Many claimants are represented by counsel who have passionately advocated on their behalf both

in this bankruptcy and in the tort system.  This Court has no doubt that counsel will continue to

zealously represent these claimants post-bankruptcy. Still more claimants, however, are either

unrepresented, are represented by counsel with limited resources, or are still yet unidentified.  The

Court queries who will pursue potential fraudulent transfer claims[16] for the benefit of *all*

---

[15] It is not lost on the Court that Movants are likely to suggest that, even if there were flames, they exist only because the substitution of the 2023 Funding Agreement served as an accelerant, and that—in any event—J&J has the financial wherewithal to assist Holdco in extinguishing the fire. However, neither this Court, nor the Third Circuit has taken issue with the propriety of the corporate restructuring, nor found that J&J had an independent obligation to satisfy the Debtor's talc liability prior to the bankruptcy. *In re LTL Mgmt.*, 64 F.4th at 106-107.

[16] The TCC contends that the termination of the 2021 Funding Agreement constituted the "largest intentional fraudulent transfer in United States history." *TCC's Motion to Dismiss* 12, ECF No. 286-1.  Counsel for Mesothelioma Plaintiff Tollefson and Certain Mesothelioma Plaintiffs further asserts that:

> LTL also maintains a $41.5 billion litigation claim for the transfer of the Consumer Business for no considerations. In addition, the assets of the bankruptcy estate (but not of LTL pre-filing) also consist of the debtor-in-possession's right to bring a potential fraudulent transfer claim against J&J for abandoning its funding backstop without reasonable exchange in value. Dismissing this case returns the right to bring such cause of action (if any) to the creditors of LTL. See, e.g., N.J. Rev. Stat. 25:2-29(a)(1) (Remedies of Creditor) ("In an action for relief against a transfer or obligation

claimants—present and future.  Likewise, the Court questions whether there is a stakeholder with

the motivation and necessary resources to pursue possible recoveries arising from the termination

of the 2021 Funding Agreement (to the extent such claims are appropriate).  Finally, the Court

harbors the same apprehensions about continued litigation in the tort system expressed in its

opinion denying the motions to dismiss in LTL 1.0. *In re LTL Mgmt., LLC*, 637 B.R. at 410-417.

There have been no developments since LTL 1.0 that have abated the Court's concerns or

resolved the problems of the extensive tort-claim backlog, or the incontrovertible fact that many

plaintiffs are denied any recovery in the tort system altogether.  In opposition to Dr. Mullin's

report, counsel for Movants repeatedly emphasized that there would be far fewer trials per year

than the 100 used by Dr. Mullin in his calculations.  Movants—based on historical data and

deposition testimony—pegged this number at closer to 10 trials per year. *See, e.g., June 29, 2023*

*Hr'g Tr. – Mullin Cross*, 94:23-100:3, ECF No. 999; *June 30, 2023 Hr'g Tr. – Ruckdeschel Closing*

48:19-23, ECF No. 1000.  This glacial pace coupled with the undeniable surge in the number of

new actions means that the vast majority of claimants will not get the opportunity to seek recovery

for years to come, if ever.  The sluggish speed of the tort system—which plaintiffs' attorneys

repeatedly acknowledged during trial—continues to trouble this Court.  Further, when a claimant

finally gets to trial, that opportunity comes with a very meaningful risk of a defendant's verdict.

On the other hand, claims reconciliation through a bankruptcy trust places reduced evidentiary and

---

under this article, a creditor, subject to the limitations in R.S.25:2-30, may obtain (1) Avoidance of
the transfer or obligation to the extent necessary to satisfy the creditor's claim. . . .").

*MRHFM's Plaintiffs' Proposed Findings of Fact and Conclusions of Law* 9 n.17, ECF No. 1068.

causation burdens on claimants, and resolution of claims and payments to victims can be achieved

at a far more expeditious pace than through uncertain litigation in the tort system. Indeed, it has

been the near decade of frustration, delay, and widely disparate results in the tort system which

prompted certain AHC counsel to seek a consensual resolution with J&J's settlement counsel.

*Murdica Decl.* ¶¶ 40-41; *Watts Decl.* ¶¶ 7, 25-26; *June 28, 2023 Hr'g Tr. (vol. 1) – Murdica Cross*,

39:3-9, ECF No. 956.

Finally, the Court again emphasizes the need to protect the interests of future claimants—

a need that is especially crucial in cases involving diseases with long latency periods, such as the

present matter.  There are two insurmountable hurdles to globally resolving talc litigation in the

tort system—latency periods for injuries and unknown future claimants. Sheila Birnbaum, Esq.,

who testified for the Debtor, opined that "MDLs are not always a good vehicle to resolve mass

personal injury litigation, especially in cases that involve future claims with latent injuries." *June

29, 2023 Hr'g Tr (vol. 1) – Birnbaum Cross*, 59:21-24, ECF No. 968; *Expert Report of Sheila L.

Birnbaum ("Birnbaum Rebuttal Report")* 1, Trial Ex. D-68.  Latent injuries make it "impossible

to identify who the plaintiffs are going to eventually be, because they have no injury at the moment,

and their injury may manifest years after their exposure to a particular product, substance, or

device." *June 29, 2023 Hr'g Tr. (vol. 1) – Birnbaum Cross*, 81:4-11; *see also Birnbaum Rebuttal

Report* at 7, 9-11.  She also testified about the due process concerns around providing notice and

an opportunity to opt out of a settlement to unknown future claimants: "That's a very big problem

in the fact of due process. That is one of the reasons that settlements through class actions after

*Amchem* and *Ortiz* just never continued because of the problems of . . . notice, of due process, of

having people understanding the ability to opt out or even know they've been exposed." *Id.* at

81:12-19 (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) (affirming decertification

of proposed asbestos class settlement for failure to meet the requirements of Rule 23); *Ortiz v.

Fibreboard Corp.*, 527 U.S. 815 (1999) (holding that certification of proposed global asbestos

class settlement was impermissible under Rule 23 and that it did not comply with *Amchem*)).

