**Nos. 23-2971, 23-2972**

## UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

IN RE: LTL MANAGEMENT LLC,
*Debtor.*

LTL MANAGEMENT LLC AND
THE AD HOC COMMITTEE OF SUPPORTING COUNSEL,
*Appellants*,

v.

THE OFFICIAL COMMITTEE OF TALC CLAIMANTS, *et al.*,
*Appellees.*

On Appeal from the U.S. Bankruptcy Court for the District of New Jersey,
No. 23-12825

## OPENING BRIEF OF APPELLANT LTL MANAGEMENT LLC

Gregory M. Gordon
JONES DAY
2727 North Harwood Street, Suite 500
Dallas, Texas 75201
Telephone: (214) 220-3939
E-mail: gmgordon@jonesday.com

Noel J. Francisco
C. Kevin Marshall
Audrey Beck
Brett J. Wierenga
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
E-mail: njfrancisco@jonesday.com
E-mail: ckmarshall@jonesday.com

*Counsel for Debtor-Appellant*
*LTL Management LLC*

## CORPORATE DISCLOSURE STATEMENT

LTL Management LLC's direct and indirect parent corporations are DePuy Synthes, Inc.; Janssen Pharmaceuticals, Inc.; Johnson & Johnson Holdco (NA) Inc.; Johnson & Johnson International and Johnson & Johnson. Johnson & Johnson, through subsidiaries, holds 10% or more of LTL Management LLC's stock. There is no publicly held corporation which is not a party to the proceeding before this Court but which has a financial interest in the outcome of the proceeding.[1]

The legal representative for future claimants is Randi S. Ellis. The members of the talc claimants committee (and their individual tort system lawyers) are listed below.

1.  Tonya Whetsel, as estate representative of Brandon Whetsel
    c/o Karst Von Oiste LLP
    Attn:  Erik Karst, Esq.
    23923 Gosling Rd., Ste. A
    Spring, TX 77389

2.  Blue Cross Blue Shield of Massachusetts
    c/o Hill Carter Franco Cole & Black, PC
    Attn:  Elizabeth Carter, Esq.
    425 Perry Street
    Montgomery, AL 36104

---

[1]  The dismissal order had the effect of dissolving a preliminary injunction issued by the Bankruptcy Court enjoining trials of talc-related claims against identified non-debtor third parties, some of which are publicly held corporations. Those claims seek to hold such third parties responsible for LTL Management LLC's alleged liability and are subject to indemnification from LTL Management. As a result, LTL Management does not believe those parties have a financial interest in the outcome.

3.    Kristie Doyle, as estate representative of Dan Doyle
      c/o Kazan, McClain, Satterley & Greenwood PLC
      Attn: Steven Kazan, Esq.
      55 Harrison St., Ste. 400
      Oakland, CA 94607

4.    April Fair
      c/o Robinson Calcagnie, Inc.
      Attn: Mark Robinson, Jr., Esq.
      19 Corporate Plaza Drive
      Newport Beach, CA 92660

5.    William Henry, as estate representative of Debra Henry
      c/o Levin Papantonio Rafferty
      Attn: Christopher Tisi, Esq.
      316 S. Baylen Street, Suite 600
      Pensacola, FL 32502

6.    Alishia Landrum
      c/o Beasley Allen Law Firm
      Attn: Leigh O'Dell, Esq.
      PO Box 4160
      Montgomery, AL 36103

7.    Rebecca Love
      c/o Ashcraft & Gerel, LLP
      Attn: Michelle Parfitt, Esq.
      1825 K Street, NW, Suite 700
      Washington, DC 20006

8.    Patricia Cook
      c/o Weitz & Luxenberg, P.C.
      Attn: Perry Weitz, Esq.
      700 Broadway
      New York, NY 10083

9.     Randy Derouen
       c/o Levy Konigsberg LLP
       Attn:  Moshe Maimon, Esq.
       605 Third Avenue, 33rd FL
       New York, NY 10158

10.    Brandi Carl
       c/o Golomb Spirt Grunfeld
       Attn:  Richard Golomb, Esq.
       1835 Market Street, Suite 2900
       Philadelphia, PA 19103

11.    Sue Sommer-Kresse
       c/o Motley Rice, LLC
       Attn:  Daniel Lapinski, Esq.
       210 Lake Drive East, Suite 101
       Cherry Hill, NJ 08002

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................1

JURISDICTION....................................................................................4

ISSUES PRESENTED............................................................................4

STATEMENT OF THE CASE.................................................................5

    A.    LTL's 2021 bankruptcy case ...............................................5

    B.    Events leading up to LTL's 2023 bankruptcy case............................8

    C.    LTL's 2023 bankruptcy case ...............................................10

SUMMARY OF ARGUMENT ...............................................................12

ARGUMENT ......................................................................................14

I.    The Bankruptcy Court Misconstrued *LTL I* In Determining That LTL Lacked Financial Distress.................................................................14

    A.    Under *LTL I*, ameliorating a likely threat to future claimants' recovery is a valid bankruptcy purpose.............................15

    B.    Under a proper interpretation of *LTL I*, LTL was in financial distress. ....................................................................24

II.    Alternatively, The Third Circuit's Good-Faith Analysis In *LTL I* Conflicts With The Bankruptcy Code In Multiple, Mutually Reinforcing Ways. ...............................................................37

    A.    A good-faith eligibility requirement is inconsistent with the Code's text and structure.................................................38

    B.    Even if the Code implicitly contained a good-faith eligibility requirement, this Court's "financial distress" requirement contravenes the Code and entrenches a sharp circuit split................46

    C.    At the least, any good-faith eligibility requirement must account for the asbestos-litigation context, consistent with § 524(g)'s imperatives. ...............................................................50

III.    The Bankruptcy Court Erred In Continuing The Talc Committee Post-Dismissal, For Which There Is No Statutory Basis......................53

CONCLUSION ...................................................................................55

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alabama v. North Carolina*,
    560 U.S. 330 (2010)....................................................................41, 42

*Amchem Prod., Inc. v. Windsor*,
    521 U.S. 591 (1997)....................................................................16, 52

*Carolin Corp. v. Miller*,
    886 F.2d 693 (4th Cir. 1989) .........................................................49, 50

*Food Marketing Inst. v. Argus Leader Media*,
    139 S. Ct. 2356 (2019).....................................................................43

*In re 15375 Mem'l Corp. v. Bepco, L.P.*,
    589 F.3d 605 (3d Cir. 2009) ...............................................................30

*In re Aearo Techs. LLC*,
    2023 WL 3938436 (Bankr. S.D. Ind. June 9, 2023)..........................51

*In re Bestwall LLC*,
    605 B.R. 43 (Bankr. W.D.N.C. 2019) .......................................6, 46, 51

*In re Bestwall LLC*,
    71 F.4th 168 (4th Cir. 2023) ........................................................46, 52

*In re Cascade Acceptance Corp.*,
    2011 WL 1253845 (Bankr. N.D. Cal. Apr. 4, 2011) .........................55

*In re Coleman*,
    426 F.3d 719 (4th Cir. 2005) .............................................................50

*In re Constellation Enterprises LLC*,
    587 B.R. 275 (D. Del. 2018).........................................................54, 55

*In re Dow Corning Corp.*,
   211 B.R. 545 (Bankr. E.D. Mich. 1997)...........................................16, 21, 34, 52

*In re Dow Corning Corp.*,
   456 F.3d 668 (6th Cir. 2006) ...............................................................................21

*In re Energy Future Holdings Corp.*,
   648 F. App'x 277 (3d Cir. 2016) .........................................................................17

*In re Great N. Paper, Inc.*,
   299 B.R. 1 (D. Me. 2003) ....................................................................................54

*In re Honx, Inc.*,
   2022 WL 17984313 (Bankr. S.D. Tex. Dec. 28, 2022)................................22, 51

*In re Imerys Talc Am., Inc.*,
   38 F.4th 361 (3d Cir. 2022) .................................................................................16

*In re Integrated Telecom Express, Inc.*,
   384 F.3d 108 (3d Cir. 2004) ................................................................................15

*In re Johns Manville Corp.*,
   36 B.R. 727 (Bankr. S.D.N.Y. 1984).....................................................19, 20, 40

*In re Johns-Manville Corp.*,
   36 B.R. 743 (Bankr. S.D.N.Y. 1984).....................................................................19

*In re Johns-Manville Corp.*,
   97 B.R. 174 (Bankr. S.D.N.Y. 1989).........................................................19, 20

*In re Little Creek Dev. Co.*,
   779 F.2d 1068 (5th Cir. 1986) .............................................................................39

*In re LTL Mgmt., LLC*,
   637 B.R. 396 (Bankr. D.N.J. 2022) .......................................................................7

*In re LTL Mgmt., LLC*,
   64 F.4th 84 (3d Cir. 2023) ...........................................................................*passim*

iii

*In re Lyons Transp. Lines, Inc.*,
  162 B.R. 460 (Bankr. W.D. Pa. 1994) .................................................54

*In re Makowka*,
  754 F.3d 143 (3d Cir. 2014) ...............................................................53

*In re Ross*,
  858 F.3d 779 (3d Cir. 2017) ...............................................................54

*In re Setzer*,
  47 B.R. 340 (Bankr. E.D.N.Y. 1985) ..................................................48

*In re SGL Carbon Corp.*,
  200 F.3d 154 (3d Cir. 1999) ...........................................15, 16, 19, 48

*In re SPM Mfg. Corp.*,
  984 F.2d 1305 (1st Cir. 1993)..............................................................54

*In re Victoria Ltd. P'ship*,
  187 B.R. 54 (Bankr. D. Mass. 1995) ......................................39, 40, 45

*In re W.R. Grace & Co.*,
  729 F.3d 311 (3d Cir. 2013) ...............................................................17

*Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*,
  399 F.3d 248 (3d Cir. 2005) ...............................................................33

*Kane v. Johns-Manville Corp.*,
  843 F.2d 636 (2d Cir. 1988) .........................................................*passim*

*Law v. Siegel*,
  571 U.S. 415 (2014).............................................................................55

*Legendary Art, LLC v. Godard*,
  2012 WL 3550040 (E.D. Pa. Aug. 17, 2012) ...............................34, 35

*Matter of Cohoes Indus. Terminal, Inc.*,
  931 F.2d 222 (2d Cir. 1991) ...............................................................19

iv

*Matter of UNR Indus., Inc.*,
     725 F.2d 1111 (7th Cir. 1984) .......................................................21

*Moody v. Sec. Pac. Bus. Credit, Inc.*,
     971 F.2d 1056 (3d Cir. 1992) .........................................................22

*SEC v. U.S. Realty & Improvement Co.*,
     310 U.S. 434 (1940)........................................................................43

*Stage I Land Co. v. United States*,
     71 B.R. 225 (D. Minn. 1986)..........................................................48

*Toibb v. Radloff*,
     501 U.S. 157 (1991)................................................................*passim*

*United States v. Huebner*,
     48 F.3d 376 (9th Cir. 1994) ............................................................46

*Wamsganz v. Boatmen's Bank of De Sota*,
     804 F.2d 503 (8th Cir. 1986) ..........................................................39

**STATUTES**

11 U.S.C. § 103 ................................................................................54, 55

11 U.S.C. § 105 ....................................................................................54

11 U.S.C. § 109 ..............................................................................*passim*

11 U.S.C. § 301 ....................................................................................53

11 U.S.C. § 330 ....................................................................................53

11 U.S.C. § 362 ................................................................................44, 46

11 U.S.C. § 503 ....................................................................................53

11 U.S.C. § 524 ..............................................................................*passim*

11 U.S.C. § 1102 ....................................................................53, 54, 55

11 U.S.C. § 1103 ............................................................... 53, 54, 55

11 U.S.C. § 1112 (2005) ................................................................ 49

11 U.S.C. § 1112 ................................................................... *passim*

11 U.S.C. § 1129 ........................................................... 39, 40, 43

28 U.S.C. § 157 .................................................................................. 4

28 U.S.C. § 158 .................................................................................. 4

28 U.S.C. § 1334 ............................................................................... 4

Bankruptcy Act of 1898,
   11 U.S.C. § 541 (1976) ........................................................... 43

## OTHER AUTHORITIES

156 Cong. Rec. H7158-01 (2010) ................................................. 49

Fed. R. App. P. 28 .............................................................................. 4

Sandrea Friedman, *Manville: Good Faith Reorganization or
   "Insulated'" Bankruptcy*, 12 Hofstra L. Rev. 121 (1983) ................. 20

H.R. Rep. 103-835 (1994) ............................................................... 17

P.A. Jackson & R.S. Brady, *Dismissal for Bad-Faith Filing Under §
   1112(b)(1)*, 28 ABI J. No. 10 (Dec./Jan. 2010) ......................... 47, 48

F.R. Kennedy & G.K. Smith, *Postconfirmation Issues*,
   44 S.C. L. Rev. 621 (1993) ..................................................... 44

Rept. of the Comm'n on the Bankruptcy Laws of the U.S., H.R. Doc.
   No. 137, 93rd Cong., 1st Sess. (1973) .................................... 44, 45

**INTRODUCTION**

This Chapter 11 bankruptcy case, LTL's second, arose because, after this Court's dismissal decision in the first case but before issuance of the mandate, law firms representing a majority of claimants approached LTL with a settlement to resolve all talc claims in Chapter 11. Seeking to end nearly a decade of delay and wildly disparate results in the tort system, this group became the Ad Hoc Committee of Supporting Counsel (the "Ad Hoc Committee"), which has likewise appealed. It is composed of seventeen plaintiffs' firms, including two that represented members of the official talc claimants' committee in LTL's first case. These firms entered into agreements memorializing their support for the terms of a plan of reorganization and commitment to recommend their clients vote for it. This second case ensued to prosecute that claimant-proposed plan.

Specifically, firms representing more than *57,000 talc claimants* support a plan that contemplates a § 524(g)[2] trust funded with *$8.9 billion* net present value ($12 billion nominally) for current and future claims. That would be the largest settlement ever in an asbestos mass-tort bankruptcy, including bankruptcies in which the debtor admitted its products contained asbestos. LTL committed to it even though it and its corporate affiliates continue to believe, based on all available science, that the ubiquitous, century-old products at issue never contained asbestos,

---

[2] Unspecified statutory citations are of Title 11.

1

did not cause the diseases alleged, and were safe. But litigating tens of thousands more claims in the tort system for another half-century is no more tenable for LTL than for the vast majority of claimants.

The financial circumstances also had substantially changed after the dismissal of *LTL I*. Through discussions with the Ad Hoc Committee, it became clear that tens of thousands of additional talc claims were being asserted. But LTL now had access to only about 50% of the value under its funding agreement, due to the fact that the J&J backstop, created to facilitate LTL's bankruptcy yet having caused this Court to dismiss it, no longer existed outside of bankruptcy.

Various parties ("Movants"), mainly plaintiffs firms representing a minority of talc claimants, sought to block LTL and plan supporters by moving to dismiss under § 1112(b), contending LTL lacked financial distress. Many of these firms are members of the steering committee in the federal MDL pending in the District of New Jersey, who stand to receive hundreds of millions of dollars in common-benefit funds but *only* if claims are resolved outside of bankruptcy, including in the MDL.

Based on a misreading of *In re LTL Mgmt., LLC*, 64 F.4th 84 (3d Cir. 2023) ("*LTL I*"), the Bankruptcy Court granted the motions. It interpreted *LTL I* as establishing a *de facto* insolvency standard. But *LTL I*, read in conjunction with the Bankruptcy Code's express criteria for asbestos bankruptcies (§ 524(g)), provides that, for a debtor to remain in Chapter 11, the risk to its future ability, outside of

2

bankruptcy, to equitably compensate current and future claimants must be real and imminent. LTL met that standard on the undisputed facts. And the Bankruptcy Court compounded its error by accepting, without explanation or reason, certain revisions of the projections by LTL's experts urged by Movants' expert.

But if the Court concludes the Bankruptcy Court properly applied *LTL I*, then the trouble lies in *LTL I*'s imposition of a "good faith" filing requirement where Congress has imposed none. The text of the Bankruptcy Code—the touchstone for eligibility to be a debtor, as the Supreme Court has confirmed—does not require "good faith." Instead, Congress in enacting Chapter 11 removed that requirement, consistent with its other efforts to remove front-end conditions on pursuing reorganization. "Good faith" is assessed at the back-end, at plan confirmation. An extra-textual good-faith eligibility requirement is thus at odds with the Code's text— including § 1112(b)—and undermines Congress's goals. Exacerbating that error— in a sharp split from other circuits—is this Circuit's unique emphasis on financial distress (i) as a threshold hurdle, (ii) mandating that such distress be "imminent," despite lack of support in the Code, and (iii) placement of the burden on the debtor to make these requisite showings. In other circuits, having the resources to reorganize *supports* remaining in Chapter 11. At the very least, § 524(g) demands that any good-faith standard operate differently for asbestos mass-tort debtors.

LTL's case serves proper bankruptcy purposes under Chapter 11 and § 524(g). Whether under or notwithstanding *LTL I*, this Court should reverse.

## JURISDICTION

The Bankruptcy Court had jurisdiction under 28 U.S.C. §§ 157(a)-(b) and 1334(a). Appellants timely filed notices of appeal. A52-56. Appellants and appellees unanimously certified the Bankruptcy Court's order for direct appeal, and this Court granted Appellants' timely petition. A57. This Court accordingly has jurisdiction under 28 U.S.C. § 158(d)(2)(A).

## ISSUES PRESENTED

1. Whether the Bankruptcy Court misapplied the law and made clearly erroneous findings of fact in dismissing LTL's bankruptcy petition "for cause" under § 1112(b), by determining that LTL lacked good faith in filing its Chapter 11 petition because it was not in imminent financial distress. *See* A25 (Opinion).[3]

2. Whether the Bankruptcy Court reversibly erred in authorizing the Official Committee of Talc Claimants (the "Talc Committee") to continue to exist, and requiring LTL to pay its ongoing fees and expenses, notwithstanding the dismissal of LTL's bankruptcy case. *See* A47 (Order).

---

[3] LTL adopts Argument II of the Ad Hoc Committee's brief, regarding § 1112(b)(2). Fed.R.App.P. 28(i).

**RELATED CASES**

A petition for mandamus arising from this case was denied by this Court, No. 23-1826. An appeal arising from this case, regarding the bankruptcy court's partial denial of a firm's substantial-contribution claim, is pending in the District of New Jersey, No. 3:23-cv-21176-MAS.

**STATEMENT OF THE CASE**

**A.    LTL's 2021 bankruptcy case**

As this Court recounted in *LTL I*, J&J began selling Johnson's Baby Powder, a talc powder, in the late 1800s. 64 F.4th at 93. Since 1979, responsibility for talc has been within wholly owned subsidiaries, most recently in LTL itself and, before that, Johnson & Johnson Consumer Inc. ("Old Consumer"). *Id.* J&J's talc products drew minimal litigation until, starting in the mid-2010s, Old Consumer was engulfed by lawsuits spurred by attorney advertising alleging that the century-old product caused ovarian cancer and mesothelioma. *Id.* at 93-94. Old Consumer and J&J deny that Baby Powder caused cancer or contained asbestos, but by 2021 claims had surged to "over 38,000 ovarian cancer actions … and over 400 mesothelioma actions," with "thousands more" expected "in decades to come." *Id.* at 94, 108. Although Old Consumer usually prevailed at trial, plaintiffs sometimes won blockbuster verdicts, including the $4.69 billion *Ingham* verdict, which remained

over \$2.2 billion after being reduced on appeal. *Id.* Meanwhile, Old Consumer spent nearly \$1 billion in defense costs. *Id.*

Old Consumer might have filed for bankruptcy, but subjecting its myriad stakeholders to a complex and exponentially more expensive bankruptcy would have benefited no one. Instead, Old Consumer developed a plan to resolve talc-related claims through Chapter 11 "without subjecting the entire Old Consumer enterprise to a bankruptcy proceeding." *Id.* at 97 (citation omitted). It underwent a divisional merger under Texas law, essentially splitting itself into LTL and "New Consumer." *Id.* at 96. New Consumer received the substantial majority of the assets and operations, and LTL received certain assets, including a royalties business, and all liabilities related to talc. *Id.*

LTL also received a funding agreement. Structured to ensure the success of LTL's bankruptcy petition, it had two payors: *First*, to avoid any ground for claiming a fraudulent transfer, New Consumer was obligated to pay (as needed, under certain conditions) LTL's talc-related costs and normal-course expenses, up to the value of New Consumer (estimated at \$61.5 billion). *Id.* at 96. *Second*, in earlier asbestos bankruptcies following a similar restructuring, claimants' counsel complained that such agreements were "illusory and insufficient," because an obligor like New Consumer might dividend away value, subverting the payment right. *E.g.*, *In re Bestwall LLC*, 605 B.R. 43, 49-50 (Bankr. W.D.N.C. 2019). To avoid that challenge,

6

the funding agreement included J&J—as a "backstop," though J&J believed "it was never required to provide" any guarantee. 64 F.4th at 109, 110-11.

After the restructuring, LTL filed for Chapter 11 relief. *Id.* at 97. LTL sought to resolve its talc liability—both current and future claims—via § 524(g), which provides for the creation of a trust for the benefit of *all* claimants. *Id.* at 94, 98.

The claimants' committee and others moved to dismiss "for cause" under § 1112(b), contending that LTL had not filed in "good faith." This included the argument (notwithstanding the J&J backstop) that the funding agreement was "an illusory contract right" meant to "deprive" talc claimants of the "assets backing their claims." *Mot. of Comm. of Talc Claimants to Dismiss* ¶¶ 6-7, No. 21-30589 (Bankr. D.N.J. Dec. 1, 2021).

After discovery and a five-day trial, the Bankruptcy Court denied the motions, finding that LTL's petition served a "valid bankruptcy purpose" of maximizing value in the face of tens of thousands of claims and that LTL had sufficient financial distress based on that extensive litigation. *In re LTL Mgmt., LLC*, 637 B.R. 396, 407-08, 419 (Bankr. D.N.J. 2022).

This Court reversed, holding that the bankruptcy served no valid bankruptcy purpose because LTL lacked sufficient financial distress. The Court did not hold that LTL's petition failed because there was anything illusory about the funding agreement. Instead, it held the opposite: The J&J backstop, put in place just hours

before the bankruptcy filing, "gave LTL direct access to J&J's exceptionally strong balance sheet" and so *eliminated* any financial distress. 64 F.4th at 106. The Court likened J&J's backstop to an "ATM disguised as a contract." *Id.* at 109. It made LTL "highly solvent," with "access to cash to meet comfortably its liabilities as they came due for the foreseeable future." *Id.* at 108. The Court acknowledged the "apparent irony" that, by putting beyond dispute LTL's *ability to fund* a Chapter 11 plan, J&J had made LTL *too financially able* for Chapter 11. *Id.* at 110. "Put another way," the Court added, "the bigger a backstop a parent company provides a subsidiary, the less fit that subsidiary is to file." *Id.* at 111.

## B.    Events leading up to LTL's 2023 bankruptcy case

During the appeal in *LTL I*, two events led to the present case. *First*, the parties, under the direction of the Bankruptcy Court, continued to pursue a settlement. After this Court issued its initial opinion (later amended) on January 30, 2023, and while LTL sought rehearing *en banc* and then a stay of the mandate, these efforts began to bear fruit, as interested parties recognized bankruptcy was the only forum allowing timely, equitable resolution of current and future claims. Significant support arose for the material terms of a plan of reorganization, in which LTL committed to pay up to $8.9 billion in net present value. Attorneys representing tens of thousands of talc claimants signed plan support agreements. A8-10 (Opinion). As part of those discussions, it became clear that plaintiffs would be asserting thousands

of additional talc claims against LTL relative to what was understood when it filed its first Chapter 11 case. While the number of current claims is still unknown, it was believed that the number of asserted claims could exceed 100,000. A4535 (Kim Decl.).

*Second*, given the Court's ruling and reasoning in *LTL I*, J&J's backstop of the 2021 funding agreement no longer served its intended purpose of facilitating a bankruptcy filing. Instead, it ironically *scuttled* it, frustrating and defeating the backstop's primary purpose. This caused J&J to take the position that the backstop was void or voidable. A4523, 4532 (Kim Decl.); A4049 (Haas Dep.). To eliminate that material risk, align the funding arrangements with the contracting parties' intentions, and ensure funding for the plan that the support agreements contemplated, LTL entered into new funding arrangements. A4532 (Kim Decl.); A4546 (Wuestoff Decl.); A2093 (Wuestoff Testimony). New Consumer (LTL's direct parent), now named Johnson & Johnson Holdco (NA) Inc. ("Holdco"), remains obligated to fund LTL's talc costs and normal-course expenses inside or outside of bankruptcy, but J&J's backstop applies solely inside of bankruptcy to fund talc-claimant trusts under such a plan, A10-11, consistent with its original purpose.[4]

---

[4] In a long-anticipated move the Bankruptcy Court found unrelated to LTL's bankruptcy case, A7, Holdco spun off its consumer-health business in January 2023. Holdco retains significant ownership interests in various, largely foreign subsidiaries and indirect affiliates. A19-20.

**C.    LTL's 2023 bankruptcy case**

After executing the plan support agreements and new funding arrangements, LTL on April 4, 2023, filed its second petition for Chapter 11 relief.

Various parties again moved to dismiss for lack of good faith, and the Bankruptcy Court, after further discovery, held another trial, this one lasting four days. To show "the scope of liabilities" LTL faces and "the capacity it has to meet them," LTL presented expert reports and testimony, plus other evidence, estimating LTL's short- and long-term talc costs and financial capacity. 64 F.4th at 104.

On the cost side, Dr. Charles Mullin, an economist with years of experience valuing mass-tort expenditures, estimated that, if LTL returned to the tort system, its costs in the first three years would run between $3 billion and $7 billion, and projected that its total cost of defending and resolving all current and future talc liabilities was up to $21 billion. A23; A6201-21 (Mullin Rept.). On the capacity side, business economist and CPA-CA Dr. Gregory Bell compiled 108 potential scenarios of LTL's expected expenses and Holdco's expected cashflow and concluded that LTL's cash requirements were likely to outpace Holdco's cashflow in 43% of scenarios, A6354 (Bell Rept.), a figure he updated to 51% after Holdco received a lower-than-expected dividend before trial, A6419-20 (Bell Supp. Rept.). Dr. Bell also estimated Holdco's going-concern value at approximately $29.9 billion and its

value, if forced to sell assets to meet obligations, at $22.3 billion. A21; A6343-44 (Bell Rept.).

Movants offered no opinion on the scope of LTL's liabilities. Nonetheless, the Talc Committee and U.S. Trustee have asserted that LTL's $8.9 billion plan pays pennies on the dollar, and the Talc Committee in discovery pegged the appropriate trust-funding amount at the value of the original funding agreement, that is, $61.5 billion. A6448 (Talc Comm. Resp. to Interrog.). The Talc Committee provided testimony from one restructuring expert, Mr. Saul Burian; his testimony, however, was limited to questioning some of the assumptions of Drs. Mullin and Bell.

The Bankruptcy Court granted the motions to dismiss. Focusing on "immediacy and certainty," as it understood this Court to have required in *LTL I*, it held LTL lacked financial distress because it believed that LTL's funding arrangements provide enough value presently to satisfy talc costs. A19, 26. It also authorized, over LTL's and the U.S. Trustee's objections, the Talc Committee to continue to exist for appeal, such that LTL would be required to pay the Talc Committee's expenses in this appeal, even though LTL is no longer in bankruptcy. A47. This direct appeal followed.

## SUMMARY OF ARGUMENT

**I.**    The Bankruptcy Court erred by misreading *LTL I* to effectively require near-term insolvency to prove financial distress (and thus, good faith). *LTL I* disclaimed any insolvency requirement. And consistent with § 524(g) and hallmark asbestos bankruptcies, current knowledge of a likely threat that asbestos-related claims could exhaust an entity's resources, thereby risking unequal recoveries for current and future claimants, warrants resort to bankruptcy.

Having misread *LTL I*, the Bankruptcy Court failed to recognize the threat of exhaustion here, in contrast to the facts of *LTL I*. Due to overwhelming asbestos-litigation costs, the undisputed evidence shows only a narrow gap between LTL's total projected liability and the value of Holdco available to LTL under the funding agreement. That alone is sufficient evidence of financial distress, warranting reversal of the court below.  In addition, the evidence at trial showed a likelihood that, even in the short term, there is a substantial risk that Holdco's income will not keep up with LTL's cash needs, forcing Holdco to sell off assets. The Bankruptcy Court's acceptance of Movants' adjustments of these short-term projections was clear error, providing yet another basis for reversal.

**II.**    Alternatively, if the Bankruptcy Court rightly interpreted *LTL I*'s financial-distress standard, *LTL I*'s good-faith analysis is flawed. The Bankruptcy Code does not condition access to Chapter 11 on "good faith." Imposing such an

eligibility requirement defies the Code's text and contradicts Congress's priorities in enacting it. Even if the Code did contemplate some good-faith eligibility requirement, this Court's iteration is misguided and unworkable, compounded by this Court's rule that the debtor bears the burden on a motion to dismiss for bad faith. On financial distress and burden, this Court's standard starkly conflicts with the Fourth Circuit's sounder approach. At the very least, § 524(g) rules out this Circuit's standard for asbestos cases like this one.

