# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

———————————

In re LTL Management LLC,
Debtor.

———————————

LTL Management LLC,
Debtor-Appellant,
v.
United States Trustee, *et al.*,
Appellees.

———————————

Ad Hoc Committee of Supporting Counsel,
Appellant,
v.
United States Trustee, *et al.*,
Appellees.

———————————

On Appeal from the United States Bankruptcy Court
for the District of New Jersey

———————————

## BRIEF FOR APPELLEE UNITED STATES TRUSTEE

———————————

*Of Counsel:*

RAMONA D. ELLIOTT
*Deputy Director and General Counsel*

P. MATTHEW SUTKO
*Associate General Counsel*

SUMI SAKATA
JOHN P. SHEAHAN
*Trial Attorneys*
*U.S. Department of Justice*
*Executive Office for United States Trustees*
*441 G Street NW, Suite 6150*
*Washington, DC 20530*

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

PHILIP R. SELLINGER
*United States Attorney*

MARK B. STERN
SEAN R. JANDA
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3388*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................1

STATEMENT OF JURISDICTION ......................................................................3

STATEMENT OF THE ISSUE ............................................................................4

STATEMENT OF THE CASE ..............................................................................4

    A.    Statutory Background ........................................................................4

    B.    Factual and Procedural Background ..............................................7

SUMMARY OF ARGUMENT ............................................................................ 18

STANDARD OF REVIEW ................................................................................. 21

ARGUMENT ......................................................................................................... 21

LTL's Second Chapter 11 Petition Was Not Filed in Good Faith and Was
Properly Dismissed ............................................................................................. 21

    A.    LTL Was Not in Financial Distress When It Filed Its Second
          Chapter 11 Petition ..........................................................................22

    B.    LTL's Conduct Before, During, and After Filing Its First Chapter
          11 Petition Underscores the Lack of Good Faith in Its Present
          Filing .................................................................................................32

    C.    The Bankruptcy Court Properly Dismissed the Petition ...........42

CONCLUSION ..................................................................................................... 47

COMBINED CERTIFICATIONS

ADDENDUM

**Cases:**                                                                                      **Page(s)**

*15375 Mem'l Corp. v. Bepco, L.P., In re,*
   589 F.3d 605 (3d Cir. 2009) ...............................................................21, 40, 41

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship,*
   526 U.S. 434 (1999)...........................................................................................40

*Butler, In re,*
   94 B.R. 433 (Bankr. N.D. Tex. 1989) ............................................................46

*Constellation Enters. LLC, In re,*
   587 B.R. 275 (D. Del. 2018) ...........................................................................46

*Czyzewski v. Jevic Holding Corp.,*
   580 U.S. 451 (2017) .................................................................................... 36, 38

*Great N. Paper, Inc., In re,*
   299 B.R. 1 (D. Me. 2003) ................................................................................46

*Integrated Telecom Express, Inc., In re,*
   384 F.3d 108 (3d Cir. 2004) ..............................................7, 21, 22, 32, 36, 40

*LTL Mgmt., LLC, In re,*
   64 F.4th 84 (3d Cir. 2023)............................... 2, 8, 9, 10, 11, 12, 13, 14, 18, 22, 23, 24,
                                         25, 26, 27, 28, 29, 31, 32, 34, 43, 44, 45

*Marvel Entm't Grp., Inc., In re,*
   140 F.3d 463 (3d Cir. 1998) ...........................................................................35

*Merit Mgmt. Grp. v. FTI Consulting, Inc.,*
   583 U.S. 366 (2018) ........................................................................................34

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
   566 U.S. 639 (2012) ..........................................................................................4

*Railway Labor Execs.' Ass'n v. Gibbons,*
   455 U.S. 457 (1982) ..........................................................................................4

*SGL Carbon Corp., In re,*
   200 F.3d 154 (3d Cir. 1999) ................................................6, 7, 23, 39, 42, 43

*Telegroup, Inc., In re,*
   281 F.3d 133 (3d Cir. 2002) ...........................................................................37

*United States v. Allegheny Ludlum Corp.*,
 366 F.3d 164 (3d Cir. 2004) ...............................................................26

*Wright v. Union Cent. Life Ins. Co.*,
 304 U.S. 502 (1938) ..........................................................................4

**Statutes:**

11 U.S.C. § 362 ....................................................................................7

11 U.S.C. § 363(b)(1) .........................................................................35

11 U.S.C. § 507 ................................................................................5, 6

11 U.S.C. § 521 ....................................................................................5

11 U.S.C. § 524(e) .............................................................................41

11 U.S.C. § 524(g) ............................................................................38

11 U.S.C. § 541 ....................................................................................5

11 U.S.C. § 548 ..................................................................................34

11 U.S.C. § 701 *et seq.* ........................................................................5

11 U.S.C. § 1101 *et seq.* ......................................................................6
 11 U.S.C. § 1112(b) ...........................................4, 11, 16, 20, 21
 11 U.S.C. § 1112(b)(1) ................................................... 6, 42
 11 U.S.C. § 1112(b)(2) .............................................13, 20, 42
 11 U.S.C. § 1112(b)(4)(F)-(G) .........................................43
 11 U.S.C. § 1129(a)(7) ...........................................................6

11 U.S.C. § 1208(c)-(d) ......................................................................7

11 U.S.C. § 1307(c)-(d) ......................................................................7

28 U.S.C. § 157(a)-(b) ........................................................................3

28 U.S.C. § 158(d)(2) .........................................................................3

28 U.S.C. § 158(d)(2)(A) ....................................................................4

28 U.S.C. § 1334(a) ............................................................................3

**Rule:**

Fed. R. Bankr. P. 1007 ......................................................................................5

**Legislative Material:**

H.R. Rep. No. 103-835 (1994) ........................................................................4, 5

**Other Authorities:**

*Johnson & Johnson Reaches Tentative Deal To Resolve Talc Baby Powder Litigation*,
    CBS News (Jan. 23, 2024), https://www.cbsnews.com/news/johnson-
    johnson-talc-baby-powder-cancer-j-j-lawsuit/ ..............................................45

Judgment, *In re LTL Mgmt.*, No. 22-2003 (Mar. 31, 2023),
    Dkt. No. 181-1 ............................................................................................14

Orders, *In re LTL Mgmt. LLC*, No. 22-2003:
    (3d Cir. Mar. 22, 2023), Dkt. No. 172...........................................................14
    (3d Cir. Mar. 31, 2023), Dkt. No. 180...........................................................14

**INTRODUCTION**

Johnson & Johnson (J&J) and its related entities sold a talc-based baby powder product for decades. There are now tens of thousands of pending tort claims contending that the product caused ovarian cancer or mesothelioma. The underlying bankruptcy proceeding concerns the efforts of J&J and related entities to move the resolution of these and future claims to bankruptcy court.

For several decades, a corporate subsidiary, Johnson & Johnson Consumer Inc. (Old JJCI), held the assets and liabilities relating to the baby powder product. In October 2021, Old JJCI split into two companies through a procedure of Texas corporate law known as a "divisional merger." One of the companies was a new subsidiary—also called Johnson & Johnson Consumer Inc. (New JJCI)—that was assigned almost all of Old JJCI's non-talc assets and liabilities. At the time, that corporation was worth approximately $61 billion. The other company was LTL Management LLC (LTL), which was assigned Old JJCI's talc-related liabilities and few assets—except for rights under a funding agreement whereby New JJCI and J&J agreed to fund LTL's operations up to the value of New JJCI.

LTL promptly filed a chapter 11 bankruptcy petition, with the goal of enabling the entire J&J corporate enterprise to resolve all talc-related tort liabilities in bankruptcy proceedings where it could take advantage of Bankruptcy Code provisions such as those that authorize a forced resolution of claims even over nonconsenting creditors' objections. This Court rejected that gambit. This Court explained that

because LTL had access to $61 billion in funding, it was not in financial distress and thus could not avail itself of bankruptcy protections which may not be properly used "to give profitable enterprises an opportunity to evade contractual or other liability." *In re LTL Mgmt., LLC*, 64 F.4th 84, 103 (3d Cir. 2023) (quotation omitted). This Court thus directed the dismissal of LTL's bankruptcy petition as not having been filed in good faith.

Following the issuance of this Court's mandate, the bankruptcy court dismissed LTL's petition on April 4, 2023. Undeterred, LTL filed a new bankruptcy petition that same afternoon. In just over two hours, LTL executed a new set of agreements with its corporate affiliates that left it with access to assets worth between $20 and $30 billion rather than assets worth more than $60 billion. According to its Chief Legal Officer, LTL hoped that the transfer of $30 billion in value would create a "sufficiently distressed" financial condition to permit it to return to bankruptcy. Kim Decl. ¶ 83, J.A. 232.

After conducting a multi-day evidentiary hearing, the bankruptcy court concluded that this reshuffling of assets did not create a basis for a good faith filing and dismissed LTL's second bankruptcy petition. That conclusion was correct, and this Court may affirm on that basis.

The absence of good faith is underscored by LTL's attempts over the past several years to exploit the bankruptcy system to evade tort liability. LTL's attempt to manufacture financial distress by transferring $30 billion to its corporate parent is only

the latest move in this gamesmanship. Throughout its brief existence, LTL has had no substantial business operations and instead has existed only as a vehicle for J&J—an extremely healthy company worth hundreds of billions of dollars—to create a bespoke bankruptcy with the sole purpose of precluding a class of tort creditors from pursuing their claims through the normal tort process. The bankruptcy court properly concluded that LTL's second foray into bankruptcy should, like its first, be rejected, and the court's dismissal of LTL's petition should be affirmed.