No party or expert has identified even a single example of a global settlement outside of

bankruptcy that has been achieved in circumstances like this case—where both latent injuries and

unknown future claimants exist—in the more than 20 years since *Amchem* and *Ortiz* were decided.

Instead, Movants' experts have offered examples of distinguishable mass tort settlements achieved

in non-bankruptcy situations that—in every case—did not involve the large numbers of

unidentified future claimants and long latency periods that are central to this chapter 11 case.[17]

Far from being an improper litigation management tool, the Debtor's experts suggest that chapter

11 provides the most practicable mechanism to resolve globally the Debtor's talc liability.

During trial, Movant's expert, Professor Theodore Rave offered in rebuttal that there are

tools available in the tort system, through the MDL process, to address and protect the rights of

unidentifiable, future claimants. *June 29, 2023 Hr'g Tr. (vol. 1) – Prof. Rave Re-Direct* 26:3-28:6,

ECF No. 968. He first explained that there could be a structure in place to create a subclass of

future claimants with their own, separate counsel who would have financial incentive to protect

---

[17] In testimony, Professor Theodore Rave pointed to the *In re NFL Concussion* MDL litigation as an example in which
a class settlement was achieved. However, unknown future claimants were not a factor in that litigation and Prof. Rave
acknowledged that it was significantly different from the talc litigation because the class members did not include
unknown future claimants. *June 29, 2023 Hr'g Tr. (vol. 1) – Rave Cross* at 16:2-18. Similarly, the *Vioxx* and *BP
Deepwater Horizon* settlements, which he cited in his report (*Rave Report* at ¶¶ 54, 58) did not include either latent
injuries or future claimants and that the *Fen-Phen* settlement did not involve latent injuries. *See id.* at 87:24-88:13.

the rights of that subclass. *Id.* at 26:10-27:3. However, Professor Rave viewed the challenge of

unidentifiable claimants as a "notice challenge," as opposed to a "structural" issue within the MDL

process. *Id.* at 26:15-17. To resolve that challenge, Professor Rave explained that courts could "do

a multimedia kind of notice" that would include "print ads and TV ads and internet advertising

over a long period of time to make sure that the message is getting out there." *Id.* at 27:16-20.

Given the 60-year latency period and the repeated allegations throughout this litigation that

Debtor's product is still readily available, the Court is dubious whether multimedia advertising

over a long period of time would adequately capture unidentified, future claimants.

In short, the Court remains unconvinced that the procedural mechanisms and notice

programs offered in the tort system can protect future claimants' rights in the same manner as the

available tools in the bankruptcy system. Given these concerns, the Court considers the possibility

that best interests of the creditors warrants continuation of this chapter 11 case.

### (1) 11 U.S.C. § 1112(b)(2)

Under § 1112(b)(2), even if "cause" exists, dismissal is precluded where "unusual

circumstances" establish that that conversion or dismissal of the case is not in the best interests of

the creditors or the bankruptcy estate. 11 U.S.C. § 1112(b)(2); *see also, e.g.*, *In re Alston*, 756 F.

App'x 160, 165 (3d Cir. 2019); *In re 1121 Pier Vill. LLC*, 635 B.R. 127, 136–37 (Bankr. E.D. Pa.

2022). The party opposing dismissal bears the burden of proving all the elements of § 1112(b)(2)

to prevent dismissal. *See In re Dr. R.C. Samanta Roy Inst. of Sci. Tech. Inc.*, 465 F. App'x 93, 97,

98 (3d Cir. 2011). Therefore, to utilize this subsection, Debtor must establish that unusual

circumstances exist, that dismissal is not in the best interests of the creditors, *and* that:

A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and

(B) the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A)--

(i) for which there exists a reasonable justification for the act or omission; and

(ii) that will be cured within a reasonable period of time fixed by the court.

11 U.S.C. § 1112(b)(2). Moreover, because § 1112(b)(2) is written in the conjunctive, a debtor must establish each element to invoke the exception and prevent dismissal or conversion. *See, e.g.*, *Andover Covered Bridge, LLC,* 553 B.R. 162, 177 n.5 (B.A.P. 1st Cir. 2016); *In re Delta AG Grp., LLC*, 596 B.R. 186, 201 (Bankr. W.D. La. 2019) ("[T]he burden shifted to Debtor to prove this case should not be dismissed or converted by proving each element set forth in § 1112(b)(2)."); *In re Ashley Oaks Dev. Corp*., 458 B.R. 280, 286 (Bankr. D.S.C. 2011); *see also In re Vascular Access Centers, L.P*., 611 B.R. 742, 761 n.5 (Bankr. E.D. Pa. 2020) (explaining all factors that must be established to preclude dismissal or conversion); *In re Korn*, 523 B.R. 453, 469 (Bankr. E.D. Pa. 2014) (discussing debtor's failure to establish separate subsections of § 1112(b)(2) as "independent reasons" for dismissal). The Court assumes—without finding—that "unusual circumstances" exist. Nevertheless, LTL is not able to meet its burden of establishing that all other elements of § 1112(b)(2) are satisfied.

In LTL 1.0, this Court buttressed its ruling on a rationale that employed § 1112(b)(2). *In re LTL Mgmt., LLC*, 637 B.R. at 406 n.8. In LTL 2.0, the Court directed the parties to provide additional briefing on the issue. After reviewing the briefing and giving the matter further reflection, the Court resolves that application of § 1112(b)(2) is not appropriate in this case. LTL's

31

petition was not filed in good faith because it lacks imminent and apparent financial distress under

applicable standards.  The Third Circuit explained that "[n]o 'reasonable justification' validates

that missing requirement" and it could not conceive of a way in which LTL's "lack of financial

distress could be overcome." *In re LTL Mgmt., LLC*, 64 F.4th at 110.  Because binding precedent—

relating to this very Debtor—establishes that LTL is unable to demonstrate either a "reasonable

justification" or a possible timely cure of the grounds for dismissal, s*ee* 11 U.S.C.