**III.** The Bankruptcy Court erred by extending the Talc Committee's existence beyond dismissal to include this appeal, thereby requiring LTL to fund the Talc Committee's ongoing expenses. Such a committee is solely a creature of Chapter 11 and automatically ceases to exist when the bankruptcy case does. The provisions setting forth the committee's duties and powers expressly do not apply outside of Chapter 11. The Talc Committee, therefore, should have dissolved when the Bankruptcy Court dismissed LTL's Chapter 11 case.

## ARGUMENT

**I.    THE BANKRUPTCY COURT MISCONSTRUED *LTL I* IN DETERMINING THAT LTL LACKED FINANCIAL DISTRESS.**

In determining that LTL lacked financial distress, the Bankruptcy Court reversibly erred by accepting Movants' misreading of *LTL I* as effectively requiring near-term equitable insolvency. This Court did not restrict financial distress to any one definition, and its opinion should be read in harmony, not in conflict, with § 524(g). That subsection's terms confirm that addressing a likely threat that current and future asbestos-related claims could exhaust an entity's resources—leading to inequitable distribution between current and future claimants—is a valid bankruptcy purpose. Accordingly, such a credible risk of exhaustion presents sufficient financial distress, and current knowledge of it makes that distress sufficiently immediate to warrant resort to bankruptcy.

The Bankruptcy Court's legal error in misinterpreting *LTL I* led it to fail to recognize the evidence of LTL's financial distress. LTL's undisputed evidence at trial showed that the gap between its total projected liabilities—up to $21 billion— and Holdco's liquidation value—$22.3 billion—is already extremely narrow. And that is not even considering (1) the risk of *Ingham*-type verdicts in the hundreds of millions of dollars or (2) Movants' views that LTL's total talc liabilities are many multiples higher. This showing alone requires reversal. In addition, consistent with this picture, LTL's near-term projections show that LTL's expenses are already

poised to outstrip Holdco's income in the next few years. The Bankruptcy Court clearly erred in accepting Movants' adjustments to those near-term projections, a separate error that also requires reversal.

***Standard of review.*** Conclusions of law are reviewed *de novo*. *LTL I*, 64 F.4th at 99. A determination of good faith or financial distress is an "ultimate fact" that "gets plenary review," while underlying facts receive "clear-error review." *Id.* at 100.

## A.    Under *LTL I*, ameliorating a likely threat to future claimants' recovery is a valid bankruptcy purpose.

**1.**    In *LTL I*, this Court rejected any attempt to pre-define every form of financial distress, recognizing that the Code does not direct courts to "set out any specific test to apply rigidly." 64 F.4th at 102. That is because the financial-distress requirement is not an end but a means for assessing whether the debtor's case serves a "valid bankruptcy purpose" by involving "the kinds of financial issues Chapter 11 aim[s] to address." *Id.* at 101-02; *accord In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 119 (3d Cir. 2004).

*LTL I* also rejected an insolvency standard for Chapter 11, as this Court and others long have done. 64 F.4th at 102; *accord In re SGL Carbon Corp.*, 200 F.3d 154, 163 (3d Cir. 1999). Insolvency is merely "relevant" to good faith, as is any "future likelihood" of insolvency. *LTL I*, 64 F.4th at 102. Insolvency would be an inappropriate standard not only because the Code "conspicuously" *omits* it for

Chapter 11, but also because "the Code contemplates 'the need for early access to bankruptcy relief to allow a debtor to rehabilitate its business before it is faced with a hopeless situation.'" *Id.* (quoting *SGL Carbon*, 200 F.3d at 163); *see* § 109(c)&(d). That is, an early filing may best position a debtor to pursue the "valid bankruptcy purpose" its petition seeks to fulfill, and the financial-distress requirement must account for this. 64 F.4th at 101-02.

*LTL I* further recognized that mass torts are a particular context in which early filing can serve valid bankruptcy purposes. *Id.* at 104 (recognizing *Johns-Manville*, *Dow Corning*, and *A.H. Robins*). Mass-tort litigation premised on injuries with long latency periods can carry a significant risk that defending and resolving current claims will require selling off assets, harming the defendant's ability to satisfy future claims. When current claimants threaten the goose that lays the golden eggs, "future claimants may lose altogether." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 598 (1997); *see In re Imerys Talc Am., Inc.*, 38 F.4th 361, 366-67 (3d Cir. 2022) (describing "natural adversity" between current and future claimants). The extraordinary inefficiency of mass-tort litigation heightens this risk, especially in asbestos litigation, where "the same issues are litigated over and over" and "transaction costs exceed the victims' recovery by nearly two to one," funneling most of the defendant's expenditures to non-stakeholder attorneys. 521 U.S. at 598. Allowing current claimants to collect at the expense of future claimants would

16

violate the principle that "all similarly situated creditors in bankruptcy are entitled to equal treatment." *In re Energy Future Holdings Corp.*, 648 F. App'x 277, 283 (3d Cir. 2016).

Congress's response to asbestos mass-tort litigation, § 524(g), which it modeled on the bankruptcy resolutions that Johns-Manville and UNR achieved, codifies this logic. As the committee report observed, "future claimants are ill-served if Johns-Manville and other asbestos companies are forced into liquidation and lose their ability to generate stock value and profits that can be used to satisfy claims." H.R. Rep. 103-835, at 41 (1994). Instead, current and future claims "channeled to a § 524(g) trust receive the same treatment, regardless of when they are brought." *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013).

Indeed, the whole point of § 524(g) is to ensure that a Debtor's assets are available to satisfy both current *and* future claimants. That is why Congress explicitly stated that, under § 524(g), a bankruptcy plan could be confirmed at the back-end when, as to financial condition:

- the debtor is "*likely* to be subject to *substantial future demands*";

- the "*actual amounts*, numbers and timing of such future demands *cannot be determined*"; and

- resolution of claims outside of a bankruptcy plan "is *likely to threaten* the plan's purpose to deal equitably with claims and future demands."

§ 524(g)(2)(B)(ii)(I)-(III) (emphases added). Because Congress has provided that a plan meeting these criteria may be confirmed at the end of a case, it follows that a debtor facing these conditions at the beginning of a case satisfies any judicially created standard of financial distress.

Nothing in *LTL I* purports to contradict these textual criteria. Additionally, it should be read consistent with § 524(g), which it acknowledged as background, recognizing that mass-tort bankruptcies premised on long latency periods raise the problem of preserving "assets to satisfy" "future claims." 64 F.4th at 98, 106. And, in analyzing LTL's case, *LTL I* further recognized the threat that § 524(g) addresses—payments from New Consumer to LTL under the funding agreement "might someday threaten [New Consumer's] ability to sustain its operational costs" and, by extension, LTL's financial means to satisfy future claims. *Id.* at 109.

Putting everything together, in the language of *LTL I*, "immediate" financial distress encompasses (at least in the § 524(g) context) a debtor that has *current* knowledge of substantial litigation—including both present and "likely" future litigation—that, although indeterminable, poses a "likely" "threat" to exhaust available resources to future claimants' detriment. Resolving such a credible risk of exhaustion serves a valid bankruptcy purpose.

2.    Earlier hallmark mass-tort bankruptcies, which this Court as well as Congress have recognized as appropriate, reinforce this reading of *LTL I*. *See id.* at

104; *SGL Carbon*, 200 F.3d at 164 & n.15 (describing a "large number of pending or potential claims" as the driving force). While this Court has rejected the idea that a debtor may file based on an "attenuated possibility" of a future problem, it has also recognized financial distress as "immediate" enough if the debtor could "anticipate the need to file in the future." *LTL I*, 64 F.4th at 102; *accord SGL Carbon*, 200 F.3d at 164.

That "anticipation" language comes from mass-tort caselaw, specifically *Johns-Manville. See Matter of Cohoes Indus. Terminal, Inc.*, 931 F.2d 222, 228 (2d Cir. 1991) (citing *In re Johns Manville Corp.*, 36 B.R. 727 (Bankr. S.D.N.Y. 1984)). And the key there was avoiding forced sale of assets, because "liquidation would preclude just compensation of some present asbestos victims and all future asbestos claimants." *Johns-Manville*, 36 B.R. at 736. What drove that bankruptcy was not actual or imminent equitable insolvency but *current knowledge* of a *future threat*. As the Second Circuit recognized in affirming plan confirmation: "From the outset of the reorganization, all concerned recognized that the impetus for Manville's action was not a present inability to meet debts but rather the *anticipation of massive personal injury liability in the future*." *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 639 (2d Cir. 1988) (emphasis added); *see also In re Johns-Manville Corp.*, 36 B.R. 743, 745 (Bankr. S.D.N.Y. 1984) ("[T]he spectre of proliferating, overburdening litigation… prompted this filing."); *In re Johns-Manville Corp.*, 97 B.R. 174, 176

(Bankr. S.D.N.Y. 1989) (filing based on "projecting the probability of continued increases in… the number of lawsuits").

Indeed, Johns-Manville's filing sparked the same controversy as LTL's. *See id.* at 179 (filing was "greeted with great surprise and consternation"). As one commentator put it then: The "Manville reorganization raises the novel question of whether the bankruptcy laws should shield a *presently sound corporation* from *possible future economic distress*." Sandrea Friedman, *Manville: Good Faith Reorganization or "Insulated'" Bankruptcy*, 12 Hofstra L. Rev. 121, 122 (1983) (emphases added). As here, the claimant committee accused Manville of "concoct[ing] evidence" of financial difficulty. *Johns-Manville*, 36 B.R. at 730. But its motion to dismiss was denied, because the company "may be liable" for "real debts" that "present holdings of cash and liquid assets would be insufficient to pay." *Id.* at 740.[5]

Dow Corning's bankruptcy fits the same mold. Beginning in 1992, the company faced a surge in lawsuits over its breast implants—18,000 claims in three

---

[5] *LTL I* observed that, "but for its filing," Johns-Manville would have been forced into accelerating a debt, possibly leading to the need to liquidate business segments to pay it. 64 F.4th at 104. But the *Manville* courts did not say Manville was unable to pay that debt, or treat the fact of it as necessary for Manville's good faith. *See* 36 B.R. at 735-40. Nor does § 524(g) make such an impact necessary, nor did this Court in *LTL I*. Manville was "presently sound" with "possible future economic distress." Friedman, *supra*, at 122.

years. *In re Dow Corning Corp.*, 211 B.R. 545, 551 (Bankr. E.D. Mich. 1997). Dow

Corning disputed that its implants caused any disease; but it incurred $200 million

in litigation costs in 1994. The Sixth Circuit observed, "Dow Corning was fully

solvent at the time it filed its bankruptcy case; it has remained so throughout the

proceedings and has never disputed its ability to pay all of its creditors. Rather, the

purpose of the bankruptcy petition was *to enable prompt and uniform settlement*."

*In re Dow Corning Corp.*, 456 F.3d 668, 671 (6th Cir. 2006) (emphasis added).

Finally, UNR's successful bankruptcy, on which § 524(g) was also modeled,

involved the same purpose. As the Seventh Circuit noted, UNR "[b]elieve[d] that its

ability to formulate a workable plan of reorganization might depend on its being able

somehow to remove the enormous cloud of *potential tort liability* represented by the

*prospective suits*." *Matter of UNR Indus., Inc.*, 725 F.2d 1111, 1113 (7th Cir. 1984)

(emphases added). The court found that, "[i]f future claims cannot be discharged

before they ripen, UNR may not be able to emerge from bankruptcy with reasonable

prospects for continued existence as a going concern" and, "[i]n that event,… future

plaintiffs would be made worse off." *Id.* at 1119-20.

In sum, *LTL I* must be read as recognizing that, so long as there is a credible

"threat"—more than an "attenuated possibility"—that mass-tort litigation will

exhaust a debtor's available resources, the debtor has sufficient financial distress.

Requiring certain, near-term insolvency cannot be squared with Congress's goal in

§ 524(g) of providing a "forward-looking solution" to mass asbestos liability. *In re Honx, Inc.*, 2022 WL 17984313, at *2 (Bankr. S.D. Tex. Dec. 28, 2022).

**3.** Spurred on by Movants, however, the Bankruptcy Court misread *LTL I*. Movants urged what was, effectively, just another insolvency standard, looking only to current conditions. Seizing on the term "immediate" in *LTL I*, Movants focused their motions to dismiss on LTL's current lack of equitable insolvency, highlighting their view that, on the petition date, LTL could pay its debts as they matured.[6] *See, e.g.*, Talc Comm. MTD 24, ECF 286 (arguing that "LTL's ability to meet its debts as they come due" is the "central question"); U.S. Trustee MTD 12, ECF 379 (arguing that "LTL's ability to meet its obligations in the ordinary course" is "crucial"); Ad Hoc Comm. of States MTD 2, ECF 350 ("Highlighting its lack of financial distress, the Debtor has also advised the Bankruptcy Court that it is solvent and that it has sufficient funds to pay talc claims."); Talc Comm. Reply in Support of MTD 42, ECF 857 (LTL's "solvency and ability to pay its debts as they come due" are "primary"). The U.S. Trustee even downplayed as "*dicta*" this Court's repeated statements about the Code's lack of an insolvency requirement. U.S. Trustee Reply in Support of MTD 11 n.6, ECF 862.

---

[6] Insolvency can mean negative net worth or "inability to pay debts as they mature." *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1064 (3d Cir. 1992).

Movants' focus on very-near-term insolvency carried through to their lone expert on financial distress, Mr. Burian, who had no prior experience estimating asbestos liability or with asbestos bankruptcies. A2814, 2825 (Burian Testimony). He viewed "threatened litigation" as "relevant … to meet the Third Circuit test" only "if it's certain and near term." A2820-21. Indeed, if a company were paying its employees, lacked vendor issues, and were currently making money, Mr. Burian testified, he would not view that company as in financial distress even if he knew there were "an 80% chance that a company would be insolvent three years from now." A2823-24. Similarly, unless it "impact[ed] the business today," whether the correct estimate of LTL's ultimate liability was "$8.9 billion, $22.9 billion, or 50 billion" was irrelevant.  A2824-25.

Movants' view carried the day. The court read *LTL I* to require visible "fire" before a debtor could file for bankruptcy—even if the sight and smell of "smoke" is obvious. A17. It downplayed the possibility that a debtor may face financial distress because of the undisputed existence of substantial future liability. It instead adopted wholesale—by block-quoting—a paragraph of the Talc Committee's brief urging that present operational difficulties are an "essential precondition." *Id.* It even omitted the words "or even in the long-term" from this Court's explanation in *LTL I* that "LTL did not have any likely need in the present or the near-term, *or even in the long-term*, to exhaust its funding rights to pay talc liabilities," thereby retaining only

the portion of the quotation highlighting the "present" and "near-term." A25 (emphasis added). It also ignored Movants' far-higher views of LTL's liability and set aside as "for another day" how the real but difficult-to-quantify risk of future liability verdicts affected the financial picture. A19.

## B. Under a proper interpretation of *LTL I*, LTL was in financial distress.

LTL showed at trial that it was in financial distress as of April 2023, due to the threat that litigation and resolution of tens of thousands of claims would outstrip Holdco's income, causing liquidation of Holdco's assets and impairing LTL's ability to deal equitably with present and future claims. The margin between total projected liability and Holdco's value is already slim, and there is significant risk that LTL's cash needs will cause Holdco to begin the process of selling off assets in the next three years. The Bankruptcy Court legally erred by ignoring this threat to future claimants. And it compounded that error with clearly erroneous factual findings.

1.    To satisfy its burden under this Court's precedent, LTL presented testimony from Drs. Mullin and Bell, alongside other evidence, to show its short-term cash requirements, long-term liabilities, and resources available to satisfy them. *See LTL I*, 64 F.4th at 104 (looking to "the scope of liabilities" and "capacity … to meet them"); *id.* at 108 (criticizing "back-of-the-envelope forecasts of hypothetical worst-case scenarios"). The evidence showed a credible threat to Holdco's assets and thus LTL's resources in the long run—and, indeed, the short run.

***Resources.*** Regarding assets, as of trial, LTL itself had $14.5 million in cash and a royalty business worth nearly $400 million. A20-21. It also has a right to payment from Holdco under the funding agreement. Holdco had $1.3 billion in cash, although most of that was a dividend it received from a subsidiary shortly before trial. A20. Holdco also holds interests in largely foreign subsidiaries and indirect affiliates, valued at $29.9 billion on a going-concern basis. A21. If Holdco had to liquidate those interests, however, that value would shrink to about $22.3 billion, as some of these are minority interests and Holdco would be selling restricted stock. *Id.* Movants' expert, Mr. Burian, similarly surmised that Holdco's discounted value could be as low as $17.1 billion. A4218 (Burian Rept.).

Regarding revenue, LTL can expect relatively minor annual dividends from its royalty business. A6344-45 (Bell Rept.). Holdco can expect several billion dollars in dividends from subsidiaries. A20-21. As Dr. Bell explained, however, Holdco cannot compel dividends from subsidiaries in which it has a minority interest, and dividends declared by international subsidiaries must filter through various jurisdictions' laws and J&J's global treasury operations. A6347-52. These dividends are subject to, among other things, underlying business operations, local statutory restrictions, and competing demands for cash through the J&J enterprise. A6321-22. As a result, the amount and timing of Holdco's historical dividends have been highly uncertain and variable, a pattern expected to continue. *Id.*

25

*Costs.*  On the other side of the equation, LTL faced 38,000 current claims when it filed its first bankruptcy case. *See LTL I*, 64 F.4th at 94. "[T]ens of thousands" have arisen since, A18, potentially 100,000 current claims, A4535 (Kim Decl.). Dr. Mullin crafted short- and long-term projections of LTL's talc-related costs for litigation and settlement (assuming no adverse verdicts). He first assessed LTL's cash requirements in the three years post-bankruptcy. Compiling three scenarios (varying based on LTL's approach to litigating and settling claims), he estimated that LTL would require between $3 and $7 billion. A22 & n.14. For the long run, he estimated that addressing 100,000 talc claims would require between $11 and 21 billion, which again excludes any adverse verdicts. A23-24.

Movants' counsel presumably think (unlike LTL) their claims have merit, meaning LTL's total liabilities should if anything be even higher than $11-$21 billion. That view contradicts Movants' position that LTL lacks financial distress, which may be why, at trial, they declined to offer any estimate even though in LTL's first bankruptcy, the Talc Committee's professionals *billed 8,000 hours on claims estimation*, paid by LTL's estate. A6467 (Summary of Evidence); LTL Proposed Findings/Conclusions ¶¶ 95-96, ECF 1079. This conspicuous failure exploits this Court's unique precedent on burden of proof, *infra* Arg. II.B, and provided another reason to reject the motions. *See Johns-Manville*, 36 B.R. at 738–39 (in denying motion to dismiss, stating: "[T]he Asbestos Committee has belied its own contention

that Manville has no debt and no real creditors by quantifying a benchmark settlement demand approaching one billion dollars for… prepetition asbestos claimants.").

In any event, there is no need to rely on a negative inference from the Talc Committee's studied silence: Both the Talc Committee and U.S. Trustee have urged that LTL's record-setting offer of $8.9 billion would compensate claimants at "pennies on the dollar." Talc Comm. Reply in Support of Mot. Suspending Case ¶ 12, ECF 517; U.S. Trustee MTD 3, ECF 379. And if one accepts the Talc Committee's position in discovery that a fair level of trust funding would be the maximum available to LTL under the first bankruptcy's funding agreement (approximately $61.5 billion), A6448, then LTL's liabilities outpace even Holdco's going-concern value ($29.9 billion) by more than two-to-one. The gap gets worse if one accepts the ambitious plan that many of the firms representing Movants proposed in the Imerys bankruptcy. *Id.* Its $100 billion of aggregate liability for LTL pegs the value of an ovarian-cancer claim at an average of $320,000—more than three times the range of values ($50,000 to $100,000) Dr. Mullin estimated and used. A6296-97 (Mullin Rebuttal Rept.).

***Distress.*** These facts, which starkly contrast with those *LTL I* presented, demonstrate that LTL was in financial distress when it filed its second petition.

In *LTL I*, this Court concluded that LTL was "comfortably" able to meet costs "for the foreseeable future." 64 F.4th at 108-09. Regarding costs, LTL had spent $4.5 billion on claims defense and resolution, proposed a $4-5 billion settlement of ovarian-cancer claims in the Imerys bankruptcy, and booked a $2.4 billion contingent loss. 64 F.4th at 107-08. But the Court rejected as "casual[]" the Bankruptcy Court's projections of tens of billions of dollars in future costs. *Id.* Regarding resources, the Court observed that LTL had access to $61.5 billion in value under the funding agreement. *Id.* at 106. "Most important," that money was backed by J&J and its more than "$400 billion in equity value." *Id.* Costs so far were just a fraction of that (7.5% of just the $61.5 billion). With no specific projections of future costs, the Court concluded that resources outstripped costs, leaving LTL with "no likely need in the present or the near-term, or even in the long-term, to exhaust its funding rights." *Id.* at 108-09.

Here, however, the evidence shows that the massive wave of talc litigation does, outside of bankruptcy, pose a credible threat to LTL's ability to deal equitably with present and future claims.

In the long run, given the dramatic increase in the number of claims filed and likely to be filed against LTL, Dr. Mullin estimated aggregate liability of up to $21 billion. That figure approaches Dr. Bell's estimate of Holdco's *entire* value of $22.3 billion if forced to sell assets and *exceeds* Mr. Burian's low-end estimate of $17.1

billion. These figures are *undisputed*. And they do not account for the possibility of *any* future verdicts akin to *Ingham*. Nor do they account for Movants' view that LTL's liability exposure is even higher. Thus, even if a showing of insolvency were required to establish financial distress, the evidence showed at least a risk that LTL was nearly balance-sheet insolvent when it filed its second case, particularly given the inherent uncertainty in estimating the cost of defending and resolving tens to hundreds of thousands of current and future claims. The Talc Committee's motion for derivative standing—to bring allegedly "colorable" claims for fraudulent transfer and breach of fiduciary duty—admits as much. *See* Talc Comm. Mot. for Standing 15, ECF 489-1.

Nor is that long-run risk a distant worry. Dr. Bell's analysis shows that forcing Holdco to sell off assets could begin soon. Dr. Bell generated dozens of scenarios combining his capacity estimates with Dr. Mullin's costs estimates. He concluded that LTL had a 43% chance of outstripping Holdco's cash inflows by the third year of tort litigation post-bankruptcy. Holdco would then become equitably insolvent, producing a serious risk that it "may be required to liquidate its ownership interests at a significant discount, impairing LTL's short- and long-term ability to receive timely and sufficient funding through the 2023 Funding Agreement." A6356 (Bell Rept.). And when he updated his analysis to account for the dividend Holdco received near trial, the odds rose to 51%. A6419-20 (Bell Supp. Rept.).

In sum, it can no longer be said that LTL is "highly solvent," with "access to cash to meet comfortably its liabilities as they came due for the foreseeable future." *LTL I*, 64 F.4th at 108.

**2.** The Bankruptcy Court's legal error in misinterpreting *LTL I* caused it to ignore key evidence and fail to recognize the threat to LTL's finances amounting to distress. That misapplication of law to fact is "subject to plenary review because it is, essentially, a conclusion of law." *In re 15375 Mem'l Corp. v. Bepco, L.P.*, 589 F.3d 605, 616 (3d Cir. 2009). This legal error is itself sufficient ground to reverse.

In LTL's first case, the Court faulted the bankruptcy court for its "casualness" in calculating LTL's litigation costs. 64 F.4th at 108. This time, the Bankruptcy Court had Dr. Mullin's expert report, with a meticulous discussion of data, assumptions, and consequent projections of LTL's costs, based on LTL's to-date litigation experience and data from other mass-tort defendants. This was not the "same record" as in *LTL I*. *Contra* A24-25.

Addressing that record, the Bankruptcy Court misunderstood *LTL I*, as described above (*supra* I.A.3). Instead of deeming the credible threat to equitable distribution sufficient financial distress, the court emphasized "immediacy and certainty." A19. That legal error caused the court to fail to recognize the narrow margin between Dr. Mullin's undisputed projected total costs and Holdco's total

salable value as a threat to equitable distribution, such that addressing it serves a valid bankruptcy purpose under *LTL I* and § 524(g).

The court's misreading of *LTL I* also caused it to ignore other evidence showing that Dr. Mullin's projections may well *under*state costs. *First*, the Bankruptcy Court misunderstood the top of Dr. Mullin's projected range as a "worst-case scenario." A23. Consistent with the tort system's volatility (and *Ingham*'s multi-billion-dollar verdict), Dr. Mullin did not so describe it. He did not even attempt to estimate adverse verdicts, basing his projections only on litigation costs and average settlement values. A6212-13. But the risk of adverse verdicts is real: During LTL's second bankruptcy, the Bankruptcy Court allowed a single case to proceed to trial, resulting in a jury verdict of *$18.8 million*. A19. Yet the court disregarded the risk of blockbuster verdicts as a "question[] for another day." *Id.* It should have recognized that this risk could only increase costs, indicating Dr. Mullin's range is not too high.

*Second*, the court acknowledged, but also disregarded, the risk posed to LTL by Movants' counsel's increasing pursuit of consolidated trials like *Ingham*. Consolidation indisputably increases *both* the *likelihood* and the *dollar amount* of a plaintiff verdict. A18.

*Third*, compounding the disregard of these risks, the court ignored that Movants consider LTL's liabilities to be *many times higher* than projections: The

Talc Committee, responding to an interrogatory, pegged the appropriate amount of funding for a trust to meet talc claims at over *$60 billion*, three times the top of Dr. Mullin's range A6448. Furthermore, the plan that several of the same firms representing Movants proposed in the Imerys bankruptcy pegs LTL's liabilities at *$100 billion*, five times higher. A6296-97 (Mullin Rebuttal Rept.).

In sum, LTL has access to Holdco's assets ($17.1-29.9 billion) to meet liabilities ranging from Dr. Mullin's estimate ($11-21 billion) to Movants' imputed estimates ($61.5-$100 billion). LTL's capacity to satisfy talc claims is already at risk, if not underwater, on these undisputed facts and regardless of the Bankruptcy Court's clearly erroneous factual findings, discussed below. The court's failure to recognize that distress is legal error, and this Court should reverse on plenary review for that reason alone. *See LTL I*, 64 F.4th at 100.

**3.**    The short-term evidence at trial also reveals financial distress, showing that this long-term threat to LTL's resources could start to affect the near future. The Bankruptcy Court clearly erred in accepting Movants' adjustments to Dr. Mullin's projections of LTL's short-term cash needs and erred further in treating casually the uncertain timing and quantity of Holdco's future income.

As discussed, based on Dr. Mullin's cost projections, Dr. Bell predicted that LTL's cash needs would outstrip Holdco's cashflow after three years in 51% of scenarios. The Bankruptcy Court, however, rejected portions of Dr. Mullin's cost

projections in favor of three modifications by Mr. Burian. It reduced (1) the number of estimated trials to 10 per year; (2) costs per tried case to $3.5 million, and (3) non-trial-litigation costs to $40 million per quarter. A22-23. Thus, instead of $3-7 billion in three years, Mr. Burian predicted "just" $0.6-4.8 billion, which the court found "more credible." *Id.* But Mr. Burian did not "provide a reasonable explanation" for his modifications, and the Bankruptcy Court did not explain why it found his estimates more credible. *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248, 263 (3d Cir. 2005) (citation omitted).

*Numbers of Trials.* In estimating 20 to 100 trials per year under different scenarios, Dr. Mullin explained that LTL's historical experience of 12 trials per year understated the number of trials LTL would experience upon reentering the tort system. A6202. He pointed out the litigation backlog LTL's first bankruptcy caused, that LTL's prepetition experience reflected talc litigation's early stages, and the expectation that tens of thousands of ovarian-cancer claims would emerge from the MDL. *Id.* None of that was disputed. Indeed, one of the Movants' witnesses, whose firm led the Steering Committee of the ovarian-cancer MDL, testified that he expected a "significantly increased number of trials" to be set for the "12 to 18 months" before LTL's first bankruptcy, noting that already the "number of trials was picking up significantly." A6582-83 (Birchfield Dep.).

Dr. Mullin's estimates accord with other mass-tort cases: They are below the number of claims slated for trial against Dow Corning before it filed its Chapter 11 petition (90 to commence in the next six months), and planned against 3M before its petition (500 cases per quarter). *See* A6202 (Mullin Rept.); A2863, 2872 (Mullin Testimony); *Dow Corning*, 211 B.R. at 552 (Bankr. E.D. Mich. 1997).

In rebuttal, Mr. Burian relied exclusively on the testimony of LTL Chief Financial Officer Robert Wuesthoff, who is not a lawyer, and a derivative closing statement from LTL's first bankruptcy, for the proposition that LTL would not try more than 10 cases per year. A4456 (Burian Rebuttal Rept.). Mr. Burian did no research or analysis of LTL's ability to try more cases. *Id.* Instead, Mr. Burian merely pointed out that Mr. Wuestoff was "told" that doing more would be "very challenging." *Id.* Using that unverified hearsay to modify Dr. Mullin's reasoned calculations was unreasonable. *See Legendary Art, LLC v. Godard*, 2012 WL 3550040, at *1 (E.D. Pa. Aug. 17, 2012) (Restrepo, J.) ("There is no evidence that Slocumb engaged in any independent verification of the [contrary] projections."). Similarly, the Bankruptcy Court did not explain its agreement with Mr. Burian or how to square it with its own finding of "significant increases in the number of individual trials." A18.