## STATEMENT OF JURISDICTION

The bankruptcy court had jurisdiction over LTL's second voluntary petition for chapter 11 relief under 28 U.S.C. §§ 157(a)-(b), 1334(a). The bankruptcy court dismissed LTL's petition on August 11, 2023. J.A. 41. LTL and the Ad Hoc Committee of Supporting Counsel filed timely notices of appeal on August 24, 2023, and September 5, 2023, respectively. J.A. 51-56. The appellants and appellees jointly certified on September 6, 2023, and the bankruptcy court certified on September 20, 2023, the dismissal order for direct appeal to this Court under 28 U.S.C. § 158(d)(2). J.A. 57-66. On October 6, 2023, LTL and the Ad Hoc Committee filed a timely petition for authorization of direct appeal, *see* Appellants' Joint Petition for Authorization of Direct Appeals Under 28 U.S.C. § 158(d)(2), *LTL Mgmt. LLC v. Official Comm. of Talc Claimants* (*In re LTL Mgmt. LLC*), No. 23-8045 (3d Cir. Oct. 6, 2023), Dkt. No. 1-1, and this Court granted that petition, *see* J.A. 68. This Court has

jurisdiction over LTL's and the Ad Hoc Committee's appeals under 28 U.S.C. § 158(d)(2)(A).

## STATEMENT OF THE ISSUE

Whether the bankruptcy court properly dismissed LTL's second chapter 11 petition for cause under 11 U.S.C. § 1112(b) as not having been filed in good faith.

## STATEMENT OF THE CASE

### A. Statutory Background

**1.** Bankruptcy is the "subject of the relations between a[] . . . debtor[] and his creditors, extending to his and their relief." *Wright v. Union Cent. Life Ins. Co.*, 304 U.S. 502, 513-14 (1938) (quotation omitted). To standardize an "expansive (and sometimes unruly) area of law," *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 649 (2012), Congress enacted the Bankruptcy Code under the Bankruptcy Clause of the U.S. Constitution, which vests Congress with power to "adjust[] . . . a failing debtor's obligations," *Railway Labor Execs.' Ass'n v. Gibbons*, 455 U.S. 457, 466 (1982) (quotation omitted).

The bankruptcy system is designed to "provide honest debtors who have fallen on hard times the opportunity for a fresh start." H.R. Rep. No. 103-835, at 32 (1994). The system also seeks to protect the interests of creditors and to do so in a way that does not advantage some groups of creditors over others. Congress thus sought to "protect creditors in general," and to prevent "an insolvent debtor from selectively paying off the claims of certain favored creditors at the expense of others," thereby

curbing the "inevitable temptation among creditors to compete fiercely over the debtor's limited funds." *Id.* at 33. Congress thus designed a bankruptcy system "to enforce a distribution of the debtor's assets in an orderly manner in which the claims of all creditors are considered fairly, in accordance with established principles rather than on the basis of the inside influence or economic leverage of a particular creditor." *Id.*

To achieve these objectives, the Code establishes a comprehensive scheme for the equitable adjustment of the debtor-creditor relationship. As part of the *quid pro quo* for obtaining bankruptcy protections, all but certain statutorily exempt debtor assets become part of the bankruptcy estate, *see* 11 U.S.C. § 541, subject to the Code's dictates for distribution of assets. Debtors also undertake a variety of obligations, including compliance with extensive disclosure and reporting obligations. *See, e.g.*, *id.* § 521; Fed. R. Bankr. P. 1007.

**2.** In general, a corporate debtor may file for bankruptcy under chapter 7 or chapter 11 of the Code. In a chapter 7 bankruptcy, the company's pre-petition assets are liquidated and distributed to creditors according to specific rules of priority established in the Code. 11 U.S.C. §§ 507, 701 *et seq.* A chapter 7 bankruptcy is typically undertaken in circumstances where the debtor's business cannot be rehabilitated.

A chapter 11 bankruptcy, in contrast, typically results in a "plan" that can either provide for the reorganization and ongoing operation of the debtor's business or a

liquidation and distribution to creditors in accordance with statutory critera. *See* 11 U.S.C. §§ 507, 1101 *et seq*. Chapter 11 reflects Congress's recognition that a debtor may suffer from temporary financial distress but may nevertheless be able to preserve its business as a going concern if it can resolve that distress. The successful implementation of a plan under chapter 11 and preservation of the debtor's business will often benefit creditors, because a company will usually be worth more as a going concern than as fixed set of assets subject to liquidation and distribution.

**3.** A debtor's right to adjust its debts through chapter 11 is subject to several important limitations. To ensure that creditors are not prejudiced by a debtor's choice to file under chapter 11 rather than chapter 7, Congress has provided that a plan may generally be confirmed only if each creditor receives at least as much as it would receive in a chapter 7 liquidation or consents to less favorable treatment. *See* 11 U.S.C. § 1129(a)(7).

Congress has also instituted mechanisms to protect creditors at the outset of a chapter 11 case. As particularly relevant here, Congress has provided that, as a general matter, "on request of a party in interest, and after notice and a hearing, the court shall convert a case under [chapter 11] to a case under chapter 7 or dismiss a case under [chapter 11], whichever is in the best interests of creditors and the estate, for cause." 11 U.S.C. § 1112(b)(1). Under this provision, a "Chapter 11 petition is subject to dismissal for 'cause' . . . unless it is filed in good faith." *In re SGL Carbon Corp.*, 200 F.3d 154, 162 (3d Cir. 1999). Section 1112(b)(1) speaks in mandatory language,

providing that the bankruptcy court "shall" convert or dismiss the case upon a finding of cause, in contrast to other provisions of the Code that provide a discretionary authority to convert or dismiss. *See* 11 U.S.C. §§ 1208(c)-(d), 1307(c)-(d).

"At its most fundamental level, the good faith requirement ensures that the Bankruptcy Code's careful balancing of interests is not undermined by petitioners whose aims are antithetical to the basic purposes of bankruptcy." *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 119 (3d Cir. 2004). As discussed, these goals are to ensure that creditors are treated fairly and receive maximum value on their claims, while imposing restrictions on creditors by, for example, preventing them from continuing to pursue their claims outside of bankruptcy during the bankruptcy case. *See* 11 U.S.C. § 362. The good faith standard thus "furthers the balancing process between the interests of debtors and creditors which characterizes so many provisions of the bankruptcy laws and is necessary to legitimize the delay and costs imposed upon parties to a bankruptcy." *SGL Carbon*, 200 F.3d at 161 (quotation omitted). The determination whether a petition was filed in good faith focuses on "(1) whether the petition serves a valid bankruptcy purpose, *e.g.*, by preserving a going concern or maximizing the value of the debtor's estate, and (2) whether the petition is filed merely to obtain a tactical litigation advantage." *Integrated Telecom*, 384 F.3d at 119-20.

### B.    Factual and Procedural Background

**1.** Johnson & Johnson is a company, first incorporated more than a century ago, that is a "household brand well-known to the public for its wide range of

products relating to health and well-being." *In re LTL Mgmt., LLC*, 64 F.4th 84, 93 (3d Cir. 2023). In 1894, J&J began selling a talc-based baby powder product.

In a series of corporate transactions beginning in the 1970s, the assets and liabilities related to that product were assigned to Old JJCI, a subsidiary of J&J. *LTL Mgmt.*, 64 F.4th at 93. In recent years, J&J and Old JJCI have faced an escalating number of lawsuits claiming that their talc-based baby powder contained asbestos and fibrous talc; that certain applications of talc powder can increase the risk of, or cause, ovarian or other cancers; and that exposure to asbestos-containing talc powder can cause mesothelioma. *See id.* at 93-94. These lawsuits threatened J&J and Old JJCI with significant liability: one case involving 20 plaintiffs resulted in a $2.24 billion final judgment assessed against J&J and Old JJCI, *see id.* at 94, and the companies believe there may be "as many [as] 100,000 current claims," Kim Decl. ¶ 58, J.A. 4535.

Nevertheless, Old JJCI "was a highly valuable enterprise, estimated" in October 2021 "by LTL to be worth $61.5 billion (excluding future talc liabilities), with many profitable products and brands." *LTL Mgmt.*, 64 F.4th at 95. Notwithstanding the $2.24 billion verdict—which J&J "described in public securities filings as 'unique' and 'not representative of other claims'"—other talc litigation was "not so damaging to J&J entities." *Id.* at 94-95. Some cases resulted in substantially lower verdicts; J&J and affiliated entities "obtain[ed] dismissals without payment" of many claims; and the companies "often avoided trial," settling "roughly 6,800 talc-related claims for just under $1 billion in total." *Id.* at 94. Thus, J&J and Old JJCI have repeatedly suggested

8

that the talc-related litigation has not created a significant risk of near-term insolvency for either company. For example, "in an October 2021 management representation letter to its auditors, J&J valued its and its subsidiaries' probable and reasonably estimable contingent loss for products liability litigation, including for talc," at "$2.4 billion for the next 24 months." *Id.* at 95.

Against that backdrop, "members of J&J's management explored ways to mitigate Old [JJCI's] exposure to talc litigation" and eventually settled on a "restructuring that would capture all asbestos liability in a subsidiary to be put into bankruptcy." *LTL Mgmt.*, 64 F.4th at 95. On October 12, 2021, Old JJCI "moved forward with this plan" and underwent a set of corporate transactions "relying principally on a [divisional] merger under Texas law" that "splits a legal entity into two, divides its assets and liabilities between the two new entities, and terminates the original entity." *Id.* at 95-96.