§1112(b)(2)(B)(i) & (ii), the exception to dismissal based on best interests of the creditors under

§ 1112(b)(2) is unavailable to LTL and this Court's analysis need not go further.  Nevertheless,

the somewhat murky and conflicting caselaw applying the limited exception under § 1112(b)(2)

merits further discussion.

Movants contend that, where cause for dismissal is found based on lack of good faith, the

exception to dismissal under § 1112(b)(2) is *never* applicable. *See, e.g.*, *Arnold & Itkin Post-Trial*

*Br.*  ¶ 82, ECF No. 1071 (citing *In re Green*, 2016 WL 6699311, at *11 (B.A.P. 9th Cir. Nov. 9,

2016) ("As the bankruptcy court found, filing a petition in bad faith could never be reasonably

justified or curable, no matter what plan Debtors could now propose."); *United States Trustee*

*Reply* 19, ECF No. 862 (citing *Layman v. Tennessee State Bank*, 2021 WL 6425951, at *8 (E.D.

Tenn. Feb. 2, 2021) (stating that actions amounting to bad faith "cannot be cured"); *In re Hinesley*

*Fam. Ltd. P'ship No. 1*, 460 B.R. 547, 553 (Bankr. D. Mont. 2011) (stating that where cause for

dismissal is premised on bad faith, "then section 1112(b)(2) would not apply because, by

determining that the debtor filed the case in bad faith, the court would foreclose a reasonable

justification for the filing.")); *TCC's Proposed Findings of Fact and Conclusions of Law* ¶ 279,

ECF No. 1079 ("As other courts have explained, there can be no reasonable justification for filing

a case in bad faith.").

In contrast, Debtor submits that the cases on which Movants rely do not involve a finding

of bad faith premised specifically on lack of financial distress.  Admittedly, those courts rooted

their bad faith findings on other grounds. *See, e.g. Layman*, 2021 WL 6425951 (finding bad faith

based on the filing of simultaneous chapter 11 restructuring bankruptcies and making a threatening

comment); *In re Hinesley*, 460 B.R. 547 (finding bad faith based on gross mismanagement of the

debtor's financial affairs and failure to cooperate/disclose information). As Debtor points out,

Movants do not identify any binding authority establishing whether "bad faith," generally,

precludes a debtor's ability to either cure or provide a reasonable justification necessary to avoid

dismissal under § 1112(b)(2).  Conversely, Debtor does not cite any authority establishing that

certain types of "bad faith"—such as lack of financial distress—can be cured or justified such that

the § 1112(b)(2) exception applies.

In this Court's view, Third Circuit dicta can be interpreted to suggest that certain types of

"bad faith" may be capable of curing or justification.  Lack of good faith can be based on a variety

of factors and the appropriateness of a particular filing ranges from the "clearly acceptable to the

patently abusive." *In re SGL Carbon Corp.*, 200 F.3d at 162.  The acknowledgement of a spectrum

implies that some petitions are filed with less good faith—or more bad faith—than others.  Indeed,

a footnote in *In re SGL Carbon* states in no uncertain terms that, although a debtor may have

engaged in some bad conduct, dismissal may not be the appropriate remedy. *Id.* at 159 n.8 ("[I]n

many circumstances, the court might be better advised to address the bad conduct of the debtor (or

some other party) in a manner other than through dismissal of the proceedings.") (quoting 7 Collier

on Bankruptcy 1112–70 (15th ed. 1996)).   However, the Circuit clarifies that alternatives to

dismissal are only appropriate "where the debtor otherwise properly belongs in bankruptcy." *Id.*

> In bad faith cases involving the filing of a petition that is an abuse of the bankruptcy
> process, however, § 1112(b)'s conversion/dismissal choice is inappropriate. **The
> proponent of an abusive petition does not belong in bankruptcy, so it is
> unnecessary to ask whether dismissal or conversion is in the interest of the
> creditors**.

*Id.* (emphasis added).  Here, the Court is faced with a Debtor who does not belong in bankruptcy

under applicable tests. *In re LTL Mgmt., LLC*, 64 F.4th at 111 ("Chapter 11 is appropriate only for

entities facing financial distress.").   Thus, lack of financial distress is not the type of "bad faith"

that could be subject to the § 1112(b)(2) exception to prevent dismissal or conversion even under

a liberal interpretation of Third Circuit dicta.  Further, the decision in *In re SGL Carbon* was issued

prior to a 2010 amendment to § 1112(b)[18] and, thus, does not specifically address the now-

applicable "unusual circumstances" test under § 1112(b)(2) and the statutory requirements that

accompany it.   Therefore, it is unclear whether—where bad faith exists—the alternatives to

dismissal discussed in *In re SLG Carbon* would include the exception to dismissal under today's

---

[18] Prior to 2010, the statute read as follows:

> (b)(1) Except as provided in paragraph (2) of this subsection, subsection (c) of this section, and
> section 1104(a)(3), on request of a party in interest, and after notice and a hearing, *absent unusual
> circumstances specifically identified by the court that establish that the requested conversion or
> dismissal is not in the best interests of creditors and the estate*, the court shall convert a case under
> this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best
> interests of creditors and the estate, if the movant establishes cause.