***Per-Trial Costs.*** Mr. Burian's revision to $3.5 million per tried case was similarly unsupported. Dr. Mullin based his estimation of $5 million on LTL's

historical costs, from its own undisputed data, for the full life of each tried case. A2864 (Mullin Testimony). The cost of the trial itself, historically $2-5 million, is just one subset of that, as Dr. Mullin and LTL's fact witnesses made clear. *Id.*; A3392 (Kim Testimony); A3383 (Wuestoff Testimony). Mr. Burian apparently misunderstood what Dr. Mullin's calculations represented, so simply grabbed that range's midpoint ($3.5 million) and plugged it into Dr. Mullin's model, ignoring both pre-trial and post-trial costs for such a case. A4457 (Burian Rebuttal Rept.). Here too, the Bankruptcy Court failed to explain why it accepted Mr. Burian's mistake. A23.

*Non-Trial-Litigation Costs.* Finally, Dr. Mullin projected that LTL's costs for non-trial-litigation would range from 75% to 250% of LTL's prepetition average of $40 million per quarter, for a total of $30-100 million. He explained that costs could rise dramatically now that the ovarian-cancer MDL may soon schedule bellwether trials or begin remanding cases. A6203-04 (Mullin Rept.). Mr. Burian lowered the figures to their prepetition average, noting Dr. Mullin's uncertainty about the MDL's future. A4458 (Burian Rebuttal Rept.). But Mr. Burian did not bother to analyze the MDL himself and provided no substantive response to Dr. Mullin's rational bases for the increase. *Id.* The court implicitly adopted this revision too, but without addressing Mr. Burian's adjustment, much less explaining why it was better. A23.

In sum, when one combines all three of Mr. Burian's unjustified adjustments of Dr. Mullin's three-year cost projections with Dr. Bell's estimates of Holdco's cashflow, the likelihood that Holdco would have insufficient cashflow declines from 51% (or 43%) to 27%. A4459 (Burian Rebuttal Rept.). Even 27%, of course, presents a substantial risk of shortfall. But the Bankruptcy Court also seemingly discounted real risks to Holdco's ability to generate cash—not only without providing any reasonable explanation but also by misinterpreting Dr. Bell's testimony. The court simply noted that Holdco stood to receive "billions" in dividends in the coming "decade." A20, 24.

Yet Dr. Bell explained, and the Bankruptcy Court failed to confront, the uncertainty of dividend timing and amount and thus the uncertainty whether they would keep up with Holdco's funding-agreement obligations. To support its conclusion that Holdco "expects significant ongoing dividends," the court cited a single $912 million GH Biotech dividend already received in June 2023, an amount it also included when assessing Holdco's current cash position. A20. The Bankruptcy Court also assumed, contrary to Holdco's historical experience, that all future "free cash flow" from its subsidiaries would become dividends. Dr. Bell, however, actually estimated the extent to which such future cash flow would translate into dividends based on historical experience and scenario analyses. Mr. Burian did not, instead simply assuming that it all would flow up to Holdco.

Such "casualness" under *LTL I* renders the Bankruptcy Court's observations not "factual findings at all." 64 F.4th at 108. Reversing Mr. Burian's unsupported adjustments and looking to specific projections of Holdco's income over three years shows that the risk that LTL's costs will force Holdco to begin selling off assets is not a distant worry. Indeed, Mr. Burian's own rebuttal report contemplated liquidation of 10% of Holdco's holdings to shore up its ability to meet near-term obligations. A4473. Correcting the Bankruptcy Court's errors makes LTL's financial distress even more clear.

## II.    ALTERNATIVELY, THE THIRD CIRCUIT'S GOOD-FAITH ANALYSIS IN *LTL I* CONFLICTS WITH THE BANKRUPTCY CODE IN MULTIPLE, MUTUALLY REINFORCING WAYS.

In the alternative, even if the Bankruptcy Court applied *LTL I* correctly, *LTL I*'s good-faith analysis is flawed at its root, at least as applied to asbestos bankruptcies, and the Third Circuit should correct it.[7] At minimum, the panel should recognize that Congress abrogated its precedent incorrectly placing the burden in a § 1112(b) motion on the debtor rather than the moving party. *See* LTL Proposed Findings/Conclusions 109-12, ECF 1079.

---

[7] While *LTL I* is binding, this panel may call for *en banc* hearing, and later rehearing. *See* 3d Cir. I.O.P. 9.2, 9.4. In any event, LTL here preserves its arguments regarding *LTL I*.

### A.    A good-faith eligibility requirement is inconsistent with the Code's text and structure.

Even if the Bankruptcy Court rightly applied this Court's good-faith analysis in *LTL I*, it erred because the Bankruptcy Code imposes no "good faith" eligibility requirement. The text, structure, history, and purpose of the Code all point against one. Indeed, Congress in replacing the prior Bankruptcy Act with the Code *removed* just such a filing requirement and, instead, replaced it with a good-faith requirement at the case's back-end confirmation stage.

1.    Congress in § 109 has specified who may and may not be a debtor, and it imposed no requirement that, to be a debtor under Chapter 11, one must file in "good faith" or have any particular financial condition. *See* § 109(d) (specifying who "may be a debtor under chapter 11"). By contrast, Congress *did* impose eligibility requirements involving financial condition and intention for a *Chapter 9* debtor ("insolvent" and "desires to effect a plan") and a *Chapter 13* debtor (has "regular income" and debts under specified cap). §§ 109(c) & (e).

This silence and contrast are telling, as the Supreme Court has established. Decades ago it confirmed, on a question involving Chapter 11, that "the plain language of the Bankruptcy Code disposes of" any eligibility requirements beyond § 109's requirements. *Toibb v. Radloff*, 501 U.S. 157, 160 (1991). In *Toibb*, the Court rejected an extra-textual requirement that a Chapter 11 debtor have "an ongoing business" to be eligible for relief, because the Code's text "contains no

ongoing business requirement" to qualify for Chapter 11. *Id.* at 161. Its "plain language … did not place Chapter 11 reorganization beyond the reach" of a debtor lacking an ongoing business, so the Court refused "to infer" such a limitation. *Id.* After all, in § 109, Congress "took care … to specify who qualifies—and who does not qualify"—to initiate a bankruptcy case, demonstrating that it "knew how to restrict recourse to the avenues of bankruptcy relief." *Id.*

That analysis governs the issue here too. As with the "ongoing business" eligibility requirement in *Toibb*, the Code similarly contains no "good faith" eligibility requirement. Indeed, the extra-textual requirement of "good faith" filing produced the extra-textual "ongoing business" requirement that *Toibb* rejected, as the latter originated as part of some courts' broader inquiry into the debtor's good faith in filing. *See Wamsganz v. Boatmen's Bank of De Sota*, 804 F.2d 503, 504 (8th Cir. 1986) (citing *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1073 (5th Cir. 1986), and similar cases), *abrogated by Toibb*, 501 U.S. 157.

Moreover, when Congress did wish to impose a "good faith" requirement in the Code, it did so expressly. In Chapter 11, Congress did so at the back end, requiring a finding of "good faith" before a bankruptcy court "confirm[s] a plan" of reorganization. § 1129(a)(3). Thus, Congress "obviously knew how to impose a good faith requirement when it wished"—*expressly* and *later* in the proceedings. *In re Victoria Ltd. P'ship*, 187 B.R. 54, 60 (Bankr. D. Mass. 1995) (discussing

§ 1129(a)(3)). Here too, Congress "knew how to restrict recourse to … bankruptcy relief." *Toibb*, 501 U.S. at 161. To require a showing of good faith at the outset thus ignores *both* Congress's omission of such a requirement at the beginning and its imposition of one only toward the end, defying *Toibb*'s controlling analysis by extra-textually "bar[ring] from chapter 11" those § 109 would permit to be there. 187 B.R. at 61 (discussing *Toibb*).

**2.**    In § 1112(b), which allows dismissal (or conversion) of bankruptcy petitions "for cause" by motion, Congress confirmed that there is no good-faith-filing requirement. Rather than indirectly and implicitly imposing new eligibility requirements, this subsection provides authority to police or respond to events during a bankruptcy itself, as its provisions show.

*First*, it expressly confines the impact of a motion to dismiss by both imposing tight procedural deadlines—a hearing within thirty days of the motion, and decision fifteen days after that—and setting a high bar to extend them. § 1112(b)(3) (requiring these deadlines absent "compelling circumstances" to extend for "specific period"). "Good faith," in contrast, is a fact-intensive question, leading to the need for discovery, full briefing, fact-finding, and even trial, as this case shows. Nor has LTL's experience been unique: In one prominent example, the good-faith inquiry entailed a year of discovery and "tomes of material," including "55 days of depositions" of the debtor's officers. *Johns-Manville*, 36 B.R. at 730. "Cause" under

§ 1112(b) should not include a ground incompatible with the subsection's own procedures.

*Second*, Congress in § 1112(b)(4) defined "cause" as "includ[ing]" sixteen specified grounds for dismissing a bankruptcy petition, and lack of "good faith" is not among them. Instead, consistent with these tight deadlines, the sixteen grounds are all relatively straightforward and overwhelmingly concern a post-filing action or failure by the debtor, such as failure to comply with an order of the bankruptcy court. They do not involve the mere act of filing the petition, much less a *pre-filing* characteristic, such as the debtor's financial state or subjective state of mind.

Nor does the term "includes" introducing the sixteen specified "causes" license lower courts to infer an implied "bad faith" cause, any more than lower courts could, in the face of *Toibb*, infer "lack of ongoing business" as a cause. *Cf. Toibb*, 501 U.S. at 165 (discussing § 1112(b) without suggesting it bore on the Court's holding). A bad-faith ground would be at odds with the list and the rest of the Code. Any implied cause to dismiss, however, must be consistent with the express ones. While those sixteen specified causes "are arguably mere examples" of cause, "they do establish illustrative applications of the general principle [that] underlies the kinds of [cause]" courts may find. *Alabama v. North Carolina*, 560 U.S. 330, 341 (2010) (cleaned up). And in discerning that general principle, it is "significant" that the enumerated "causes" overwhelmingly concern a debtor's *post-petition* acts or

omissions, not its pre-filing characteristics. This "context dictates precisely which [grounds] are authorized" for dismissal, and bad faith is not. *Alabama*, 560 U.S. at 341.

*Third*, another part of the subsection, § 1112(b)(2), reinforces this reading. It includes an exception to the requirement of dismissal for cause where there are unusual circumstances and the debtor meets certain requirements described below. And in setting out the exception, it assumes that "grounds for … dismissing the case" will be some "*act or omission* of the debtor," not simply the *fact of being* a certain type of debtor. (Emphasis added.) *Cf. Toibb*, 501 U.S. at 165 (describing § 1112(b) as a tool "for dealing with recalcitrant Chapter 11 debtors").

*Fourth*, the dismissal exception itself in § 1112(b)(2) further shows the error of a good-faith eligibility requirement. The exception prohibits dismissal where, among other things, the grounds include a *reasonably justified* and *curable* act or omission. The Bankruptcy Court, reluctantly applying *LTL I* on this issue, questioned whether a debtor facing dismissal for "bad faith" could *ever* justify or cure that problem. *See* A31-36 (citing 64 F.4th at 110). But if debtors facing dismissal for bad faith *can never* satisfy § 1112(b)(2), then to treat "bad faith" as an implied "cause" is to nullify § 1112(b)(2) in such cases, contrary to normal rules of statutory construction.

Doing so is all the more inappropriate given that § 1112(b)(2) does include one *explicit* exception, applicable where the "cause" is the first of the enumerated grounds, "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." § 1112(b)(4)(A). Thus, as with the term "good faith" itself, Congress knew how to bar a debtor from the dismissal exception when it wished. For courts to read unenumerated "cause" so as to add an additional, implied bar from that exception is inconsistent with the Code's for-cause dismissal regime and "casual[ly] disregard[s] … the rules of statutory interpretation." *Food Marketing Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019) (construing FOIA exemption's statutory requirements, rejecting extra-textual requirement added by "a number of courts" as "a relic from a bygone era of statutory construction" (cleaned up)).

**3.** The statutory history of the Code confirms this reading of its text and context. The Bankruptcy Act's primary precursor to Chapter 11 contained an explicit "good faith" requirement, delaying relief from litigation until the debtor (who also had to be insolvent) secured the bankruptcy court's approval that the bankruptcy petition "ha[d] been filed in good faith." Bankruptcy Act of 1898, § 141, 11 U.S.C. § 541 (1976) (repealed); *see generally SEC v. U.S. Realty & Improvement Co.*, 310 U.S. 434, 444-54 (1940) (analyzing Chapter X of Act, including this requirement).

43

But in 1978, Congress repealed the Act and, in the Code, did away with the threshold good-faith filing requirement, as well as (for Chapter 11) the insolvency requirement. Instead, under the Code, relief is now automatic (via the automatic stay, § 362) when any proper debtor (under § 109) files a bankruptcy petition. Congress paired its elimination of upfront hurdles with additional protections during and at the end of the case. Although the stay is automatic, for example, Congress allowed for relief from it. *See* § 362(d) (permitting such relief, including for cause such as "lack of adequate protection"). Section 1112(b) is such a provision, as discussed above, to address problematic acts or omissions of a debtor. And "good faith" is expressly required to confirm a plan. § 1129(a)(3). Courts cannot re-insert eligibility requirements that Congress specifically abandoned, whether via § 1112(b)(4) or otherwise.

**4.**     This shift was no accident. The drafters of what became the Code explained why they recommended that the Act's "preliminary approval" system, including the upfront "good faith test," be "eliminated": In their considered view, a good-faith requirement at the *threshold* spawned premature litigation. *See* F.R. Kennedy & G.K. Smith, *Postconfirmation Issues*, 44 S.C. L. Rev. 621, 732-33 n.409 (1993) (cleaned up) (setting forth minutes of the Commission on the Bankruptcy Law of the United States). Early, costly litigation to defend a bankruptcy, the drafters believed, did not "encourage resort to [bankruptcy]." Rept. of the Comm'n on the

Bankruptcy Laws of the U.S., H.R. Doc. No. 137, 93rd Cong., 1st Sess., at 75 (1973), as reprinted in B. Collier on Bankruptcy App. Pt. 4I. In addition, "[b]elated commencement of a case may kill an opportunity for reorganization." *Id.*

A good-faith eligibility requirement defeats this considered and deliberate choice. Indeed, the judicially created bad-faith standard (unlike Congress's enumerated grounds for dismissal in § 1112(b)(4)) "function[s] at such a high level of abstraction that one can scarcely discern what might be beneath." *Victoria*, 187 B.R. at 57 n.21 (cleaned up). Thus, Chapter 11 cases often begin with lengthy, costly, factually intensive litigation over a motion to dismiss for bad faith—as here, in *LTL I*, and in *Johns-Manville*, among other examples. These distortive proceedings require a *full trial*, perversely at the *outset*, delaying meaningful discussion of a reorganization plan. This is the opposite of what the drafters intended, as well as what § 1112(b) calls for in a motion to dismiss "for cause." It also contrasts starkly with the plausibility- and allegation-focused dismissal proceedings in other civil litigation.

5.     Finally, an unenumerated bad-faith ground for dismissal serves no practical purpose. If a debtor filed for abusive reasons and therefore fails to timely file a reorganization plan, or if it cannot confirm one because it cannot show good faith at that stage, the court may dismiss for cause under § 1112(b)(4)(J). *See Toibb*, 501 U.S. at 165 (pointing out that § 1112(b), among other provisions, "gives

bankruptcy courts substantial discretion to dismiss … [when] the debtor files an untenable plan," as well as to address "recalcitrant" debtors). Moreover, § 362(d), noted above, directs the court at any time to grant appropriate relief from the automatic stay. That is "done in bankruptcy proceedings on a routine basis where appropriate." *In re Bestwall LLC*, 71 F.4th 168, 183 (4th Cir. 2023). There is no work for a bad-faith ground for dismissal to do.

**B.    Even if the Code implicitly contained a good-faith eligibility requirement, this Court's "financial distress" requirement contravenes the Code and entrenches a sharp circuit split.**

1.    Even if some uneasy fit for a kind of good-faith requirement in the Code were possible, if the Bankruptcy Court properly construed what this Court meant in requiring "imminent" or "immediate" "financial distress" (*see supra* Arg. I.A.3), then that requirement, so read in isolation from the whole of the opinion and from § 524(g), is misguided and out of step with other circuits' law. "It has never been and is not currently an explicit statutory *requirement* of the Bankruptcy Code" that the debtor be in "a certain amount of financial distress," *Bestwall*, 17-bk-31795, H'rg Tr. 8 (Bankr. W.D.N.C. July 28, 2023) (denying motion to dismiss) (emphasis added), or have "any particular *degree* of financial distress as a condition precedent to a petition seeking relief," *United States v. Huebner*, 48 F.3d 376, 379 (9th Cir. 1994) (emphasis added). Certainly, courts and commentators broadly agree that the

Code does not require insolvency. *See* 10 W.L. Norton III, Norton Bankr. L. & Prac. 3d, 11 U.S.C. § 1112.

Yet in *LTL I*, this Court clarified that "a debtor who does not suffer from financial distress *cannot* demonstrate … good faith." *LTL I*, 64 F.4th at 101-02 (emphases added). More particularly, the Court specified that financial distress must be sufficiently immediate to justify filing. *See id.* While the Court acknowledged that "insolvency is not strictly required," the import of its analysis is that a Chapter 11 petition is premature until necessary to stave off financial collapse. *Id.* at 102.

This Court conceded that this standard draws "a fine line." *Id.* Even before *LTL I*, commentators described this Court's good-faith standard as "fall[ing] well short of bridging the gap between theoretical abstraction and practical application." P.A. Jackson & R.S. Brady, *Dismissal for Bad-Faith Filing Under § 1112(b)(1)*, 28 ABI J. No. 10 (Dec./Jan. 2010). By requiring an uncertain but high degree of financial distress, merely cautioning that insolvency is "not *strictly* required," this Court's standard leaves bankruptcy courts at sea, with no guiding light *other than* insolvency, to which they inevitably yet inappropriately grope, as the Bankruptcy Court did here. *Supra* Arg. I.A.3.

**2.**    Debtors, too, are at sea. Compounding the problem of this Court's elusive or easily misunderstood "good faith" requirement is its equally erroneous requirement that *the debtor* facing a motion to dismiss bear the burden of proving

47

good faith, rather than placing the burden on the movant to prove bad faith. *See LTL I*, 64 F.4th at 100. This Court does not even, as some at least do, require a movant to carry an "initial burden to make a *prima facie* showing to support the allegation of bad faith." 7 Collier on Bankruptcy ¶ 1112.04[4].

Thus, a debtor facing even a meritless motion to dismiss on this basis has no choice but to "respond … with every weapon in its litigation arsenal," such that "the cost to the movant of filing and minimally prosecuting the § 1112(b) motion will, almost inevitably, be vastly outstripped by the cost to the debtor of defending it." Jackson & Brady, *supra*. In LTL's case, for instance, as explained in Part I.B, Movants never presented evidence to support their claim of bad faith; they simply attacked LTL's evidence of good faith.

This perverse phenomenon rests on a legal error Congress has already addressed. This Court drew its burden rule from cases hailing from a time when the Code was arguably "silent with regard to the burden of proof in dismissal motions." *In re Setzer*, 47 B.R. 340, 345 (Bankr. E.D.N.Y. 1985) (cited in *Stage I Land Co. v. United States*, 71 B.R. 225, 229 (D. Minn. 1986)); *see SGL Carbon*, 200 F.3d at 162 (adopting rule and citing *Stage I*, 71 B.R. 225). But if there were any question whether the background norm that movants must justify their sought relief applied to motions to dismiss under § 1112(b), Congress resolved it in 2005 when it amended that provision to clarify, per the norm, that dismissal is proper only "if the

movant establishes cause." 11 U.S.C. § 1112(b)(1) (2005). While that language no longer appears in the statute due to non-substantive amendments, *see, e.g.*, 156 Cong. Rec. H7158-01, H7161 (2010), this Court should at minimum recognize that the 2005 amendments superseded its precedent setting its prior rule; that there is no basis for imposing the burden of proof on the *non-moving* party; and reverse and remand to require the *claimants* to *establish* bad faith as cause, not simply pick at LTL's good-faith showing.

**3.** In equating good faith with imminent financial distress (and in practice with insolvency), and putting the burden on the debtor, this Court's standard is also in outcome-determinative conflict with the Fourth Circuit's longstanding test, as well as others that look to a debtor's objective ability to achieve a reorganization and its subjective intent to pursue one. No one in this case has disputed this split. The Fourth Circuit will not find bad faith without both an objectively futile case *and* subjective bad intent. *Carolin Corp. v. Miller*, 886 F.2d 693, 701 (4th Cir. 1989). That means a debtor with a viable path to reorganization—including due to adequate funding for its plan, like LTL—automatically shows *good faith*, regardless of subjective intent. But in this Court, too much funding rules out imminent financial distress and shows *bad faith*, regardless of subjective good intent. The Fourth Circuit and this Court thus mean *opposite* things by "good faith."

The Fourth Circuit's standard is more faithful to the Code. It is "stringent," setting a high bar, because that court recognizes that dismissals for bad-faith filing are "inherently drastic." *Carolin*, 886 F.2d at 700-01. And it requires the party moving to dismiss to prove bad faith. *See In re Coleman*, 426 F.3d 719, 727-28 (4th Cir. 2005). Its approach thus better serves the Code's structure and purpose of generally allowing access to Chapter 11 and leaving good faith to the plan-confirmation stage. *Supra* Arg. II.A.

### C.   At the least, any good-faith eligibility requirement must account for the asbestos-litigation context, consistent with § 524(g)'s imperatives.

Finally, even if a good-faith requirement were consistent with the Code, and even if it were appropriate that financial distress be part of that requirement, any application must still account for the unique nature of asbestos litigation, as Congress in § 524(g) recognized and required. As explained in Part I.A, Congress in enacting § 524(g) worried about how to "protect the future asbestos claimants." H.R. Rept. 103-835, 41. The statute therefore makes its trust-and-channeling-injunction mechanism available to any asbestos debtor who "is likely to be subject to substantial future demands," the number and timing of which "cannot be determined," and which "threaten the plan's purpose to deal equitably" with current claims and future demands. § 524(g)(2)(B)(ii)(III). An entity whom Congress has said may *pursue a plan* in such circumstances necessarily may *be a debtor* under the

Code. Thus, Congress has marked out whatever eligibility requirements may exist for asbestos debtors facing "similarly overwhelming liability," and courts may not add to them. H.R. Rept. 103-835, 41.

Consistent with § 524(g), other courts have recognized that any good-faith requirement must account for the nature of asbestos litigation. *See In re Honx, Inc.*, 2022 WL 17984313, at *2 (Bankr. S.D. Tex. Dec. 28, 2022) ("Congress recognized that while an asbestos bankruptcy *differs from a 'classic' bankruptcy with an insolvent or near-insolvent debtor*, it is still a forward-looking solution meant to treat fairly all parties in interest. That is the hallmark purpose of chapter 11." (emphasis added)); *Bestwall*, 605 B.R. at 49 ("Attempting to resolve asbestos claims through 11 U.S.C. § 524(g) is a valid reorganizational purpose, and filing for Chapter 11, *especially in the context of an asbestos or mass tort case*, need not be due to insolvency." (emphasis added)). And, correspondingly, other mass-tort bankruptcy cases, even ones involving solvent debtors, historically understood that the litigation itself was sufficient financial distress to the extent required. *See supra* Arg. I.A.2. That is why *LTL I* was the first mass-tort bankruptcy—ever—to be dismissed for lack of financial distress, and it remains the only such case, except for the 3M earplug bankruptcy, which depended on *LTL I*'s reasoning. *See In re Aearo Techs. LLC*, 2023 WL 3938436, at *16-18 (Bankr. S.D. Ind. June 9, 2023).

*LTL I* justified diverging from prior mass-tort bankruptcy cases by pointing to the "considerable powers" vested in Chapter 11 petitioners and the need to prevent disruption of "creditors' existing claims against the debtor," including "the chance to prove [their cases] to a jury of their peers." 64 F.4th at 103, 111. That is an extremely rosy view of asbestos litigation. In truth, there is little to disrupt. If there are 100,000 claims and 10 or 100 trials per year (*see supra* Arg. I.B.3), getting before a jury is only marginally more likely than being struck by lightning: "[T]he vast majority of claimants will not get the opportunity to seek recovery for years to come, if ever." A27. Naturally, "long delays are routine." *Amchem*, 521 U.S. at 598.

The process does not empower claimants, who "have weak to nonexistent control over their attorneys across the mass tort context for reasons that are inherent to the economics of mass tort litigation." *In re Dow Corning Corp.*, 211 B.R. 545, 575 (Bankr. E.D. Mich. 1997) (citation omitted); *see Bestwall*, 71 F.4th at 184 (questioning claimant counsels' "relentless[ ] attempt[ ] to circumvent the bankruptcy proceeding" and noting "that aspirational greater fees that could be awarded to [them] in the state-court proceedings is not a valid reason to object" to the bankruptcy).

Furthermore, the concern expressed in *LTL I* for existing claimants is unwarranted in light of the special protections Congress already provided in § 524(g). That includes the specially high requirement of a 75% supermajority vote

by current claimants. § 524(g)(2)(b)(ii)(IV). Current claimants could therefore decide for themselves whether speedier, more-certain compensation is a good deal in exchange for a .01-.001% chance at a jury trial in a given year. (Here, as noted above, it is likely that a vast majority of claimants prefer such a deal, which is what prompted LTL's second filing.) Instead, however, the good-faith requirement replaces the votes of tens of thousands of claimants with the votes of one bankruptcy judge. That result is inconsistent with § 524(g).

## III. THE BANKRUPTCY COURT ERRED IN CONTINUING THE TALC COMMITTEE POST-DISMISSAL, FOR WHICH THERE IS NO STATUTORY BASIS.

The Bankruptcy Court also erred by authorizing the Talc Committee to continue to exist for appeal, and requiring LTL to pay associated fees and expenses. *See* A47. The statutory basis for the Talc Committee's existence expired with the dismissal of LTL's bankruptcy case, as LTL and the U.S. Trustee argued. *See* LTL Letter 2-4, ECF 1174; U.S. Trustee Letter 2-3, ECF 1169.

***Standard of Review.*** Questions of statutory interpretation are reviewed *de novo*. *In re Makowka*, 754 F.3d 143, 147 (3d Cir. 2014).

Section 1102(a) authorizes the U.S. Trustee to appoint an unsecured-creditors committee upon a Chapter 11 filing. §§ 301(a)-(b), 1102(a). Sections 1102(b) and 1103 define the committee's duties and empower it to employ various professionals. Assets of the debtor's estate compensate the fees and expenses of committee members and their professionals. §§ 330(a)(1)(A), 503(b)(2), 503(b)(3)(F).

Because such a committee "exists only under … chapter 11," it is "automatically dissolved" and "cease[s] to exist" with the Chapter 11 case, as "[n]umerous courts have agreed." *In re Constellation Enterprises LLC*, 587 B.R. 275, 281 (D. Del. 2018). Therefore, after dismissal or conversion, a committee has no "rights." *In re Great N. Paper, Inc.*, 299 B.R. 1, 5 (D. Me. 2003).

Section 103(g) reinforces this conclusion. It provides that §§ 1102 and 1103 "*apply only in a case under*" Chapter 11. § 103(g) (emphasis added); *see Constellation*, 587 B.R. at 284. Upon dismissal or conversion, there is no "case under such chapter," so §§ 1102 and 1103 may not "apply."

Below, the Talc Committee invoked *In re SPM Mfg. Corp.*, 984 F.2d 1305 (1st Cir. 1993), as permitting an official committee to persist after conversion to Chapter 7. But whether the committee should have survived was never litigated. *See Constellation*, 587 B.R. at 282-83 (observing that *SPM* did not reach the issue). Thus *Great Northern Paper*, within the First Circuit, held it not controlling. *See* 299 B.R. at 5.

The Talc Committee also relied on *In re Lyons Transp. Lines, Inc.*, 162 B.R. 460 (Bankr. W.D. Pa. 1994), in which the court purported to use its § 105(a) authority to authorize the committee's post-conversion existence. But a bankruptcy court exceeds its authority under § 105(a) if its order "conflict[s] with the [Code's] 'explicit mandates' and 'express terms.'" *In re Ross*, 858 F.3d 779, 785 (3d Cir.

2017) (quoting *Law v. Siegel*, 571 U.S. 415, 521 (2014)). Here, the Talc Committee's continued existence conflicts with § 103(g)'s express terms by extending §§ 1102 and 1103 beyond a Chapter 11 case. *See Constellation*, 587 B.R. at 281-82. And "[b]ecause the committee is automatically dissolved[,] … an attorney for a creditors' committee is not entitled to compensation from the bankruptcy estate for [post-dismissal] services." *In re Cascade Acceptance Corp.*, 2011 WL 1253845, at *1 (Bankr. N.D. Cal. Apr. 4, 2011) (collecting cases). The Bankruptcy Court therefore erred.

## CONCLUSION

For these reasons, LTL respectfully requests that the Court reverse the Bankruptcy Court's order dismissing LTL's bankruptcy case, authorizing the Talc Committee to continue to exist, and mandating that LTL pay its fees and expenses.