"Ultimately, the restructuring created two new entities, LTL and New [JJCI]," and divided Old JJCI's assets and liabilities among those two entities. *LTL Mgmt.*, 64 F.4th at 96. In that division, LTL received "responsibility for essentially all liabilities of Old [JJCI] tied to talc-related claims." *Id.* In addition, LTL received Old JJCI's talc-related assets, along with approximately $6 million in cash and a royalty revenue stream valued at approximately $367.1 million. *See id.* And "most important," LTL received rights under a Funding Agreement that generally obligated New JJCI and J&J "jointly and severally" to pay LTL "cash up to the value of New [JJCI] for purposes

9

of satisfying any talc-related costs as well as normal course expenses." *Id.* That obligation existed whether LTL was inside or outside of bankruptcy. *See id.* In the event of an LTL chapter 11 bankruptcy, the Funding Agreement obligated J&J and New JJCI to "pay [LTL] cash in the same amount to satisfy its administrative costs and to fund a trust, created in a plan of reorganization, to address talc liability for the benefit of existing and future claimants." *Id.* The amount of cash J&J and New JJCI were obligated to pay LTL "could not drop below a floor defined as the value of New [JJCI] measured as of the time of the divisional merger, estimated by LTL at $61.5 billion, and was subject to increase as the value of New [JJCI] increased." *Id.* at 97. All other assets and liabilities of Old JJCI were allocated to New JJCI. *Id.*

**2.** Two days after the divisional merger, LTL filed a voluntary petition for chapter 11 relief in the Western District of North Carolina. *LTL Mgmt.*, 64 F.4th at 97. The stated purpose of the corporate restructuring and subsequent bankruptcy filing was to enable LTL to "globally resolv[e] talc-related claims through a chapter 11 reorganization without subjecting the entire Old [JJCI] enterprise to a bankruptcy proceeding." *Id.* (quotation omitted). Although LTL was the only J&J entity to file for bankruptcy, LTL frankly acknowledged that its goal was to leverage the bankruptcy to obtain permanent resolution of talc-related claims not just for LTL but also for J&J's various affiliates. *See id.* It thus moved for, and obtained, an order temporarily enjoining talc claims against various affiliates. *Id.*

LTL's bankruptcy petition was ultimately transferred to the District of New Jersey, and a handful of creditors moved to dismiss the petition under 11 U.S.C. § 1112(b) as not having been filed in good faith. *LTL Mgmt.*, 64 F.4th at 97-98. At the same time, LTL moved to extend the injunction enjoining claimants from continuing with their claims against third-party affiliates. *Id.* at 98. The bankruptcy court denied the motions to dismiss and granted the motion to extend the injunction. *Id.*

The movants appealed that decision, and this Court reversed, concluding that LTL's petition had not been filed in good faith. *LTL Mgmt.*, 64 F.4th at 111. This Court explained that Circuit "precedents show a debtor who does not suffer from financial distress cannot demonstrate its Chapter 11 petition serves a valid bankruptcy purpose." *Id.* at 101; *see id.* ("The theme is clear: absent financial distress, there is no reason for Chapter 11 and no valid bankruptcy purpose."). That is so because "the good faith gateway asks whether the debtor faces the kinds of problems that justify Chapter 11 relief"—namely, the problems that arise "when there are not enough assets to go around" such that "the system of individual creditor remedies may be bad for the creditors as a group." *Id.* at 102 (emphases and quotation omitted).

To ameliorate these problems, "bankruptcy significantly disrupts creditors' existing claims against the debtor," including by "vest[ing] petitioners with considerable powers—the automatic stay, the exclusive right to propose a reorganization plan, the discharge of debts, etc.—that can impose significant hardship on particular creditors." *LTL Mgmt.*, 64 F.4th at 103 (quotation omitted). "When

11

*financially troubled* petitioners seek a chance to remain in business, the exercise of those powers is justified." *Id.* (quotation omitted). By contrast, Congress did not intend the use of those extraordinary tools as a mechanism "to give profitable enterprises an opportunity to evade contractual or other liability." *Id.* (quotation omitted).

This Court further explained that "[f]inancial distress must not only be apparent, but it must be immediate enough to justify a filing." *LTL Mgmt.*, 64 F.4th at 102. Although it "cannot today predict all forms of financial difficulties that may in some cases justify a debtor's presence in Chapter 11," this Court explained that "a debtor's balance-sheet insolvency or insufficient cash flows to pay liabilities (or the future likelihood of these issues occurring) are likely always relevant." *Id.* So too, this Court explained, are various other concrete "threat[s]" to a debtor's "[f]inancial health," such as a debtor's inability to "efficiently obtain[] financing and investment" or an "exodus of customers and suppliers wary of a firm's credit-risk." *Id.*

Applying that standard to LTL, this Court concluded that LTL was not "in financial distress when it filed its Chapter 11 petition." *LTL Mgmt.*, 64 F.4th at 106. This Court explained that at the time of the first petition, "LTL had the right, outside of bankruptcy, to cause J&J and New [JJCI], jointly and severally, to pay it cash up to the value of New [JJCI] as of the petition date (estimated at $61.5 billion) to satisfy any talc-related costs and normal course expenses." *Id.* This payment right "was reliable, as J&J and New [JJCI] were highly creditworthy counterparties"—indeed, J&J

"had well over $400 billion in equity value" and "distributed over $13 billion to shareholders in each of 2020 and 2021." *Id.*

This Court concluded that "LTL did not have any likely need in the present or the near-term, or even in the long-term, to exhaust its funding rights to pay talc liabilities." *LTL Mgmt.*, 64 F.4th at 108. For example, in "over five years of litigation," the "aggregate costs had reached $4.5 billion"—with "about half of these costs attributable to one" verdict; J&J had "valued the probable and reasonably estimable contingent loss for its product liability litigation" at $2.4 billion for the next two years; and LTL suggested "that $4 billion to $5 billion was at one time considered by plaintiffs' lawyers to be in the ballpark to resolve virtually all" ovarian cancer claims. *Id.* "LTL, at the time of its filing, was [thus] highly solvent with access to cash to meet comfortably its liabilities as they came due for the foreseeable future." *Id.* This Court therefore concluded that "LTL was not in financial distress" and "it cannot show its petition served a valid bankruptcy purpose and was filed in good faith." *Id.* at 110.

This Court held that dismissal was the appropriate remedy for the lack of good faith. As this Court explained, the Code permits a bankruptcy court to refuse to dismiss even when a ground for dismissal is established if "unusual circumstances" exist and if, among other things, there is a "reasonable justification" for the debtor's act or omission that gives rise to the ground for dismissal and the ground "will be cured within a reasonable period of time." *LTL Mgmt.*, 64 F.4th at 110 (quoting 11 U.S.C. § 1112(b)(2)). But no "reasonable justification validates" the "lack of financial

distress," and this Court could not "see how [LTL's] lack of financial distress could be overcome." *Id.* (quotation omitted).

Following this Court's decision, LTL petitioned for rehearing and rehearing en banc; that petition was denied with no noted dissents. *See* Order, *In re LTL Mgmt. LLC*, No. 22-2003 (3d Cir. Mar. 22, 2023), Dkt. No. 172. LTL then moved to stay this Court's mandate—in effect, to maintain its bankruptcy and the injunction preventing prosecution of tort claims against LTL and its affiliates—pending a petition for a writ of certiorari. *See* Motion to Stay the Mandate, *LTL Mgmt.*, No. 22-2003 (Mar. 22, 2023), Dkt. No. 173. That motion was denied and the mandate issued on March 31, 2023. *See* Order, *LTL Mgmt.*, No. 22-2003 (Mar. 31, 2023), Dkt. No. 180; Judgment, *LTL Mgmt.*, No. 22-2003 (Mar. 31, 2023), Dkt. No. 181-1. On April 4, the bankruptcy court entered an order dismissing LTL's first chapter 11 bankruptcy. *See* J.A. 8.

**3.** "Approximately two hours later," LTL filed a new petition under chapter 11. J.A. 8. In advance of that filing, LTL "structured new funding arrangements in anticipation" of the new bankruptcy. J.A. 10.

First, LTL agreed to terminate the 2021 Funding Agreement that had obligated J&J and New JJCI—now called HoldCo—to pay LTL up to $61.5 billion to cover expenses. J.A. 10. Second, LTL executed a new 2023 Funding Agreement with HoldCo—but not J&J—that "obligated HoldCo"—but not J&J—"to provide funding to [LTL] for talc liabilities and other costs in the normal course of business."

14

*Id.* Because New JJCI/HoldCo "spun off its consumer health business assets to its parent entity, Janssen Pharmaceuticals, Inc." during LTL's first bankruptcy, HoldCo is now worth approximately $29.9 billion, as compared to the $61.5 billion that New JJCI was worth when LTL first filed for bankruptcy. *See* J.A. 7, 21. Because the new Funding Agreement does not obligate J&J, LTL's rights under the agreement are worth only what HoldCo can provide. Finally, LTL executed an agreement with J&J and HoldCo that obligated "J&J to provide a funding backstop [but] only upon the confirmation of a Chapter 11 Plan." J.A. 10.

Thus, LTL agreed to give up its rights under the 2021 Funding Agreement—worth a minimum of $61.5 billion and backstopped by the exceptionally creditworthy J&J—and instead accept a new set of payment rights under the 2023 Funding Agreement that give it access (outside of bankruptcy) only to HoldCo's assets, worth less than half of the minimum value of the original agreement, and with no backstop from J&J.

In addition, "in conjunction with" its bankruptcy petition, LTL filed a "term sheet which provided for a plan of reorganization that includes the establishment of a trust funded in the amount of $8.9 billion on a net present value basis." J.A. 9. Before the second bankruptcy filing, J&J and LTL had agreed to so-called "plan support agreements" with 17 law firms representing "approximately 58,392 claimants," in which those firms agreed to work with LTL and J&J "to finalize and seek

confirmation of a plan of reorganization" along the lines of the plan contained in the term sheet. J.A. 8-9.