11 U.S.C. § 1112(b)(1) (superseded) (emphasis added).

§ 1112(b)(2). In any event, what *is* clear is that *In re SLG Carbon*'s underlying holding—that an alternative to dismissal is reserved for only those who properly belong in bankruptcy—remains unchallenged.[19]

Moreover, this Court is not inclined to distinguish between the various grounds supporting a finding of "bad faith." Whatever the basis, it is "bad faith," generally, that is the accepted "cause" for dismissal or conversion in this Circuit. The weight of the case law supports the conclusion that "bad faith" cannot be cured or justified such that the exception to dismissal under § 1112(b)(2) applies. *See, e.g.*, *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1395 (11th Cir. 1988) (citing *In re Nat. Land Corp.*, 825 F.2d 296, 298 (11th Cir. 1987) and stating that "[t]he possibility of a successful reorganization cannot transform a bad faith filing into one undertaken in good faith"); *In re Ozcelebi*, 639 B.R. 365, 425 (Bankr. S.D. Tex. 2022) ("[G]iven those [bad faith] findings, there is no reasonable likelihood that Debtor could confirm a plan pursuant to § 1191(b), which incorporates § 1129(a)(2), requiring that '[t]he proponent of the plan complies with the applicable provisions of this title.' "). Rather, this Court is inclined to agree with Movants that the exception to dismissal under § 1112(b)(2) is intended for use where "cause" for dismissal is based on "technical mistakes" or other procedural and ministerial failings. *June 30, 2023 Hr'g Tr. – Jonas Closing Rebuttal*, 168:24-169:5.

Notwithstanding that § 1112(b)(2) cannot serve as an independent bases to deny dismissal, the Court hears the concerns raised by nearly 58,000 claimants and harbors its own apprehension

---

[19] This is not to say that an alternative to dismissal such as the appointment of a trustee or examiner would not apply. *See* 11 U.S.C. § 1112(b)(1), discussed *supra*. Given the 2010 amendment and the clear statutory text, this Court does not interpret the holding in *In re SLG Carbon* as precluding those alternatives even in the face of bad faith.

regarding the best interests of creditors; specifically, how best to protect all claimants in this case—including their possible need to pursue fraudulent transfer claims or contractual recoveries under the funding agreements. It is clear from the statute that these concerns are better addressed—if at all—under § 1112(b)(1).

### (2) 11 U.S.C. § 1112(b)(1) – Appointment of a Trustee or Examiner

As determined, cause for dismissal has been established in the form of lack of imminent financial distress. And, for reasons discussed, LTL cannot establish the requisite elements to avail itself of the exception to dismissal under § 1112(b)(2). Nevertheless, this Court may decline to dismiss the case and, instead, appoint an examiner or trustee under § 1112(b)(1) if such appointment is in the best interests of the creditors.[20] *See* 11 U.S.C. § 1112(b)(1) (explaining that where cause exists, a bankruptcy court shall dismiss or convert a case "unless the court determines that the appointment under section 1104(a) of a trustee or examiner is in the best interests of the creditors and the estate"); 11 U.S.C. § 1104(a)(2) (addressing appointment of a trustee or examiner); *see also In re Dr. R.C. Samanta Roy Inst. of Sci. Tech. Inc.*, 465 F. App'x 93, 96–97 (3d Cir. 2011); *In re Morningstar Marketplace, Ltd*, 544 B.R. 297, 304 (Bankr. M.D. Pa. 2016); *Grasso v. Madison Cap. Co.*, 2014 WL 1281123, at *2 (E.D. Pa. Mar. 31, 2014).[21]

---

[20] During the hearing on these Motions, counsel for the States of Mississippi and New Mexico suggested this Court *sua sponte* appoint a Chapter 11 trustee under 11 U.S.C. § 1104(a)(2). *June 30, 2023 Hrg. Tr. – Malone Closing*, 45:17-46:1, ECF No. 1000.

[21] Despite what this Court perceives as unambiguous language and informative statutory history, there appears to be some inconsistency in the application of the alternatives or exceptions to dismissal under § 1112(b)—a confusion stemming from the 2010 amendment to the statute. *See* FN 18, *infra*; *see also Grasso v. Madison Cap. Co.*, 2014 WL 1281123, at *2 n.9 (E.D. Pa. Mar. 31, 2014) (concisely explaining the 2010 amendment to § 1112(b)). Many courts still conflate the principles in the pre- and post-2010 versions. *See e.g.*, *La Trinidad Elderly LP SE*, 627 B.R. 779, 798 (B.A.P. 1st Cir. 2021) (quoting *In re Costa Bonita Beach Resort, Inc.*, 513 B.R. 184, 195 (Bankr. D.P.R. 2014)) ("Once cause is found, 'the burden shifts to the debtor to demonstrate . . . the "unusual circumstances" that establish that

Courts may appoint a trustee or examiner for cause, *see* 11 U.S.C. § 1104(a)(1), or "if such appointment is in the interests of creditors," 11 U.S.C. § 1104(a)(2).  This Court has "broad discretion to take judicial notice of the entire file" to determine best interest of creditors. *In re U.S. Min. Prod. Co.*, 105 F. App'x 428, 431 (3d Cir. 2004) (quotations and citations omitted).  Simply put, the appointment of either a trustee or an examiner is likely to result in little more headway than we have seen to date.  For instance, an examiner would retain costly professionals, spend thousands of billable hours producing a report filled with hundreds (if not thousands) of pages of text and exhibits, and offer a conclusion that there are indeed potential causes of action arising from the corporate restructuring transactions.  We know all of this already.  Likewise, the appointment of a chapter 11 trustee would also engender substantial litigation and extensive delays, all while leading to additional layers of professionals and attendant administrative costs.