December 13, 2023

Respectfully submitted,

*/s/* Noel J. Francisco

Noel J. Francisco
C. Kevin Marshall
Audrey Beck
Brett J. Wierenga
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
E-mail: njfrancisco@jonesday.com
E-mail: ckmarshall@jonesday.com

Gregory M. Gordon
JONES DAY
2727 North Harwood Street, Suite 500
Dallas, Texas 75201
Telephone: (214) 220-3939
E-mail: gmgordon@jonesday.com

*Counsel for Debtor-Appellant*
*LTL Management LLC*

## COMBINED CERTIFICATIONS

In accordance with the Federal Rules of Appellate Procedure and the Local Rules of this Court, I hereby certify the following:

1.    I am a member in good standing of the Bar of this Court.

2.    This Brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 12,904 words, excluding the parts exempted by Fed. R. App. P. 32(f).

3.    This Brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) & (a)(6) because it has been prepared in a proportionally spaced 14-point font, using Microsoft Word in a 14-point Times New Roman font in the text and the footnotes.

4.    The text of the electronic Brief is identical to the text in the paper copies.

5.    The electronic file containing the Brief was scanned for viruses using Microsoft Safety Scanner version 1.403.445.0, and no virus was detected.

DATED: December 13, 2023                    By:    */s/ C. Kevin Marshall*
                                                    C. Kevin Marshall

## CERTIFICATE OF SERVICE

I certify that the foregoing was filed with the Clerk using the appellate CM/ECF system on December 13, 2023. All counsel of record are registered CM/ECF uses, and service will be accomplished by the CM/ECF system.

DATED: December 13, 2023          By:    */s/ C. Kevin Marshall*
                                                C. Kevin Marshall

**Nos. 23-2971, 23-2972**

## UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

IN RE: LTL MANAGEMENT LLC,
*Debtor*.

LTL MANAGEMENT LLC AND
THE AD HOC COMMITTEE OF SUPPORTING COUNSEL,
*Appellants*,

v.

THE OFFICIAL COMMITTEE OF TALC CLAIMANTS, *et al.*,
*Appellees*.

On Appeal from the U.S. Bankruptcy Court for the District of New Jersey,
No. 23-12825

## JOINT APPENDIX VOLUME 1 OF 13 (Pages A1 to A68)

Gregory M. Gordon
JONES DAY
2727 North Harwood Street, Suite 500
Dallas, Texas 75201
Telephone: (214) 220-3939
E-mail: gmgordon@jonesday.com

Noel J. Francisco
C. Kevin Marshall
Audrey Beck
Brett J. Wierenga
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
E-mail: njfrancisco@jonesday.com
E-mail: ckmarshall@jonesday.com

*Counsel for Debtor-Appellant*
*LTL Management LLC*

# JOINT APPENDIX
## TABLE OF CONTENTS

## VOLUME 1
## IN COMPLIANCE WITH LOCAL RULE 32.2(c)

| ITEM | D.I. NO. | DESCRIPTION | APPENDIX PAGE |
|---|---|---|---|
| | | **VOLUME 1** | |
| | | **DOCUMENTS FILED IN CASE NO. 23-12825-MBK (BANKRUPTCY CASE)** | |
| 1. | 1127 | Memorandum Opinion | A1 |
| 2. | 1211 | Order (I) Dismissing Debtor's Chapter 11 Petition Pursuant to 11 U.S.C. § 1112(b); (II) Establishing Procedures With Respect to Requests for Compensation; and (III) Granting Related Relief | A40 |
| 3. | 1262 | LTL Management LLC Notice of Appeal (omitting declaration and exhibits) | A51 |
| 4. | 1306 | The Ad Hoc Committee of Supporting Counsel Notice of Appeal (omitting declaration and exhibits) | A54 |
| 5. | 1310 | Joint Certification to the Court of Appeals by All Appellants and Appellees | A57 |
| 6. | 1395 | Order Certifying Direct Appeal to the United States Court of Appeals for the Third Circuit | A63 |
| | | **DOCUMENTS FILED IN THIRD CIRCUIT CASE NO. 23-8045** | |
| 7. | 19 | Grant of Permission for Leave to Appeal Pursuant to 28 U.S.C. Section 158(d)(2)(A) | A67 |

## VOLUMES 2 – 5
## DOCUMENTS FILED IN CASE NOS. 23-12825-MBK, 23-01092-MBK, and 21-30589-MBK

| DOCUMENTS FILED IN CASE NO. 23-12825 -MBK | | | |
|---|---|---|---|
| ITEM | D.I. NO. | DESCRIPTION | APPENDIX PAGE |
| | | **VOLUME 2** | |
| 8. | -- | Docket | A69 |

| 9. | 4 | Declaration of John K. Kim in Support of First Day Pleadings | A204 |
|---|---|---|---|
| 10. | 262 | Apr. 18, 2023 Hearing Transcript | A330 |
| 11. | 263 | Apr. 20, 2023 Hearing Transcript | A340 |
| 12. | 470 | Verified Statement of Paul Hastings LLP, Cole Schotz P.C., and Parkins & Rubio LLP Pursuant to Bankruptcy Rule 2019 | A357 |
| **VOLUME 3** | | | |
| | 470 | Verified Statement of Paul Hastings LLP, Cole Schotz P.C., and Parkins & Rubio LLP Pursuant to Bankruptcy Rule 2019 (cont'd) | |
| 13. | 477 | May 9, 2023 Hearing Transcript | A1746 |
| 14. | 537 | May 16, 2023 Hearing Transcript | A1753 |
| 15. | 807 | First Supplemental Verified Statement of Paul Hastings LLP, Cole Schotz P.C. and Parkins & Rubio LLP Pursuant to Bankruptcy Rule 2019 | A1759 |
| **VOLUME 4** | | | |
| 16. | 912 | Amended Chapter 11 Plan of Reorganization of LTL Management LLC | A1790 |
| 17. | 933 | June 27, 2023 Hearing Transcript | A1988 |
| 18. | 956 | June 28, 2023 AM Hearing Transcript | A2286 |
| 19. | 957 | June 28, 2023 PM Hearing Transcript | A2455 |
| **VOLUME 5** | | | |
| 20. | 968 | June 29, 2023 AM Hearing Transcript | A2654 |
| 21. | 969 | June 29, 2023 PM Hearing Transcript | A2787 |
| 22. | 977 | June 30, 2023 Hearing Transcript | A2946 |
| **DOCUMENTS FILED IN CASE NO. 23-01092-MBK (ADVERSARY PROCEEDING)** | | | |
| 23. | 104 | Motion of Ad Hoc Committee of Supporting Counsel to Intervene | A3128 |
| 24. | 138 | Order Granting Motion of Ad Hoc Committee of Supporting Counsel to Intervene in the Adversary Proceeding | A3142 |
| 25. | 184 | Notice of Filing of Certifications of Members of Ad Hoc Committee of Supporting Counsel Pursuant to Order Granting Motion of the Ad Hoc Committee of Supporting Counsel to Intervene in the Adversary Proceeding | A3151 |

| | | DOCUMENTS FILED IN CASE NO. 21-30589-MBK (THE PRIOR BANKRUPTCY CASE) | |
|---|---|---|---|
| 26. | 3 | Informational Brief of LTL Management LLC | A3224 |
| 27. | 5 | Declaration of John K. Kim in Support of First Day Pleadings | A3229 |
| 28. | 174-77 | Oct. 22, 2021 Hearing Recording | A3283 |
| 29. | 178 | Oct. 20, 2021 Hearing Transcript | A3284 |
| 30. | 390 | Nov. 4, 2021 Hearing Transcript | A3304 |
| 31. | 391 | Nov. 5, 2021 Hearing Transcript | A3344 |
| 32. | 416 | Order Transferring Case to the District of New Jersey | A3354 |
| 33. | 1481 | Feb. 14, 2022 Hearing Transcript | A3379 |
| 34. | 1494 | Feb. 15, 2022 Hearing Transcript | A3387 |
| 35. | 1518 | Feb. 16, 2022 Hearing Transcript | A3396 |
| 36. | 1553 | Feb. 18, 2022 Hearing Transcript | A3404 |

## VOLUMES 5 – 9
## EXHIBITS ADMITTED OR PREPARED FOR ADMISSION AT TRIAL[1]

| ITEM | TRIAL EX. NO. | DESCRIPTION | APPENDIX PAGE |
|---|---|---|---|
| | | MOVANTS' EXHIBITS | |
| | | VOLUME 5 (cont'd) | |
| 37. | 2 | Form 10-Q for 3Q 2021 | A3413 |
| 38. | 9 | Oct. 11, 2021 Internal Approval Request for Restructuring of JJCI – Memo of Approval | A3416 |
| 39. | 26 | Nov. 12, 2021 J&J Press Release Re: Johnson & Johnson Announces Plans to Accelerate Innovation, Serve Patients and Consumers, and Unlock Value through | A3418 |

---

[1]    Movants' and Debtor's exhibits were admitted per the Evidentiary Stipulation for Hearing on the Motions to Dismiss Debtor's Bankruptcy Case [Dkt. 852], the Joint Stipulation Regarding the Admission of Certain Evidence at Trial [Dkt. 955] and the Joint Stipulation and Agreed Order Regarding the Admission of Exhibits and Deposition Designations in Connection With the Motion to Dismiss Hearing [Dkt. 1100]. Certain exhibits were admitted for a limited purpose or remain under seal, as noted herein.

| | | Intent to Separate Consumer Health Business | |
|---|---|---|---|
| 40. | 259 | Verdict Form, *Leavitt v. Johnson & Johnson*, Case No. RG17882401 (Cal. Super. Ct., Alameda Cnty. Mar. 13, 2019) | A3424 |
| 41. | 262 | Verdict Form, *Patricia Schmitz v. Johnson & Johnson et al*, California Superior Court, Alameda County, Case No. RG189231615; June 12, 2019. | A3425 |
| 42. | 263 | Jury Verdict Sheets - Amended, *Barden v. Johnson & Johnson*, Case No. MID-L-1809-17 (AS) (N.J. Super. Ct., Middlesex Cnty. Sept. 11, 2019) | A3435 |
| 43. | 265 | Phase 2 Verdict Transcript, *Douglas and Roslyn Barden, et al., v. Brenntag North America, et al.*, New Jersey Superior Court, Middlesex County, Docket No.: MID-1809-17AS; February 6, 2020. | A3437 |
| 44. | 267 | Verdict Form, *Prudencio v. Johnson & Johnson*, Case No. RG20061303 (Cal. Super. Ct., Alameda Cnty. Aug. 23, 2021) | A3458 |
| 45. | 268 | Verdict on Punitive Damages, *Christina Prudencio v. Johnson & Johnson, et al.*, California Superior Court, Alameda Co., Case No. RG20061303; August 27, 2021. | A3460 |
| 46. | 270 | Johnson & Johnson's Motion for Entry of Order Modifying Automatic Stay, *In re Imerys Talc America, Inc., et al.*, Dist. Del. Bankr., 19-10289, Doc. No. 1567; March 20, 2020. | A3461 |
| 47. | 271 | Johnson & Johnson's Omnibus Reply in Support of J&J's Motion for Entry of Order Modifying Automatic Stay, *In re: Imerys Talc America, Inc., et al.*, Dist. Del. Bankr., 19-10289, Doc. No. 1769; May 28, 2020. | A3468 |
| 48. | 284 | J&J Worldwide Financial Procedures | A3476 |
| 49. | 300 | Email re: Plato | A3480 |
| 50. | 377 | Jan. 28, 2022 Expert Report of Matthew Diaz | A3484 |

| 51. | 503.01 | Anderson Judgment | A3487 |
|---|---|---|---|
| 52. | 503.02 | Barden, Etheridge, McNeil, and Roning Judgments | A3501 |
| 53. | 503.05 | Dividend Increase | A3517 |
| 54. | 503.08 | Fox Judgment | A3518 |
| 55. | 503.09 | Giannecchini Verdict | A3521 |
| 56. | 503.12 | Johnson Judgment | A3529 |
| **VOLUME 6** | | | |
| 57. | 503.13 | Leavitt Judgment | A3540 |
| 58. | 503.17 | Moure-Cabrerra Judgment | A3561 |
| 59. | 503.19 | Prudencio Judgment | A3564 |
| 60. | 503.21 | Ristesund Judgment | A3584 |
| 61. | 503.27 | Schmitz Judgment | A3587 |
| 62. | 503.28 | Slempt Judgment | A3627 |
| 63. | 558 | Compilation Exhibit reflecting verdicts in talc litigation | A3632 |
| 64. | 559 | Declaration of Alexandria Picard, chief financial officer of the Debtors in Support of Chapter 11 Petitions and First Day Pleadings, *In re Imerys Talc America, Inc., et al.* (Bankr. Del. 19-10289), Dkt. 10 | A3633 |
| 65. | 600.33 | January 6, 1989 Agreement Between Cyprus Mines Corp. and Johnson & Johnson | A3712 |
| 66. | 600.043 | Johnson & Johnson Medical Safety Counsel Charter, dated April 19, 2013 | A3715 |
| 67. | 600.044 | Johnson & Johnson Medical Safety Counsel Charter, dated April 10, 2014 | A3719 |
| 68. | 600.045 | Johnson & Johnson Medical Safety Counsel Charter, dated July 27, 2015 | A3722 |
| 69. | 600.050 | Lisman Dec. 20, 2021 Declaration | A3728 |
| 70. | 600.052 | Johnson & Johnson Baby Products Company Action Authorized by Unanimous Consent of Shareholder, dated July 21, 1981, attaching Agreement for Transfer of Assets and Bill of Sale, dated July 27, 1981, between Johnson & Johnson Baby Products Company and Omni Education Corporation | A3734 |
| 71. | 600.054 | Agreement for Transfer of Assets and Bill of Sale, dated January 3, 1988, between | A3737 |

| | | Johnson & Johnson Baby Products Company (renamed Johnson & Johnson Orthopaedics) and Johnson & Johnson Dental Products (renamed Johnson & Johnson Consumer Products, Inc.) | |
|---|---|---|---|
| 72. | 600.060 | Asset Purchase Agreement among Johnson & Johnson Consumer Companies, Inc. and Valeant Pharmaceutics International, Inc., dated September 9, 2012 | A3739 |
| 73. | 600.064 | Johnson & Johnson Worldwide Financial Procedures, 330Ba - Legal Fees, last revised March 2005 | A3744 |
| 74. | 600.065 | Johnson & Johnson 10-K, dated January 2, 1977 | A3748 |
| 75. | 600.066 | Johnson & Johnson 10-K, dated December 30, 1979 | A3752 |
| 76. | 600.068 | Johnson & Johnson 10-K, dated January 1, 1978 | A3754 |
| 77. | 600.069 | Johnson & Johnson 10-K, dated December 31, 1978 | A3757 |
| 78. | 600.070 | Excerpt from 1985 Annual Report | A3759 |
| 79. | 600.071 | Excerpt from 1986 Annual Report | A3760 |
| 80. | 600.072 | Excerpt from 1989 Annual Report | A3761 |
| 81. | 601.001 | *Barden et al. v. Brenntag et al.* Transcript 7/22/2019 | A3762 |
| 82. | 601.002 | *Herford v. AT&T Corp. et al.* Transcript 10/30/2017 | A3765 |
| 83. | 601.003 | John Hopkins, Ph.D. Apr. 11, 2018 Dep. Tr. | A3768 |
| 84. | 601.004 | John Hopkins Deposition Transcript 1/28/2019 | A3773 |
| 85. | 601.012 | J&J "What We Know" Advertisement Review Email 12/17/2018 | A3776 |
| 86. | 601.013 | J&J Letter to U.S. House Subcommittee 3/11/2019 | A3778 |
| 87. | 601.014 | J&J CEO Alex Gorsky Twitter Video December 2018 | A3782 |
| 88. | 601.015 | CNN "Mad Money" Screenshot Featuring J&J CEO Alex Gorsky | A3783 |

| | | | |
|---|---|---|---|
| 89. | 601.040 | JJBPC Shareholder Meeting and APA re: Omni Transfer 7/21/1981 | A3787 |
| 90. | 601.041 | JJBPC and J&J Dental APA 1/3/1988 | A3795 |
| 91. | 601.044 | J&J 1979 Annual Report | A3800 |
| 92. | 601.045 | J&J 1980 Annual Report | A3802 |
| 93. | 601.050 | J&J & Cyprus Mines Agreement 1/6/1989 | A3805 |
| 94. | 601.159 | *Barden v. Brenntag North America*, No. MID-1809-17AS (ACV), Dkt. 9736, 88 (D.N.J. May 7, 2019) | A3808 |
| 95. | 601.168 | What you need to know about the new JJ Medical Safety Standard | A3811 |
| 96. | 601.173 | 2018 Draft Screening Assessment on Talc - Health Canada | A3824 |
| 97. | 601.174 | 2021 Final Screening Assessment on Talc - Health Canada | A3826 |
| 98. | 601.201 | Schmitz Jury Verdict Sheets | A3831 |
| 99. | 601.202 | Leavitt Jury Verdict Sheets | A3864 |
| 100. | 601.203 | Prudencio Jury Verdict Sheets | A3889 |
| 101. | 601.205 | Oct. 31, 2021 Schirger-Ward Dep. Tr. | A3905 |
| 102. | 601.206 | Oct. 30, 2021 Lisman Dep. Tr. | A3921 |
| 103. | 602.002 | Excerpts from Dr. Joanne Waldstreicher's sworn deposition testimony in (i) *Ingham v. Johnson & Johnson*, No. 1522-CC10417, on April 19, 2018, in the Circuit Court of the City of St. Louis in the State of Missouri, and (ii) *Leavitt v. Johnson & Johnson*, No. RG-17-882401, on September 14, 2018, in the Superior Court of California, County of Alameda | A3936 |
| 104. | 603.001 | Oct. 31, 2021 Kim Dep. Tr. | A3944 |
| 105. | 603.002 | Brochure titled "What you want to know about JOHNSON'S Baby Powder," copyright Johnson & Johnson, 1976 | A3948 |
| 106. | 603.003 | Document titled "Johnson & Johnson Baby Powder Questions and Answers" marked Confidential, December 1985 | A3951 |
| 107. | 603.005 | Transcript of deposition of Danielle Devine taken on January 19, 2021 in *Pulido v. Johnson and Johnson* | A3956 |

| 108. | 603.017 | Memorandum of Law in Support of Johnson & Johnson's and Johnson & Johnson Consumer Inc.'s Motion to Fix Venue for Claims Related to Imerys's Bankruptcy Under 28 U.S.C. §§ 157 (b)(5) and 1334(b), *In re Imerys Talc America, Inc., et al.* (D. Del. 19-MC-00103), Dkt. 2 ("Motion to Fix Venue") | A3970 |
|---|---|---|---|
| 109. | 603.018 | Reply Memorandum of Law in Support of Johnson & Johnson's and Johnson & Johnson Consumer Inc.'s Motion to Fix Venue for Claims Related to Imerys's Bankruptcy Under 28 U.S.C. §§ 157(b)(5) and 1334(b), *In re Imerys Talc America, Inc., et al.* (D. Del. 19-MC-00103), Dkt. 81 | A3973 |
| 110. | 604.005 | Excerpts from Dr. John Hopkins' sworn trial testimony on July 30, 2019 in *Hayes v. Colgate-Palmolive Co.*, No. 16-CI-03503, in the Jefferson Circuit Court of Kentucky | A3978 |
| 111. | 604.006 | Excerpts from Dr. Hopkins' sworn deposition testimony on October 1, 2019 in *O'Hagan v. Johnson & Johnson* in the Superior Court of California, County of Alameda | A3986 |
| 112. | 604.007 | Excerpts from Dr. Hopkins' sworn deposition testimony on September 27, 2018 in *Leavitt v. Johnson & Johnson* in the Superior Court of California, County of Alameda | A3992 |
| 113. | 604.008 | Excerpts from Dr. Susan Nicholson's sworn deposition testimony on September 22, 2020 in *Monroe v. Johnson & Johnson*, No. 2018RCSC01222, in the State Court of Richmond County, State of Georgia | A3999 |
| 114. | 760 | Chapter 11 Plan of Reorganization of LTL Management LLC | A4008 |
| 115. | 761 | June 14, 2023 Pulaski Dep. Tr. | A4010 |
| 116. | 763 | Onder Law Article ($8.9 Billion J&J Talc Resolution: Questions and Answers) | A4017 |

| 117. | 764 | Plan Support Agreement signed by Mikal Watts | A4021 |
|---|---|---|---|
| 118. | 766 | Watts LTL/J&J Deposition Prep Notes | A4032 |
| 119. | 768 | Transcript of Oral Argument Before Third Circuit | A4034 |
| 120. | 770 | June 1, 2023 Kim Dep. Tr. | A4039 |
| 121. | 772 | June 7, 2023 Haas Dep. Tr. | A4044 |
| 122. | 776 | May 24, 2023 Nachawati Dep. Tr. | A4051 |
| 123. | 785 | April 28, 2023 J&J Form 10-Q | A4083 |
| 124. | 792 | 2021 Funding Agreement | A4086 |
| 125. | 800 | Mar. 16, 2023 Minutes of LTL's Board of Managers | A4107 |
| 126. | 801 | Mar. 28, 2023 Minutes of LTL's Board of Managers | A4109 |
| 127. | 802 | Mar. 28, 2023 Presentation to Board of Managers of LTL Management | A4114 |
| 128. | 804 | Apr. 2, 2023 Minutes to Board of Managers of LTL Management | A4141 |
| 129. | 805 | Apr. 2, 2023 Presentation to Board of Managers of LTL Management | A4155 |
| 130. | 830 | OnderLaw Criteria for Referring Attorneys | A4167 |
| 131. | 832 | June 8, 2023 Onder Dep. Ex. 7 | A4168 |
| 132. | 858 | March Monthly Operating Report, Case No. 21-30589-MBK, Dkt. 3948-1 | A4170 |
| 133. | 863 | May 30, 2023 Wuesthoff Dep. Tr. | A4173 |
| 134. | 876 | Expert Report of Saul E. Burian | A4177 |
| 135. | 892 | May 31, 2023 Dickinson Dep. Tr. | A4248 |
| 136. | 904 | Transcript of 341 Meeting of Creditors Before Linda Richenderfer, Esq. Office of the U.S. Trustee | A4251 |
| 137. | 909 | Dec. 22, 2021 Wuesthoff Dep. Tr. | A4256 |
| 138. | 913 | Supplemental Declaration of John K. Kim in Support of Debtor's Complaint for Declaratory and Injunctive Relief and Related Motions | A4259 |
| 139. | 923 | Johnson & Johnson Form 10-K- Annual Report for FY ending Jan. 2, 2022 | A4262 |
| 140. | 924 | Johnson & Johnson Form 10-K- Annual Report for FY ending Jan. 1, 2023 | A4265 |

| 141. | 951 | Apr. 14, 2023 Kim Dep. Tr. | A4268 |
|---|---|---|---|
| 142. | 952 | April 15, 2023 Pulaski Dep. Tr. | A4274 |
| 143. | 953 | Apr. 16, 2023 Murdica Dep. Tr. | A4279 |
| 144. | 955 | Dickinson PI Dep. Tr. | A4286 |
| 145. | 966 | Rave Report | A4289 |
| 146. | 967 | Rave Rebuttal Report | A4324 |
| 147. | 980 | Furgeson Report | A4330 |
| 148. | 1012 | Onder June 20, 2023 Litigation Update | A4352 |
| 149. | 1016 | J.P. Morgan - Johnson & Johnson: Quick Thoughts on Today's Talc Update (North America Equity Research) (JPM-0000001) | A4353 |
| 150. | 1018 | May 30, 2023 Hearing Tr. | A4354 |
| 151. | 1019 | June 2, 2023 Hearing Tr. | A4357 |
| 152. | 1020 | June 13, 2023 Hearing Tr. | A4371 |
| 153. | 1022 | OnderLaw Talc Litigation Update | A4377 |
| 154. | 1073 | June 23, 2023  Direct Declaration of John K. Kim | A4378 |
| 155. | 1075 | MTD Direct Declaration of Richard Dickinson | A4385 |
| 156. | 1077 | MTD Direct Declaration of Robert Wuesthoff | A4389 |
| 157. | 1078 | Exhibit A to MTD Direct Declaration of Robert Wuesthoff (Agreement for Transfer of Assets and Bill of Sale) | A4393 |
| **VOLUME 7** | | | |
| 158. | 1081 | Termination and Substitution Agreement | A4402 |
| 159. | 1082 | 2023 Funding Agreement | A4410 |
| 160. | 1083 | J&J Support Agreement | A4428 |
| 161. | 1087 | Feb. 23, 2023 Minutes of LTL's Board of Managers | A4443 |
| 162. | 1112 | Rebuttal Report of Saul E. Burian | A4445 |
| 163. | 1113 | Jan. 31, 2022 Kim Dep. Tr. | A4501 |
| 164. | 1118 | Onder Decl. | A4508 |
| 165. | 1119 | Lisman June 23, 2023 Decl. | A4510 |
| **DEBTOR'S EXHIBITS** | | | |
| 166. | D-1 | Declaration of John K. Kim (June 23, 2023) (sans exhibits) | A4515 |
| 167. | D-3 | Robert Wuesthoff Direct Testimony Declaration and Exhibits G, H, and I | A4537 |

| 168. | D-5 | James Murdica Direct Testimony Declaration and Exhibits | A4589 |
| 169. | D-6 | Mikal Watts Direct Testimony Declaration and Exhibits | A4615 |
| **VOLUME 8** | | | |
| | D-6 | Mikal Watts Direct Testimony Declaration and Exhibits (cont'd) | A5316 |
| 170. | D-7 | James Onder Direct Testimony Declaration and Exhibits | A5559 |
| **VOLUME 9** | | | |
| 171. | D-64 | Expert Report of Charles H. Mullin, Ph.D. | A6164 |
| 172. | D-65 | Rebuttal Expert Report of Charles H. Mullin, Ph.D. | A6282 |
| 173. | D-66 | Expert Report of Gregory K. Bell, Ph.D. | A6316 |
| 174. | D-67 | Supplemental Expert Report of Gregory K. Bell, Ph.D. | A6416 |
| 175. | D-198 | Group Holdings Ownership Structure (2022) | A6424 |
| 176. | D-199 | J&J HoldCo (NA) Org Chart (February 2022) | A6425 |
| 177. | D-385 | Royalty A&M five-year cashflow projection | A6426 |
| 178. | D-386 | HoldCo Organizational Chart (February 2023) | A6427 |
| 179. | D-387 | HoldCo Legal Entities and Valuations | A6428 |
| 180. | D-389 | KGMP Summary of GH BioTech Legal Entities Fair Market Value | A6429 |
| 181. | D-390 | HoldCo Dividends | A6439 |
| 182. | D-481 | TCC's Verified Responses and Objections to the Debtor's First Set of Interrogatories | A6444 |
| 183. | D-552 | TCC's Professionals' Time Expended on Claims Estimation | A6467 |

## VOLUME 10
## EXHIBITS FILED UNDER SEAL

| ITEM | TRIAL EX. NO. | DESCRIPTION | APPENDIX PAGE |
|------|---------------|-------------|---------------|
| **MOVANTS' EXHIBITS** | | | |
| **VOLUME 10** | | | |
| 184. | 68 | JJCI Valuation | A6468 |

| 185. | 309 | Ovarian, Meso/Asbestos, Other Litigation Cost Chart | A6470 |
|---|---|---|---|
| 186. | 600.036 | Asset Purchase Agreement between Johnson & Johnson Consumer Companies, Inc. and Pharma Teach Industries, Inc., dated Apr. 4, 2005 | A6472 |
| 187. | 600.037 | Manufacturing and Supply Agreement between Johnson & Johnson Consumer Companies, Inc. and Pharma Teach Industries, Inc., dated Aug. 29, 2005 | A6474 |
| 188. | 600.041 | Indemnification agreement between Bausch Health Companies (f/k/a Valeant Pharmaceuticals International, Inc.) and Johnson & Johnson Consumer, Inc., dated Sept. 9, 2012. | A6549 |
| 189. | 600.046 | Consumer Medical Safety Counsel Operational Charter, dated June 26, 2017 | A6557 |
| 190. | 600.047 | Consumer Medical Safety Counsel Operational Charter, dated June 28, 2018 | A6559 |
| 191. | 600.048 | Consumer Medical Safety Counsel Operational Charter, dated March 6, 2019 | A6563 |
| 192. | 600.060 | Asset Purchase Agreement among Johnson & Johnson Consumer Companies, Inc. and Valeant Pharmaceutics International, Inc., dated September 9, 2012 | A6567 |
| 193. | 600.081 | Johnson & Johnson Medical Safety Standard | A6572 |
| 194. | 827 | May 30, 2023 Birchfield Dep. Tr. | A6578 |
| 195. | 957 | Apr. 17, 2023 Birchfield Dep. Tr. | A6588 |
| **DEBTOR'S EXHIBITS** | | | |
| 196. | D-70 | Mullin Reliance Materials | A6592 |
| 197. | D-90 | Mullin Reliance Materials (Master Settlement Agreement between Johnson & Johnson and Johnson & Johnson Consumer, Inc. and The Lanier Law Firm PC, Hovde Dassow + Deets, and Holland Law firm (December 30, 2020)) | A6593 |
| 198. | D-183 | Term Sheet with Exhibit A | A6628 |

**VOLUMES 11-13
FURTHER EXHIBITS ADMITTED AT TRIAL**

| ITEM | TRIAL EX. NO. | DESCRIPTION | APPENDIX PAGE |
|------|------|------|------|
|  | DEBTOR'S EXHIBITS |
|  | VOLUME 11 |
| 199. | D-1 | Exhibits A through V to Declaration of John K. Kim (June 23, 2023) | A6629 |
|  | VOLUME 12 |
| | D-1 | Exhibits A through V to Declaration of John K. Kim (June 23, 2023) (cont'd) | A7399 |
|  | VOLUME 13 |
| | D-1 | Exhibits A through V to Declaration of John K. Kim (June 23, 2023) (cont'd) | A8189 |

**FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in Compliance with D.N.J. LBR 9004-2(c)**

In re:

LTL MANAGEMENT, LLC,

               Debtor.