After LTL filed its second bankruptcy petition, a number of parties, including the United States Trustee, moved to dismiss the bankruptcy petition under 11 U.S.C. § 1112(b) as having not been filed in good faith. J.A. 14. The bankruptcy court held a four-day evidentiary hearing on those motions that included testimony from several fact and expert witnesses. J.A. 13-14. Following that hearing, the bankruptcy court granted the motions to dismiss, concluding that LTL was not in financial distress as would justify a good faith bankruptcy filing.

First, the bankruptcy court found that, as of the date of LTL's second filing, it had: "$14.5 million in cash[;] annual royalty revenue streams and access to approximately $1.3 billion in cash from HoldCo"; an equity interest "in Royalty A&M, worth nearly $400 million"; and "access to the value of HoldCo's equity interests, valued at approximately $29.9 billion or, if discounted in a forced liquidation, $22.3 billion." J.A. 20-21.

The bankruptcy court also found that LTL's expected short-term and long-term expenses would be substantially less than those assets. Under the most "credible projections" offered by an expert, the court estimated "LTL's total costs in the first three years upon return to the tort system" at between "$0.6 billion" and "$4.8 billion." J.A. 23. The court explained that LTL's own expert provided an "above-expectation estimate of LTL's total aggregate talc liabilities—which would extend out

for decades into the future and includes the cost to defend and resolve all personal injury talc claims, governmental talc claims, and any indemnification obligations—at approximately $11 billion." *Id.* (quotation omitted). That same expert "performed a high-end stress test scenario that estimates a worst-case scenario for talc liability at $21 billion." *Id.* (quotation omitted).

Thus, the court explained, "clearly there are resources readily available to LTL" that "can satisfy" LTL's short-term expected costs related to talc litigation. J.A. 23. And even the worst-case scenario presented by LTL's own expert for total aggregate talc liabilities fell short of "the total value of the 2023 Funding Agreement." J.A. 24. Thus, the court explained, "as in LTL 1.0," "LTL is not sufficiently financially distressed to avail itself of bankruptcy at this time." J.A. 25.

Finally, the bankruptcy court held that the appropriate remedy for the lack of good faith was dismissal. The court explained that "binding precedent—relating to this very Debtor—establishes that LTL is unable to demonstrate either a reasonable justification or a possible timely cure of the grounds for dismissal," both of which would be required to forgo dismissing the bankruptcy. J.A. 32 (quotation omitted). The court noted that this Court's precedents establish "that an alternative to dismissal is reserved for only those who properly belong in bankruptcy," and the lack of financial distress experienced by LTL makes clear that it "does not belong in bankruptcy" at all. J.A. 34-35. Thus, the court dismissed LTL's second bankruptcy petition, J.A. 41, and this appeal followed.

## SUMMARY OF ARGUMENT

**A.** The bankruptcy court correctly held that LTL's second chapter 11 petition was not filed in good faith because LTL was not in financial distress at the time of filing. As this Court's precedents explain, the Bankruptcy Code provides substantial powers to a debtor that constrain creditors' rights to pursue their claims and the use of those powers is only justified when a debtor is facing financial distress. And as this Court stressed in *LTL*, such financial distress must be both "apparent" and "immediate" to support a good faith bankruptcy filing. *See In re LTL Mgmt., LLC*, 64 F.4th 84, 102 (3d Cir. 2023).

The bankruptcy court correctly applied this precedent to the facts developed during an extended evidentiary hearing. Based on the record evidence, the court found that LTL had access to $1.3 billion in cash and access to equity interests valued at between $22.3 and $29.9 billion. J.A. 20-21. The court also found—based on substantial expert testimony—that LTL's expected expenses in the tort system would be substantially less than those assets, in both the short and the long term. JA. 22-23. Based on those findings—which the court viewed as establishing a picture of financial health materially indistinguishable from the one that this Court found in *LTL*—the court correctly held that LTL was (as with its previous bankruptcy filing) not suffering financial distress and thus had not filed in good faith.

LTL mistakenly argues that the bankruptcy improperly imposed a strict insolvency requirement. But that argument misunderstands both this Court's

precedents and the bankruptcy court's decision. This Court's precedents make clear that an entity must be in immediate financial distress—even if not insolvent—to avail itself of bankruptcy, and the bankruptcy court properly understood and applied the standard articulated in those precedents. And although LTL quarrels with aspects of the bankruptcy court's underlying factual findings, none of those arguments establishes clear error. The bankruptcy court's findings were based on the careful evaluation of expert testimony and are amply supported by the record.

**B.** Even setting aside the lack of any financial distress, LTL's lack of good faith in filing its second petition is manifest. In the two hours that it was outside bankruptcy, LTL consummated an attempt to manufacture financial distress by executing agreements that effectively transferred more than $30 billion in value to its corporate parent. LTL's Board authorized the entry into those agreements, including the transfer of assets, while still in bankruptcy, *see* J.A. 4530-32, notwithstanding its fiduciary duty to creditors to protect the value of the estate. That transaction—which renders any financial distress manufactured for purposes of bankruptcy—highlights the lack of good faith inherent in LTL's second bankruptcy petition.

LTL's lack of good faith is further underscored by many additional circumstances surrounding its creation. Because LTL has no substantial ongoing business operations, its petition cannot preserve any going concern. And because LTL's petition was self-evidently filed in large part as an attempt to extend the benefits of bankruptcy to nondebtor corporate affiliates, it cannot further a valid

bankruptcy purpose. That conclusion is confirmed by the pre-(first)-petition corporate restructuring that was undertaken for the purpose of enabling the company to misuse the Code by making its bankruptcy filing a weapon against tort claimants rather than a good faith means of reorganization.

**C.** Generally, 11 U.S.C. § 1112(b) requires that a bankruptcy court dismiss (or convert to chapter 7) any chapter 11 case when cause exists. Although that statute also establishes a narrow exception when—among other things—the grounds for dismissal arise from conduct that is reasonably justified and that may be cured, *see* 11 U.S.C. § 1112(b)(2), the bankruptcy court correctly held that provision inapplicable here. This Court's precedents make clear that the alternatives to dismissal or conversion are unavailable when a debtor does not file its petition in good faith, because such a debtor does not belong in bankruptcy at all and such a filing can neither be justified nor cured.

The Ad Hoc Committee's argument that LTL's failure to file in good faith may be justified and cured because a majority of claimants supposedly support LTL's proposed plan is unavailing. Not only is that argument inconsistent with this Court's precedent but it also ignores that the claimants' majority support is only relevant if a debtor is in financial distress. Without that distress, there is no need for a debtor to have the extraordinary power that bankruptcy confers to bind all creditors to a global resolution. Instead, each creditor may properly pursue his own remedies. If the majority of creditors agree with LTL on the proper valuation of their claims, they may

settle those claims in the tort system. And because LTL is not in financial distress, the remaining creditors can pursue their claims in litigation without substantial risk that those creditors' recovery will undermine any such settlement.

## STANDARD OF REVIEW

A petition under chapter 11 is "subject to dismissal under 11 U.S.C. § 1112(b) unless filed in good faith, and the burden is on the bankruptcy petitioner to establish that its petition has been filed in good faith." *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 118 (3d Cir. 2004).[1] The bankruptcy court's underlying factual findings are subject to review for clear error, and the determination of whether the "facts of a case support the conclusion of good faith" is "subject to plenary review because it is, essentially, a conclusion of law." *In re 15375 Mem'l Corp. v. Bepco, L.P.*, 589 F.3d 605, 616 (3d Cir. 2009).

## ARGUMENT

### LTL's Second Chapter 11 Petition Was Not Filed in Good Faith and Was Properly Dismissed

The bankruptcy court correctly applied this Court's precedents—and, in particular, this Court's decision in the previous LTL bankruptcy—to hold that LTL failed to meet the good faith requirement because it was not in financial distress at the

---

[1] LTL devotes a substantial portion of its brief (at 37-53) to arguing that this Court's precedents establishing and applying the good faith standard are incorrect. As LTL appears to recognize (at 37 n.7), those precedents are binding on this Court and the United States Trustee thus does not address LTL's arguments at this juncture.

time of filing. And even setting the question of financial distress aside, the facts surrounding LTL's creation and the company's conduct over the last several years demonstrate that its second chapter 11 petition fails the good faith test in every respect. The bankruptcy court properly dismissed LTL's second chapter 11 petition, and this Court should affirm.

## A. LTL Was Not in Financial Distress When It Filed Its Second Chapter 11 Petition

**1.** This Court has repeatedly held, including in directing the dismissal of LTL's first chapter 11 petition, that "good faith necessarily requires some degree of financial distress on the part of a debtor." *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 121 (3d Cir. 2004).; *see In re LTL Mgmt., LLC*, 64 F.4th 84, 101 (3d Cir. 2023) ("The theme [of this Court's precedents] is clear: absent financial distress, there is no reason for Chapter 11 and no valid bankruptcy purpose.").

This Court has explained that "[a]t its most basic level, the Bankruptcy Code maximizes value by alleviating the problem of financial distress." *Integrated Telecom*, 384 F.3d at 121. The Bankruptcy Code provides a debtor with substantial powers intended to alleviate the problems that flow from the reality "that the system of individual creditor remedies may be bad for the creditors as a group when there are not enough assets to go around." *Id.* at 120-21 (emphases and quotations omitted). Without financial distress, those problems do not arise; creditors as a group are not made worse off by the system of individual creditor remedies. Congress did not intend, in

that circumstance, for "profitable enterprises" to be able to leverage bankruptcy's powerful tools "to evade contractual or other liability." *LTL Mgmt.*, 64 F.4th at 103 (quotation omitted). Thus, courts "have consistently dismissed Chapter 11 petitions filed by financially healthy companies with no need to reorganize under the protection of Chapter 11." *In re SGL Carbon Corp.*, 200 F.3d 154, 166 (3d Cir. 1999).