The Court takes judicial notice of the approximately 4,900 docket entries that have been filed in these two, chapter 11 cases since their inception, nearly 20 months ago.  From the Court's vantage point, the docket speaks to the complexities and far-reaching impact of this case on all parties in interest.  This Court does not—and cannot—find that the appointment of an examiner and/or chapter 11 trustee will yield results in the best interests of creditors.  Rather, the Court urges

---

dismissal or conversion to Chapter 7 is not in the best interests of the creditors and the estate.'"); *In re Burgess*, No. 11-1257, 2013 WL 5874616, at *3 (Bankr. N.D.W. Va. Oct. 30, 2013) (same).  In its Reply brief, the TCC asserts that "there is only *one* exception to the mandatory duty of dismissal for cause—an exception (now located exclusively in Section 1112(b)(2)) requiring all three conjunctive conditions to be satisfied." *Reply Br.* 68, ECF No. 857.  Admittedly, this Court encouraged the parties to focus on the exception to dismissal under § 1112(b)(2) and—although the TCC does not discuss § 1112(b)(1) at length—the TCC does quote the portion of § 1112(b)(1) that references appointment of a trustee or examiner. *Id.* at 65.  Accordingly, the TCC's reference to "*one* exception" to dismissal may be purely semantics and not intended to exclude the alternative to dismissal under § 1112(b)(1) in the form of appointment of a trustee or examiner.  The Court now examines that possibility.

the parties to build upon the remarkable progress that has been achieved in the past 120 days in reaching a viable global settlement. The foundation for a fair, efficient, and expeditious settlement has been laid by the dogged efforts of the AHC, Debtor and other parties. While the Court is obliged to dismiss this case, the parties should—and are strongly encouraged to—continue to pursue a global resolution. It has been represented that, of the total claimants, approximately 58,000 talc claimants have an "agreement in principle on material financial terms to resolve talc claims through a chapter 11 plan, which, upon final agreement and if confirmed, would constitute the largest settlement in any asbestos bankruptcy case and one of the largest settlements of personal injury claims in U.S. history." *Omnibus Objection of the Ad Hoc Committee of Supporting Counsel Motion to Dismiss* ¶¶ 3 & 12, ECF No. 613. This Court sees no reason why this type of settlement cannot be pursued in a context other than this current bankruptcy case, such as part of the pending *Imerys* chapter 11 bankruptcy proceeding in Delaware. As an initial matter, LTL contemplates this notion insofar as the Debtor's Amended Chapter 11 Plan of Reorganization provides that the proceeds from a settlement in *Imerys* would be contributed to the settlement proceeds available in this case for the benefit of talc claimants. *Amended Chapter 11 Plan of Reorganization of LTL Management LLC* § 8.1(g), ECF No. 913. Further, in its opinion dismissing LTL 1.0, the Third Circuit explicitly recognized the continued possibility of settlement in the *Imerys* case. *See In re LTL Mgmt., LLC*, 64 F.4th at 108 ("Nor is there anything that shows all hope of a meaningful global or near-global settlement was lost after the initial *Imerys* offer was rebuffed. The *Imerys* bankruptcy remained a platform to negotiate settlement."). Little has changed since.

## IV.  Conclusion

For the foregoing reasons, the Court finds cause for dismissal due to LTL's lack of imminent and immediate financial distress.[22]  The Court determines that neither the appointment of a chapter 11 trustee nor an examiner under § 1112(b)(1) is in the best interests of creditors and finds that an exception to dismissal under § 1112(b)(2) is unavailable because the statutory elements have not been satisfied.  Accordingly, the Court grants the Motions and dismisses the case.  The parties are directed to settle a proposed form of Order consistent with this Opinion.

Michael B. Kaplan, Chief Judge
U.S. Bankruptcy Court
District of New Jersey

Dated: July 28, 2023

---

[22] The Court notes that Movants raised other "good faith" issues with respect to the Debtor's actions in refiling and its ability to file and confirm a plan.  Given that a debtor must first pass through the initial good faith gateway to avail itself of bankruptcy, Debtor's petition is subject to dismissal for lack of imminent financial distress and the Court need not address the other proffered bases for dismissal raised by Movants.

**EXHIBIT B**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **GENOVA BURNS LLC** | **BROWN RUDNICK LLP** |
| Daniel M. Stolz, Esq. | David J. Molton, Esq. |
| Donald W. Clarke, Esq. | Michael S. Winograd, Esq. |
| Gregory S. Kinoian, Esq. | Susan Sieger-Grimm, Esq. |
| dstolz@genovaburns.com | Kenneth J. Aulet, Esq. |
| dclarke@genovaburns.com | dmolton@brownrudnick.com |
| gkinoian@genovaburns.com | mwinograd@brownrudnick.com |
| 110 Allen Road, Suite 304 | ssieger-grimm@brownrudnick.com |
| Basking Ridge, NJ 07920 | kaulet@brownrudnick.com |
| Tel: (973) 533-0777 | Seven Times Square |
| Fax: (973) 533-1112 | New York, NY 10036 |
| *Local Counsel for the Official* | Tel: (212) 209-4800 |
| *Committee of Talc Claimants* | Fax: (212) 209-4801 |
| | -And- |
| | Jeffrey L. Jonas, Esq. |
| | Sunni P. Beville, Esq. |
| | Eric R. Goodman, Esq. |
| | jjonas@brownrudnick.com |
| | sbeville@brownrudnick.com |
| | egoodman@brownrudnick.com |
| | One Financial Center |
| | Boston, MA 02111 |
| | Tel: (617) 856-8200 |
| | Fax: (617) 856-8201 |
| | *Co-Counsel for the* |
| | *Official Committee of Talc Claimants* |
| **OTTERBOURG PC** | **MASSEY & GAIL LLP** |
| Melanie L. Cyganowski, Esq. | Jonathan S. Massey, Esq. |
| Jennifer S. Feeney, Esq. | Bret R. Vallacher, Esq. |
| Michael R. Maizel, Esq. | jmassey@masseygail.com |
| mcyganowski@otterbourg.com | bvallacher@masseygail.com |
| jfeeney@otterbourg.com | 1000 Maine Ave. SW, Suite 450 |
| mmaizel@otterbourg.com | Washington, DC 20024 |
| 230 Park Avenue | Tel: (202) 652-4511 |
| New York, NY 10169 | Fax: (312) 379-0467 |
| Tel: (212) 905-3628 | *Co-Counsel for the Official Committee of Talc* |
| Fax: (212) 682-6104 | *Claimants* |
| *Co-Counsel for the Official* | |
| *Committee of Talc Claimants* | |
| In re: | Chapter 11 |
| LTL MANAGEMENT, LLC,[1] | Case No.: 23-12825 (MBK) |
| Debtor. | Honorable Michael B. Kaplan |