Case No. 23-12825 (MBK)

Chapter 11

Hearing Date: June 26-30, 2023

Judge: Michael B. Kaplan

*All Counsel of Record*

## MEMORANDUM OPINION

At a point early in the first chapter 11 filing of LTL Management, LLC ("Debtor" or "LTL") (Case No. 21-30589, "LTL 1.0"), the Court queried of Debtor's counsel the origin of the name given the 2021 Corporate Restructuring Project—Project Plato—which gave rise to the initial bankruptcy filing. The Court was familiar with comparable divisive merger efforts undertaken by other companies in chapter 11 cases pending in North Carolina, which employed project names such as "Project Omega"[1] or "Project Horizon"[2], but thought there may be other relevance attached to the chosen project name in this matter. While Debtor's counsel suggested that the project name was selected randomly, this Court harbors some doubts and imputes far greater significance to the denomination, "Plato". Indeed, with the long-awaited opportunity to

---

[1] Bestwall LLC (Case No. 17-31795, Bankr. W.D.N.C. Nov. 2, 2017) filed on November 2, 2017.

[2] DBMP LLC (Case No. 20-30080, Bankr. W.D.N.C. Jan. 23, 2020) filed on January 23, 2020.

draw finally upon the lessons instilled in my mandatory undergraduate philosophy course,[3] the Court perceives a far more relevant—if unintended— meaning.[4]

It is well acknowledged, without need of citation, that Plato was one of the earliest ancient Greek philosophers and is undoubtedly one of the most prominent thinkers of Western philosophy. In his influential work, the *Republic*, Plato suggests that a right or just action can be defined as one which flows naturally from a just disposition.[5]  In other words, whether an action is "good" or "bad" depends on the outcome. This ethical philosophy is commonly identified as "consequentialism," in which actions are judged right or wrong based on their consequences.[6]  For consequentialists, the ends necessarily justify the means.

So, the ultimate inquiry for this Court would be whether the aptly named Project Plato, with its corporate restructuring in 2021, as modified in 2023, and resulting two chapter 11 filings, could, in fact, produce a just and right result, notwithstanding the highly debatable means undertaken.  For the reasons discussed below, and based on the evidence at trial,[7] this Court is

---

[3] With appreciation to the late Dr. Thomas P. McTighe, Past Chair of the Philosophy Department at Georgetown University.

[4] It should be noted, of course, that the Court's observation reflects little more than conjecture, and that the truth may well rest on the mere fact that an attorney involved in the underlying transaction has a dog or cat named "Plato".

[5] PLATO, THE REPUBLIC 443-444, Book 4 (c. 375 BCE).

[6] CONSEQUENTIALISM, BRITANNICA.COM, https://www.britannica.com/topic/consequentialism (last visited July 27, 2023).

[7] Given the extensive number of witnesses offered by all parties and the considerable data-driven nature of the evidence, direct testimony of the witnesses was submitted by declaration.  The witnesses were present at the trial for live cross examination and re-direct.  The direct testimony was admitted with limited or no objection.  The experts' reports and rebuttal reports were attached as exhibits to the declarations.  Although the reports are technically hearsay, no party objected exclusively on such grounds and other limited objections were resolved by the Court on the record.

constrained to bypass this challenging inquiry and dismiss this chapter 11 proceeding, as the

evidentiary record fixed at trial does not establish sufficient "imminent" or "immediate" financial

distress to satisfy the criteria enunciated by the Third Circuit in *In re LTL Mgmt., LLC*. 64 F.4th

84 at 102, 108 (3d Cir. 2023). Simply put, the Debtor does not meet the more exacting gateway

requirement implemented by the Circuit with respect to "good faith" under 11 U.S.C. §1112(b),

which would allow LTL to take advantage of the tools available under the Bankruptcy Code to

resolve its present and future talc liabilities. Therefore, for the reasons expressed below, the Court

GRANTS the motions seeking dismissal of the within bankruptcy proceeding as having been filed

in bad faith (collectively, "Motions").[8] The Court issues the following findings of fact and

conclusions of law as required by FED. R. BANKR. P. 7052.[9]

---

[8] The Motions—ten in total, with two joinders—were filed by the Official Committee of Talc Claimants (ECF No. 286), by Maune, Raichle, Hartley, French & Mudd LLC on behalf of the Ad Hoc Group of Mesothelioma Claimants (ECF No. 335) and Various Talc Claimants (ECF No. 358), by Moshe Maimon on behalf of Paul Crouch (ECF No. 346), by the Ad Hoc Committee of States Holding Consumer Protection Claims (ECF No. 350), by the United States Trustee (ECF No. 379), by the law firm of Arnold & Itkin, LLP on behalf of certain talc personal injury claimants (ECF No. 384), by the State of Mississippi and the State of New Mexico (ECF No. 480); and two motions mistakenly filed in the Adversary Proceeding by the Estate of Melissa Fleming (ECF No. 117 in Adv. Pro. No. 23-01092) and the Estate of Sherri Gendelman (ECF No. 118 in Adv. Pro. No. 23-01092) (together, "Movants"). Joinders to the Motions were filed by the Barnes Law Group, LLC on behalf of Georgia State Court Claimants (ECF No. 473) and by Leah Cylia Kagan on behalf of Various Talc Claimants (ECF No. 352).

[9] To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

## I.  Venue and Jurisdiction

The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and
157(a) and the Standing Order of the United States District Court dated July 10, 1984, as amended
September 18, 2012, referring all Bankruptcy cases to the Bankruptcy Court.  This matter is a core
proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).  Venue is proper in this Court pursuant
to 28 U.S.C. § 1408.

## II.  Background & Procedural History

The parties are familiar with the factual background and procedural history of this case.
LTL Management, LLC, which is an indirect subsidiary of Johnson & Johnson ("J&J"), traces its
roots back to Johnson & Johnson Baby Products, Company, a New Jersey company incorporated
in 1970 as a wholly owned subsidiary of J&J. *Declaration of John K. Kim in Support of First Day
Pleadings* ("*Kim First Day Decl.*") ¶¶ 13-15, ECF No. 4 in Case No. 23-12825.[10]  A thorough
discussion of the history of J&J and its talc products can be found in this Court's February 25,
2022, Opinion Denying the Motions to Dismiss and the Court will limit its recitation of the factual
background here. *See In re LTL Mgmt., LLC*, 637 B.R. 396 (Bankr. D.N.J. 2022).  In relevant part,
in 1979, J&J transferred all its assets associated with the Baby Products division to J&J Baby
Products Company (the "1979 Agreement").   Thereafter, as the result of intercompany
transactions, one of J&J's corporate subsidiaries, Johnson & Johnson Consumer Inc. ("Old JJCI")

---

[10] Unless otherwise specified, all ECF Nos. will refer to docket entries in the instant bankruptcy case ("LTL 2.0"),
Case No. 23-12825.

assumed responsibility for all claims alleging that J&J's talc-containing products caused ovarian cancer and mesothelioma. *Kim First Day Decl.* ¶¶ 16-21, ECF No. 4.

On October 12, 2021, Old JJCI engaged in a series of transactions pursuant to the Texas divisional merger statute, *See* TEX. BUS. ORGS. CODE ANN. §§ 10.001 *et seq.* (the "2021 Corporate Restructuring") through which it ceased to exist and two new companies, LTL and Johnson & Johnson Consumer Inc. ("New JJCI"), were formed. *Kim First Day Decl.* ¶ 24, ECF No. 4. The alleged purpose of this restructuring was to "globally resolve talc-related claims through a chapter 11 reorganization without subjecting the entire Old JJCI enterprise to a bankruptcy proceeding." *Kim Decl. in Support of First Day Pleadings* ¶ 21, ECF No. 5 in Case No. 21-30589. As a result of the restructuring, LTL assumed responsibility for all Old JJCI's talc-related liabilities. *Id.* Through the restructuring, LTL also received rights under a funding agreement (the "2021 Funding Agreement"). *Kim Decl.* ¶ 32, ECF No. 4. Under the 2021 Funding Agreement, J&J and New JJCI were obligated to pay, *inter alia*, the "Payee's Talc-Related Liabilities", as well as "any and all costs and expenses" LTL incurs during its bankruptcy case, "including the costs of administering the Bankruptcy Case" to the extent necessary. *Kim First Day Decl. Annex 2 – Funding Agreement* 6, ECF No. 5 in Case No. 21-30589; *see also Kim First Day Decl.* ¶ 32, ECF No. 4.

On October 14, 2021, LTL filed its initial voluntary petition for chapter 11 relief in the United States Bankruptcy Court for the Western District of North Carolina. *Petition*, ECF No. 1 in Case No. 21-30589. One week after the chapter 11 filing, Debtor initiated an adversary proceeding (the "Talc Adversary Proceeding"), seeking declaratory and injunctive relief against plaintiffs (the "Talc Claimants") who had filed federal and state actions against Debtor's affiliates

and other entities for talc-related claims (the "Talc Actions"). *Complaint*, ECF No. 1 in Adv. Pro. No. 21-03032. By way of the Talc Adversary Proceeding, the Debtor sought an order declaring that the automatic stay applies to those actions against non-debtors or, in the alternative, to enjoin such actions and grant a temporary restraining order pending a final hearing. Debtor simultaneously filed a motion requesting a preliminary injunction enjoining the prosecution of actions outside of the chapter 11 case on account of the same talc claims that exist against the Debtor in the chapter 11 case. *Motion*, ECF No. 2 in Adv. Pro. No. 21-03032. Ultimately, the chapter 11 and related adversary proceeding case were transferred to the District of New Jersey. Following a five-day evidentiary hearing—during which the Court contemporaneously heard arguments on the pending motions to dismiss and continuation of the preliminary injunction—the Court denied the motions to dismiss in the underlying bankruptcy case and granted the motion for preliminary injunction in the Talc Adversary Proceeding. *See In re LTL Mgmt., LLC*, 637 B.R. 396 (Bankr. D.N.J. 2022) (denying motions to dismiss); *In re LTL Management, LLC*, 638 B.R. 291, 297 (Bankr. D.N.J. 2022) (granting preliminary injunction). Several other adversary proceedings followed wherein Debtor sought similar relief. *See Securities Adversary Proceeding*, Adv. Pro. No. 22-01073; *Consumer Protection Adversary Proceeding*, Adv. Pro. No. 22-01231. This Court likewise granted the motion for preliminary injunction and extended the automatic stay to non-debtor defendants in those actions. *See In re LTL Mgmt., LLC*, 640 B.R. 322 (Bankr. D.N.J. 2022); *In re LTL Mgmt., LLC*, 645 B.R. 59 (Bankr. D.N.J. 2022).

Meanwhile, several parties appealed this Court's denial of the motions to dismiss and its imposition of a preliminary injunction in the Talc Adversary Proceeding. While the appeals were

6

pending, New JJCI—which had continued consumer health operations—changed its name to Johnson & Johnson HoldCo (NA) Inc. ("HoldCo") in December 2022. *Kim First Day Decl.* ¶ 26, ECF No. 4. HoldCo is the direct parent of the Debtor. *Id.* at ¶ 27. In early January 2023, HoldCo spun off its consumer health business assets to its parent entity, Janssen Pharmaceuticals, Inc. *Id.* at ¶ 26; *see also TCC's Proposed Findings of Fact and Conclusions of Law* ¶ 121, ECF No. 1075. "The transfer was in connection with the long-contemplated transfer of the [c]onsumer [b]usiness as a new entity, called Kenvue, Inc., which was publicly announced in November 2021." *Lisman Decl.* ¶ 21, Trial Ex. D-4. The evidence presented supports Debtor's contention that "[t]here was no relationship between the transfer of the [c]onsumer [b]usiness and the filing of either the 2021 or the 2023 Chapter 11 Case." *Id.*; *see also Debtor's Reply in Support of Motion to Extend and Modify Preliminary Injunction* 2, ECF No. 185 in Adv. Pro. No. 23-01092; *Exhibits C & D to Supplemental Decl. of Amanda Rush in Support of Motion to Extend and Modify Preliminary Injunction*, ECF Nos. 185-4 & 185-5 in Adv. Pro. No. 23-01092.

On January 30, 2023, the Third Circuit ruled on the pending appeals and issued an opinion directing this Court to dismiss the 2021 Chapter 11 Case (the "Third Circuit Opinion"). *See In re LTL Mgmt., LLC*, 58 F.4th 738 (3d Cir. 2023) as amended by 64 F.4th 84 (3d Cir. 2023). Specifically, the Third Circuit determined that the case was not filed in good faith due to Debtor's lack of imminent and apparent financial distress. The Debtor filed a petition for rehearing and rehearing *en banc* with the Third Circuit, which the Circuit denied on March 22, 2023. The Debtor then filed a motion seeking a stay of the Third Circuit's mandate, pending appeal to the United States Supreme Court, which the Circuit denied on March 31, 2023. After the Third Circuit's

Opinion was issued, LTL, J&J, and various plaintiff law firms—with the assistance of the court-appointed mediators and pursuant to the Court's mediation order—continued negotiating a potential consensual resolution of the case. *Murdica Decl.* ¶ 40, Trial Ex. D-5; *Watts Decl.* ¶ 25, Trial Ex. D-6; *Onder Decl.* ¶¶ 23-24, Trial Ex. D-7; *June 28, 2023 Hr'g Tr. (vol. 2) – Onder Redirect*, 117:16-118:9, ECF No. 957.

This Court entered an order dismissing the initial chapter 11 bankruptcy case on April 4, 2023. *Dismissal Order*, ECF No. 3938 in Case No. 21-30589.  Approximately two hours later, Debtor initiated the instant bankruptcy case, the impetus of which was a proposal by law firms representing nearly 60,000 talc claimants for a bankruptcy resolution of the Debtor's talc liability. Mikal Watts, a plaintiff lawyer representing over 16,000 talc claimants, had contacted James Murdica of Barnes & Thornburg to discuss a final, global resolution of the talc liability, including all present and future claims, to be efficiently administered through a second bankruptcy by LTL. *Murdica Decl.* ¶¶ 40-41; *Watts Decl.* ¶¶ 7, 25-26; *June 28, 2023 Hr'g Tr. (vol. 1) – Murdica Cross*, 39:3-9, ECF No. 956.  Mr. Murdica, J&J's long-time settlement counsel who has worked for over three years to resolve the talc litigation, was authorized by LTL and J&J to negotiate on their behalf. *June 27, 2023 Hr'g Tr. – Kim Cross*, 238:8-15, ECF No. 933; *June 28, 2023 Hr'g Tr. (vol. 1) – Murdica Cross*, 8:21-9:8.  In early 2023, Mr. Watts and other plaintiffs' lawyers (including Mr. James Onder, who represents over 20,000 talc claimants) negotiated with Mr. Murdica and Erik Haas, J&J's Worldwide Head of Litigation, regarding terms of a Plan Support Agreement ("PSA"), pursuant to which the parties agreed to work together to finalize and seek confirmation of a plan of reorganization that, if confirmed and consummated, would fully resolve all current

8

and future talc claims. *Murdica Decl.* ¶ 43; *Watts Decl.* ¶¶ 26-27; *June 28, 2023 Hr'g Tr. (vol. 2) – Watts Cross*, 32:5-11; *Onder Decl.* ¶¶ 24-27.

Once the deal terms were agreed upon, LTL, J&J, and 17 law firms executed PSAs that were substantially identical. *Murdica Decl.* ¶¶ 42-43; *Watts Decl.* ¶ 28; *Onder Decl.* ¶ 28; *Kim Decl.* ¶ 29, Trial Ex. D-1; *Kim Decl.* Exs. A-V, Trial Ex. D-1; *First Supplemental Verified Statement of Paul Hastings LLP*, Trial Ex. D-486; *Verified Statement of Paul Hastings LLP*, Trial Ex. D-563. According to the 2019 statements filed with the Court, these supporting law firms disclosed that they represent approximately 58,392 claimants. *See Verified Statement of Paul Hastings LLP*, Trial Ex. D-563; *First Supplemental Verified Statement of Paul Hastings LLP*, Trial Ex. D-486. The 17 firms that signed PSAs formed the Ad Hoc Committee of Supporting Counsel ("AHC") to advance their common interests in connection with LTL's second bankruptcy. *Id.* The AHC include counsel to members of the mass tort plaintiffs' bar who have decades of experience in mass tort litigation generally and who have led the talc litigation specifically. *Id.*; *Onder Decl.* ¶ 29. Thousands of their clients filed talc lawsuits before LTL commenced the 2021 Chapter 11 Case. *Id.* Two of the 17 firms that comprise the AHC—Nachawati Law Firm (f/k/a Fears Nachawati) and OnderLaw, LLC—were previously counsel to members of the Official Committee of Talc Claimants in the 2021 Chapter 11 Case. *Murdica Decl.* ¶ 44.

Thereafter, in conjunction with the Petition, Debtor filed the PSA and term sheet which provided for a plan of reorganization that includes the establishment of a trust funded in the amount of $8.9 billion on a net present value basis. *Murdica Decl.* ¶ 47; *Kim Decl.* ¶ 28; *id.* Exs. A-V. One key issue that was also resolved in principle relates to medical liens on settlement amounts that

9

claimants would be entitled to receive under the Plan. *June 28, 2023 Hr'g Tr. (vol. 2) – Onder Redirect*, 120:4-19, ECF No. 957. Additionally, a settlement has been reached with counsel to private lienholders, which hold around 85-90% of the medical liens. *Id*. at 134:5-135:25. This resolution would allow payments to claimants to be made faster, which is a primary goal of the AHC. *Id.* Members of the AHC anticipated recommending to their clients that they vote in favor of the plan, once finalized. *June 28, 2023 Hr'g Tr. (vol. 2) – Watts Redirect*, 26:12-18, 58:5-11, ECF No. 957; *id. – Onder Redirect* at 121:14-122:9.

Along with the execution of the PSAs and term sheets, the Debtor also structured new funding arrangements in anticipation of the new chapter 11 filing. Specifically, the Debtor authorized the execution of three agreements to implement the April 4, 2023, changes to its funding arrangements. First, Debtor executed a Termination and Substitution Agreement (the "TSA") with HoldCo and J&J to terminate the 2021 Funding Agreement. *Termination and Substitution Agreement*, TCC Trial Ex. 1081. Second, Debtor executed a new 2023 Funding Agreement ("2023 Funding Agreement") with HoldCo, which obligated HoldCo to provide funding to Debtor for talc liabilities and other costs in the normal course of business. *2023 Funding Agreement*, TCC Trial Ex. 1082. Third, Debtor executed a Support Agreement with J&J ("J&J Support Agreement") and HoldCo, for J&J to provide a funding backstop only upon the confirmation of a Chapter 11 Plan consistent with the PSAs and term sheet. *J&J Support Agreement*, TCC Trial Ex. 1083. Debtor contends that the substitution of a new funding agreement was necessary to address issues raised by both J&J and the Debtor as to the continuing enforceability of the 2021 Funding Agreement.

10

A10

Under the 2023 Funding Agreement, Debtor (as Payee) has a right to seek from HoldCo (as Payor) a funding request for any permitted funding use, the only restriction being that Debtor may not request more than it needs for permitted funding uses. *2023 Funding Agreement* 6-7, TCC Trial Ex. 1082. A "permitted funding use" includes the "payment of any and all costs and expenses of the Payee incurred in the normal course of its business . . . at any time when there is no proceeding under the Bankruptcy Code pending with respect to the Payee," as well as "the funding of any amounts to satisfy (i) the Payee's Talc Related Liabilities . . . at any time when there is no proceeding under the Bankruptcy Code pending with respect to the Payee . . . and (iii) in the case of either (i) or (ii),any ancillary costs and expenses of the Payee associated with such Talc Related Liabilities and any litigation thereof, including the costs of any appeals." *Id.* at 4-5. The J&J Support Agreement applies inside bankruptcy only and requires J&J to backstop HoldCo's payment obligations under the 2023 Funding Agreement solely to fund plan trusts created in connection with this bankruptcy. *J&J Support Agreement* 4 (§ 2(a)(i)), TCC Trial Ex. 1083. The J&J Support Agreement also confirms that HoldCo's funding obligation to Debtor exists outside of bankruptcy. *Id.* at 1 (Recital B).

Shortly after filing the Petition, Debtor commenced an Adversary Proceeding (Adv. Pro. No. 23-01092) and filed a motion seeking to extend the automatic stay and issue an injunction preventing continued litigation directed at certain named "Protected Parties". The Court issued an *ex parte* Temporary Restraining Order (ECF No. 9 in Adv. Pro No. 23-01092), which was thrice amended (ECF Nos. 15, 16, and 20 in Adv. Pro No. 23-01092). After considering objections and arguments raised during a hearing April 18, 2023, the Court entered a limited preliminary

11

A11

injunction (the "Preliminary Injunction") that dissolved the prior temporary restraints, extended the automatic stay, and granted limited relief. *Preliminary Injunction*, ECF No. 91 in Adv. Pro. No. 23-01092. Apart from the Multi-District Litigation ("MDL"), the limited Preliminary Injunction prohibited only the commencement or continuation of any trial and appellate practice against any of the parties identified in Appendix B to the Verified Complaint, as amended.[11] The Motions to Dismiss were filed shortly after the Court issued the Preliminary Injunction.

Notably, when the Court issued the Preliminary Injunction, the Court declined to rule at that time on a Motion for Relief from Stay filed in the main case (ECF No. 71) by Joseph Satterley, Esq. on behalf of talc claimant, Anthony Hernandez Valadez. Instead, that matter was carried to May 3, 2023. On that date, the Court granted relief from the automatic stay and from the Preliminary Injunction—permitting the plaintiff to proceed to trial and verdict in the case captioned *Anthony Hernandez Valadez v. Johnson & Johnson, et al.* (the "*Valadez* Case"), which was pending in the Superior Court of California, County of Alameda, against the Debtor and certain parties protected by the Preliminary Injunction. *Order Granting Movant Anthony Hernandez Valadez Relief from the Automatic Stay and Preliminary Injunction*, ECF No. 585. The *Valadez* Case proceeded to trial before a California court, while the remaining parties proceeded in this Court and—with the Court's assistance—established a briefing schedule and selected hearing dates for the Motions to Dismiss.

---

[11] As discussed on the record during the April 20, 2023, hearing, Janssen Pharmaceuticals, Inc. and Kenvue Inc. were excluded, and the Preliminary Injunction does not extend to those entities.

The Debtor and the AHC filed objections to the Motions (ECF Nos. 614 & 613, respectively), certain Movants filed Replies and Joinders[12], and Debtor and the AHC filed sur-replies.[13]  On June 27, 2023, the Court commenced a four-day evidentiary hearing to address the Motions and the continuation of the Preliminary Injunction in the pending Adversary Proceeding (ECF No. 2 in Adv. Pro. No. 23-01092).  Prior to the hearing, the Movants, Debtor and AHC stipulated to the admission of certain evidence. *Evidentiary Stipulation*, ECF No. 852.  Both sides presented oral argument and introduced fact and expert witnesses.   Specifically, the Court considered live testimony from the following fact witnesses:

- Robert O. Wuesthoff, President of LTL Management, LLC and President of Royalty A&M LLC
- Richard Dickinson, Chief Financial Officer of LTL Management, LLC and member of Board of Managers
- John H. Kim, Chief Legal Officer of LTL Management, LLC
- James Murdica, Esq., Barnes & Thornburg, LLP, J&J's national settlement counsel
- Mikal Watts, Esq., Member of the Ad Hoc Committee of Supporting Counsel ("AHC")
- James Onder, Esq., Member of the AHC
- Adam Lisman, Vice President and Assistant Corporate Controller of Johnson & Johnson

The Court also heard testimony from five expert witnesses including:

- Charles H. Mullin, PhD, Managing Partner at Bates White Economic Consulting for Debtor
- Sheila Birnbaum, Esq., Co-Chair, Products Liability & Mass Tort Group, Dechert, LLP, for Debtor
- Saul E. Burian, Managing Director at Houlihan Lokey, for Movants

---

[12] Replies were filed by the Official Committee of Talc Claimants (ECF No. 857), the Ad Hoc Committee of States (ECF No. 863), the United States Trustee (ECF No. 862), Arnold & Itkin, on behalf of certain talc claimants (ECF No. 854), Maune Raichle Harley French & Mudd, LLC (ECF No. 855), State of New Mexico and State of Mississippi (ECF No. 872), and one Joinder was filed by the Ad Hoc Group of Mesothelioma Claimants (ECF No. 866).

[13] *AHC's Sur-Reply*, ECF No. 900; *Debtor's Sur-Reply*, ECF No. 906.

- Hon. Royal Fergeson, U.S.D.J. (ret.), for Movants
- Prof. Theodore Rave, University of Texas School of Law, for Movants

Additionally, the Court has reviewed declarations and/or video deposition testimony for

the following witnesses:

- Gregory K. Bell, PhD, Group Vice President of Charles River Associates, for Debtor
- John R. Castellano, Managing Director at Alix Partners, for Debtor
- Matthew Diaz, Senior Managing Director at FTI Consulting, Inc., for Movants
- Majed Nachawati, Esq., Member of the AHC, for Debtor
- Adam Pulaski, Esq., Member of the AHC, for Debtor
- Erik Haas, Esq., Counsel for Johnson & Johnson, for Debtor

On June 30, 2023, the Court heard closing arguments and the parties submitted their

electronic slide decks to the Court.  At the Court's instruction, the parties submitted a stipulation

of admitted exhibits. *Joint Stipulation and Agreed Order Regarding the Admission of Exhibits and*

*Deposition Designations*, ECF No. 1100.  The Court also directed the parties to submit proposed

findings of fact and conclusions of law no later than July 19, 2023.


## III.  Discussion

### A.  Overview

Movants have asked this Court to dismiss Debtor's case "for cause" under 11 U.S.C

§1112(b), as not having been filed in good faith. *See In re SGL Carbon Corp.*, 200 F.3d 154, 162

(3d Cir. 1999) (explaining that "a Chapter 11 petition is subject to dismissal for 'cause' under 11

U.S.C. § 1112(b) unless it is filed in good faith").   Under the standard employed in the Third

Circuit, a petition is filed in good faith if it (i) serves a valid bankruptcy purpose and (ii) is not

filed merely to obtain a tactical litigation advantage. *LTL Mgmt.*, 64 F.4th at 100-01 (citing *In re*

14

*15375 Mem'l Corp. v. BEPCO, L.P.*, 589 F.3d 605, 618 (3d Cir. 2009) and *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 119-20 (3d Cir. 2004)).  The parties' arguments—both in their briefing and during the four-day trial—touch on a significant issue previously debated in LTL 1.0: namely, whether and to what extent a corporation facing staggering mass tort claims may employ the bankruptcy courts to resolve its mass tort liabilities. The Court expressed its thoughts on this issue in its Opinion denying the Motions to Dismiss in the LTL 1.0 case. *See In re LTL Mgmt., LLC*, 637 B.R. 396 (Bankr. D.N.J. 2022).  This Court's views remain unchanged; nor did the Third Circuit's ruling delve much into the merits and value of the tools that bankruptcy offers for resolving mass torts, apart from noting, "[t]he takeaway here is that when financial distress is present, bankruptcy may be an appropriate forum for a debtor to address mass tort liability." *In re LTL Mgmt.*, 64 F.4th at 104.  Nevertheless, this Court's beliefs as to the benefits and advantages of bankruptcy, or the appropriateness of employing a chapter 11 filing to resolve mass tort liability are of no moment for resolution of the pending Motions.  Taking guidance from the Third Circuit, this Court "start[s], and stay[s], with good faith" and the requirement of financial distress. *In re LTL Mgmt., LLC*, 64 F.4th at 93.

## B.  Financial Distress Requirement of Good Faith

"[A] Chapter 11 petition is subject to dismissal for 'cause' under 11 U.S.C. § 1112(b) unless it is filed in good faith." *In re SGL Carbon Corp.*, 200 F.3d 154, 162 (3d Cir. 1999).  It is well-established in the Third Circuit that "good faith necessarily requires some degree of financial distress on the part of a debtor." *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 121 (3d Cir. 2004); *see also In re LTL Mgmt., LLC*, 64 F.4th at 101 ("Our precedents show a debtor who

15

does not suffer from financial distress cannot demonstrate its Chapter 11 petition serves a valid bankruptcy purpose supporting good faith."); *In re SGL Carbon Corp.*, 200 F.3d at 166. "Once at issue, the burden to establish good faith is on the debtor." *Id.* at 100. "Whether the good faith requirement has been satisfied is a 'fact intensive inquiry' in which the court must examine 'the totality of facts and circumstances' and determine where a 'petition falls along the spectrum ranging from the clearly acceptable to the patently abusive.'" *In re 15375 Mem'l Corp. v. Bepco, L.P.*, 589 F.3d at 618 (citing *In re Integrated Telecom Express, Inc.*, 384 F.3d at 118) (other citations omitted). Here, Debtor's good faith—specifically, the financial distress requirement—has been placed squarely at issue. Thus, the burden shifts to the Debtor to demonstrate that it was financially distressed at the time of the chapter 11 filing.