Moreover, as this Court stressed in *LTL*, "[f]inancial distress must not only be apparent, but it must be immediate enough to justify a filing." *LTL Mgmt.*, 64 F.4th at 102. Thus, a debtor must show some substantial degree of immediate impairment of its ability to function as a healthy corporate entity in order to avail itself of bankruptcy. Most obviously, a debtor may be able to demonstrate "balance-sheet insolvency or insufficient cash flows to pay liabilities"—either now or in the "immediate enough" future—to establish financial distress. *Id.* Or, in the absence of such insolvency, a debtor might point to other concrete "threat[s]" to its health, such as an inability to "efficiently obtain[] financing and investment" or an "exodus of customers and suppliers wary of a firm's credit-risk." *Id.*

Indeed, as this Court explained, the "[r]isks associated with premature filing may be particularly relevant in the context of a mass tort bankruptcy." *LTL Mgmt.*, 64 F.4th at 103. In such a case—like this one—a bankruptcy court will be required to "estimat[e] claims on a great scale," which may result in "undervaluing future claims" and present the "difficulty of fairly compensating claimants with wide-ranging degrees

of exposure and injury." *Id.* Moreover, "a longer history of litigation outside of bankruptcy may provide a court with better guideposts when tackling these issues." *Id.*

**2.** Applying this precedent to the facts developed during a several-day evidentiary hearing, the bankruptcy court properly found that LTL had not established any "immediate enough," *LTL Mgmt.*, 64 F.4th at 102, financial distress to justify its second chapter 11 petition. As the bankruptcy court explained, on the asset side of its ledger, LTL had access to a $400 million equity interest in Royalty A&M, along with access to $1.3 billion in cash and $29.9 billion in equity interests (or $22.3 billion in equity interests if valued at a forced-liquidation price) from HoldCo. J.A. 20-21. Those figures are apparently undisputed. *See* LTL Br. 25.

On the other side of the ledger, LTL's expected expenses—in both the short and long term—were substantially less than those assets. In the short term, the bankruptcy court credited expert projections estimating that "LTL's total costs in the first three years upon return to the tort system" would be between "$0.6 billion" and "$4.8 billion." J.A. 23. Even LTL's own contrary expert—who the bankruptcy court found had employed "assumptions which are dramatically at odds with the historical run rates"—estimated only slightly higher three-year costs of between $3 billion and $7 billion. J.A. 22. Looking at projected expenditures over the longer term, the court explained that LTL's own expert provided an "above-expectation estimate of LTL's total aggregate talc liabilities—which would extend out for decades into the future and includes the cost to defend and resolve all personal injury talc claims, governmental

talc claims, and any indemnification obligations—at approximately $11 billion." J.A. 23 (quotation omitted). That same expert "performed a high-end stress test scenario that estimates a worst-case scenario for talc liability at $21 billion." *Id.* (quotation omitted).

Thus, based on its consideration of the expert testimony, the bankruptcy court reasonably determined that LTL is not subject to any immediate—or, at this point, even long-term—financial distress. The court's conclusions are supported by the forward-looking expert testimony in the record and are also consistent with previous expenditure patterns. Before LTL's first bankruptcy, Old JJCI had settled "roughly 6,800 talc-related claims for just under $1 billion in total" and had "obtain[ed] dismissals without payment of about 1,300 ovarian cancer, and over 250 mesothelioma, actions." *LTL Mgmt.*, 64 F.4th at 94. And Old JJCI was incurring a "continuing run rate" of "between $10 million" and "$20 million per month." *Id.* Projected forward, the figures described in this Court's prior opinion are generally consistent with the expected short-term and long-term resolution costs found by the bankruptcy court in this proceeding. *Cf.* J.A. 22 (relying in part on "historical run rates as to both trial costs and settlements" in determining which projections to credit).

Thus, the bankruptcy court explained, "clearly there are resources readily available to LTL" that "can satisfy" LTL's short-term expected costs related to talc litigation. J.A. 23. And even the worst-case scenario presented by LTL's own expert for total aggregate talc liabilities fell short of "the total value of the 2023 Funding

Agreement." J.A. 24. Those conclusions, which are subject to the highly deferential review this Court accords to the lower court's crediting of expert testimony and findings of fact, *see United States v. Allegheny Ludlum Corp.*, 366 F.3d 164, 186 (3d Cir. 2004), are abundantly supported by the record evidence. And in light of those reasonable factual findings, the court properly concluded that, "as in LTL 1.0," "LTL is not sufficiently financially distressed to avail itself of bankruptcy at this time." J.A. 24-25.

**3.** In response, LTL urges first that the bankruptcy court misunderstood this Court's precedent, either by imposing a "very-near-term insolvency" requirement (at 15-16, 23-24) or by failing to properly take account of the asbestos context (at 16-22). And LTL argues (at 24-30) that the court's findings of fact cannot survive appellate review. LTL is wrong in both respects.

**a.** First, the bankruptcy court made clear its understanding that the Bankruptcy "Code contemplates early access to bankruptcy relief to allow a debtor to rehabilitate its business before it is faced with a hopeless situation." J.A. 19 (quoting *LTL Mgmt.*, 64 F.4th at 102). Thus, the court explained, "the Third Circuit has been clear in holding that a debtor is not required to be insolvent—either from a balance-sheet or equitable perspective—to file for chapter 11 relief." J.A. 20. And the court explicitly rejected arguments that this Court's precedent "forecloses consideration" of more long-term and uncertain "future talc liabilities in the financial distress analysis,"

emphasizing instead that nothing in the Code "requires that liabilities be liquidated or certain to justify" a chapter 11 petition. J.A. 24.

Consistent with that understanding of this Court's precedents, the bankruptcy court evaluated both LTL's anticipated short-term costs and its projected long-term costs—"extend[ing] out for decades into the future"—in determining whether LTL had demonstrated the requisite financial distress. J.A. 23-24 (quotation omitted). The court determined that it was "presented with nearly the same record" regarding future costs "as in LTL 1.0," J.A. 24-25, in which this Court determined that LTL could not justify its first filing based on the "attenuated possibility that talc litigation may require it to file for bankruptcy in the future," J.A. 25 (quoting *LTL Mgmt.*, 64 F.4th at 109). That decision forecloses LTL's attempt to file a second bankruptcy petition based on "nearly the same record."

Moreover, although LTL urges that near-term distress is not required to show good faith, this Court stressed in *LTL* that financial distress "must be immediate enough to justify a filing." *LTL Mgmt.*, 64 F.4th at 102. Although this Court made clear that "insolvency" was not required to demonstrate financial distress, *id.*, nowhere does LTL develop any argument that it currently faces other concrete "threat[s]" to its health that could constitute financial distress, *id.* For example, LTL nowhere claims that it has experienced an inability to access capital markets or experienced an "exodus of customers and suppliers," *id.* In the absence of any such articulated present effects on LTL's business, the bankruptcy court properly concluded that LTL

27

had not demonstrated the requisite "immediate enough" financial distress—even setting aside LTL's inability to demonstrate that its liabilities will exceed its assets in the long term.

Second, LTL suggests (at 16-22) that the financial-distress standard should be loosened in the asbestos context, because Congress has enacted a special scheme in that context that "allows a debtor satisfying certain conditions to establish, in a plan of reorganization, a trust for the benefit of current and future claimants against which an injunction channels all asbestos litigation," *LTL Mgmt.*, 64 F.4th at 98; *see* 11 U.S.C. § 524(g). But the bankruptcy court applied this Court's analysis in *LTL* to facts that it considered materially identical to the facts at issue in that case. *LTL* arose in precisely the same context as LTL's second venture into bankruptcy. The Court noted LTL's intent to take advantage of the special tools § 524(g) provides for asbestos bankruptcies and nonetheless concluded that LTL had not established the requisite financial distress to support a bankruptcy filing. So too here.

**b.** LTL's attacks on the bankruptcy court's underlying factual findings provide no firmer basis to reverse.

As an initial matter, LTL does not appear to dispute the principal conclusions of the bankruptcy court, with respect to either LTL's assets or its liabilities. LTL appears to agree that HoldCo—whose full value constitutes an LTL asset under the 2023 Funding Agreement—is valued at $29.9 billion on a going-concern basis; has $1.3 billion in cash; and has a $22.3 billion liquidation value. *See* LTL Br. 25. And as

28

LTL admits, its own expert estimated the total costs—stretching across many years—to resolve talc-related claims against LTL as between $11 billion and $21 billion. *See* LTL Br. 26. LTL thus does not dispute that even under its own expert's worst-case, stress test scenario the cost over many decades to resolve all talc claims is lower than HoldCo's estimated current liquidation value. Nor does LTL point to any other record evidence, beyond projected future costs, establishing immediate financial distress that it believes the bankruptcy court failed to properly credit.

LTL instead suggests that the bankruptcy court's—and, by extension, LTL's expert's—estimations of LTL's assets and liabilities are both uncertain. Thus, LTL claims (at 25) that "the amount and timing" of HoldCo's future dividends—and, thus, LTL's future access to cash—are "uncertain and variable." And LTL suggests (at 26-27) that perhaps the total cost of resolving talc-related claims will be higher than its experts projected.