FILED
JEANNE A. NAUGHTON, CLERK
AUG 11 2023
U.S. BANKRUPTCY COURT
TRENTON, NJ
BY_____DEPUTY

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

**ORDER (I) DISMISSING DEBTOR'S CHAPTER 11 PETITION
PURSUANT TO <u>11 U.S.C. § 1112(b)</u>; <u>(II)</u> ESTABLISHING
PROCEDURES WITH RESPECT TO REQUESTS FOR
<u>COMPENSATION; AND (III) GRANTING RELATED RELIEF</u>**

The relief set forth on the following pages is **ORDERED.**

8/11/23

MICHAEL B. KAPLAN
US BJ

This Court enters this order (this "Dismissal Order") to effectuate dismissal of the chapter 11 case of LTL Management LLC (the "Debtor" or "LTL") pursuant to 11 U.S.C. § 1112(b) and to address, pursuant to 11 U.S.C. §§ 105(a) and 349(b), certain related matters as necessary to permit an orderly dismissal and for purposes such as fairness, judicial economy, and convenience to interested parties. This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, dated September 18, 2012 (Simandle, C.J.) (the "Standing Order"); venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The TCC (as defined below), the other Movants (as defined below) and the Debtor have agreed to the terms of this Dismissal Order. After due deliberation, this Court has found and determined that good and sufficient cause appears under the facts and applicable law for the relief granted herein.

WHEREAS, on April 4, 2023 (the "Petition Date"), the Debtor filed a voluntary petition (the "Petition") pursuant to chapter 11 of Title 11 of the United States Code commencing this case (the "Chapter 11 Case");

WHEREAS, on July 28, 2023, this Court entered the *Memorandum Opinion* [ECF No. 1127], granting the motions filed by the Official Committee of Talc Claimants (the "TCC") [ECF No. 286], the Ad Hoc Group of Mesothelioma Claimants [ECF No. 335], Paul Crouch [ECF No. 346], the Ad Hoc Committee of States Holding Consumer Protection Claims [ECF No. 350], law firms on behalf of certain mesothelioma claimants [ECF No. 352], the law firm of Maune Raichle Hartley French & Mudd, LLC [ECF No. 358], the law firm of Arnold & Itkin LLP [ECF No. 384], the Georgia State claimants represented by The Barnes Law Group, LLC [ECF No. 473],

3

the States of New Mexico and Mississippi [ECF No. 480][2] (collectively, the "Movants"), and the

motion filed by the U.S. Trustee [ECF No. 379], that sought an order of this Court dismissing the

Chapter 11 Case pursuant to 11 U.S.C. § 1112(b) as not having been filed in good faith;

WHEREAS, on April 25, 2023, this Court entered the *Order Dissolving Temporary*

*Restraining Order, Extending the Automatic Stay, and Granting Limited Preliminary Restraints*

[Adv. No. 23-01092, ECF No. 91] (the "Initial Preliminary Injunction Order") extending the

automatic stay under 11 U.S.C. § 362 and preliminarily enjoining the commencement or

conducting of any trial or appeal of any Debtor Talc Claim against any of the parties identified as

Modified Protected Parties (as defined in the Initial Preliminary Injunction Order), but otherwise

allowing any party to commence or proceed with discovery or other pretrial matters in any suits

and to permit the filing of suit, on notice to the Debtor, against any Modified Protected Party (other

than with respect to the multi-district litigation pending before the Honorable Michael A. Shipp

for which no legal action was allowed); and

WHEREAS, on July 14, 2023, this Court entered the *Order Extending The Preliminary*

*Injunction* [Adv. No. 23-01092, ECF No. 203] (together with the Initial Preliminary Injunction

Order, the "Preliminary Injunction Orders") on substantially the same terms as the Initial

Preliminary Injunction Order except to add Janssen Pharmaceuticals, Inc and Kenvue Inc. to the

list of Modified Protected Parties.

**NOW THEREFORE, IT IS HEREBY ORDERED THAT:**

1.  Dismissal. The Chapter 11 Case is hereby dismissed pursuant to section 1112(b)

of the Bankruptcy Code as of the date of this Dismissal Order (the "Dismissal Date"). The Court

---

[2]  In addition to those identified above, two motions adopting the arguments asserted by the TCC were incorrectly filed in an adversary proceeding relating to this Chapter 11 Case. *See* Adv. No. 23-01092; ECF Nos. 117 (motion of Estate of Melissa Fleming) and 118 (motion of Robert Gendelman).

has jurisdiction to enter this Dismissal Order pursuant to 28 U.S.C. §§157 and 1334 and the

Standing Order. For cause shown, pursuant to 11 U.S.C. § 349(a), the Debtor, its affiliates,

successors and assigns, are enjoined from filing any petition seeking voluntary relief under Title

11 of the United States Bankruptcy Code, for a period of 180 days measured from the date of entry

of the Dismissal Order.

2.     Closing the Chapter 11 Case. This Court directs that the Clerk of this Court close

the Chapter 11 Case promptly following the filing of a notice by LTL, with the prior written

acknowledgement from the U.S. Trustee, that there is no objection to the closing of the case and

confirming the completion of the following conditions: (i) all monthly operating reports of LTL

have been filed, (ii) all fees due and owing in the Chapter 11 Case to the Clerk of this Court and/or

the U.S. Trustee pursuant to 28 U.S.C. § 1930 have been paid in full, (iii) notice of the Appeal

Exhaustion Date (as defined below) has been filed with this Court, (iv) all Substantial Contribution

Motions (as defined below) have been heard by this Court and determined pursuant to a final order,

(v) all amounts requested pursuant to a Final Fee Application, a Reimbursement Request or a Post-

Dismissal Fee Application (all as defined below) have been paid by LTL or, if not paid,

determined by this Court not to be allowable; and (vi) all amounts owed to the co-mediators have

been paid by LTL. The date that the parties jointly file a notice with the Court indicating that all

appellate proceedings, including proceedings for review or otherwise before the U.S. Supreme

Court, involving this Dismissal Order ("Appeals") are exhausted or resolved, or that the parties

will not pursue the Appeals shall hereinafter be referred to as the "Appeal Exhaustion Date."