The Third Circuit has not "set out any specific test to apply rigidly when evaluating financial distress." *In re LTL Mgmt., LLC* 64 F.4th at 102. To be sure, the Circuit confirms that it is not possible to "predict all forms of financial difficulties that may in some cases justify a debtor's presence in [c]hapter 11." *Id.* ("So many spokes can lead to financial distress in the right circumstances that we cannot divine them all."). Rather, considering "all relevant facts in light of the purposes of the Code," "the good-faith gateway asks whether the debtor faces the kinds of problems that justify [c]hapter 11 relief." *Id.*

Financial distress serves as a gating requirement for relief under chapter 11; in denying the motions to dismiss in LTL 1.0, this Court found LTL to be distressed sufficiently to avail itself of the bankruptcy system. *See In re LTL Mgmt., LLC*, 637 B.R. at 417-421 (discussing Debtor's financial distress). Nevertheless, the Third Circuit reached an opposite conclusion. The chief

16

difference lies in the perceived lack of "immediacy" of such financial distress. *See In re LTL Mgmt., LLC*, 64 F.4th at 102 ("[f]inancial distress must not only be apparent, but it must be immediate enough to justify a filing."). The Third Circuit mandated that the Debtor's financial distress must be "immediate", "imminent" and "apparent"; the Circuit further advanced that "an attenuated possibility standing alone" regarding a bankruptcy filing does not establish good faith. *Id.* (quoting *SGL Carbon*, 200 F.3d at 164). One can view the Third Circuit's ruling as being somewhat at odds with a pro-active approach to trouble. When one smells smoke, the wise course of action is to get out of the house and call for help. However, as it stands now, in gauging financial distress, observing smoke may not be enough—one must see flames. Indeed, as noted by the TCC:

> The Court of Appeals referred to "businesses teetering on the verge of a fatal financial plummet", [*LTL Mgmt.,* 64 F.4th] at 103, and drew comparisons to *In re Johns-Manville Corp.*, 36 B.R. 727, 730 (Bankr. S.D.N.Y. 1984), where the debtor faced "urgency," including "forced liquidation of key business segments," and *In re A.H. Robins Co., Inc.*, 89 B.R. 555, 558 (E.D. Va. 1988), which "had only $5 million in unrestricted funds" and was unable to borrow. *LTL Mgmt.*, 64 F.4th at 103–04. The Third Circuit did not treat such "urgen[t]" circumstances as ***merely one illustrative type*** of financial distress that would warrant bankruptcy. *Id.* at 104. Rather, it treated them as an ***essential precondition*** for a bankruptcy filing, warning that "[r]isks associated with premature filing may be particularly relevant in the context of a mass tort bankruptcy" and explaining that further litigation in the tort system would help, not hinder, LTL's reorganization.

*TCC's Proposed Findings of Fact and Conclusions of Law* ¶ 5, ECF No. 1075 (citation omitted) (emphasis in original).

Few will argue that from a financial restructuring perspective, a "wait and see" approach often gives rise to serious risks and increased costs that may threaten the viability of the business. Chapter 11 professionals know all too well that companies which flounder too long without restructuring assistance face increased borrowing costs, diminished goodwill, and a lethal loss of

17

leverage with vendors and lenders. Drawing upon the history of mass tort bankruptcies, most companies fare no better when trying to ride out massive, decades-long litigation firestorms. Here, "LTL inherited massive liabilities," *In re LTL Mgmt., LLC*, 64 F.4th at 109, and faces tens of thousands of potential lawsuits involving various types of cancer, *id.* at 108 (conceding that "the number of talc claims had surged in recent years"). This case involves more than the mere possibility of threatened litigation. In point of fact, the record suggests that there are tens of thousands of additional claims since LTL's first filing, and that the Debtor expects to face tens of thousands more in the future. While it is difficult to assess the eventual cost to defend and resolve the talc claims, there is nothing speculative about the fact the Debtor faces substantial liability. It has already incurred billions of dollars in judgments, settlements, and litigation costs. And, due to the backlog that developed during LTL 1.0, the Debtor faces significant increases in the number of individual trials, the dollar-value of settlement demands, and related defense costs. As counsel conceded during the hearing, Movants have already sought—and intend to pursue—consolidated trials (like the one that resulted in the multi-billion-dollar *Ingham* judgment). These trials pose enhanced verdict risk—both in terms of an increased risk of a verdict for the claimants and an increased risk of larger dollar awards. *Kim Decl.* at ¶ 36; *see also June 27, 2023 Hr'g Tr. – Kim Redirect*, 261:2-262:20.

The $4.5 billion verdict in *Ingham* has been described as an "outlier" in the few trials that proceeded to verdict. *In re LTL Mgmt., LLC*, 64 F.4th at 107. Yet, how many more *Ingham*-sized verdicts must be rendered before the claims are deemed a threat to LTL's resources? Is it unreasonable to anticipate a dozen or more such "outliers" out of tens of thousands of current

claims, let alone future claims?  Indeed, in the recent single-plaintiff *Valadez* Case, plaintiff's counsel asked the jury to return a $500 million verdict against J&J—$50 million for compensatory damages and "nine times" that amount for punitive damages.  In the end, notwithstanding counsel's plea, the jury returned a verdict of $18.8 million in compensatory damages and no punitive damages in favor of the plaintiff. *July 18, 2023 Jury Verdict Transcript (Valadez Case)*, Trial Ex. D-566.  At what frequency must large verdicts be handed out before it is apparent that a debtor will come close to exhausting its funding capacity?  These are questions for another day.

Unquestionably, the Third Circuit recognizes that "the Code contemplates 'early access to bankruptcy relief to allow a debtor to rehabilitate its business before it is faced with a hopeless situation;'" however, the prospect and benefits of an early filing must be balanced against the potential for, and risks of, premature filings. *In re LTL Mgmt., LLC*, 64 F.4th at 102 (quoting *SGL Carbon*, 200 F.3d at 163)*.  The Circuit acknowledges that there is often a "fine line" between a proper, early filing and an abusive, premature filing, and reaffirms that bankruptcy courts are "in the best position to draw it." *Id.*  By way of these Motions, this Court has been asked again to draw such a line.  Given the Circuit's focus on immediacy and certainty, this Court rules, as discussed in greater detail below, that on the petition date, LTL fell on the wrong side of the line.

It is undisputed that, as of the filing date of LTL 2.0, Debtor was solvent and—with assistance from HoldCo and the 2023 Funding Agreement—was able to satisfy its liabilities. *See, e.g. Wuesthoff Decl.* ¶ 26; *Tr. of June 27, 2023 Hrg. – Wueshoff Cross* 71:1-14; *Tr. of June 27, 2023 Hrg. – Dickinson Cross* 134:19-21.  Although "balance-sheet insolvency or insufficient cash flows to pay liabilities (or the future likelihood of these issues occurring) are likely always

19

relevant," the Third Circuit has been clear in holding that a debtor is not required to be insolvent—either from a balance-sheet or equitable perspective—to file for chapter 11 relief. *See In re LTL Mgmt., LLC*, 64 F.4th. at 102 ("We recognize as much, as the Code conspicuously does not contain any particular insolvency requirement.") (citing *In re SGL Carbon Corp.*, 200 F.3d at 163; *Integrated Telecom*, 384 F.3d at 121). Thus, the threshold issue for a chapter 11 filing is not "insolvency" but "financial distress." Nevertheless, Debtor's solvency as of the petition date provides this Court with a starting point for the financial distress analysis.

With respect to assets available to the Debtor as of its April 4, 2023, filing, the Court looks first to its cash position and future revenues. The Debtor has $14.5 million in cash, annual royalty revenue streams and access to approximately $1.3 billion in cash from HoldCo, the obligor under the 2023 Funding Agreement, including a $912 million dividend that HoldCo received in June 2023. *Expert Report of Gregory K. Bell, Ph.D. ("Bell Report")* ¶¶ 39-41, June 7, 2023, Trial Ex. D-66; *Supplemental Expert Report of Gregory K. Bell, Ph.D. ("Supp. Bell Report")* ¶ 8, June 20, 2023, Trial Ex. D-67. Specifically, on June 22, 2023, HoldCo received a dividend of $912 million from its indirect subsidiary GH Biotech, through several intermediate subsidiaries. *Id*. Nothing in the record suggests that the receipt of this dividend was extraordinary. Rather, HoldCo expects significant ongoing future dividends, according to Debtor's expert, Dr. Bell. *Bell Report* ¶ 71, Trial Ex. D-66; *see also Bell Report Ex. N*. An independent third party's free cash flow forecasts for Janssen Sciences Ireland Unlimited Company ("JSI"), relied upon by Dr. Bell, estimates between $3.6 billion and $5.6 billion in annual total free cash flows over the next decade, which would translate into billions of dollars of dividends to HoldCo. *Bell Report Ex. M*. HoldCo has other

20

subsidiaries that also generate hundreds of millions of dollars in annual cash flow. *Rebuttal Expert Report of Saul Burian ("Burian Rebuttal Report")* 34, TCC Trial Ex. 1112.

As to other assets— as of the date of the chapter 11 filing—LTL owned the equity interest in Royalty A&M, worth nearly $400 million and, again, has access to the value of HoldCo's equity interests, valued at approximately $29.9 billion or, if discounted in a forced liquidation, $22.3 billion. *Bell Report* ¶ 39-41, 58. In this regard, Dr. Bell testified that HoldCo holds 36.1143% minority interests in two J&J affiliates domiciled in Ireland, JSI and Janssen Irish Finance Unlimited Company ("JIFC"). *Bell Report* ¶ 45. As of April 4, 2023, JSI's fair market value was $34,672,900,000, for a HoldCo share of $12,521,875,000, and JIFC's fair market value was $26,569,100,000, for a HoldCo share of $9,595,244,000. *Bell Report Ex. H*; *Lisman Decl.* ¶ 24, Trial Ex. D-4. HoldCo's other major assets are 100% holdings in Janssen-Cilag GmbH, valued at $4,007,900,000, and Janssen France Treasury Unlimited Company valued at $1,778,407,000. *Bell Report Ex. H*; *Lisman Decl.* at 9, Figure 1. HoldCo also holds several other interests valued at a total of $1,972,941,000, along with $300 million in cash. *Bell Report Ex. H*; *Lisman Decl.* at 9, Figure 1. According to Dr. Bell, if forced to liquidate its equity interests, HoldCo would receive $22.3 billion, after applying a 10% "minority interest discount" to JSI and JIFC and a marketability discount of 20.6%, for sales of restricted stock. *Bell Report* ¶ 51.

Debtor posits that—although it can meet its debts *now*—its liabilities will increase in both the short and long term. However, LTL's Chief Financial Officer, Mr. Wuestoff, did not have any financial flow analysis if the talc claims were returned to the tort system. *See, e.g., June 27, 2023 Hr'g Tr. – Wuestoff Cross*, 58:13-16. He knew only what had been historically spent on defense

costs. *Id.* at 137:9. Likewise, in advance of the chapter 11 filing, LTL had not performed any

evaluation of how much cash flow it would need in the tort system over the next three or even five

years. *June 27, 2023 Hr'g Tr. – Dickinson Cross*, 163:17–22. J&J's assistant controller testified

that outside of bankruptcy, "J&J has no aggregate estimate of talc liability." *June 28, 2023 Hr'g*

*Tr. (vol. 2) – Lisman Cross*, 144:12-15. Without such estimate, Debtor has opted to present expert

opinions to buttress its financial distress contentions. Dr. Charles H. Mullin opined that LTL faces

a "wave of litigation" in the near future. *Mullin Report* ¶ 64. Dr. Mullin constructed three

hypothetical "cash flow" scenarios and pegs the estimated short-term defense and resolution costs

upon a return to the tort system in a range between $3 billion and $7 billion over the next 3 years.[14]

*Id.* at ¶ 12; *Debtor's Proposed Findings of Fact and Conclusions of Law* ¶75, ECF No. 1079. Yet,

these figures are bottomed on assumptions which are dramatically at odds with the historical run

rates as to both trial costs and settlements.

On rebuttal, Movants' expert, Mr. Burian, questioned Dr. Mullin's use of 100 trials in two

of his three scenarios (or even 20 trials in his third scenario), noting that Mr. Wuestoff had

previously testified that LTL could not realistically try more than 10 cases per year, and even 20

was not possible. *Burian Rebuttal Report* 12, TCC Trial Ex. 1112; *Feb. 14, 2022 Hr'g Tr. –*

---

[14] The three scenarios are: (a) "Litigate All," which assumed 100 trials per year and no settlements or paid judgments
(given that all judgments would be appealed) and assumed LTL's non-trial litigation costs would increase by 150%;
(b) "Selective Litigation and Settlements (Low End)," which assumed 20 trials per year and certain settlements with
no paid judgments (again on account of appeals) and assumed LTL's non-trial litigation costs would decrease by 25%,
and (c) "Selective Litigation and Settlements (High End)," which assumed 100 trials per year and substantial
settlements and paid judgments, and assumed LTL's non-trial litigation costs would increase by 150%. LTL's total
costs in the first three years upon return to the tort system according to Dr. Mullin would be $2.7 billion under the first
scenario, $2.65 billion under the second scenario, and $6.9 billion under the third scenario. *Mullin Report* ¶¶ 59-89,
Trial Ex. D-65; *id.*, TCC Trial Ex. 1001.

*Wuestoff Cross*, 180:7-16, ECF No. 1481 in Case No. 21-30589.  Mr. Burian further challenged as inflated Dr. Mullin's assumptions with respect to trial and non-trial litigation costs.  *Burian Rebuttal Report* at 12-14.  Using Dr. Mullin's $40 million quarterly figure for non-trial litigation costs but adjusting other variables (revising per-trial costs to $3.5 million based on the historical average, and assuming an average of ten trials per year, consistent with the historical average and LTL's president's testimony), Mr. Burian performed a re-analysis of Dr. Mullin's short term "cash flow" scenarios. *Id*.  With Mr. Burian's adjustments, LTL's total costs in the first three years upon return to the tort system would be only $0.6 billion under the first scenario, $2.6 billion under the second scenario, and $4.8 billion under the third scenario.  *Id*. at 15.  Ultimately, Mr. Burian's re-analysis provides the more credible projections.  And although, on paper, there is not enough cash in either LTL's or HoldCo's coffers to satisfy even the TCC's lower numbers, clearly there are resources readily available to LTL to secure satisfaction of these amounts.  Given LTL's assets—including the 2023 Funding Agreement—the record demonstrates that LTL can satisfy these costs; accordingly, there is no imminent financial distress.

Regarding total talc liabilities facing the Debtor, Dr. Mullin provided at trial an "above-expectation" estimate of LTL's total aggregate talc liabilities—which would extend out for "decades" into the future and includes the cost to "defend and resolve" all personal injury talc claims, governmental talc claims, and any indemnification obligations—at approximately $11 billion. *Mullin Report* ¶¶ 7, 102, 104, 112*,* Trial Ex. D-65; *June 29, 2023 Hr'g Tr. (vol. 2) – Mullin Cross*, 82:7–83:19, 154:13–16.23, ECF No. 1028.  Dr. Mullin further performed a "high-end stress test scenario" that estimates a worst-case scenario for talc liability at $21 billion. *Mullin Report*

23

¶¶ 19, 105; *June 29, 2023 Hr'g Tr. (vol. 2) – Mullin Cross* at 83:3–5. Even assuming total talc liability closer to this worst-case scenario figure, the Debtor still will not have exhausted the total value of the 2023 Funding Agreement. As explained, that asset includes not only LTL's cash and equity interests, HoldCo's cash, HoldCo's anticipated revenue through subsidiaries, and HoldCo's expected future dividends with projected values in the billions, but also HoldCo's $22.3 billion forced liquidation value—which, alone, could cover the Debtor's total estimated worst-case scenario for talc liability.

In further support of its financial distress argument, Debtor points to the unpredictability of future costs. Unquestionably, LTL's precise cash needs are speculative and will depend on LTL's chosen litigation strategy and litigation events, the timing of which may be beyond LTL's control. *See Mullin Report* at ¶ 83. Moreover, Dr. Mullin opined that expenditures in the tort system will become increasingly uncertain and volatile beyond the three-year period used for his analysis. *Id.* at ¶¶ 7, 102, 104, 112. The TCC argues that the Third Circuit's emphasis on "imminent" and "immediate" financial distress forecloses consideration of this "considerable uncertainty" surrounding Debtor's future talc liabilities in the financial distress analysis. This takes the Circuit's ruling too far. There is nothing in the Bankruptcy Code which requires that liabilities be liquidated or certain to justify a voluntary chapter 11 filing—especially in cases invoking § 524(g) to address asbestos liability. Quite the opposite. *See* 11 U.S.C. §524(g)(2)(B)(ii)(II).

In sum, given the freeze in litigation arising from the automatic stay and Preliminary Injunction, this Court is presented with nearly the same record with respect to verdicts and costs

24

as in LTL 1.0.  In reviewing that record, the Third Circuit found that LTL's ability to fund its liabilities "exceeded any reasonable projections available on the record." *In re LTL Mgmt., LLC*, 64 F.4th at 109.  While recognizing that the tort landscape may change and that LTL may encounter larger verdicts in the future, the Third Circuit stated that "[t]he 'attenuated possibility' that talc litigation may require it to file for bankruptcy in the future does not establish its good faith as of its petition date." *Id.*  This Court abides by that ruling.

Given the submissions and testimony at trial, this Court concludes that LTL is not sufficiently financially distressed to avail itself of bankruptcy at this time.  The weight of the evidence indicates that LTL does "not have any likely need in the present or the near-term . . . to exhaust its funding rights to pay talc liabilities." *In re LTL Mgmt., LLC*, 64 F.4th at 108.  Consistent with the Third Circuit's instructions, courts analyzing financial distress must focus on the financial state of the debtor. *In re LTL Mgmt., LLC*, 64 F.4th at 105.  At the time of filing, LTL had assets valued at approximately $380 million, with approximately $14.5 million in cash. *Debtor's Proposed Findings of Fact and Conclusions of Law* ¶ 61, ECF No. 1079; *Lisman Decl* ¶¶ 12-13; *Bell Report* ¶ 55.  Most importantly, the Debtor was contractually entitled to a funding backstop— in the form of the 2023 Funding Agreement—that allowed it to access the value of HoldCo's significant cash holdings, anticipated annual dividends, and equity interests having a value approaching $30 billion—exceeding the projected near term and aggregate talc liability.  This asset—which the Third Circuit previously described as "an ATM disguised as a contract"—is properly considered in LTL's financial distress analysis.  Thus, "the financial condition of [HoldCo] is relevant only to the extent it informs [this Court's] view of the financial condition of

25

A25

LTL itself." *In re LTL Mgmt.*, LLC, 64 F.4th at 106.  In sum, this Court smells smoke, but does

not see the fire.[15]  Therefore, the emphasis on certainty and immediacy of financial distress closes

the door of chapter 11 to LTL at this juncture.

### C.  Best Interests of Creditors

Having found cause for dismissal, the Court is compelled to address the possibility of

continuing this chapter 11 bankruptcy in the best interests of the creditors.  *See* 11 U.S.C.

§1112(b)(1) & (2).  The Court asked the parties to brief these issues amid the Court's concerns

over the obstacles hindering claimants' collective access to recoveries outside of bankruptcy.

Many claimants are represented by counsel who have passionately advocated on their behalf both

in this bankruptcy and in the tort system.  This Court has no doubt that counsel will continue to

zealously represent these claimants post-bankruptcy. Still more claimants, however, are either

unrepresented, are represented by counsel with limited resources, or are still yet unidentified.  The

Court queries who will pursue potential fraudulent transfer claims[16] for the benefit of *all*

---

[15] It is not lost on the Court that Movants are likely to suggest that, even if there were flames, they exist only because the substitution of the 2023 Funding Agreement served as an accelerant, and that—in any event—J&J has the financial wherewithal to assist Holdco in extinguishing the fire. However, neither this Court, nor the Third Circuit has taken issue with the propriety of the corporate restructuring, nor found that J&J had an independent obligation to satisfy the Debtor's talc liability prior to the bankruptcy. *In re LTL Mgmt.*, 64 F.4th at 106-107.

[16] The TCC contends that the termination of the 2021 Funding Agreement constituted the "largest intentional fraudulent transfer in United States history." *TCC's Motion to Dismiss* 12, ECF No. 286-1.  Counsel for Mesothelioma Plaintiff Tollefson and Certain Mesothelioma Plaintiffs further asserts that:

> LTL also maintains a $41.5 billion litigation claim for the transfer of the Consumer Business for no considerations. In addition, the assets of the bankruptcy estate (but not of LTL pre-filing) also consist of the debtor-in-possession's right to bring a potential fraudulent transfer claim against J&J for abandoning its funding backstop without reasonable exchange in value. Dismissing this case returns the right to bring such cause of action (if any) to the creditors of LTL. See, e.g., N.J. Rev. Stat. 25:2-29(a)(1) (Remedies of Creditor) ("In an action for relief against a transfer or obligation

26

claimants—present and future.  Likewise, the Court questions whether there is a stakeholder with

the motivation and necessary resources to pursue possible recoveries arising from the termination

of the 2021 Funding Agreement (to the extent such claims are appropriate).  Finally, the Court

harbors the same apprehensions about continued litigation in the tort system expressed in its

opinion denying the motions to dismiss in LTL 1.0. *In re LTL Mgmt., LLC*, 637 B.R. at 410-417.

There have been no developments since LTL 1.0 that have abated the Court's concerns or

resolved the problems of the extensive tort-claim backlog, or the incontrovertible fact that many

plaintiffs are denied any recovery in the tort system altogether.  In opposition to Dr. Mullin's

report, counsel for Movants repeatedly emphasized that there would be far fewer trials per year

than the 100 used by Dr. Mullin in his calculations.  Movants—based on historical data and

deposition testimony—pegged this number at closer to 10 trials per year. *See, e.g., June 29, 2023*

*Hr'g Tr. – Mullin Cross*, 94:23-100:3, ECF No. 999; *June 30, 2023 Hr'g Tr. – Ruckdeschel Closing*

48:19-23, ECF No. 1000.  This glacial pace coupled with the undeniable surge in the number of

new actions means that the vast majority of claimants will not get the opportunity to seek recovery

for years to come, if ever.  The sluggish speed of the tort system—which plaintiffs' attorneys

repeatedly acknowledged during trial—continues to trouble this Court.  Further, when a claimant

finally gets to trial, that opportunity comes with a very meaningful risk of a defendant's verdict.

On the other hand, claims reconciliation through a bankruptcy trust places reduced evidentiary and

---

under this article, a creditor, subject to the limitations in R.S.25:2-30, may obtain (1) Avoidance of
the transfer or obligation to the extent necessary to satisfy the creditor's claim. . . .").

*MRHFM's Plaintiffs' Proposed Findings of Fact and Conclusions of Law* 9 n.17, ECF No. 1068.

causation burdens on claimants, and resolution of claims and payments to victims can be achieved

at a far more expeditious pace than through uncertain litigation in the tort system. Indeed, it has

been the near decade of frustration, delay, and widely disparate results in the tort system which

prompted certain AHC counsel to seek a consensual resolution with J&J's settlement counsel.

*Murdica Decl.* ¶¶ 40-41; *Watts Decl.* ¶¶ 7, 25-26; *June 28, 2023 Hr'g Tr. (vol. 1) – Murdica Cross*,

39:3-9, ECF No. 956.

      Finally, the Court again emphasizes the need to protect the interests of future claimants—

a need that is especially crucial in cases involving diseases with long latency periods, such as the

present matter.  There are two insurmountable hurdles to globally resolving talc litigation in the

tort system—latency periods for injuries and unknown future claimants. Sheila Birnbaum, Esq.,

who testified for the Debtor, opined that "MDLs are not always a good vehicle to resolve mass

personal injury litigation, especially in cases that involve future claims with latent injuries." *June*

*29, 2023 Hr'g Tr (vol. 1) – Birnbaum Cross*, 59:21-24, ECF No. 968; *Expert Report of Sheila L.*

*Birnbaum ("Birnbaum Rebuttal Report")* 1, Trial Ex. D-68.  Latent injuries make it "impossible

to identify who the plaintiffs are going to eventually be, because they have no injury at the moment,

and their injury may manifest years after their exposure to a particular product, substance, or

device." *June 29, 2023 Hr'g Tr. (vol. 1) – Birnbaum Cross*, 81:4-11; *see also Birnbaum Rebuttal*

*Report* at 7, 9-11.  She also testified about the due process concerns around providing notice and

an opportunity to opt out of a settlement to unknown future claimants: "That's a very big problem

in the fact of due process. That is one of the reasons that settlements through class actions after

*Amchem* and *Ortiz* just never continued because of the problems of . . . notice, of due process, of

having people understanding the ability to opt out or even know they've been exposed." *Id.* at

81:12-19 (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) (affirming decertification

of proposed asbestos class settlement for failure to meet the requirements of Rule 23); *Ortiz v.*

*Fibreboard Corp.*, 527 U.S. 815 (1999) (holding that certification of proposed global asbestos

class settlement was impermissible under Rule 23 and that it did not comply with *Amchem*)).

No party or expert has identified even a single example of a global settlement outside of

bankruptcy that has been achieved in circumstances like this case—where both latent injuries and

unknown future claimants exist—in the more than 20 years since *Amchem* and *Ortiz* were decided.

Instead, Movants' experts have offered examples of distinguishable mass tort settlements achieved

in non-bankruptcy situations that—in every case—did not involve the large numbers of

unidentified future claimants and long latency periods that are central to this chapter 11 case.[17]

Far from being an improper litigation management tool, the Debtor's experts suggest that chapter

11 provides the most practicable mechanism to resolve globally the Debtor's talc liability.

During trial, Movant's expert, Professor Theodore Rave offered in rebuttal that there are

tools available in the tort system, through the MDL process, to address and protect the rights of

unidentifiable, future claimants. *June 29, 2023 Hr'g Tr. (vol. 1) – Prof. Rave Re-Direct* 26:3-28:6,

ECF No. 968.  He first explained that there could be a structure in place to create a subclass of

future claimants with their own, separate counsel who would have financial incentive to protect

---

[17] In testimony, Professor Theodore Rave pointed to the *In re NFL Concussion* MDL litigation as an example in which
a class settlement was achieved. However, unknown future claimants were not a factor in that litigation and Prof. Rave
acknowledged that it was significantly different from the talc litigation because the class members did not include
unknown future claimants. *June 29, 2023 Hr'g Tr. (vol. 1) – Rave Cross* at 16:2-18. Similarly, the *Vioxx* and *BP
Deepwater Horizon* settlements, which he cited in his report (*Rave Report* at ¶¶ 54, 58) did not include either latent
injuries or future claimants and that the *Fen-Phen* settlement did not involve latent injuries. *See id.* at 87:24-88:13.

the rights of that subclass. *Id.* at 26:10-27:3. However, Professor Rave viewed the challenge of

unidentifiable claimants as a "notice challenge," as opposed to a "structural" issue within the MDL

process. *Id.* at 26:15-17.  To resolve that challenge, Professor Rave explained that courts could "do

a multimedia kind of notice" that would include "print ads and TV ads and internet advertising

over a long period of time to make sure that the message is getting out there." *Id.* at 27:16-20.

Given the 60-year latency period and the repeated allegations throughout this litigation that

Debtor's product is still readily available, the Court is dubious whether multimedia advertising

over a long period of time would adequately capture unidentified, future claimants.

In short, the Court remains unconvinced that the procedural mechanisms and notice

programs offered in the tort system can protect future claimants' rights in the same manner as the

available tools in the bankruptcy system.  Given these concerns, the Court considers the possibility

that best interests of the creditors warrants continuation of this chapter 11 case.

### (1) 11 U.S.C. § 1112(b)(2)

Under § 1112(b)(2), even if "cause" exists, dismissal is precluded where "unusual

circumstances" establish that that conversion or dismissal of the case is not in the best interests of

the creditors or the bankruptcy estate. 11 U.S.C. § 1112(b)(2); *see also, e.g.*, *In re Alston*, 756 F.

App'x 160, 165 (3d Cir. 2019); *In re 1121 Pier Vill. LLC*, 635 B.R. 127, 136–37 (Bankr. E.D. Pa.

2022).  The party opposing dismissal bears the burden of proving all the elements of § 1112(b)(2)

to prevent dismissal. *See In re Dr. R.C. Samanta Roy Inst. of Sci. Tech. Inc.*, 465 F. App'x 93, 97,

98 (3d Cir. 2011).  Therefore, to utilize this subsection, Debtor must establish that unusual

circumstances exist, that dismissal is not in the best interests of the creditors, *and* that:

A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and

(B) the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A)--

(i) for which there exists a reasonable justification for the act or omission; and

(ii) that will be cured within a reasonable period of time fixed by the court.

11 U.S.C. § 1112(b)(2).  Moreover, because § 1112(b)(2) is written in the conjunctive, a debtor must establish each element to invoke the exception and prevent dismissal or conversion. *See, e.g.*, *Andover Covered Bridge, LLC,* 553 B.R. 162, 177 n.5 (B.A.P. 1st Cir. 2016); *In re Delta AG Grp., LLC*, 596 B.R. 186, 201 (Bankr. W.D. La. 2019) ("[T]he burden shifted to Debtor to prove this case should not be dismissed or converted by proving each element set forth in § 1112(b)(2)."); *In re Ashley Oaks Dev. Corp.*, 458 B.R. 280, 286 (Bankr. D.S.C. 2011); *see also In re Vascular Access Centers, L.P.*, 611 B.R. 742, 761 n.5 (Bankr. E.D. Pa. 2020) (explaining all factors that must be established to preclude dismissal or conversion); *In re Korn*, 523 B.R. 453, 469 (Bankr. E.D. Pa. 2014) (discussing debtor's failure to establish separate subsections of § 1112(b)(2) as "independent reasons" for dismissal).  The Court assumes—without finding—that "unusual circumstances" exist.  Nevertheless, LTL is not able to meet its burden of establishing that all other elements of § 1112(b)(2) are satisfied.