As explained, LTL does not dispute the bankruptcy court's essential findings—many of which were predicated on the court's crediting LTL's own experts. And regardless, uncertainty in this context—particularly uncertainty about the proper valuation of the talc-related claims—weighs against a finding of financial distress. As this Court has repeatedly explained, "the burden to establish good faith is on the debtor," *LTL Mgmt.*, 64 F.4th at 100, and any uncertainty regarding future costs or assets underscores that LTL has not established the requisite financial distress.

LTL suggests that its expert's high-end figure of $21 billion to resolve all talc-related claims is an underestimate, because it "do[es] not account for the possibility of *any* future verdicts akin to *Ingham*." Br. 28-29. As an initial matter, that description of the expert testimony appears to misunderstand the expert report, which did "account for the possibility" of future adverse verdicts. Although the expert did not attempt to quantify potential future adverse verdicts, the expert assumed the existence of such verdicts and incorporated them into the worst-case scenario by inflating the value of all future settlements—consistent with the reality, reflected in the pre-bankruptcy talc litigation, that the vast majority of cases will be resolved through settlement (if not dismissal). Thus, the expert report in question explains that the high-end "stress test scenario" assumes that "LTL initially litigates all claims" and that "the litigation outcomes are adverse to LTL," which doubles "future settlement values." J.A. 6218. And it finds that under this "high-end stress test scenario in which LTL aggressively and unsuccessfully litigates, the total costs of defending and resolving talc claims would be less than[ ]$20 billion." J.A. 6218-19.

Moreover, as explained, LTL offered the expert testimony establishing $21 billion as a worst-case scenario; LTL cannot now complain that the bankruptcy court should have rejected its own expert's testimony. Nor does LTL identify any evidence in the record that it believes the bankruptcy court should have credited, or used as the basis for an upper-bound cost estimate, instead of the testimony of its expert.

In any event, any uncertainty about total talc-related costs stretching years into the future is beside the point. As explained, this Court has made clear that a good faith bankruptcy filing requires financial distress that is both "apparent" and "immediate enough to justify a filing." *LTL Mgmt.*, 64 F.4th at 102. But this argument that LTL is in financial distress relies on taking LTL's own expert's worst-case scenario projected over decades into the future and then adjusting that scenario upward to reflect additional speculative negative developments. Any such resulting mismatch between LTL's assets and liabilities is neither apparent nor immediate and could not justify LTL's filing at this time.

Finally, LTL argues (at 29) that the bankruptcy court should have credited expert testimony stating that there is a 43% chance—or perhaps a 51% chance—that LTL's talc-related expenses will surpass HoldCo's cash inflows by the third year after a return to the tort system. But that testimony is both unpersuasive and irrelevant. The testimony in question was based on cost estimates produced by LTL's expert, Dr. Mullin. *See* LTL Br. 29. But the bankruptcy court declined to credit Dr. Mullin's estimates—some of which assumed that LTL would complete 100 trials per year despite other testimony "that LTL could not realistically try more than 10 cases per year"—as "bottomed on assumptions which are dramatically at odds with the historical run rates as to both trial costs and settlements." J.A. 22 & n.14. And LTL cites no support for the proposition that a 43% chance of cash-flow deficits three

years into the future constitutes the requisite immediate financial distress to justify a bankruptcy filing now.

> **B.** **LTL's Conduct Before, During, and After Filing Its First Chapter 11 Petition Underscores the Lack of Good Faith in Its Present Filing**

Even setting the question of financial distress to the side, LTL's lack of good faith in filing its second bankruptcy petition is manifest. In determining whether a petition is filed in good faith, a court considers "(1) whether the petition serves a valid bankruptcy purpose, *e.g.*, by preserving a going concern or maximizing the value of the debtor's estate, and (2) whether the petition is filed merely to obtain a tactical litigation advantage." *Integrated Telecom*, 384 F.3d at 119-20. Here, LTL's second petition fails that good faith test in every respect, as is demonstrated by its actions during and after its first petition, by the corporate maneuvering before its first petition, and by its current status as a bankruptcy-only vehicle.

**1.** The lack of good faith that this Court found in LTL's first bankruptcy filing was compounded by LTL's actions during that bankruptcy and immediately after that bankruptcy was dismissed. When LTL filed its first bankruptcy petition, its primary asset was the 2021 Funding Agreement, which obligated New JJCI and J&J to fund—inside or outside of bankruptcy—LTL's talc-related costs up to a floor of approximately $61.5 billion. *LTL Mgmt.*, 64 F.4th at 106.

In the 131-minute interval between the dismissal of LTL's first bankruptcy and the filing of its second, LTL finalized an agreement terminating the 2021 Funding

32

Agreement and giving up its rights to a $61.5 billion asset. *See* J.A. 10; *see also* J.A. 4403 (termination agreement). In its place, LTL agreed to accept a materially less valuable asset: rights under a new Funding Agreement obligating HoldCo—but not J&J—to provide funding. *See* J.A. 10; *see also* J.A. 4410 (2023 Funding Agreement). Because that Funding Agreement is not backed by J&J, it is worth substantially less than the 2021 Funding Agreement—no more than HoldCo's value of less than $30 billion. *See* J.A. 10, 21. Finally, LTL also entered into a so-called "support agreement" with J&J. But that agreement obligates J&J to provide funding only upon confirmation of a chapter 11 plan consistent with a pre-determined $8.9 billion value. *See* J.A. 10; *see also* J.A. 4428 (support agreement). LTL's Board apparently formally authorized entry into those agreements ceding $30 billion of value back to J&J on April 2, 2023—before LTL's first bankruptcy was dismissed—and, given the agreements' complexity, presumably had taken substantial steps to devise the agreements even before that. *See* J.A. 4530-32 (describing formal Board authorization); *see generally* J.A. 229-32 (first-day filings describing the new agreements).

The decision to cede all of LTL's rights under the 2021 Funding Agreement is replete with bad faith. Most obviously, LTL's decision to effectively transfer more than $30 billion in value to corporate affiliates hours before filing its second bankruptcy petition is, at a minimum, in substantial tension with the Code's fraudulent transfer provisions. Under those provisions, a trustee or chapter 11 debtor in possession is given the power to avoid any transfer of assets from or obligations to

the debtor if the transfer was made within two years of the petition filing date and if various actual or constructive fraud conditions are satisfied. These include transfers made "with actual intent to hinder, delay, or defraud any entity to which the debtor was or became" indebted and transfers in which the debtor "received less than a reasonably equivalent value in exchange" and "became insolvent as a result." 11 U.S.C. § 548. This avoidance power "help[s] implement the core principles of bankruptcy" by allowing the trustee or debtor in possession to "set aside transfers that unfairly or improperly deplete assets" of the estate to the detriment of creditors. *Merit Mgmt. Grp. v. FTI Consulting, Inc.*, 583 U.S. 366, 370 (2018) (alteration and quotation omitted).

LTL ceded more than $30 billion in value to its corporate parent for the clear purposes of placing those assets out of reach of its creditors and attempting to generate financial distress sufficient to permit a new bankruptcy filing. And LTL did so notwithstanding this Court's previous suggestion that LTL could not merely "part with its funding backstop to render itself fit for a renewed filing" because LTL would be required to "receiving reasonably equivalent value in exchange for forgoing its rights under the Funding Agreement" or else the transfer would be avoidable. *LTL Mgmt.*, 64 F.4th at 110 n.18. LTL's machinations also sought to limit talc claimants to recovery from a contemplated trust that LTL and J&J pre-determined should be worth approximately $8.9 billion. To help achieve that end, their agreement provides

34

that confirmation of a plan with such a trust constitutes the only circumstance under which J&J is obligated to provide funding. *See* J.A. 9-10.

LTL's attempt to place billions of dollars in assets out of the reach of creditors is particularly egregious because, given the timing, LTL had seemingly already determined that it would enter into the agreements before its first bankruptcy was dismissed. But when LTL was a chapter 11 debtor in possession during its first case, it was "a fiduciary of the creditors" and had "an obligation to refrain from acting in a manner which could damage the estate." *In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 471 (3d Cir. 1998) (quotation omitted). And LTL was required to disclose to creditors and obtain approval of the bankruptcy court before engaging in any proposed transactions outside the ordinary course of business. 11 U.S.C. § 363(b)(1). But LTL did not disclose, or receive approval for, its decision to terminate the 2021 Funding Agreement. Even if LTL waited until its fiduciary obligations and its § 363 obligations dissipated to fully execute the transfer of assets away from the estate, its agreement to do so violates at least the spirit of those duties. LTL's failure to act on behalf of the creditors is further underscored by its failure to pursue any fraudulent transfer claim once it reentered bankruptcy two hours later and its fiduciary duties resumed.

Those decisions highlight the lack of good faith underlying LTL's second bankruptcy filing. When evaluated in the context of LTL's previous petition and its actions to transfer assets out of reach of creditors, it is clear that LTL's new petition does not "serve[] a valid bankruptcy purpose" but instead reflects LTL's attempt to

continue leveraging bankruptcy for a "tactical litigation advantage." *Integrated Telecom*, 384 F.3d at 119-20. That lack of good faith reinforces that LTL's petition was properly dismissed.

**2.** In addition, the 2021 corporate restructuring that created LTL underscores the absence of good faith in LTL's repeated attempts to take advantage of the bankruptcy system. Through that restructuring, Old JJCI spun off its talc-related liabilities into a separate entity with minimal assets other than its rights under the 2021 Funding Agreement. That entity then filed a chapter 11 petition to benefit not only itself but also its highly solvent nondebtor corporate affiliates. Those corporate maneuvers have resulted in bankruptcy filings that "circumvent the Code's procedural safeguards," *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 468 (2017), and undermine the "Code's careful balancing of interests," *Integrated Telecom*, 384 F.3d at 119. That provides additional cause to affirm the dismissal of LTL's second petition.