3.     Preliminary Injunction Orders.[3] On the Dismissal Date, the Preliminary Injunction

Orders [Adv. No. 23-01092, ECF Nos. 91 and 203] are vacated as moot. Pursuant to section 105

---

[3]  Capitalized terms that are used but are not defined herein shall have the meanings ascribed to them in the
     Preliminary Injunction Orders.

and in accordance with 11 U.S.C. § 108(c), this Dismissal Order shall toll, as of April 24, 2023, to the extent such period has not expired before then, the expiration of any period under any applicable non-bankruptcy law, any order entered in a non-bankruptcy proceeding, or any agreement that fixes a period under which a Defendant is required to commence or continue a civil action in a court other than this Court on any Debtor Talc Claim asserted against any of the Modified Protected Parties until the later of: (a) the end of such period, including any suspension of such period occurring on or after April 4, 2023; or (b) thirty (30) days after notice of this Dismissal Order. For the avoidance of doubt, if a Defendant, through counsel, notified the Debtor in writing of his, her, or their intent to proceed with the filing of a complaint pursuant to the Preliminary Injunction Orders, any tolling of the period for any such Defendant to file a complaint asserting a Debtor Talc Claim against a Modified Protected Party terminated upon the Debtor's receipt of written notice of such Defendant's intent to file such a complaint.

4.    Termination of Stay. To the extent not already terminated by an order of this Court, the automatic stay with respect to LTL is terminated immediately upon the Dismissal Date. In accordance with 11 U.S.C. § 108(c), this Dismissal Order shall toll, as of April 4, 2023, to the extent such period had not expired before then, the expiration of any period under any applicable non-bankruptcy law, any order entered in a non-bankruptcy proceeding, or any agreement that fixes a period for commencing or continuing a civil action in a court other than this Court on Debtor Talc Claims until the later of: (a) the end of such period, including any suspension of such period occurring on or after April 4, 2023; or (b) thirty (30) days after notice of this Dismissal Order. For the avoidance of doubt, if a Defendant, through counsel, notified the Debtor in writing of his, her, or their intent to proceed with the filing of a complaint pursuant to the Preliminary Injunction Orders, any tolling of the period for any such Defendant to file a complaint asserting a

6

Debtor Talc Claim against a Modified Protected Party terminated upon the Debtor's receipt of written notice of such Defendant's intent to file such a complaint.

5. Procedures for Final Allowance of Fees and Expenses. All professionals retained pursuant to sections 105, 327, 328 or 1103 of the Bankruptcy Code ("Retained Professionals"), in addition to the Future Claimants Representative (the "FCR") and her professionals, seeking compensation pursuant to sections 330 or 331 of the Bankruptcy Code shall file and serve monthly, interim and final fee applications for periods through and including the Dismissal Date within thirty (30) days of the Dismissal Date (the "Final Fee Applications"); and shall file and serve any fee applications for periods from the Dismissal Date through and including the Appeal Exhaustion Date ("Post-Dismissal Fee Applications" and together with the Final Fee Applications, the "Fee Applications") within thirty (30) days of the Appeal Exhaustion Date. The Fee Applications shall be in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of this Court, the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Retained Professionals* [ECF No. 562] (the "Compensation Procedures Order"). Any objections to the Fee Applications shall be filed and served on counsel for LTL and the entity submitting the application to which an objection is being filed no later than twenty-one (21) days following the filing of such Fee Application. The Court will schedule hearings, at the Court's convenience, to consider the Fee Applications. The fees and expenses of professionals retained by the Ad Hoc Committee of Supporting Counsel shall remain subject to the expense reimbursement agreement, which was attached as Exhibit A to ECF No. 575.

6. Compensation Procedures Order; Reimbursement Requests; Post-Dismissal Monthly Fees. The Compensation Procedures Order shall remain in full force and effect through and including the Appeal Exhaustion Date, including as to requests for reimbursement of expenses

incurred by members of the TCC and their representatives (a "Reimbursement Request") and the

submission and payment of monthly fee statements by Retained Professionals. After the Appeal

Exhaustion Date, the Compensation Procedures Order shall remain in effect as to the submission

and payment of Fee Applications and Reimbursement Requests.

7.    Substantial Contribution Motions. Any party, including any ad hoc committee that

participated in the Chapter 11 Case, seeking payment of a claim for substantial contribution in this

Chapter 11 Case may file and serve a motion seeking such relief ("Substantial Contribution

Motion") no later than thirty (30) days following the Dismissal Date. The Court will schedule a

hearing, at the Court's convenience, to consider the Substantial Contribution Motion. Any party-

in-interest may object to a Substantial Contribution Motion no later than seven (7) days prior to

the hearing date, and the movant may reply no later than four (4) days prior to the hearing date.

8.    Limited Continued Existence of TCC. The TCC shall remain in existence after the

Dismissal Date solely to pursue or defend any Appeals, and its Retained Professionals shall be

authorized to continue to perform services on the TCC's behalf and communicate with its

constituents concerning the pursuit or defense of any Appeals. For the avoidance of doubt, this _MBK_

shall include the appeals currently pending before the District Court ~~for the District Court~~ for the

District of New Jersey (Case Nos. 23-cv-02567; 23-cv-02918; and 23-cv-03935).* On the Appeal

Exhaustion Date, the TCC shall be automatically dissolved, and all members and professionals

retained by the TCC shall be discharged from all duties, responsibilities, and obligations arising

from, or related to the TCC. Following such dissolution, any attorney-client privilege and similar

rights previously held by the TCC shall remain in existence and shall be enforceable by any person

or entity that was a member of the TCC as of its dissolution (directly or indirectly through their

respective counsel or other representative). Notwithstanding anything contained herein to the    (MBK)