In LTL 1.0, this Court buttressed its ruling on a rationale that employed § 1112(b)(2). *In re LTL Mgmt., LLC*, 637 B.R. at 406 n.8.  In LTL 2.0, the Court directed the parties to provide additional briefing on the issue.  After reviewing the briefing and giving the matter further reflection, the Court resolves that application of § 1112(b)(2) is not appropriate in this case.  LTL's

31

petition was not filed in good faith because it lacks imminent and apparent financial distress under applicable standards. The Third Circuit explained that "[n]o 'reasonable justification' validates that missing requirement" and it could not conceive of a way in which LTL's "lack of financial distress could be overcome." *In re LTL Mgmt., LLC*, 64 F.4th at 110. Because binding precedent— relating to this very Debtor—establishes that LTL is unable to demonstrate either a "reasonable justification" or a possible timely cure of the grounds for dismissal, s*ee* 11 U.S.C. §1112(b)(2)(B)(i) & (ii), the exception to dismissal based on best interests of the creditors under § 1112(b)(2) is unavailable to LTL and this Court's analysis need not go further. Nevertheless, the somewhat murky and conflicting caselaw applying the limited exception under § 1112(b)(2) merits further discussion.

Movants contend that, where cause for dismissal is found based on lack of good faith, the exception to dismissal under § 1112(b)(2) is *never* applicable. *See, e.g.*, *Arnold & Itkin Post-Trial Br.* ¶ 82, ECF No. 1071 (citing *In re Green*, 2016 WL 6699311, at *11 (B.A.P. 9th Cir. Nov. 9, 2016) ("As the bankruptcy court found, filing a petition in bad faith could never be reasonably justified or curable, no matter what plan Debtors could now propose."); *United States Trustee Reply* 19, ECF No. 862 (citing *Layman v. Tennessee State Bank*, 2021 WL 6425951, at *8 (E.D. Tenn. Feb. 2, 2021) (stating that actions amounting to bad faith "cannot be cured"); *In re Hinesley Fam. Ltd. P'ship No. 1*, 460 B.R. 547, 553 (Bankr. D. Mont. 2011) (stating that where cause for dismissal is premised on bad faith, "then section 1112(b)(2) would not apply because, by determining that the debtor filed the case in bad faith, the court would foreclose a reasonable justification for the filing.")); *TCC's Proposed Findings of Fact and Conclusions of Law* ¶ 279,

32

A32

ECF No. 1079 ("As other courts have explained, there can be no reasonable justification for filing

a case in bad faith.").

In contrast, Debtor submits that the cases on which Movants rely do not involve a finding

of bad faith premised specifically on lack of financial distress. Admittedly, those courts rooted

their bad faith findings on other grounds. *See, e.g. Layman*, 2021 WL 6425951 (finding bad faith

based on the filing of simultaneous chapter 11 restructuring bankruptcies and making a threatening

comment); *In re Hinesley*, 460 B.R. 547 (finding bad faith based on gross mismanagement of the

debtor's financial affairs and failure to cooperate/disclose information). As Debtor points out,

Movants do not identify any binding authority establishing whether "bad faith," generally,

precludes a debtor's ability to either cure or provide a reasonable justification necessary to avoid

dismissal under § 1112(b)(2). Conversely, Debtor does not cite any authority establishing that

certain types of "bad faith"—such as lack of financial distress—can be cured or justified such that

the § 1112(b)(2) exception applies.

In this Court's view, Third Circuit dicta can be interpreted to suggest that certain types of

"bad faith" may be capable of curing or justification. Lack of good faith can be based on a variety

of factors and the appropriateness of a particular filing ranges from the "clearly acceptable to the

patently abusive." *In re SGL Carbon Corp.*, 200 F.3d at 162. The acknowledgement of a spectrum

implies that some petitions are filed with less good faith—or more bad faith—than others. Indeed,

a footnote in *In re SGL Carbon* states in no uncertain terms that, although a debtor may have

engaged in some bad conduct, dismissal may not be the appropriate remedy. *Id.* at 159 n.8 ("[I]n

many circumstances, the court might be better advised to address the bad conduct of the debtor (or

33

A33

some other party) in a manner other than through dismissal of the proceedings.") (quoting 7 Collier

on Bankruptcy 1112–70 (15th ed. 1996)). However, the Circuit clarifies that alternatives to

dismissal are only appropriate "where the debtor otherwise properly belongs in bankruptcy." *Id.*

> In bad faith cases involving the filing of a petition that is an abuse of the bankruptcy process, however, § 1112(b)'s conversion/dismissal choice is inappropriate. **The proponent of an abusive petition does not belong in bankruptcy, so it is unnecessary to ask whether dismissal or conversion is in the interest of the creditors**.

*Id.* (emphasis added). Here, the Court is faced with a Debtor who does not belong in bankruptcy

under applicable tests. *In re LTL Mgmt., LLC*, 64 F.4th at 111 ("Chapter 11 is appropriate only for

entities facing financial distress."). Thus, lack of financial distress is not the type of "bad faith"

that could be subject to the § 1112(b)(2) exception to prevent dismissal or conversion even under

a liberal interpretation of Third Circuit dicta. Further, the decision in *In re SGL Carbon* was issued

prior to a 2010 amendment to § 1112(b)[18] and, thus, does not specifically address the now-

applicable "unusual circumstances" test under § 1112(b)(2) and the statutory requirements that

accompany it. Therefore, it is unclear whether—where bad faith exists—the alternatives to

dismissal discussed in *In re SLG Carbon* would include the exception to dismissal under today's

---

[18] Prior to 2010, the statute read as follows:

> (b)(1) Except as provided in paragraph (2) of this subsection, subsection (c) of this section, and section 1104(a)(3), on request of a party in interest, and after notice and a hearing, *absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate*, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.

11 U.S.C. § 1112(b)(1) (superseded) (emphasis added).

34

§ 1112(b)(2).  In any event, what *is* clear is that *In re SLG Carbon*'s underlying holding—that an alternative to dismissal is reserved for only those who properly belong in bankruptcy—remains unchallenged.[19]

Moreover, this Court is not inclined to distinguish between the various grounds supporting a finding of "bad faith."  Whatever the basis, it is "bad faith," generally, that is the accepted "cause" for dismissal or conversion in this Circuit.  The weight of the case law supports the conclusion that "bad faith" cannot be cured or justified such that the exception to dismissal under § 1112(b)(2) applies. *See, e.g.*, *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1395 (11th Cir. 1988) (citing *In re Nat. Land Corp.*, 825 F.2d 296, 298 (11th Cir. 1987) and stating that "[t]he possibility of a successful reorganization cannot transform a bad faith filing into one undertaken in good faith"); *In re Ozcelebi*, 639 B.R. 365, 425 (Bankr. S.D. Tex. 2022) ("[G]iven those [bad faith] findings, there is no reasonable likelihood that Debtor could confirm a plan pursuant to § 1191(b), which incorporates § 1129(a)(2), requiring that '[t]he proponent of the plan complies with the applicable provisions of this title.' "). Rather, this Court is inclined to agree with Movants that the exception to dismissal under § 1112(b)(2) is intended for use where "cause" for dismissal is based on "technical mistakes" or other procedural and ministerial failings. *June 30, 2023 Hr'g Tr. – Jonas Closing Rebuttal*, 168:24-169:5.

Notwithstanding that § 1112(b)(2) cannot serve as an independent bases to deny dismissal, the Court hears the concerns raised by nearly 58,000 claimants and harbors its own apprehension

---

[19] This is not to say that an alternative to dismissal such as the appointment of a trustee or examiner would not apply. *See* 11 U.S.C. § 1112(b)(1), discussed *supra*.  Given the 2010 amendment and the clear statutory text, this Court does not interpret the holding in *In re SLG Carbon* as precluding those alternatives even in the face of bad faith.

regarding the best interests of creditors; specifically, how best to protect all claimants in this case—including their possible need to pursue fraudulent transfer claims or contractual recoveries under the funding agreements. It is clear from the statute that these concerns are better addressed—if at all—under § 1112(b)(1).

### (2) 11 U.S.C. § 1112(b)(1) – Appointment of a Trustee or Examiner

As determined, cause for dismissal has been established in the form of lack of imminent financial distress. And, for reasons discussed, LTL cannot establish the requisite elements to avail itself of the exception to dismissal under § 1112(b)(2). Nevertheless, this Court may decline to dismiss the case and, instead, appoint an examiner or trustee under § 1112(b)(1) if such appointment is in the best interests of the creditors.[20] *See* 11 U.S.C. § 1112(b)(1) (explaining that where cause exists, a bankruptcy court shall dismiss or convert a case "unless the court determines that the appointment under section 1104(a) of a trustee or examiner is in the best interests of the creditors and the estate"); 11 U.S.C. § 1104(a)(2) (addressing appointment of a trustee or examiner); *see also In re Dr. R.C. Samanta Roy Inst. of Sci. Tech. Inc.*, 465 F. App'x 93, 96–97 (3d Cir. 2011); *In re Morningstar Marketplace, Ltd*, 544 B.R. 297, 304 (Bankr. M.D. Pa. 2016); *Grasso v. Madison Cap. Co.*, 2014 WL 1281123, at *2 (E.D. Pa. Mar. 31, 2014).[21]

---

[20] During the hearing on these Motions, counsel for the States of Mississippi and New Mexico suggested this Court *sua sponte* appoint a Chapter 11 trustee under 11 U.S.C. § 1104(a)(2). *June 30, 2023 Hrg. Tr. – Malone Closing*, 45:17-46:1, ECF No. 1000.

[21] Despite what this Court perceives as unambiguous language and informative statutory history, there appears to be some inconsistency in the application of the alternatives or exceptions to dismissal under § 1112(b)—a confusion stemming from the 2010 amendment to the statute. *See* FN 18, *infra*; *see also Grasso v. Madison Cap. Co.*, 2014 WL 1281123, at *2 n.9 (E.D. Pa. Mar. 31, 2014) (concisely explaining the 2010 amendment to § 1112(b)). Many courts still conflate the principles in the pre- and post-2010 versions. *See e.g.*, *La Trinidad Elderly LP SE*, 627 B.R. 779, 798 (B.A.P. 1st Cir. 2021) (quoting *In re Costa Bonita Beach Resort, Inc.*, 513 B.R. 184, 195 (Bankr. D.P.R. 2014)) ("Once cause is found, 'the burden shifts to the debtor to demonstrate . . . the "unusual circumstances" that establish that

Courts may appoint a trustee or examiner for cause, *see* 11 U.S.C. § 1104(a)(1), or "if such appointment is in the interests of creditors," 11 U.S.C. § 1104(a)(2). This Court has "broad discretion to take judicial notice of the entire file" to determine best interest of creditors. *In re U.S. Min. Prod. Co*., 105 F. App'x 428, 431 (3d Cir. 2004) (quotations and citations omitted). Simply put, the appointment of either a trustee or an examiner is likely to result in little more headway than we have seen to date. For instance, an examiner would retain costly professionals, spend thousands of billable hours producing a report filled with hundreds (if not thousands) of pages of text and exhibits, and offer a conclusion that there are indeed potential causes of action arising from the corporate restructuring transactions. We know all of this already. Likewise, the appointment of a chapter 11 trustee would also engender substantial litigation and extensive delays, all while leading to additional layers of professionals and attendant administrative costs.

The Court takes judicial notice of the approximately 4,900 docket entries that have been filed in these two, chapter 11 cases since their inception, nearly 20 months ago. From the Court's vantage point, the docket speaks to the complexities and far-reaching impact of this case on all parties in interest. This Court does not—and cannot—find that the appointment of an examiner and/or chapter 11 trustee will yield results in the best interests of creditors. Rather, the Court urges

---

dismissal or conversion to Chapter 7 is not in the best interests of the creditors and the estate.'"); *In re Burgess*, No. 11-1257, 2013 WL 5874616, at *3 (Bankr. N.D.W. Va. Oct. 30, 2013) (same). In its Reply brief, the TCC asserts that "there is only *one* exception to the mandatory duty of dismissal for cause—an exception (now located exclusively in Section 1112(b)(2)) requiring all three conjunctive conditions to be satisfied." *Reply Br.* 68, ECF No. 857. Admittedly, this Court encouraged the parties to focus on the exception to dismissal under § 1112(b)(2) and—although the TCC does not discuss § 1112(b)(1) at length—the TCC does quote the portion of § 1112(b)(1) that references appointment of a trustee or examiner. *Id.* at 65. Accordingly, the TCC's reference to "*one* exception" to dismissal may be purely semantics and not intended to exclude the alternative to dismissal under § 1112(b)(1) in the form of appointment of a trustee or examiner. The Court now examines that possibility.

37

the parties to build upon the remarkable progress that has been achieved in the past 120 days in

reaching a viable global settlement.  The foundation for a fair, efficient, and expeditious settlement

has been laid by the dogged efforts of the AHC, Debtor and other parties.  While the Court is

obliged to dismiss this case, the parties should—and are strongly encouraged to—continue to

pursue a global resolution.  It has been represented that, of the total claimants, approximately

58,000 talc claimants have an "agreement in principle on material financial terms to resolve talc

claims through a chapter 11 plan, which, upon final agreement and if confirmed, would constitute

the largest settlement in any asbestos bankruptcy case and one of the largest settlements of personal

injury claims in U.S. history." *Omnibus Objection of the Ad Hoc Committee of Supporting Counsel

Motion to Dismiss* ¶¶ 3 & 12, ECF No. 613.  This Court sees no reason why this type of settlement

cannot be pursued in a context other than this current bankruptcy case, such as part of the pending

*Imerys* chapter 11bankruptcy proceeding in Delaware.  As an initial matter, LTL contemplates this

notion insofar as the Debtor's Amended Chapter 11 Plan of Reorganization provides that the

proceeds from a settlement in *Imerys* would be contributed to the settlement proceeds available in

this case for the benefit of talc claimants. *Amended Chapter 11 Plan of Reorganization of LTL

Management LLC* § 8.1(g), ECF No. 913.  Further, in its opinion dismissing LTL 1.0, the Third

Circuit explicitly recognized the continued possibility of settlement in the *Imerys* case. *See In re

LTL Mgmt., LLC*, 64 F.4th at 108 ("Nor is there anything that shows all hope of a meaningful

global or near-global settlement was lost after the initial *Imerys* offer was rebuffed. The *Imerys*

bankruptcy remained a platform to negotiate settlement.").  Little has changed since.

## IV.  Conclusion

For the foregoing reasons, the Court finds cause for dismissal due to LTL's lack of imminent and immediate financial distress.[22]  The Court determines that neither the appointment of a chapter 11 trustee nor an examiner under § 1112(b)(1) is in the best interests of creditors and finds that an exception to dismissal under § 1112(b)(2) is unavailable because the statutory elements have not been satisfied.  Accordingly, the Court grants the Motions and dismisses the case.  The parties are directed to settle a proposed form of Order consistent with this Opinion.

Michael B. Kaplan, Chief Judge
U.S. Bankruptcy Court
District of New Jersey

Dated: July 28, 2023

---

[22] The Court notes that Movants raised other "good faith" issues with respect to the Debtor's actions in refiling and its ability to file and confirm a plan.  Given that a debtor must first pass through the initial good faith gateway to avail itself of bankruptcy, Debtor's petition is subject to dismissal for lack of imminent financial distress and the Court need not address the other proffered bases for dismissal raised by Movants.

| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT** **DISTRICT OF NEW JERSEY** | |
| **GENOVA BURNS LLC** Daniel M. Stolz, Esq. Donald W. Clarke, Esq. Gregory S. Kinoian, Esq. dstolz@genovaburns.com dclarke@genovaburns.com gkinoian@genovaburns.com 110 Allen Road, Suite 304 Basking Ridge, NJ 07920 Tel: (973) 533-0777 Fax: (973) 533-1112 *Local Counsel for the Official Committee of Talc Claimants* | **BROWN RUDNICK LLP** David J. Molton, Esq. Michael S. Winograd, Esq. Susan Sieger-Grimm, Esq. Kenneth J. Aulet, Esq. dmolton@brownrudnick.com mwinograd@brownrudnick.com ssieger-grimm@brownrudnick.com kaulet@brownrudnick.com Seven Times Square New York, NY 10036 Tel: (212) 209-4800 Fax: (212) 209-4801 And- Jeffrey L. Jonas, Esq. Sunni P. Beville, Esq. Eric R. Goodman, Esq. jjonas@brownrudnick.com sbeville@brownrudnick.com egoodman@brownrudnick.com One Financial Center Boston, MA 02111 Tel: (617) 856-8200 Fax: (617) 856-8201 *Co-Counsel for the Official Committee of Talc Claimants* |
| **OTTERBOURG PC** Melanie L. Cyganowski, Esq. Jennifer S. Feeney, Esq. Michael R. Maizel, Esq. mcyganowski@otterbourg.com jfeeney@otterbourg.com mmaizel@otterbourg.com 230 Park Avenue New York, NY 10169 Tel: (212) 905-3628 Fax: (212) 682-6104 *Co-Counsel for the Official Committee of Talc Claimants* | **MASSEY & GAIL LLP** Jonathan S. Massey, Esq. Bret R. Vallacher, Esq. jmassey@masseygail.com bvallacher@masseygail.com 1000 Maine Ave. SW, Suite 450 Washington, DC 20024 Tel: (202) 652-4511 Fax: (312) 379-0467 *Co-Counsel for the Official Committee of Talc Claimants* |
| In re: LTL MANAGEMENT, LLC,[1] Debtor. | Chapter 11 Case No.: 23-12825 (MBK) Honorable Michael B. Kaplan |

**FILED**
JEANNE A. NAUGHTON, CLERK

AUG 1 1 2023

U.S. BANKRUPTCY COURT
TRENTON, NJ
BY_____DEPUTY

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

**ORDER (I) DISMISSING DEBTOR'S CHAPTER 11 PETITION
PURSUANT TO <u>11 U.S.C. § 1112(b)</u>; <u>(II)</u> ESTABLISHING
PROCEDURES WITH RESPECT TO REQUESTS FOR
<u>COMPENSATION; AND (III) GRANTING RELATED RELIEF</u>**

The relief set forth on the following pages is **ORDERED.**

8/11/23

MICHAEL B. KAPLAN
US BJ

2

This Court enters this order (this "Dismissal Order") to effectuate dismissal of the

chapter 11 case of LTL Management LLC (the "Debtor" or "LTL") pursuant to 11 U.S.C.

§ 1112(b) and to address, pursuant to 11 U.S.C. §§ 105(a) and 349(b), certain related matters as

necessary to permit an orderly dismissal and for purposes such as fairness, judicial economy, and

convenience to interested parties. This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and

1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United

States District Court for the District of New Jersey, dated September 18, 2012 (Simandle, C.J.)

(the "Standing Order"); venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

~~The TCC (as defined below), the other Movants (as defined below) and the Debtor have agreed to~~

~~the terms of this Dismissal Order.~~ After due deliberation, this Court has found and determined

that good and sufficient cause appears under the facts and applicable law for the relief granted

herein.

WHEREAS, on April 4, 2023 (the "Petition Date"), the Debtor filed a voluntary petition

(the "Petition") pursuant to chapter 11 of Title 11 of the United States Code commencing this case

(the "Chapter 11 Case");

WHEREAS, on July 28, 2023, this Court entered the *Memorandum Opinion* [ECF No.

1127], granting the motions filed by the Official Committee of Talc Claimants (the "TCC") [ECF

No. 286], the Ad Hoc Group of Mesothelioma Claimants [ECF No. 335], Paul Crouch [ECF No.

346], the Ad Hoc Committee of States Holding Consumer Protection Claims [ECF No. 350], law

firms on behalf of certain mesothelioma claimants [ECF No. 352], the law firm of Maune Raichle

Hartley French & Mudd, LLC [ECF No. 358], the law firm of Arnold & Itkin LLP [ECF No.

384], the Georgia State claimants represented by The Barnes Law Group, LLC [ECF No. 473],

3

the States of New Mexico and Mississippi [ECF No. 480][2] (collectively, the "Movants"), and the

motion filed by the U.S. Trustee [ECF No. 379], that sought an order of this Court dismissing the

Chapter 11 Case pursuant to 11 U.S.C. § 1112(b) as not having been filed in good faith;

WHEREAS, on April 25, 2023, this Court entered the *Order Dissolving Temporary*

*Restraining Order, Extending the Automatic Stay, and Granting Limited Preliminary Restraints*

[Adv. No. 23-01092, ECF No. 91] (the "Initial Preliminary Injunction Order") extending the

automatic stay under 11 U.S.C. § 362 and preliminarily enjoining the commencement or

conducting of any trial or appeal of any Debtor Talc Claim against any of the parties identified as

Modified Protected Parties (as defined in the Initial Preliminary Injunction Order), but otherwise

allowing any party to commence or proceed with discovery or other pretrial matters in any suits

and to permit the filing of suit, on notice to the Debtor, against any Modified Protected Party (other

than with respect to the multi-district litigation pending before the Honorable Michael A. Shipp

for which no legal action was allowed); and

WHEREAS, on July 14, 2023, this Court entered the *Order Extending The Preliminary*

*Injunction* [Adv. No. 23-01092, ECF No. 203] (together with the Initial Preliminary Injunction

Order, the "Preliminary Injunction Orders") on substantially the same terms as the Initial

Preliminary Injunction Order except to add Janssen Pharmaceuticals, Inc and Kenvue Inc. to the

list of Modified Protected Parties.

**NOW THEREFORE, IT IS HEREBY ORDERED THAT:**

1.    Dismissal.  The Chapter 11 Case is hereby dismissed pursuant to section 1112(b)

of the Bankruptcy Code as of the date of this Dismissal Order (the "Dismissal Date"). The Court

---

[2]  In addition to those identified above, two motions adopting the arguments asserted by the TCC were incorrectly
filed in an adversary proceeding relating to this Chapter 11 Case. *See* Adv. No. 23-01092; ECF Nos. 117 (motion
of Estate of Melissa Fleming) and 118 (motion of Robert Gendelman).

has jurisdiction to enter this Dismissal Order pursuant to 28 U.S.C. §§157 and 1334 and the

Standing Order. For cause shown, pursuant to 11 U.S.C. § 349(a), the Debtor, its affiliates, successors and assigns, are enjoined from filing any petition seeking voluntary relief under Title 11 of the United States Bankruptcy Code, for a period of 180 days measured from the date of entry of the Dismissal Order.

2.    Closing the Chapter 11 Case. This Court directs that the Clerk of this Court close

the Chapter 11 Case promptly following the filing of a notice by LTL, with the prior written

acknowledgement from the U.S. Trustee, that there is no objection to the closing of the case and

confirming the completion of the following conditions: (i) all monthly operating reports of LTL

have been filed, (ii) all fees due and owing in the Chapter 11 Case to the Clerk of this Court and/or

the U.S. Trustee pursuant to 28 U.S.C. § 1930 have been paid in full, (iii) notice of the Appeal

Exhaustion Date (as defined below) has been filed with this Court, (iv) all Substantial Contribution

Motions (as defined below) have been heard by this Court and determined pursuant to a final order,

(v) all amounts requested pursuant to a Final Fee Application, a Reimbursement Request or a Post-

Dismissal Fee Application (all as defined below) have been paid by LTL or, if not paid,

determined by this Court not to be allowable; and (vi) all amounts owed to the co-mediators have

been paid by LTL. The date that the parties jointly file a notice with the Court indicating that all

appellate proceedings, including proceedings for review or otherwise before the U.S. Supreme

Court, involving this Dismissal Order ("Appeals") are exhausted or resolved, or that the parties

will not pursue the Appeals shall hereinafter be referred to as the "Appeal Exhaustion Date."

3.    Preliminary Injunction Orders.[3] On the Dismissal Date, the Preliminary Injunction

Orders [Adv. No. 23-01092, ECF Nos. 91 and 203] are vacated as moot. Pursuant to section 105

---

[3]    Capitalized terms that are used but are not defined herein shall have the meanings ascribed to them in the Preliminary Injunction Orders.

and in accordance with 11 U.S.C. § 108(c), this Dismissal Order shall toll, as of April 24, 2023, to the extent such period has not expired before then, the expiration of any period under any applicable non-bankruptcy law, any order entered in a non-bankruptcy proceeding, or any agreement that fixes a period under which a Defendant is required to commence or continue a civil action in a court other than this Court on any Debtor Talc Claim asserted against any of the Modified Protected Parties until the later of: (a) the end of such period, including any suspension of such period occurring on or after April 4, 2023; or (b) thirty (30) days after notice of this Dismissal Order. For the avoidance of doubt, if a Defendant, through counsel, notified the Debtor in writing of his, her, or their intent to proceed with the filing of a complaint pursuant to the Preliminary Injunction Orders, any tolling of the period for any such Defendant to file a complaint asserting a Debtor Talc Claim against a Modified Protected Party terminated upon the Debtor's receipt of written notice of such Defendant's intent to file such a complaint.

4.    Termination of Stay. To the extent not already terminated by an order of this Court, the automatic stay with respect to LTL is terminated immediately upon the Dismissal Date. In accordance with 11 U.S.C. § 108(c), this Dismissal Order shall toll, as of April 4, 2023, to the extent such period had not expired before then, the expiration of any period under any applicable non-bankruptcy law, any order entered in a non-bankruptcy proceeding, or any agreement that fixes a period for commencing or continuing a civil action in a court other than this Court on Debtor Talc Claims until the later of: (a) the end of such period, including any suspension of such period occurring on or after April 4, 2023; or (b) thirty (30) days after notice of this Dismissal Order. For the avoidance of doubt, if a Defendant, through counsel, notified the Debtor in writing of his, her, or their intent to proceed with the filing of a complaint pursuant to the Preliminary Injunction Orders, any tolling of the period for any such Defendant to file a complaint asserting a

6

Debtor Talc Claim against a Modified Protected Party terminated upon the Debtor's receipt of written notice of such Defendant's intent to file such a complaint.

5.      <u>Procedures for Final Allowance of Fees and Expenses</u>. All professionals retained pursuant to sections 105, 327, 328 or 1103 of the Bankruptcy Code ("<u>Retained Professionals</u>"), in addition to the Future Claimants Representative (the "<u>FCR</u>") and her professionals, seeking compensation pursuant to sections 330 or 331 of the Bankruptcy Code shall file and serve monthly, interim and final fee applications for periods through and including the Dismissal Date within thirty (30) days of the Dismissal Date (the "<u>Final Fee Applications</u>"); and shall file and serve any fee applications for periods from the Dismissal Date through and including the Appeal Exhaustion Date ("<u>Post-Dismissal Fee Applications</u>" and together with the Final Fee Applications, the "<u>Fee Applications</u>") within thirty (30) days of the Appeal Exhaustion Date. The Fee Applications shall be in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of this Court, the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Retained Professionals* [<u>ECF No. 562</u>] (the "<u>Compensation Procedures Order</u>"). Any objections to the Fee Applications shall be filed and served on counsel for LTL and the entity submitting the application to which an objection is being filed no later than twenty-one (21) days following the filing of such Fee Application. The Court will schedule hearings, at the Court's convenience, to consider the Fee Applications. The fees and expenses of professionals retained by the Ad Hoc Committee of Supporting Counsel shall remain subject to the expense reimbursement agreement, which was attached as Exhibit A to <u>ECF No. 575</u>.

6.      <u>Compensation Procedures Order; Reimbursement Requests; Post-Dismissal Monthly Fees</u>. The Compensation Procedures Order shall remain in full force and effect through and including the Appeal Exhaustion Date, including as to requests for reimbursement of expenses

7

incurred by members of the TCC and their representatives (a "Reimbursement Request") and the submission and payment of monthly fee statements by Retained Professionals. After the Appeal Exhaustion Date, the Compensation Procedures Order shall remain in effect as to the submission and payment of Fee Applications and Reimbursement Requests.

7.     Substantial Contribution Motions. Any party, including any ad hoc committee that participated in the Chapter 11 Case, seeking payment of a claim for substantial contribution in this Chapter 11 Case may file and serve a motion seeking such relief ("Substantial Contribution Motion") no later than thirty (30) days following the Dismissal Date. The Court will schedule a hearing, at the Court's convenience, to consider the Substantial Contribution Motion. Any party-in-interest may object to a Substantial Contribution Motion no later than seven (7) days prior to the hearing date, and the movant may reply no later than four (4) days prior to the hearing date.

8.     Limited Continued Existence of TCC. The TCC shall remain in existence after the Dismissal Date solely to pursue or defend any Appeals, and its Retained Professionals shall be authorized to continue to perform services on the TCC's behalf and communicate with its constituents concerning the pursuit or defense of any Appeals. For the avoidance of doubt, this MBK shall include the appeals currently pending before the District Court ~~for the District Court~~ for the District of New Jersey (Case Nos. 23-cv-02567; 23-cv-02918; and 23-cv-03935). * On the Appeal Exhaustion Date, the TCC shall be automatically dissolved, and all members and professionals retained by the TCC shall be discharged from all duties, responsibilities, and obligations arising from, or related to, the TCC. Following such dissolution, any attorney-client privilege and similar rights previously held by the TCC shall remain in existence and shall be enforceable by any person or entity that was a member of the TCC as of its dissolution (directly or indirectly through their respective counsel or other representative). Notwithstanding anything contained herein to the

*✱ Within seven (7) days of the entry of the within order, counsel for the TCC shall provide the District Courts handling the referenced appeals with a copy of this Order and 8 a request to stay the appeals pending resolution of any appeal of this Order. Such request should be made initially by correspondence unless the District Court directs otherwise.