The 2021 corporate restructuring and LTL's subsequent bankruptcy petitions undermine the basic *quid pro quo* contemplated by the Bankruptcy Code. To benefit from bankruptcy, a debtor is required to shoulder a host of obligations. A chapter 11 debtor must make extensive disclosures of its creditors, assets and liabilities, income and expenditures, and the nature of its financial affairs. It must then, under the supervision of the bankruptcy court, agree to, and obtain confirmation of, a plan of reorganization that meets a variety of substantive requirements to ensure that the plan is feasible, treats all of the creditors' claims equitably, and generally leaves each class

of creditors no worse off than it would be if the debtor were liquidated. Furthermore, the equity owners of the debtor generally cannot retain their interest or receive a distribution on account of their ownership until all creditors' claims have been paid in full. *In re Telegroup, Inc.*, 281 F.3d 133, 139 (3d Cir. 2002).

Because only LTL has filed a bankruptcy petition, only LTL has agreed to take on the obligations and duties that the Code requires. Neither HoldCo nor J&J has made the extensive financial disclosures required for a debtor, and neither has submitted itself to the supervision of the bankruptcy court to obtain relief under a feasible and equitable plan of reorganization. At the same time, because of the corporate restructuring that left LTL with few assets other than its (now less generous) rights under the Funding Agreement, LTL can meet creditor demands only to the extent that those demands are covered by that agreement. As reflected in LTL's first-day filings, the corporate enterprise's apparent strategy is to have J&J and HoldCo fund a settlement trust for talc claimants as part of an LTL plan of reorganization and, in exchange, to seek an injunction from the bankruptcy court preventing claimants from continuing to pursue those claims against nondebtors J&J and HoldCo. And LTL sought preliminary relief not only for its own benefit but also for the benefit of its corporate affiliates.

In short, through the corporate restructuring and subsequent bankruptcy filings, J&J and HoldCo seek to garner the fundamental benefits of bankruptcy—a stay that prevents talc claimants from pursuing litigation in the forum of their choice

and the ability to reach a single, overarching resolution of all current and future talc-related tort claims (even over some claimants' potential objections)—without themselves shouldering its attendant obligations, undermining the framework established by the Code.[2]

In addition, through its eve-of-bankruptcy transactions, J&J essentially chose which subset of its assets would be exposed to the bankruptcy cases and which subset of its creditors would be forced to deal with the delay and uncertainty of the bankruptcy process. That undermines the Code's priority scheme, "which ordinarily determines the order in which the bankruptcy court will distribute assets of the estate" and which provides that equity holders "receive nothing until all previously listed creditors have been paid in full." *Jevic*, 580 U.S. at 457. That scheme "constitutes a basic underpinning of business bankruptcy law" and "has long been considered fundamental to the Bankruptcy Code's operation." *Id.* at 464-65.

Carving out that single class of tort creditors also provides additional evidence that LTL's petition was "filed merely for tactical advantage" in ongoing litigation.

---

[2] Only one provision of the Code, 11 U.S.C. § 524(g), contemplates permitting a bankruptcy court to extinguish third-party claims against a nondebtor. That provision permits bankruptcy courts to enjoin third parties from pursuing certain asbestos-related claims against a limited set of non-debtors where several stringent requirements are satisfied. *See id.* Here, although it is possible that some of the talc claimants' tort claims might be subject to that provision, LTL has not yet demonstrated that most or all of the claims would be or that it will comply with the stringent requirements articulated in that provision. And in any event, the possibility that LTL's nondebtor affiliates could permissibly obtain some relief under § 524(g) does not cure the many bad faith aspects of LTL's filing.

*SGL Carbon*, 200 F.3d at 165. In *SGL Carbon*, for example, the debtor filed for bankruptcy after it was named as a defendant in a large antitrust suit, apparently because it believed that bankruptcy would provide a preferable venue for resolving the antitrust claims. In evaluating a motion to dismiss the petition, this Court examined the proposed reorganization plan, which provided for all creditors to "be paid in full in cash" except antitrust judgment creditors—who would be "required to accept limited-time credits to purchase SGL Carbon's products." *Id.* at 167. This Court explained that the "plan's differing treatment of creditors suggests SGL Carbon's petition was not filed to reorganize the company but rather to put pressure on antitrust plaintiffs to accept the company's settlement terms." *Id.*

Although J&J and its affiliates have pursued different tactics, the fundamental result is the same: J&J and HoldCo continue to satisfy their obligations to all of the enterprise's creditors outside of bankruptcy, with the single exception of the talc-related tort claimants. Those creditors, and those creditors alone, have now had their claims subjected to the burdens of bankruptcy twice. Thus, through the corporate restructuring, the J&J affiliates have essentially managed to achieve what SGL Carbon sought: they have put pressure on talc claimants—and no other creditors—to take a bankruptcy-induced discount on their claims.

**3.** Finally, although LTL filed for chapter 11 bankruptcy, it has no substantial ongoing business operations that might be protected by a bankruptcy filing, and its

attempt to leverage bankruptcy's tools to protect third parties is not a valid bankruptcy purpose.

A central purpose of chapter 11 is to allow a distressed business to "preserv[e] going concerns" while navigating financial hardship. *Integrated Telecom*, 384 F.3d at 119 (quoting *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999)). As an entity created as a vehicle to file for bankruptcy, LTL has no substantial going concerns to preserve. Other than various items linked to Old JJCI's talc-related assets and liabilities and some cash, LTL's only assets are an equity interest in a single royalty revenue stream and rights under the 2023 Funding Agreement. *See* J.A. 20-21. Because LTL has "no going concerns to preserve—no employees, offices, or business other than the handling of litigation," *In re 15375 Mem'l Corp. v. Bepco, L.P.*, 589 F.3d 605, 619 (3d Cir. 2009)—the petition cannot substantially further the fundamental reorganization purpose of chapter 11.

Moreover, the avowed purpose of LTL's bankruptcy filing is not to protect creditors but to protect corporate affiliates that are not themselves in bankruptcy. As LTL itself explained, the corporate restructuring and bankruptcy petitions were implemented to enable LTL "to fully resolve current and future talc-related claims through a plan of reorganization without subjecting the entire Old JJCI enterprise to a bankruptcy proceeding," and LTL's "goal in this chapter 11 case is to . . . consummate a plan of reorganization" that would "provide for the issuance of an injunction that will permanently protect [LTL], its affiliates and certain other parties from further

talc-related claims." Kim Decl. ¶¶ 25, 86, J.A. 211, 232-33. But the purpose of the Code is to provide a mechanism for the adjustment of the debtor-creditor relationship, not to permit nondebtors—who do not themselves shoulder the obligations of bankruptcy—to benefit from the Code's protections. *Cf.* 11 U.S.C. § 524(e) (providing that a discharge in bankruptcy generally "does not affect the liability of any" nondebtor for that debt). LTL's designed filing—designed, like its first, primarily (if not exclusively) to benefit nondebtor corporate affiliates—does not serve a valid bankruptcy purpose. *See Bepco*, 589 F.3d at 624-25.

The absence of good faith is underscored by the absence of evidence that LTL made an independent decision to seek bankruptcy protection, much less to do so for any purpose other than to protect corporate affiliates. LTL's filings suggest— consistent with the two-day gap between LTL's creation and its first bankruptcy petition—that the decision to have LTL initially file for bankruptcy was made by J&J or Old JJCI before LTL's creation. *See* Kim Decl. ¶ 25, J.A. 211. And LTL's second bankruptcy filing appears to reflect simply another step in the attempt to garner protection for J&J and other nondebtor affiliates. This Court has recognized bad faith in similar circumstances, where the debtor was directed by a representative who "was primarily concerned with protecting [nondebtor affiliates], not the Debtors." *Bepco*, 589 F.3d at 624 (emphasis omitted); *see also id.* at 624-25 (explaining that it weighed in favor of bad faith that "the Debtors' decision to file for bankruptcy was not their own; [a corporate affiliate] was ultimately in control of whether the Debtors filed").

## C. The Bankruptcy Court Properly Dismissed the Petition

The Ad Hoc Committee of Supporting Counsel suggests (at 31-46) that even assuming LTL's petition was filed in bad faith, the bankruptcy court should have refused to dismiss it. In support of that view, the Ad Hoc Committee cites 11 U.S.C. § 1112(b)(2), which creates a narrow exception to the section's mandatory dismissal command. As the bankruptcy court correctly determined, however, § 1112(b)(2) is not available in this case because LTL's bad faith filing cannot be justified or cured. *See* J.A. 30-36.

**1.** Congress has directed that a bankruptcy court generally "shall" dismiss (or convert to chapter 7) a case under chapter 11 when "cause" for dismissal exists. 11 U.S.C. § 1112(b)(1). A narrow exception to that rule permits a bankruptcy court to refuse to dismiss or convert if a debtor can show—among other things—that the "grounds for converting or dismissing the case include an act or omission of the debtor" for which there is a "reasonable justification" and which "will be cured within a reasonable period of time." *Id.* § 1112(b)(2). As the bankruptcy court correctly held, this provision cannot save LTL's second petition from dismissal.

This Court's precedents make clear that a debtor such as LTL—which is not facing financial distress and does not belong in bankruptcy—cannot avail itself of the alternatives to dismissal under § 1112(b)(2). A debtor that is not facing financial distress and has instead filed "an abusive petition does not belong in bankruptcy." *SGL Carbon Corp.*, 200 F.3d at 159 n.8. As a result, in such a case, it would be

"inappropriate" to permit the debtor to remain in bankruptcy. *Id.* In other words, unlike other forms of misconduct that could form the basis of a dismissal—such as the "failure to satisfy timely any filing or reporting requirement" or "to attend the meeting of creditors" without good cause, *see* 11 U.S.C. § 1112(b)(4)(F)-(G)—a bad faith filing cannot be reasonably justified or timely cured. *Cf.* J.A. 35 ("[T]his Court is inclined to agree with Movants that the exception to dismissal under § 1112(b)(2) is intended for use where 'cause' for dismissal is based on 'technical mistakes' or other procedural and ministerial failings."). Such a filing precludes a debtor from being in bankruptcy at all, and dismissal is always the appropriate remedy.