*\* Within seven (7) days of the entry of the within order, counsel for the TCC shall provide the District Courts handling the referenced appeals with a copy of this order and a request to stay the appeals pending resolution of any appeal of this Order. Such request should be made initially by correspondence unless the District Court directs otherwise.*

contrary, the TCC, TCC members and their representatives and the TCC's Retained Professionals shall be authorized to seek payment of fees and reimbursement of expenses in accordance with the Compensation Procedures Order and with Paragraphs 5 – 7 herein. **✱✱**

9.  <u>Discharge of the FCR</u>.  On the Dismissal Date, the appointment of the legal representative for future talc claimants in this Chapter 11 Case (the "<u>FCR</u>") shall be terminated, and all professionals retained by the FCR shall be discharged from all duties, responsibilities, and obligations from or related to the FCR.  Following such termination, any attorney-client privilege and similar rights previously held by the FCR shall remain in existence and shall be enforceable by the FCR (directly or indirectly through her respective counsel or other representative).

10.  <u>Discharge of the Co-Mediators</u>.  On the Dismissal Date, the appointment of the co-mediators in this Chapter 11 Case shall be terminated and the co-mediators shall be discharged from all duties, responsibilities, and obligations from or related to the court-ordered mediation in this Chapter 11 Case.  Within fourteen (14) days of this Dismissal Order, the co-mediators shall submit to LTL final invoices for services rendered and expenses incurred, and LTL shall promptly pay such invoices.

11.  <u>Services of Epiq Corporate Restructuring, LLC ("Epiq")</u>.  Epiq is authorized to assist LTL with service of this Dismissal Order.  On or about thirty (30) days after the entry of this Dismissal Order, Epiq, as the Debtor's claims and noticing agent, shall (a) forward to the Clerk of the Court an electronic version of all imaged claims; (b) upload the creditor mailing list into CM/ECF; and (c) docket a combined final claims register containing claims against the Debtor. Epiq shall be discharged from all duties, responsibilities, and obligations as the Debtor's claims and noticing agent in this Chapter 11 Case following the conclusion of such services pursuant to this Dismissal Order and the closing of this Chapter 11 Case.  Epiq shall be entitled to payment

*[Handwritten annotation:]* **✱✱** The TCC is not authorized to retain additional professionals absent further order of this Court. Pursuant to 11 USC § 349 (b)(3), such funds necessary to pay the fees and expenses, approved by the Court and in accordance with the procedures set forth herein, remain property of the estate and do not revest in the entity in which such property was vested immediately before the commencement of the case.

*[Handwritten initials in margin:]* MBK

and reimbursement of its fees and costs in accordance with Paragraph 5 hereof. Epiq is authorized

to take all actions necessary and appropriate to effectuate the terms of this Dismissal Order.

12.     <u>Payment of Quarterly Fees</u>. Not later than thirty (30) days after the Dismissal Date,

LTL shall pay to the U.S. Trustee any quarterly fees owed through the date of the Dismissal Date

pursuant to <u>28 U.S.C. § 1930(a)(6)</u>. Any disbursements, including but not limited to, the payments

of professional fees and expenses by LTL between the Dismissal Date through and including the

Appeal Exhaustion Date must be reported on the Debtor's Final Report and ~~shall~~ may be subject to the 

payment of fees owed pursuant to <u>28 U.S.C. § 1930</u>.

13.     <u>Continued Effect of Confidentiality Orders</u>. Notwithstanding any other provision

of this Dismissal Order, any obligations arising under confidentiality agreements, joint interest

agreements, and protective orders, if any, entered into during the Chapter 11 Case in connection

with the Chapter 11 Case shall remain in full force and effect in accordance with their terms;

provided, however, that the provisions set forth in paragraph 14 of this Dismissal Order shall

supersede any contrary provisions in any agreed protective order entered in this Chapter 11 Case;

provided, further, however, that notwithstanding anything contained therein to the contrary, the

obligations set forth in Section L of the *Protective Order* entered at <u>ECF No. 545</u> shall not become

applicable until thirty (30) days after the Appeal Exhaustion Date .

14.     <u>Destruction of Documents by Third Parties</u>. Reasonably promptly following the

closing of the Chapter 11 Case, any mediator appointed in the Chapter 11 Case and the Rule of

Evidence 706 expert appointed by order of this Court entered at <u>ECF No. 2881</u> in the Debtor's

prior chapter 11 case (Case No. 21-30589) (the "<u>Prior Chapter 11 Case</u>") and his professionals

each shall destroy any documents, electronic files or information in his or their possession,

custody, or control (or in the possession, custody, or control of their respective agents, experts or

consultants) that were provided on a confidential basis, whether during this Chapter 11 Case or during the Prior Chapter 11 Case, by LTL, the FCR, the TCC, or plaintiff law firms or their respective counsel, or any of the TCC members, and shall certify destruction thereof to such providing party.

15.    Notice. On or before seven (7) days following the Dismissal Date, LTL shall serve notice of this Dismissal Order (including a copy of this Dismissal Order) pursuant to Bankruptcy Rules 2002(f)(2) and 2002(k) on the TCC, the U.S. Trustee, the Master Service List, the Modified Protected Parties, all entities that have requested notice pursuant to Bankruptcy Rule 2002, and such additional persons and entities deemed appropriate by LTL.

16.    Retained Jurisdiction. Notwithstanding the dismissal of the Chapter 11 Case, this Court shall retain jurisdiction to hear and determine all matters arising from or related to the Chapter 11 Case, including without limitation, certification of any appeal of this Dismissal Order, the interpretation, implementation, or enforcement of this Dismissal Order and the Court's prior orders, and to hear and consider Substantial Contribution Motions and any objection to a Fee Application or a Reimbursement Request.

17.    Immediate Effectiveness. Notwithstanding any provisions in the Bankruptcy Rules to the contrary, this Dismissal Order shall be immediately effective and enforceable upon its entry.