MBK

A47

contrary, the TCC, TCC members and their representatives and the TCC's Retained Professionals

shall be authorized to seek payment of fees and reimbursement of expenses in accordance with the

Compensation Procedures Order and with Paragraphs 5 – 7 herein. **

9.     Discharge of the FCR.  On the Dismissal Date, the appointment of the legal

representative for future talc claimants in this Chapter 11 Case (the "FCR") shall be terminated,

and all professionals retained by the FCR shall be discharged from all duties, responsibilities, and

obligations from or related to the FCR.  Following such termination, any attorney-client privilege

and similar rights previously held by the FCR shall remain in existence and shall be enforceable

by the FCR (directly or indirectly through her respective counsel or other representative).

10.     Discharge of the Co- Mediators.  On the Dismissal Date, the appointment of the co-

mediators in this Chapter 11 Case shall be terminated and the co-mediators shall be discharged

from all duties, responsibilities, and obligations from or related to the court-ordered mediation in

this Chapter 11 Case.  Within fourteen (14) days of this Dismissal Order, the co- mediators shall

submit to LTL final invoices for services rendered and expenses incurred, and LTL shall promptly

pay such invoices.

11.     Services of Epiq Corporate Restructuring, LLC ("Epiq").  Epiq is authorized to

assist LTL with service of this Dismissal Order.  On or about thirty (30) days after the entry of this

Dismissal Order, Epiq, as the Debtor's claims and noticing agent, shall (a) forward to the Clerk of

the Court an electronic version of all imaged claims; (b) upload the creditor mailing list into

CM/ECF; and (c) docket a combined final claims register containing claims against the Debtor.

Epiq shall be discharged from all duties, responsibilities, and obligations as the Debtor's claims

and noticing agent in this Chapter 11 Case following the conclusion of such services pursuant to

this Dismissal Order and the closing of this Chapter 11 Case.  Epiq shall be entitled to payment

*MBK*

** The TCC is not authorized to retain additional professionals absent
further order of this Court. Pursuant to 11 USC § 349 (b)(3), such funds necessary
to pay the fees and expenses, approved by the Court and in accordance with the
procedures set forth herein, remain property of the estate and do not revest
in the entity in which such property was vested immediately before the commencement of the
case.

A48

and reimbursement of its fees and costs in accordance with Paragraph 5 hereof. Epiq is authorized

to take all actions necessary and appropriate to effectuate the terms of this Dismissal Order.

12.    Payment of Quarterly Fees. Not later than thirty (30) days after the Dismissal Date,

LTL shall pay to the U.S. Trustee any quarterly fees owed through the date of the Dismissal Date

pursuant to 28 U.S.C. § 1930(a)(6). Any disbursements, including but not limited to, the payments

of professional fees and expenses by LTL between the Dismissal Date through and including the

Appeal Exhaustion Date must be reported on the Debtor's Final Report and ~~shall~~ may be subject to the



payment of fees owed pursuant to 28 U.S.C. § 1930.

13.    Continued Effect of Confidentiality Orders. Notwithstanding any other provision

of this Dismissal Order, any obligations arising under confidentiality agreements, joint interest

agreements, and protective orders, if any, entered into during the Chapter 11 Case in connection

with the Chapter 11 Case shall remain in full force and effect in accordance with their terms;

provided, however, that the provisions set forth in paragraph 14 of this Dismissal Order shall

supersede any contrary provisions in any agreed protective order entered in this Chapter 11 Case;

provided, further, however, that notwithstanding anything contained therein to the contrary, the

obligations set forth in Section L of the *Protective Order* entered at ECF No. 545 shall not become

applicable until thirty (30) days after the Appeal Exhaustion Date .

14.    Destruction of Documents by Third Parties. Reasonably promptly following the

closing of the Chapter 11 Case, any mediator appointed in the Chapter 11 Case and the Rule of

Evidence 706 expert appointed by order of this Court entered at ECF No. 2881 in the Debtor's

prior chapter 11 case (Case No. 21-30589) (the "Prior Chapter 11 Case") and his professionals

each shall destroy any documents, electronic files or information in his or their possession,

custody, or control (or in the possession, custody, or control of their respective agents, experts or

consultants) that were provided on a confidential basis, whether during this Chapter 11 Case or during the Prior Chapter 11 Case, by LTL, the FCR, the TCC, or plaintiff law firms or their respective counsel, or any of the TCC members, and shall certify destruction thereof to such providing party.

15.    <u>Notice</u>. On or before seven (7) days following the Dismissal Date, LTL shall serve notice of this Dismissal Order (including a copy of this Dismissal Order) pursuant to Bankruptcy Rules 2002(f)(2) and 2002(k) on the TCC, the U.S. Trustee, the Master Service List, the Modified Protected Parties, all entities that have requested notice pursuant to Bankruptcy Rule 2002, and such additional persons and entities deemed appropriate by LTL.

16.    <u>Retained Jurisdiction</u>. Notwithstanding the dismissal of the Chapter 11 Case, this Court shall retain jurisdiction to hear and determine all matters arising from or related to the Chapter 11 Case, including without limitation, certification of any appeal of this Dismissal Order, the interpretation, implementation, or enforcement of this Dismissal Order and the Court's prior orders, and to hear and consider Substantial Contribution Motions and any objection to a Fee Application or a Reimbursement Request.

17.    <u>Immediate Effectiveness</u>. Notwithstanding any provisions in the Bankruptcy Rules to the contrary, this Dismissal Order shall be immediately effective and enforceable upon its entry.

11

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**WOLLMUTH MAHER & DEUTSCH LLP**
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)

*ATTORNEYS FOR DEBTOR*

| | |
|---|---|
| In re:<br><br>LTL MANAGEMENT LLC,[1]<br><br>           Debtor. | Chapter 11<br><br>Case No.: 23-12825 (MBK)<br><br>Judge: Michael B. Kaplan |

<u>**NOTICE OF APPEAL**</u>

**<u>Part 1: Identify the appellant</u>**

    *Name of appellant*:  LTL Management LLC.

    *Position of appellant in the bankruptcy case that is the subject of this appeal*:

LTL Management LLC is the debtor.

---

[1]      The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

**Part 2:  Identify the subject of this appeal**

*Describe the judgment, order, or decree appealed from*:  Under 28 U.S.C. § 158 and
Federal Rules of Bankruptcy Procedure 8002 and 8003, Appellant hereby gives notice of appeal
to the United States District Court for the District of New Jersey from the Bankruptcy Court's
*Memorandum Opinion* [Dkt. 1127], attached as <u>Exhibit A</u> to the *Declaration of Dan B. Prieto*,
filed contemporaneously herewith (the "<u>Counsel Declaration</u>"), and implementing *Order
(I) Dismissing Debtor's Chapter 11 Petition Pursuant to 11 U.S.C. 1121(b); (II) Establishing
Procedures With Respect to Requests for Compensation; and (III) Granting Related Relief*
[Dkt. 1211] (the "<u>Dismissal Order</u>"), attached as <u>Exhibit B</u> to the Counsel Declaration.

*State the date on which the judgment, order, or decree was entered*:  The Dismissal Order
was entered on August 11, 2023.  The court issued its Memorandum Opinion on July 28, 2023.

**Part 3:  Identify the other parties to the appeal**

The names of all parties to the judgment, order, or decree appealed from and the names,
addresses, and telephone numbers of their attorneys are attached as <u>Exhibit C</u> to the Counsel
Declaration.

**Part 4:  Optional election to have appeal heard by District Court**

Not applicable in this judicial district.

NAI-1537899849

**Part 5:  Sign Below**

Dated:  August 24, 2023

**WOLLMUTH MAHER & DEUTSCH LLP**

*/s/ Paul DeFilippo*
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, NY 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, TX 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)

*Attorneys for Debtor*

NAI-1537899849

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**
Caption in Compliance with D.N.J. LBR 9004-1(b)

PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
Kristopher M. Hansen (*admitted pro hac vice*)
Ryan P. Montefusco (*admitted pro hac vice*)

PAUL HASTINGS LLP
71 South Wacker Drive, Suite 4500
Chicago, Illinois 60606
Matthew M. Murphy (*admitted pro hac vice*)
Matthew Micheli (*admitted pro hac vice*)

COLE SCHOTZ P.C.
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
Michael D. Sirota
Warren A. Usatine
Seth Van Aalten (*admitted pro hac vice*)
Justin Alberto (*admitted pro hac vice*)

PARKINS & RUBIO LLP
700 Milam, Suite 1300
Houston, Texas 77002
Lenard M. Parkins (*admitted pro hac vice*)
Charles M. Rubio (*admitted pro hac vice*)

*Counsel to Ad Hoc Committee of Supporting*
*Counsel*

| | |
|---|---|
| In re: | Chapter 11 |
| LTL MANAGEMENT LLC,[1] | Case No.: 23-12825 (MBK) |
| Debtor. | Judge: Michael B. Kaplan |

## NOTICE OF APPEAL

---

[1]     The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

## Part 1:  Identify the appellants

*Name of appellant*:  The Ad Hoc Committee of Supporting Counsel.

*Position of appellant in the bankruptcy case that is the subject of this appeal*:  The Ad Hoc Committee of Support Counsel is a group of law firms who represent certain talc claimants.

## Part 2:  Identify the subject of this appeal

*Describe the judgement, order, or decree appealed from*:  Under 28 U.S.C. § 158 and Federal Rules of Bankruptcy Procedure 8002 and 8003, Appellant hereby gives notice of appeal to the United States District Court for the District of New Jersey from the Bankruptcy Court's *Memorandum Opinion* [Dkt. 1127], attached as <u>Exhibit A</u> to the *Declaration of Seth Van Aalten*, filed contemporaneously herewith (the "<u>Counsel Declaration</u>"), and implementing *Order (I) Dismissing Debtor's Chapter 11 Petition Pursuant to 11 U.S.C. 1112(b); (II) Establishing Procedures With Respect to Requests for Compensation; and (III) Granting Related Relief* [Dkt. 1211] (the "<u>Dismissal Order</u>"), attached as <u>Exhibit B</u> to the Counsel Declaration.

*State the date on which the judgment, order, or decree was entered*:  The Dismissal Order was entered on August 11, 2023.  The court issued its Memorandum Opinion on July 28, 2023.

## Part 3:  Identify the other parties to the appeal

The names of all parties to the judgment, order, or decree appealed from and the names, addresses, and telephone numbers of their attorneys are attached as <u>Exhibit C</u> to the Counsel Declaration.

## Part 4:  Optional election to have appeal heard by District Court

Not applicable in this judicial district.

**Part 5: Sign Below**

Dated:  September 5, 2023

**COLE SCHOTZ P.C.**

*/s/ Michael D. Sirota*
Michael D. Sirota (NJ Bar No. 014321986)
Warren A. Usatine (NJ Bar No. 025881995)
Seth Van Aalten (*admitted pro hac vice*)
Justin Alberto (*admitted pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, NJ 07602-0800
(201) 489-3000
Email:  msirota@coleschotz.com
wusatine@coleschotz.com
svanaalten@coleschotz.com
jalberto@coleschotz.com

**PAUL HASTINGS LLP**

Kristopher M. Hansen (*admitted pro hac vice*)
Ryan P. Montefusco (*admitted pro hac vice*)
200 Park Avenue
New York, NY 10166
Telephone: (212) 318-6000
Email:  krishansen@paulhastings.com
ryanmontefusco@paulhastings.com

Matthew M. Murphy (*admitted pro hac vice*)
Matthew Micheli (*admitted pro hac vice*)
71 South Wacker Drive, Suite 4500
Chicago, IL 60606
Telephone: (312) 499-6000
Email:  mattmurphy@paulhastings.com
mattmicheli@paulhastings.com

**PARKINS & RUBIO LLP**

Lenard M. Parkins (*admitted pro hac vice*)
Charles M. Rubio (*admitted pro hac vice*)
700 Milam, Suite 1300
Houston, TX 77002
Telephone: (713) 715-1660
Email:  lparkins@parkinsrubio.com
crubio@parkinsrubio.com

*Counsel to the Ad Hoc Committee of Supporting Counsel*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**WOLLMUTH MAHER & DEUTSCH LLP**
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)

*ATTORNEYS FOR DEBTOR*

| | |
|---|---|
| In re: | Chapter 11 |
| LTL MANAGEMENT LLC,[1] | Case No.:  23-12825 (MBK) |
| Debtor. | Judge:  Michael B. Kaplan |

### JOINT CERTIFICATION TO THE COURT OF APPEALS
### BY ALL APPELLANTS AND APPELLEES

A notice of appeal having been filed in the above-captioned chapter 11 case on

August 24, 2023, from the order described below, all of the appellants and all of the appellees

hereby certify to the court under 28 U.S.C. § 158(d)(2)(A) that a circumstance specified in 28

U.S.C. § 158(d)(2) exists as stated below.

---

[1]    The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is
501 George Street, New Brunswick, New Jersey 08933.

The appellants are LTL Management LLC and the Ad Hoc Committee of Supporting Counsel.

The appellees are the Official Committee of Talc Claimants; Paul Crouch; the Ad Hoc Group of Mesothelioma Claimants; mesothelioma claimants represented by Maune Raichle Hartley French & Mudd LLC; the States of New Mexico and Mississippi; claimants represented by Arnold & Itkin LLP; the Ad Hoc Committee of States Holding Consumer Protection Claims; claimants represented by The Barnes Law Group; and the Office of the United States Trustee for the District of New Jersey.

Leave to appeal in this matter is not required under 28 U.S.C. § 158(a).

This certification arises in an appeal from a final judgment, order, or decree of the United States Bankruptcy Court for the District of New Jersey entered on August 11, 2023, dismissing this bankruptcy case. Dkt. 1211.

The judgment, order, or decree involves a matter of public importance. *See* 28 U.S.C. § 158(d)(2)(A)(i). In addition, an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken. *See* 28 U.S.C. § 158(d)(2)(A)(iii).

Dated: September 6, 2023

**WOLLMUTH MAHER & DEUTSCH LLP**

*/s/ Paul DeFilippo*
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, NY 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com

**JONES DAY**

Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, TX 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)

*Attorneys for Debtor*

**COLE SCHOTZ P.C.**

*/s/ Michael D. Sirota*
Michael D. Sirota (NJ Bar 014321986)
Warren A. Usatine (NJ Bar 025881995)
Seth Van Aalten (admitted *pro hac vice*)
Court Plaza North, 25 Main Street
Hackensack, NJ 07602-0800
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
svanaalten@coleschotz.com
jalberto@coleschotz.com

**PAUL HASTINGS LLP**

Kris Hansen (admitted *pro hac vice*)
200 Park Avenue
New York, NY 10166
Telephone: (212) 318-6000
krishansen@paulhastings.com

Matthew M. Murphy (admitted *pro hac vice*)
Matthew Micheli (admitted *pro hac vice*)
71 South Wacker Drive, Suite 4500
Chicago, IL 60606
Telephone: (312) 499-6000
mattmurphy@paulhastings.com
mattmicheli@paulhastings.com

**PARKINS & RUBIO LLP**

Lenard M. Parkins (admitted *pro hac vice*)
Charles M. Rubio (admitted *pro hac vice*)
700 Milam, Suite 1300
Houston, TX 77002
Telephone: (713) 715-1660
lparkins@parkinsrubio.com
crubio@parkinsrubio.com

*Counsel to Ad Hoc Committee of Supporting
Counsel*

**GENOVA BURNS, LLC**

*/s/ Daniel M. Stolz*
Daniel M. Stolz, Esq.
Donald W. Clarke, Esq.
110 Allen Road, Suite 304
Basking Ridge, NJ 07920
Telephone: (973) 533-0777
Facsimile: (973) 467-8126
dstolz@genovaburns.com
dclarke@genovaburns.com

**MASSEY & GAIL LLP**

Jonathan S. Massey, Esq.
Rachel S. Morse, Esq.
Bret R. Vallacher, Esq.
jmassey@masseygail.com
rmorse@masseygail.com
1000 Maine Ave. SW, Suite 450
Washington, DC 20024
Tel: (202) 652-4511
Fax: (312) 379-0467

**BROWN RUDNICK LLP**

David J. Molton, Esq.
Jeffrey L. Jonas, Esq.
Michael S. Winograd, Esq.
Susan Sieger-Grimm, Esq.
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
dmolton@brownrudnick.com
jjonas@brownrudnick.com
mwinograd@brownrudnick.com
ssieger-grimm@brownrudnick.com

and

Sunny P. Beville, Esq.
Eric R. Goodman, Esq.
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
Facsimile: (617) 856-8201
sbeville@brownrudnick.com
egoodman@brownrudnick.com

**OTTERBOURG P.C**.

Melanie L. Cyganowski, Esq.
Richard G. Haddad, Esq.
Adam C. Silverstein, Esq.
Jennifer S. Feeney, Esq.
David A. Castleman, Esq.
mcyganowski@otterbourg.com
rhaddad@otterbourg.com
asilverstein@otterbourg.com
jfeeney@otterbourg.com
dcastleman@otterbourg.com
230 Park Avenue
New York, NY 10169
Tel: (212) 661-9100
Fax: (212) 682-6104

*Attorneys to the Official Committee
of Talc Claimants*

4

**LEVY KONIGSBERG, LLP**

/s/ Moshe Maimon
Moshe Maimon, Esq. (I.D. 042691986)
605 Third Avenue, 33rd FL
New York, NY 10158
Telephone: (212) 605-6200
Facsimile: (212) 605-6290
mmaimon@levylaw.com

*Attorneys for Talc Claimant Paul Crouch,
Individually and as Executor and as Executor Ad
Prosequendum of the Estate of Cynthia Lorraine
Crouch*

-and-

**THE RUCKDESCHEL LAW FIRM, LLC**

Jonathan Ruckdeschel
8357 Main Street
Ellicott City, Maryland 21043
Email: ruck@rucklawfirm.com

*Attorneys for Talc Claimant Paul Crouch,
Individually and as Executor and as Executor Ad
Prosequendum of the Estate of Cynthia Lorraine
Crouch*

**MAUNE RAICHLE HARTLEY
FRENCH & MUDD, LLC**

/s/ Clayton Thompson
Clayton L. Thompson, Esq.
150 W. 30th Street, Suite 201
New York, NY 10001
Telephone: (800) 358-5922
cthompson@mrhfmlaw.com

*Attorneys for Mesothelioma Claimants
Katherine Tollefson, Sandra Weathers,
Mary Jackson, Elizabeth Meikle, Marzena
Zachara, Robert Radin, and Christine Woodfin*

**COONEY & CONWAY**

/s/ Kathy Byrne
Kathy Byrne, Esq.
kbyrne@cooneyconway.com
120 N. LaSalle Street, Suite 3000
Chicago, Illinois 60602
Tel: (312) 236-6166
*Attorneys for Mesothelioma Claimant
Giovanni Sosa
*Admitted Pro Hac Vice*

**GIBBONS P.C.**

/s/ Robert Malone
Robert K. Malone, Esq.
David N. Crapo, Esq.
Kyle P. McEvilly, Esq.
One Gateway Center
Newark, New Jersey 07102
Telephone: (973) 596-4500
rmalone@gibbonslaw.com
dcrapo@gibbonslaw.com
kmcevilly@gibbonslaw.com

*Attorneys for the States of
New Mexico and Mississippi*

**DEAN OMAR BRANHAM SHIRLEY,
LLP**

/s/ J. Bradley Smith
J. Bradley Smith, Esq.
Bsmith@dobslegal.com
302 N. Market Road
Suite 300
Dallas, Texas 75202
Tel: (214) 722-5990
*Attorneys for Mesothelioma Claimant Evan
Plotkin
*Admitted Pro Hac Vice*

5

A61

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Colin Robinson*
Laura Davis Jones
Colin R. Robinson
Peter J. Keane
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
ljones@pszjlaw.com
crobinson@pszjlaw.com
pkeane@pszjlaw.com

*Counsel to Arnold & Itkin LLP, on Behalf of
Certain Personal Injury Claimants represented
by Arnold & Itkin LLP*

**McMANIMON, SCOTLAND &
BAUMANN, LLC**

*/s/ Sari Placona*
Anthony Sodono, III
Sari B. Placona
75 Livingston Avenue, Ste. 201
Roseland, NJ 07068
Telephone: (973) 622-1800
asodono@msbnj.com
splacona@msbnj.com

*Attorneys for Claimants Represented
by Barnes Law Group, LLC*

**WOMBLE BOND DICKINSON (US) LLP**

*/s/ Ericka Johnson*
Ericka F. Johnson (NJ Bar 032162007)
Lisa Bittle Tancredi (admitted *pro hac vice*)
1313 N. Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 252-4320
ericka.johnson@wbd-us.com
lisa.tancredi@wbd-us.com

*Counsel for the Ad Hoc Committee of States
Holding Consumer Protection Claims*

**ANDREW R. VARA UNITED STATES
TRUSTEE REGIONS 3 & 9**

*/s/ Jeffrey Sponder*
Jeffrey M. Sponder
Lauren Bielskie
United States Department of Justice
Office of the United States Trustee
One Newark Center, Suite 2100
Newark, NJ 07102

-and-

Linda Richenderfer
Trial Attorney
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801
Telephone: (302) 573-6491
linda.richenderfer@usdoj.gov

*Counsel for the Office of the United States
Trustee*

6

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

**WOLLMUTH MAHER & DEUTSCH LLP**
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com



Order Filed on September 20, 2023
by Clerk
U.S. Bankruptcy Court
District of New Jersey

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)

*ATTORNEYS FOR DEBTOR*

In re:                                            Chapter 11

LTL MANAGEMENT LLC,[1]           Case No.: 23-12825 (MBK)

                         Debtor.         Judge: Michael B. Kaplan

## ORDER CERTIFYING DIRECT APPEAL TO THE
## UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

The relief set forth on the following pages is hereby **ORDERED**.

**DATED: September 20, 2023**

Honorable Michael B. Kaplan
United States Bankruptcy Judge

A63

(Page 2)
Debtor:  LTL Management LLC
Case No. 23-12825-MBK
Caption:  Order Certifying Direct Appeal to the United States Court of Appeals for the Third
Circuit

This matter comes before the Court pursuant to the *Joint Certification to the*

*Court of Appeals by all Appellants and Appellees* [Dkt. 1310] (the "Joint Certification"), filed by

LTL Management LLC and the Ad Hoc Committee of Supporting Counsel (together,

the "Appellants") and the Appellees[2]; the Court having reviewed the Joint Certification; the

Court finding that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334, and the *Standing Order of Reference to the Bankruptcy Court Under Title 11 of the*

*United States District Court for the District of New Jersey*, dated September 18, 2012 (Simandle,

C.J.); (b) venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; (c) this is a

core proceeding pursuant to 28 U.S.C. § 157(b); (d) notice of the Joint Certification was

sufficient under the circumstances and no further notice is necessary; the Court further finds and

concludes as follows:

A.      Notices of appeal [Dkt. 1262, 1306] were filed in the above-captioned

chapter 11 case by the Appellants from the *Memorandum Opinion* [Dkt. 1127] and the

implementing *Order (I) Dismissing Debtor's Chapter 11 Petition Pursuant to 11 U.S.C.*

*1121(b); (II) Establishing Procedures with Respect to Requests for Compensation; and*

*(III) Granting Related Relief* [Dkt. 1211] (together, the "Dismissal Order");

---

[2]      The "Appellees" are the Official Committee of Talc Claimants; Paul Crouch; the Ad Hoc Group of
Mesothelioma Claimants; mesothelioma claimants represented by Maune Raichle Hartley French & Mudd
LLC; the States of New Mexico and Mississippi; claimants represented by Arnold & Itkin LLP; the Ad Hoc
Committee of States Holding Consumer Protection Claims; claimants represented by The Barnes Law
Group; and the Office of the United States Trustee for the District of New Jersey.

(Page 3)
Debtor:  LTL Management LLC
Case No. 23-12825-MBK
Caption:  Order Certifying Direct Appeal to the United States Court of Appeals for the Third
Circuit

B.      all of the Appellants and the Appellees agreed in the Joint Certification

that a circumstance specified in 28 U.S.C. § 158(d)(2) exists because the Dismissal Order

involves a matter of public importance and an immediate appeal from the Dismissal Order may

materially advance the progress of the case or proceeding in which the appeal is taken;

C.      the Joint Certification was properly filed pursuant to 28 U.S.C.

§ 158(d)(2)(A);

D.      the Court agrees with the Appellants and Appellees that the conditions of

28 U.S.C. § 158(d)(2) have been met; more specifically, that the Dismissal Order involves a

matter of public importance and an immediate appeal from the Dismissal Order may materially

advance the progress of the case or proceeding in which the appeal is taken;

E.      no papers were filed in opposition to the Joint Certification;

F.      consistent with Rule 8006(c)(2) of the Federal Rules of Bankruptcy

Procedure, the Court submits the following statement expressing its agreement that the Dismissal

Order merits certification:  During LTL's first bankruptcy proceeding, the Court certified its

order denying motions to dismiss the case because, among other reasons, direct appeal would

materially advance the proceeding.  See No. 21-30589, Dkt. 1926 (Bankr. D.N.J. Mar. 31, 2022).

Given the extensive record and briefing produced during trial in that case, the Court found no

need for "further development in the District Court" or that additional review by the District

Court would add anything of value.  Id. at 71.  It therefore did not "serve any purpose" to engage

in an "intermediate appeal."  Id. at 72.  The Court also found that LTL's case and the questions it

implicated were publicly important.  Id. at 74-75.  The case drew significant attention, including

(Page 4)
Debtor:  LTL Management LLC
Case No. 23-12825-MBK
Caption:  Order Certifying Direct Appeal to the United States Court of Appeals for the Third
Circuit

from journalists and policymakers; there were "billions upon billions of dollars" at stake and

"thousands upon tens of thousands of potential claimants"; and the question that the dismissal

order raised regarding restructuring in the face of mass-tort litigation went "beyond the litigants"

and would impact other restructurings and potential restructurings. Id. The Court finds that the

Dismissal Order at issue here merits certification for substantially the same reasons; and

      G.     just cause exists for the relief granted herein;

**IT IS THEREFORE HEREBY ORDERED THAT:**

      1.     The Joint Certification is GRANTED.

      2.     Pursuant to 28 U.S.C. § 158(d)(2)(A) and Rule 8006 of the Federal Rules

of Bankruptcy Procedure, the Dismissal Order is certified for direct appeal to the United States

Court of Appeals for the Third Circuit.

# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

# NOTICE

## GRANT OF PERMISSION FOR LEAVE TO APPEAL PURSUANT TO 28 U.S.C. SECTION 158(d)(2)(A)

The Court of Appeals has granted a petition for leave to appeal in this matter. Petitioners must pay the $207.00 docketing fee in the bankruptcy court within 14 days after the entry of the order granting permission for leave to appeal. If the United States government is the appellant, an additional fee by the government is not required. Fed. R. App. P.5.

A new notice of appeal does not need to be filed. A copy of the Court's order granting permission for leave to appeal serves as the notice of appeal and has been forwarded to the appropriate court.

The entry of date of the order granting permission to appeal serves as the date of filing of the notice of appeal for calculating time under Fed. R. App. P. 5(d)(1). **Petitioners shall notify the Court of Appeals by filing a notification through ECF in the current case that the filing fee has been paid.**

Upon receipt of the notice from Petitioners, the appeal will be opened on the general docket. All future filings regarding the appeal will be entered under the new docket number.

Very truly yours,
Patricia S. Dodszuweit, Clerk


By: s/Laurie
Case Manager
267-299-4936
cc: All Counsel of Record
Honorable Michael B. Kaplan
Ms. Jeanne A. Naughton
Melissa E. Rhoads
Honorable Michael A. Shipp

A67

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

ECO-006

No. 23-8045

In re: LTL MANAGEMENT LLC,

Debtor

LTL Management LLC; Ad Hoc Committee of Supporting Counsel,

Petitioner

(D.N.J. Nos. 23-12825, 3-23-cv-10979, & 3-23-cv-17597)

Present: SHWARTZ, RESTREPO, and AMBRO, <u>Circuit Judges</u>

1. Petition for Permission to Appeal pursuant to 28 U.S.C. Section 158(d)(2) filed by Petitioners Ad Hoc Committee of Supporting Counsel and LTL Management LLC

2. Response filed by Respondent Official Committee of Talc Claimants

3. Response filed by Respondent Claimants represented by Arnold & Itkin LLP

Respectfully,
Clerk/lmr

_____ORDER_____

The foregoing Petition for Permission to Appeal pursuant to 28 U.S.C. Section 158(d)(2) filed by Petitioners Ad Hoc Committee of Supporting Counsel and LTL Management LLC, is **granted.**

The Clerk is directed to assign the resulting appeal(s) to the panel of Judges Shwartz, Restrepo, and Ambro once briefing is completed.

By the Court,

s/ Thomas L. Ambro
Circuit Judge

A True Copy:

Dated: October 20, 2023
Lmr/cc: All Counsel of Record

Patricia S. Dodszuweit, Clerk

A68