Consistent with that precedent, this Court in *LTL* directed the dismissal of LTL's petition. As this Court explained, the "ground for dismissal is LTL's lack of financial distress." *LTL Mgmt.*, 64 F.4th at 110. As such, this Court explained that "[n]o 'reasonable justification' validates that missing requirement" and that it "cannot currently see how [LTL's] lack of financial distress could be overcome." *Id.* So too here. LTL did not file its second chapter 11 petition in good faith—including because, as in its first petition, it lacked financial distress—and that lack of good faith can neither be justified nor cured.

**2.** In response, the Ad Hoc Committee argues that LTL's filing can be justified by the purported support of a majority of claimants for the bankruptcy (at 40-42) and can be cured by confirmation of a plan consistent with § 524(g)'s supermajority voting requirements (at 42-44). As explained, that argument is inconsistent with this Court's

explanation in *SGL Carbon* that a debtor—like LTL—who does not belong in bankruptcy at all cannot avail itself of alternatives to dismissal.

The argument is, in any event, unpersuasive, because support among a majority of claimants and compliance with the requirements of § 524(g) are only relevant insofar as a debtor is in financial distress in the first place. As explained, bankruptcy provides a debtor with extraordinary powers that limit creditors' usual rights to pursue their claims, including the power to bind nonconsenting claimants to a particular resolution of their claims through a properly confirmed plan. Those powers—and, in particular, the ability to bind *all* claimants to a global resolution—are necessary "when there are not enough assets to go around" such that "the system of individual creditor remedies may be bad for the creditors as a group." *LTL Mgmt.*, 64 F.4th at 102 (emphases and quotation omitted). And to the extent that § 524(g) reflects Congress' view that it is important to ensure sufficient funds for future claimants in asbestos cases, *see* Ad Hoc Committee Br. 43-44, that benefit too comes into play only when a debtor is in financial distress; without distress, allowing current claimants to pursue their claims individually will not impair future claimants' ability to do the same.

By contrast, the ability to bind nonconsenting claimants to a global resolution with a majority (or supermajority) vote is not necessary when a debtor is not in financial distress. In such a circumstance, nonconsenting claimants may validly pursue their claims through the usual system of creditor remedies without impairing other current or future claimants' ability to collect. In other words, to the extent that the Ad

Hoc Committee is correct that a majority of LTL's current tort creditors agree with debtor about the appropriate valuation and resolution of their claims, nothing prevents that group of creditors from settling their claims—outside of bankruptcy—with LTL.[3] And because LTL is not in financial distress, allowing the remaining creditors to pursue their claims through the tort system will not impair the majority's ability to collect the funds from any such settlement (or future claimants' ability to pursue their own claims).

The additional benefit that LTL seeks through the bankruptcy system is not the ability to settle with that group of consenting claimants, which LTL can do outside bankruptcy. Instead, the benefit LTL seeks is the ability to leverage that group's consent to also bind the remaining, nonconsenting claimants to a resolution through a confirmed plan. But without the predicate of financial distress, J&J's use of bankruptcy to resolve nonconsenting creditors' claims simply reflects a "profitable enterprise['s]" improper attempt to abuse bankruptcy's extraordinary powers as a mechanism "to evade contractual or other liability." *LTL Mgmt.*, 64 F.4th at 103 (quotation omitted). And nothing about that possible abuse of the bankruptcy

---

[3] Indeed, just this week, J&J confirmed that it has reached a tentative agreement with 43 States that resolves the States' talc-related claims outside of the bankruptcy process. *See Johnson & Johnson Reaches Tentative Deal To Resolve Talc Baby Powder Litigation*, CBS News (Jan. 23, 2024), https://www.cbsnews.com/news/johnson-johnson-talc-baby-powder-cancer-j-j-lawsuit/.

system—or the fact that a majority of creditors supposedly consent to it—can justify

or cure the bad faith underlying LTL's second filing.[4]

---

[4] On appeal, LTL also briefly argues (at 53-55) that the bankruptcy court erred by authorizing the Official Committee of Talc Claimants to continue to exist for the limited purpose of defending the court's order on appeal and requiring LTL to pay associated fees and expenses. *See* J.A. 47-48. As the United States Trustee indicated below, *see* Bankruptcy Ct. Dkt. No. 1169, at 2-3, other courts have held that when a chapter 11 case is dismissed or converted to chapter 7, the official creditors' committee is automatically dissolved. *See, e.g., In re Constellation Enters. LLC,* 587 B.R. 275, 284 (D. Del. 2018) (dissolved upon conversion); *In re Great N. Paper, Inc.,* 299 B.R. 1, 5 (D. Me. 2003) (same); *In re Butler,* 94 B.R. 433, 436 (Bankr. N.D. Tex. 1989) (dissolved upon dismissal). Those holdings are consistent with the absence of any Bankruptcy Code provision expressly authorizing the bankruptcy court to extend the existence of such a committee beyond the case's dismissal. Regardless, the United States Trustee does not further address this issue, and other appellees, including the United States Trustee, stand ready to defend the bankruptcy court's order directing the dismissal of LTL's case.

**CONCLUSION**

The judgment of the bankruptcy court should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney
General*

*Of Counsel:*

PHILIP R. SELLINGER
*United States Attorney*

RAMONA D. ELLIOTT
*Deputy Director and General Counsel*

P. MATTHEW SUTKO
*Associate General Counsel*

MARK B. STERN

SUMI SAKATA
JOHN P. SHEAHAN
*Trial Attorneys*
*U.S. Department of Justice*
*Executive Office for United States Trustees*
*441 G Street NW, Suite 6150*

*Washington, DC 20530*

 *s/ Sean R. Janda*
SEAN R. JANDA
 *Attorneys, Appellate Staff*
 *Civil Division, Room 7260*
 *U.S. Department of Justice*
 *950 Pennsylvania Avenue NW*
 *Washington, DC 20530*
 *(202) 514-3388*
 *sean.r.janda@usdoj.gov*

January 2024

## COMBINED CERTIFICATIONS

1.      Government counsel are not required to be members of the bar of this Court.

2.      This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,030 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

3.      The text of the electronic version of this document is identical to the text of the hard copies that will be provided.

4.      This document was scanned for viruses using CrowdStrike Windows Sensor, Version 7.05.17706.0 and no virus was detected.

*s/ Sean R. Janda*
Sean R. Janda

**ADDENDUM**

# TABLE OF CONTENTS

11 U.S.C. § 1112 ...................................................................................................................A1

**11 U.S.C. § 1112**

## § 1112. Conversion or dismissal

(a) The debtor may convert a case under this chapter to a case under chapter 7 of this title unless—

(1) the debtor is not a debtor in possession;

(2) the case originally was commenced as an involuntary case under this chapter; or

(3) the case was converted to a case under this chapter other than on the debtor's request.

(b)(1) Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

(2) The court may not convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate, and the debtor or any other party in interest establishes that—

(A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and

(B) the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A)—

(i) for which there exists a reasonable justification for the act or omission; and

(ii) that will be cured within a reasonable period of time fixed by the court.

(3) The court shall commence the hearing on a motion under this subsection not later than 30 days after filing of the motion, and shall decide the motion not later than 15 days after commencement of such hearing, unless the movant expressly consents to a continuance for a specific period of time or compelling circumstances prevent the court from meeting the time limits established by this paragraph.

(4) For purposes of this subsection, the term "cause" includes—

(A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;

(B) gross mismanagement of the estate;

(C) failure to maintain appropriate insurance that poses a risk to the estate or to the public;

(D) unauthorized use of cash collateral substantially harmful to 1 or more creditors;

(E) failure to comply with an order of the court;

(F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter;

(G) failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor;

(H) failure timely to provide information or attend meetings reasonably requested by the United States trustee (or the bankruptcy administrator, if any);

(I) failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief;

(J) failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court;

(K) failure to pay any fees or charges required under chapter 123 of title 28;

(L) revocation of an order of confirmation under section 1144;

(M) inability to effectuate substantial consummation of a confirmed plan;

(N) material default by the debtor with respect to a confirmed plan;

(O) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and

(P) failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.

(c) The court may not convert a case under this chapter to a case under chapter 7 of this title if the debtor is a farmer or a corporation that is not a moneyed, business, or commercial corporation, unless the debtor requests such conversion.

(d) The court may convert a case under this chapter to a case under chapter 12 or 13 of this title only if—

(1) the debtor requests such conversion;

(2) the debtor has not been discharged under section 1141(d) of this title; and

(3) if the debtor requests conversion to chapter 12 of this title, such conversion is equitable.

(e) Except as provided in subsections (c) and (f), the court, on request of the United States trustee, may convert a case under this chapter to a case under chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate if the debtor in a voluntary case fails to file, within fifteen days after the filing of the petition commencing such case or such additional time as the court may allow, the information required by paragraph (1) of section 521(a), including a list containing the names and addresses of the holders of the twenty largest unsecured claims (or of all unsecured claims if there are fewer than twenty unsecured claims), and the approximate dollar amounts of each of such claims.

(f) Notwithstanding any other provision of this section, a case may not be converted to a case under another chapter of this title unless the debtor may be a debtor under such chapter.